FILED
U.S. DIST COURT
IDDLE DIST. OF LA

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

**ROBERT KING WILKERSON, ET AL**

2004 MAR 31  P 2: 14

**VERSUS**                    CIVIL ACTION NO. 00-304-C-M3

BY DEPUTY CLERK

**RICHARD STALDER, ET AL**
**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

<u>**MEMORANDUM IN SUPPORT OF**</u>
<u>**MOTION FOR PARTIAL SUMMARY JUDGMENT**</u>

**MAY IT PLEASE THE COURT:**

**I.    Introduction.**

This lawsuit was filed by three current and former inmates sentenced to the custody of

the Louisiana Department of Public Safety and Corrections ("Department") at Louisiana State

Penitentiary at Angola ("LSP") - Robert King Wilkerson, Albert Woodfox, and Herman Wallace

(hereinafter jointly referred to as "the inmates").  At all times relevant herein the inmates were

confined at LSP.[1]  The inmates claim that their confinement in extended lockdown at LSP

violates the United States and Louisiana Constitution.   Specifically, the Second Amended

Complaint filed in this matter asserts two (2) causes of action:

(1)    Violations of the inmates' right to be free of cruel and unusual punishment as

guaranteed by the Eighth Amendment of the United States Constitution and

Article I, Section 20 of the Louisiana Constitution of 1974; and

(2)    Violations of the inmates' right to due process of law as guaranteed by the

Fourteenth Amendment of the United States Constitution and Article I, Section 2

of the Louisiana Constitution of 1974.

---

[1]  In 2001, Wilkerson was released from LSP after his conviction was amended to Conspiracy to commit
Second Degree Murder and his sentence was reduced to time served.

159583.1

| INITIALS | DOCKET# |
|----------|---------|
| nt | 75 |



On May 9, 2000 the State Defendants filed a motion to dismiss the inmates' complaint. Among the grounds sought was a claim that the State Defendants were entitled to qualified immunity on the due process claim. On April 22, 2002 this Court partially granted and partially denied this motion. However, the Court denied the State Defendants' claim of qualified immunity.

State Defendants appealed the denial of their qualified immunity directly to the Fifth Circuit under the collateral order doctrine. On May 14, 2003, the Fifth Circuit affirmed this Court's ruling. *See, Wilkerson, et al. v. Stalder, et al.*, 329 F.3d 431 (5th Cir. 2003). However, the Fifth Circuit held that if the inmates' confinement in extended lockdown resulted from the crime of their convictions, then the due process claim should be dismissed. *Id.* at 436. The Court explained that if the inmates' confinement in extended lockdown was the result of the crime of their conviction then the due process clause is not implicated. *Id.* at 435 -36.

As set forth fully below, there is no question of fact exists concerning this issue - the inmates' confinement in extended lockdown was the result of the crime of their conviction. Thus, as a matter of law the inmates' due process claim should be dismissed. Summary judgment is appropriate.

## II.    The inmates confinement in extended lockdown is the result of the crime of their conviction; therefore, the due process clause is not implicated.

### A.    Inmates do not have a liberty interest in their classification.

The Fifth Circuit has instructed this Court to dismiss the inmates' due process claim if the inmates were placed into extended lockdown as a result of the crimes of their conviction, as opposed to violations of less serious prison disciplinary rules. The Fifth Circuit held that the due process clause is implicated only, "if the inmates' confinement in extended lockdown is <u>not</u> the

result of their initial classification." *Id.* at 436. (Emphasis added.) The Court made clear that an inmate does <u>not</u> have a liberty interest in their classification.[2] The Court explained that:

> an inmate has no protectable liberty interest in his classification. *See, Harper v. Showers*, 174 F.3d 716, 719 (5th Cir. 1999); *Whitley v. Hunt*, 158 F.3d 882, 889 (5th Cir. 1998); *Woods v. Edwards*, 51 F.3d 577, 581-82 (5th Cir. 1995) (citing *Wilkerson v. Maggio*, 703 F.2d 909, 911 (5th Cir. 1983)) ("Classification of inmates in Louisiana is a duty of the Louisiana Department of Corrections and an inmate has no right to a particular classification under state law.")

The Fifth Circuit provided this Court with guidance in determining whether a liberty interest may exist in this case. It stated:

> in resolving the nature of the liberty interest and the process that is due for confinement of prisoners in extended lockdown under these circumstances, it is crucial to know whether, based on their crimes of conviction, the inmates' confinement is the result of an initial classification by prison officials as opposed to confinement for violations of less serious prison disciplinary rules. Generally, courts are not concerned with a prisoner's initial classification level based on his criminal history before his incarceration. *Id.* at 435.

Here, two of the inmates, Woodfox and Wallace, were convicted of first degree murder for killing a correctional officer while they were serving sentences at LSP. The remaining inmate, Wilkerson was convicted of first degree murder for killing another inmate while he was serving a

---

[2]  The Fifth Circuit recognized the challenges faced by prison officials in maintaining security and order and that classification of prisoners plays a vital role in this process. As a result, prison officials must have broad discretion in classification of prisoners. The Fifth Circuit stated:

> Classification of prisoners is a matter left to the discretion of prison officials." *McCord v. Maggio*, 910 F.2d 1248, 1250 (5th Cir. 1990) (citing *Wilkerson v. Maggio, supra*). "[I]t is well settled that '[p]rison officials must have broad discretion, free from judicial intervention, in classifying prisoners in terms of their custodial status.'" *Id.* "Prison officials should be accorded the widest possible deference in the application of policies and practices designed to maintain security and preserve internal order." *Id.* at 1251. (citing *Bell v. Wolfish*, 441 U.S. 520, 547 (1979)).

sentence at LSP.  As set forth fully in the affidavit of Darrel Vannoy, Deputy Warden of Security at LSP, these inmates present a serious threat to the safety, security, and good order of LSP, other inmates, and the staff.  As a result of these crimes and their present threat to others, the inmates remain in extended lockdown.

The test that this Court must apply is clear - if the inmates have been in extended lockdown as a result of their crimes of conviction, as opposed to violations of less serious prison rules, then the due process claim should be dismissed.  As set forth below, no question of fact exists concerning this issue, these claims should be dismissed as a matter of law.  Indeed, the inmates were placed in extended lockdown as a result of committing murder while at LSP. Summary judgment is appropriate.

**B.      The Inmates have been housed in extended lockdown due to the crimes of their conviction.**

The three inmates were all placed in extended lockdown after being convicted for murder while within the custody of the Department.  Woodfox and Wallace murdered Brent Miller, a corrections officer, in 1972.  Woodfox and Wallace were both convicted of first degree murder for this crime.[3]  Wilkerson was convicted of first degree murder of another inmate while at LSP.[4]

These crimes occurred while the inmates were confined at LSP.  Woodfox, Wallace, and Wilkerson have already proven that they present a serious threat to the safety and security of LSP, other inmates, and the staff.  Indeed, they have already killed a correctional officer and another inmate.  Due to the nature of these crimes, the inmates were classified as maximum

---

[3]   See the affidavit of Darrel Vannoy, Deputy Warden of Security at LSP.

[4]   See the affidavit of Darrel Vannoy, Deputy Warden of Security at LSP.

security and were placed in extended lockdown. The inmates remain in extended lockdown and their maximum security classification continues due to their continued threat to others.[5]

Department regulations define Maximum Custody as:

> Generally, assignment of an inmate to a cell based upon the need to protect the inmate, other inmates, the public, staff or the institution. This includes temporary assignment to Administrative Segregation or permanent assignment to Disciplinary Detention/Extended Lockdown and Working Cellblock and may include Protective Custody/Extended Lockdown.

See, Department Regulation No. B-02-001 attached to the affidavit of Darrel Vannoy, Deputy Warden of Security at LSP. Due to the nature of the inmates' crimes the three inmates were all classified as maximum custody inmates. As maximum custody the inmates were placed in extended lockdown, "to protect the inmate, other inmates, the public, staff or the institution." As set forth above, the inmates have no liberty interest in this classification.

## III.   Summary Judgment is Appropriate.

A party is entitled to summary judgment on a claim as to which there is no genuine issue of material fact and to which the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 247, 106 S. Ct. 2505, 2509-10, 91 L.Ed.2d 202 (1986). The moving party has the initial burden of showing that there is no genuine issue of material fact. *Anderson*, 477 U.S. 256, 106 S.Ct. 2514. The movant may discharge this burden by pointing out the absence of evidence to support one or more essential elements of the non-moving party's claim "since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25, 106 S.Ct. 2548, 2552-54, 91 L.Ed.2d 265 (1986).

---

[5]   See the affidavit of Darrel Vannoy, Deputy Warden of Security at LSP.

Once the moving party has carried its burden under Rule 56(c), the non-moving party must do more than merely show that there is some metaphysical doubt as to the material facts. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 2548, 2552-54 (1986). The party opposing the motion may not rest on mere allegations or denials of pleading, but must set forth specific facts showing a genuine issue for trial. *Anderson*, 477 U.S. 248, 256, 106 S.Ct. 2510, 2514. To meet this burden, the non-movant party must "identify specific evidence in the record and articulate the 'precise manner' in which that evidence support[s] [its] claim[s]." *Forsyth v. Barr*, 19 F.2d 1527, 1537 (5th Cir.), *cert. denied*, 513 U.S. 871, 115 S.Ct. 195, 130 L.Ed.2d 127 (1994). An issue is material only if its resolution could affect the outcome of the action. *Anderson*, 477 U.S. 248, 106 S.Ct. 2510. Unsupported allegations, conclusory in nature, are insufficient to defeat a proper motion for summary judgment. *Simmons v. Lyons*, 746 F.2d 265, 269 (5th Cir. 1984). If the record taken as a whole could not lead to a rational trier of fact to find for the non-moving party, there is no genuine issue for trial. *Matsushita*, 475 U.S. 597, 106 S.Ct. 1361.

Here, no genuine issue of fact exists - the inmates have been in extended lockdown as a result of the crime of their conviction as opposed to violations of less serious prison rules. As a matter of law the due process claim should be dismissed.

## IV.     Conclusion.

The Fifth Circuit has instructed this Court to dismiss the due process claims if the inmates' confinement in extended lockdown resulted from the crime of their conviction as opposed to violations of prison rules. *Wilkerson,* 329 F.3d at 436. No question of fact exists concerning this issue - the  inmates' have been confined in extended lockdown as a result of murdering a correctional officer and another inmate while at LSP. The inmates have proven that

they present a serious threat to the other inmates, the public, the staff and the institution. For this reason, they are classified as maximum security inmates and continue to be confined to extended lockdown.

As a matter of law the inmates' due process claim should be dismissed. This motion for summary judgment should be granted.

Respectfully submitted:

**CHARLES C. FOTI, JR.**
Louisiana Attorney General

Richard A. Curry, La Bar Roll 4671
M. Brent Hicks, La Bar Roll 23778
*McGlinchey Stafford, PLLC*
14th Floor, One American Place
Baton Rouge, Louisiana 70825
Telephone: (225) 383-9000
*Attorneys for State Defendants*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been served via United States Mail, proper postage pre-paid, on all counsel of record, namely:

Thomas W. Milliner, Esq.
ACLU FOUNDATION OF LOUISIANA
One Canal Place, Suite 2800
365 Canal Street
New Orleans, LA 70130

Nicholas J. Trenticosta, Esq.
ATTORNEY & COUNSELOR AT LAW
7100 St. Charles Avenue
New Orleans, LA 70118

Baton Rouge, Louisiana, this 31 day of March, 2004.

_____
M. Brent Hicks

159583.1

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF LOUISIANA

**ROBERT KING WILKERSON, ET AL**

**VERSUS**                                    **CIVIL ACTION NO. 00-304-C-M3**

**RICHARD STALDER, ET AL**
▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪

### AFFIDAVIT

**BEFORE ME**, the undersigned authority, personally came and appeared, Darrel Vannoy, Deputy Warden for Security at the Louisiana State Penitentiary, who after being duly sworn and deposed, did state that:

1.  I am the Deputy Warden for Security at Louisiana State Penitentiary at Angola ("LSP"). As Deputy Warden for Security, I am responsible for the overall security of LSP.

2.  I am familiar with and have knowledge of the master prison records maintained by LSP on all inmates. This record includes conviction, sentencing, and classification information on each inmate assigned to LSP.

3.  I have personal knowledge that the facts related to this case and sworn to within this affidavit, or I am attesting to information contained within the inmates master prison record, which information is also maintained in the regular course of LSP's business practice.

4.  I have reviewed the master prison records regarding the plaintiffs in this case, Robert King Wilkerson, DOC #80966; Albert Woodfox, DOC #72148; and Herman Wallace, DOC #76759.

5.      I have also reviewed the Louisiana Department of Public Safety and Corrections' (the "Department") regulations addressing "inmate classification, sentencing, and service functions" (the "regulations"). A copy of the regulations are attached as Exhibit "1".

6.      According to the regulations, there are three classifications of inmates: minimum, medium, or maximum.

7.      Minimum custody is generally defined as inmates assigned to a dormitory housing area whose movements outside of a secure perimeter is usually authorized without armed supervision or restraint. Institutional procedures govern the level of staff supervision when outside the secure perimeter, as well as internal movement controls.

8.      Medium custody is generally defined as assignment of an inmate to a dormitory housing area. Movement outside of a secure perimeter is accomplished only under armed supervision or when appropriately restrained or otherwise secured and appropriately supervised.

9.      Maximum custody is generally defined as assignment of an inmate to a cell based housing area. This level is based upon the need to protect the inmate, other inmates, the public, staff, or the institution. This includes temporary assignment to Administrative Segregation or permanent assignment to Disciplinary Detention/Extended Lockdown and Working cellblock and may include Protective Custody/Extended Lockdown. Movements inside the secure perimeter of a facility by maximum custody inmates are closely monitored by staff and may include the utilization of restraints in accordance with institutional policy.

Movement outside of a secure perimeter is accomplished only under armed supervision or when appropriately restrained or otherwise secured and appropriately supervised.

10. The criteria used to determine an inmate's classification includes the inmate's conviction, sentence, age, previous arrest history, conduct while in the parish jail or Department of Corrections, potential for violence, medical condition, mental condition, the inmate's potential for violence, the inmate's potential for escape, the need for protection, security of the institution, the need to protect the inmate, staff, other inmates, or the general public.

11. When an inmate arrives at LSP, he undergoes a formal process to determine how he should be classified for security purposes.

12. Robert King Wilkerson, DOC #80966, was an inmate at LSP from October 8, 1971 until his release on February 8, 2001.   On June 5, 1970, Wilkerson was convicted of armed robbery and on August 19, 1970 he was convicted of Aggravated Escape.  He was sentenced to the custody of the Department and confined at LSP.  He was initially classified as maximum custody.

13. The Department considered the following factors in making this classification: He was convicted of Armed Robbery and Aggravated Escape.  He was sentenced to 35 years on the Armed Robbery and eight years on the Aggravated Escape to be served consecutively.   He had pending charges of Aggravated Battery related to an attack with a knife on a deputy in Orleans Parish.  He was convicted of the Aggravated Battery on 4/18/1972.  He was sentenced to seven years to run

concurrrently with the remainder of his sentence.    His maximum custody classification was continued thereafter.

14.    While at LSP, he was charged with First Degree murder of another inmate, August Kelly , DOC #73841.    He was convicted of first degree murder on February 20, 1975.    His maximum custody classification was continued pending trial.

15.    Wilkerson's initial classification was maximum following his conviction for first degree murder on February 20, 1975.

16.    The Department considered the following factors in making this classification: Wilkerson's convictions displayed a pattern of violence toward other inmates and law enforcement officers which presented a threat to the safety, security and good order of the facility, other inmates, and the staff.

17.    Wilkerson's classification remained maximum until his release from LSP on February 8, 2001 after his conviction for First Degree murder was amended to Criminal Conspiracy to Commit Second Degree Murder and his sentence was reduced to seventeen years, 217 days with credit for time served.

18.    Albert Woodfox, DOC #72148, has been an inmate at LSP since August 5, 1971. On July 31, 1969, Woodfox was convicted of armed robbery and sentenced to the custody of the Department and  confined at LSP.    He was initially classified as medium custody.

19.    The Department considered the following factors in making this classification: Criminal charge of conviction, length of sentence, demeanor, age, previous arrest history, conduct while in the parish jail, potential for violence, medical condition,

mental condition, the inmate's potential for violence, the inmate's potential for escape, the need for protection, security of the institution, the need to protect the inmate, staff, other inmates, and the general public.

20. While at LSP, he was charged with first degree murder of a correctional officer, Brent Miller. His classification was increased to maximum pending trial. He was convicted of first degree murder on March 7, 1973.

21. Woodfox's initial classification was maximum following his conviction for first degree murder on March 7, 1973.

22. The Department considered the following factors in making this classification: He presented a serious threat to the safety of the staff, other inmates, the general public, and a threat to the safety, security, and good order of the facility.

23. Woodfox has remained in extended lockdown throughout his sentence for first degree murder due to his classification. He was granted a new trial regarding this conviction and the crime was amended to Second Degree Murder on February 23, 1999. His classification to maximum custody was continued thereafter due to the continued serious threat to the safety of the staff, other inmates, the general public, and threat to the safety, security and good order of the facility.

24. Herman Wallace, DOC #76759, has been an inmate at LSP since June 27, 1969. On February 23, 1967 and February 2, 1968, Wallace was convicted of two counts of armed robbery and sentenced to the custody of the Department and confined at LSP. He was initially classified as medium custody.

25.   The Department considered the following factors in making this classification: the crime for which he was convicted, length of sentence, record while in Parish Jail, and demeanor before the Initial Classification Board, age, previous arrest history, conduct while in the parish jail, potential for violence, medical condition, mental condition, the inmate's potential for violence, the inmate's potential for escape, the need for protection,  security of the institution, the need to protect the inmate, staff, other inmates, and the general public.

26.   While at LSP, he was charged with first degree murder of a correctional officer, Brent Miller.  His classification was increased to maximum pending trial.  He was convicted of first degree murder on January 10, 1974.

27.   Wallace's initial classification was maximum following his conviction for first degree murder on January 10, 1974.

28.   The Department considered the following factors in making this classification: Wallace presented a serious threat to the safety of the staff, other inmates, the general public, and a threat to the safety, security, and good order of the facility.

29.   Wallace has remained in extended lockdown throughout his sentence for first degree murder due to his classification and because he continues to be a serious threat to others and to the facility.

30.    The affiant stated no further.

WITNESSES:

_Dora Rabalais_                          _Darrel Vannoy_
                                         Darrel Vannoy, Deputy Warden/Security,
_Theresa Deville_                        Affiant


Sworn To And Subscribed Before Me, this  _10th_  day of  _MArch_          2004.


_Tiesh Foster_
Notary Public
(Signature, Seal and Notary / Bar No.)

_Tish Foster_
Notary Public
(Print/Type Name)

**STATE OF LOUISIANA**
**DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS**
**CORRECTIONS SERVICES**

**Department Regulation**
**No. B-02-001**                                                                 **01 October 2003**

### INMATE CLASSIFICATION, SENTENCING, AND SERVICE FUNCTIONS
### Classification
### Assignment and Transfer of Inmates

1.  **AUTHORITY:** Secretary of the Department of Public Safety and Corrections as contained in Chapter 9 of Title 36, La. R.S. 15:574.7, 15:574.8(B), 15:711, 15:824, 15:827(A)(4), 15:828, 15:832, 15: 833(B)(3), 15:893.1, 15:1111, and 15:1135.

2.  **REFERENCES:** ACA Standards 4-4295 through 4303, 4305, 4348, 4374, 4399 (Adult Correctional Institutions).

3.  **PURPOSE:** To establish the Secretary's policy regarding selection criteria to be followed under normal circumstances in the placement and transfer of adult inmates to the various operational units within, under contract, or otherwise available to the Department.

4.  **APPLICABILITY:** The Assistant Secretary of the Office of Adult Services, the Warden at Elayn Hunt Correctional Center/Hunt Reception and Diagnostic Center, the Warden at David Wade Correctional Center/Wade Reception and Diagnostic Center, the Warden at Louisiana Correctional Institute for Women/Female Reception and Diagnostic Center, Wardens and Classification Personnel at all adult institutions, the Director of the Division of Probation and Parole, and the Chairman of the Parole Board are responsible for implementation of this regulation. They shall ensure that necessary information and instructions are furnished to affected employees and inmates.

5.  **DEFINITIONS:**

    A.  DPS&C Facility - Includes, for the purpose of this regulation, state operated prison facilities, Winn Correctional Center, Allen Correctional Center, and all work release facilities under contract to or under cooperative endeavor agreement with the Department of Public Safety and Corrections.

    B.  Regional Facility - Hunt Reception and Diagnostic Center (HRDC) and Wade Reception and Diagnostic Center (WRDC) will serve as regional institutions responsible for pre-classification, reception and diagnostic processing, IMPACT, work release placement, transfers, escapes, apprehensions, extraditions and returns. The Secretary shall designate the parishes which will comprise the regions for HRDC and WRDC. (See attached Regional Map.) Female inmates shall be the responsibility of the Female Reception and Diagnostic Center (FRDC).

    C.  Classification - A process for determining the needs and requirements of those for whom confinement has been ordered and for assigning them to housing units and programs.

**EXHIBIT**
**1**

**Department Regulation No. B-02-001**
**01 October 2003**
**Page Two**

1) Initial Classification--The first assignment of an inmate to custody status, housing unit and job after the inmate has been designated an institution/program based on the criteria outlined herein.

2) Reclassification - Scheduled, systematic review of classification status in programming, custody, housing and job assignments. This includes interim information on institutional behavior and program participation and permits changes that may be warranted.

D. Custody - The type of housing and the level of supervision required for an inmate. Custody assignments will reflect public safety as the first priority, staff and inmate safety within the institution as the second priority, and then institutional or inmate need.

1) Minimum Custody

a. Generally, assignment of an inmate to a dormitory housing area. Movement outside of a secure perimeter is usually authorized without armed supervision or restraint. Institutional procedure governs the level of staff supervision when outside the secure perimeter, as well as internal movement controls.

b. Medical-Minimum Custody - A form of minimum custody that allows for the classification profile to be overwhelmingly influenced by a terminal or serious medical condition that dramatically reduces the inmate's risk to public safety. Inmates who were convicted of an enumerated crime as follows are ineligible for this designation:

•First degree murder;
•Second degree murder;
•Attempted murder;
•Aggravated rape;
•Attempted aggravated rape;
•Forcible rape;
•Aggravated kidnapping;
•Aggravated arson;
•Armed robbery;
•Attempted armed robbery;
•Producing, manufacturing, distributing or dispensing or possession with intent to produce, manufacture, distribute or dispense a Schedule I or II controlled dangerous substance (La. R.S. 40:964);
•Habitual Felony Conviction (La. R.S. 15:529.1).

Note: In accordance with La. R.S. 15:833(B)(3)(a and b), these provisions cannot be waived.

**Department Regulation No. B-02-001**
**01 October 2003**
**Page Three**

    c.    Only "minimum custody" inmates may exit the secure perimeter of an institution without being properly restrained, under armed supervision, or in an appropriately screened and secured vehicle regardless of the type or purpose of the trip.

  2)    Medium Custody

    Generally, assignment of an inmate to a dormitory housing area. Movement outside of a secure perimeter is accomplished only under armed supervision or when appropriately restrained or otherwise secured and appropriately supervised. Institutional procedure governs internal movement controls.

  3)    Maximum Custody

    Generally, assignment of an inmate to a cell based upon the need to protect the inmate, other inmates, the public, staff, or the institution. This includes temporary assignment to Administrative Segregation or permanent assignment to Disciplinary Detention/Extended Lockdown and Working Cellblock and may include Protective Custody/Extended Lockdown. Movements inside the secure perimeter of a facility by maximum custody inmates are closely monitored by staff and may include the utilization of restraints in accordance with institutional policy. Movement outside of a secure perimeter is accomplished only under armed supervision or when appropriately restrained or otherwise secured and appropriately supervised.

E.    Security - The physical construction characteristics of the facility in terms of perimeter security, building construction type, and internal movement controls.

F.    Protective Custody-Level 1

  1)    Highest level based on nature of crime, prior employment history, age, or other significant protection concerns;

  2)    Generally, determined to be unable to live in general population at any institution;

  3)    Long-term protection concerns (except very youthful offenders who are eligible for Protective Custody-Level 1 status but who are forecast to eventually become eligible for general population);

  4)    May result in assignment to N-5 cellblock unit at David Wade Correctional Center or Protective Custody/Extended Lockdown at Louisiana State Penitentiary, Elayn Hunt Correctional Center, or David Wade Correctional Center.

**Department Regulation No. B-02-001**
**01 October 2003**
**Page Four**

G.    Protective Custody-Level 2

1)    Lower level protection assignment which is generally made at the inmate's request but may be originated by staff and which must be confirmed by a Disciplinary Officer or Disciplinary Board;

2)    Protection concerns generally arise from problems of a current nature within an institution, but may result from external factors;

3)    The protection concerns are of a short-term or long-term nature;

4)    May result in placement in Lockdown status at the assigned institution ("Protective Custody/Extended Lockdown" or "Administrative Segregation Pending Transfer");

5)    Periodic review of placement in lockdown is generally conducted by a "Disciplinary Officer," "Disciplinary Board," "Classification Committee," or "Lockdown Review Board;"

6)    All Class 1, 2, and 3 institutions are eligible to house Protective Custody - Level 2 inmates.

H.    Earliest Possible Release Date - The earliest date on which the inmate is legally eligible for release or release consideration.

I.    Level of Care Designation - Will ensure proper placement at an institution which provides the medical and mental health resources required by the inmate. The level of care indicates the highest level of care available at each institution, thereby including consecutively lower level of care designations:

1)    Medical

a.    Level of Care 1

•    Has availability of 24 hour in-patient care facility staffed with licensed health care providers;

•    A physician is on-site 24 hours a day or readily available to travel to the facility;

•    The inmates need consultation or management by special medical staff not available at a LOC 2 institution (i.e. on-site internal medicine, neurology, etc.)

**Department Regulation No. B-02-001**
**01 October 2003**
**Page Five**

    b.    Level of Care 2

- Has availability of 24 hour in-patient care facility staffed with licensed or registered/certified health care providers;

- A physician is on-call 24 hours a day or there is access to an emergency medical facility in a nearby community;

- The inmates may need significant nursing care and management by an in-house physician with access to diagnostic resources.

    c.    Level of Care 3

- Has availability of 24 hour health care trained staff on-site or in a community setting;

- Inmates should be medically stable, needing only routine care.

(See Appendix II-Levy Dabadie Correctional Center and DCI-Unit 3 for additional details.)

Medical LOC Ratings are:

LOC 1      LSP, LCIW, EHCC

LOC 2      DWCC, DCI, WCI, AVC, ALC, WNC, PCC

LOC 3      LDCC, DCI-Unit 3, adult work release facilities*

*To be judged medically stable for assignment to an adult work release facility, an inmate must additionally meet the following requirements:

•Must be stabilized on all currently prescribed medications;
•Have no significant medication conditions that require routine medical monitoring as determined by the Medical Director or designee.

2)    Mental Health

    a.    Level of Care 1 - assigned to inmates who have a mental disorder and the symptoms are severe and persistent to the point of interfering with the inmate's ability to behaviorally and cognitively live in general population. These inmates have the ability to attend to their basic physiological needs. Inmates assigned LOC 1 shall be seen by a qualified mental health professional at least every 14 days.

**Department Regulation No. B-02-001**
**01 October 2003**
**Page Six**

b.    Level of Care 1A - assigned to inmates who have a mental disorder and the symptoms are exacerbated or severe and persistent to the point of interfering with the inmate's ability to behaviorally and cognitively live in a less structured and secured environment. These inmates are not appropriately treated in any less acute level of care. Inmates assigned LOC 1A shall be seen by a qualified mental health professional at least every 14 days.

c.    Level of Care 2 - assigned to inmates who have a diagnosed mental disorder that requires or is likely to require ongoing mental health services and the availability of on-site psychiatric treatment at least bi-monthly. Inmates assigned LOC 2 have a mental disorder which is stable or is expected to re-stabilize within four weeks of intensified treatment as may be available within the LOC 2 designated institution. Inmates assigned LOC 2 may require temporary management on a suicide watch or mental health observation. However, if the inmate's condition does not stabilize within four weeks of intensified treatment or if the Health Care Authority or designee determines that the inmate requires a level of care beyond the resources available at the institution, the LOC shall be increased to LOC 1 or 1A. Inmates assigned LOC 2 shall be seen by a qualified mental health professional at least every 90 days.

d.    Level of Care 2A - assigned to inmates who do not meet the criteria for LOC 1 or 1A, but who have a chronic mental disorder characterized by frequent and rapid exacerbation of symptoms, and who are likely to periodically require a higher level of care. Inmates assigned LOC 2A may require placement in close proximity to a LOC 1 or 1A designated institution or transition unit. Inmates assigned to LOC 2A shall be seen by a qualified mental health professional at least every 60 days.

e.    Level of Care 3 - assigned to inmates who require or are likely to require mental health services per recommended need, but who are not expected to require psychiatric medication. These individuals may or may not have a documented mental health diagnosis, but demonstrate behavior or report complaints that may be appropriate for mental health intervention. Inmates assigned to LOC 3 shall be seen by a qualified mental health professional at least every 180 days.

**Department Regulation No. B-02-001**
**01 October 2003**
**Page Seven**

f.    Level of Care 4 - assigned to inmates who are identified as developmentally disabled and who are unable to live in less than a highly structured and secure environment.    These individuals typically require placement in non-correctional facilities or in units specifically designated for managing developmentally disabled inmates.    The presence of a developmental disability alone is insufficient for designation as LOC 4 as many developmentally disabled individuals may be managed effectively at a lower level of care (e.g., LOC 2 or LOC 3) within the general population when provided with supportive services.  Inmates assigned to LOC 4 shall be seen by a qualified mental health professional at least every 60 days.

g.    Level of Care 5 - assigned to inmates who have no apparent need for mental health services currently and who have no known prior history of mental disorder or treatment.  Inmates assigned a LOC 5 shall be seen as needed.

h.    Level of Care 5A - assigned to inmates who have no apparent need for mental health services currently, but who have a history of previous mental disorder or treatment.  Inmates assigned a LOC 5A shall be seen as needed.

Mental Health LOC Ratings are:

LOC 1       LSP (death row inmates only), EHCC, LCIW

LOC 1A      LSP (death row inmates only), EHCC, LCIW

LOC 2       DWCC, DCI, WCI, AVC, ALC, WNC, PCC, LSP, EHCC, LCIW

LOC 2A      LSP, EHCC, LCIW

LOC 3       All DPS&C facilities

LOC 4       EHCC, LCIW

LOC 5       All DPS&C facilities

LOC 5A      All DPS&C facilities

J.    Regional Coordinator - The designated staff person at each regional facility responsible for all activities enumerated in Section 5.B.

**Department Regulation No. B-02-001**
**01 October 2003**
**Page Eight**

6.    **GENERAL POLICY:**

A.    A comprehensive classification process for assignment and transfer of inmates within the system is essential in order to fulfill the purposes and goals of the Department:

- To maximize public safety;
- To provide for staff and inmate safety;
- To provide basic services;
- To provide an opportunity for change;
- To provide an opportunity to make amends.

It is also important to ensure efficient operations by maintaining each institution at capacity, minimizing the frequency of inter-institutional transfers, and being responsive to institutional needs for semi-skilled and skilled inmate labor.

B.    The selection and transfer criteria, except as based in statute, may be waived at any time by the Secretary or authorized designee. During an emergency situation, any member of the Executive Staff at Headquarters or the Headquarters Duty Officer may waive selection criteria but such waiver must be confirmed by the Secretary as soon as possible thereafter.

C.    In accordance with Department Regulation No. B-06-001 "Health Care," any inmate who is being considered for transfer must have an annual PPD test current and be in a non-infectious state. Disciplinary or emergency transfers should be evaluated relative to TB testing or treatment status as well as other infectious diseases. Additionally, inmates with active staphylococcus aureus infections will not be transferred in most situations. If the inmate has any boils or open draining wounds clinically suggestive of a staph infection, he will be treated at the facility where he resides and then transferred at a later date when there is no longer any drainage. Exceptions will be allowed with the approval of the Assistant Secretary or designee, (and such approval will not be given absent the need for emergency transfer due to mental health, medical, custody, or other urgent considerations.)

D.    DNA samples shall be obtained in accordance with Department Regulation No. B-08-016 "DNA Protocols."

E.    It is the responsibility of both the sending and receiving institutions to evaluate protection concerns and other potential causes of instability that may result from a transfer.

**Department Regulation No. B-02-001**
**01 October 2003**
**Page Nine**

    F.    Geographical transfers may result from the following:

        1)    When initial placement by HRDC/WRDC is to an institution not geographically appropriate and where transfer could later be accomplished to a facility with an equivalent security and custody designation that significantly improves maintenance of family ties. Geographical requests in this category should normally be initiated only after inmates have served at least six consecutive months in general population without significant disciplinary activity;

        2)    When an inmate at a Class 1 facility that is not geographically appropriate has earned a status reduction from maximum to medium custody and where transfer could be accomplished to a Class 2 facility that is geographically appropriate and that significantly improves maintenance of family ties.

        Note: Consideration of geographical transfers should only result from accurate and substantiated information and should significantly improve proximity to family or primary visitors. Otherwise, such transfers are to be minimized.

    G.    Each regional facility will have autonomy to coordinate inter-institutional transfers within its region. This includes requests for exceptions to the eligibility requirements regarding length of sentence. The Warden of the regional facility will transmit the request for exceptions to the Assistant Secretary for final approval. Transfers between regions will be coordinated through each respective Regional Coordinator.

    H.    All inmates recommended for status reduction must have a current (within 180 days) nationwide (NCIC) and in-state criminal history (LACCH) check completed prior to transfer.

    I.    Inmates sentenced to death may only be assigned to Louisiana State Penitentiary/Louisiana Correctional Institute for Women regardless of any other classification data.

    J.    An inmate assigned to LSP may be transferred to a Class 1 facility (EHCC or DWCC) with no waiver required provided he has served a minimum of ten years at LSP, has a good disciplinary record and meets the medical and mental health status for the receiving facility.

    K.    Technical violators who have had a preliminary hearing with a recommendation of continued detention and revocation may be moved into HRDC/WRDC/FRDC with transfer into general population, after review, as appropriate.

**Department Regulation No. B-02-001**
**01 October 2003**
**Page Ten**

7.    **PROCEDURES FOR CLASSIFICATION SCREENINGS:**

A.    Each Warden shall establish Classification Boards to conduct initial and reclassification screenings. Each board shall be composed of at least two people-- one representing each of the following two categories:

1)    Classification, social service, medical/mental health, academic or vocational education; and

2)    Security (Captain or higher).

NOTE:   The composition of each board should reflect the purpose of the screening.

B.    Decisions of two member Classification Boards must be unanimous.  If the decision is not unanimous, the matter is automatically deferred for referral to a different Classification Board.

C.    Each Classification Board should follow the "Classification Plan" developed at each institution in accordance with ACA Standards.

D.    All Classification Board results are subject to the review and approval or modification by the appropriate Warden.

E.    The results of each Classification Board's screenings should be maintained in such a manner that they can be readily retrieved for review.

F.    All inmates reclassified to minimum custody must have a current (within 180 days) nationwide (NCIC) and in-state criminal history (LACCH) check completed.

8.    **CUSTODY CLASS DESIGNATIONS AND SELECTION CRITERIA:**

Custody class designations and selection criteria are reflected in the attached chart and appendixes.  Other factors such as adjustment potential, excessive criminal behavior, escape history, and observable behavior should also be considered in this and any other classification selection process.

9.    **DETAINERS:**

A.    All felony detainers, except as described in C. below, shall serve to disqualify inmates from assignment to LDCC or DCI-Unit 3.  Misdemeanor detainers do not automatically disqualify the inmate for such assignment.

B.    A felony detainer is an important consideration in classification decision making, particularly custody class assignment.  Possible sentence consequences should also be evaluated.

**Department Regulation No. B-02-001**
**01 October 2003**
**Page Eleven**

    C.    A detainer for a concurrent sentence which is shorter than the sentence which the inmate is serving with the Department should be disregarded unless the nature of the offense itself changes the inmate's security class or should logically generate further review.

    D.    Increased custody status resulting from Escape/Attempted Escape should result from application of the "Disciplinary Rules and Procedures for Adult Inmates." HRDC/WRDC/FRDC staff should incorporate escape history in the initial assessment process.

    E.    Nothing in this regulation necessarily serves to disqualify an inmate appropriately placed under prior regulations or policy from continuing such placement.

Richard L. Stalder
Secretary

mc

This regulation supersedes Department Regulation No. B-02-001 dated 15 June 1998, Page Two dated 12 April 2001, Page Two (A) and Three dated 10 October 2001, Page Four dated 30 August 1999 and the Custody Class Designations and Descriptions Chart dated August, 2001.

Attachments:    Custody Class Designations and Descriptions
                  Appendix I, II, III, and IV
                  Regional Map

CUSTODY CLASS DESIGNATIONS AND DESCRIPTIONS - October, 2003

Dept. Reg. No. B-02-001

| Class | Inst. | Custody Eligibility | % | Operational Capacity | Rated Capacity | Level of Care Med. | Level of Care MH | Description |
|-------|-------|---------------------|---|----------------------|----------------|------|------|-------------|
| 1A | LSP | Maximum (administrative segregation, extended lockdown & working cellblock)  Medium - Minimum | 29%  71% | 5108 | 5439 | 1 | 2 (Except Death Row which is MH LOC 1 &1A) | All inmates (male). |

**Special Functions:** Death Row (including initial reception intake), Disciplinary adjustment to maximum custody/extended lockdown or working cellblock, Protective Custody Level 1, In-patient medical-all levels, Hospice Program.

| Class | Inst. | Custody Eligibility | % | Operational Capacity | Rated Capacity | Med. | MH | Description |
|-------|-------|---------------------|---|----------------------|----------------|------|------|-------------|
| 1B | LCIW | Maximum (administrative segregation, extended lockdown &working cellblock)  Medium - Minimum | 17%  83% | 900 | 989 | 1 | 1 | All inmates (female). |

**Special Functions:** Reception and Diagnostic Center for all female inmates responsible for pre-classification, reception and diagnostic processing, IMPACT, work release placement, transfers, escapes, apprehensions, extraditions and returns. Death Row, Disciplinary adjustment to maximum custody/extended lockdown or working cellblock, Protective Custody Level 1, In-patient medical/mental health-all levels, Residential Substance Abuse Pre-release Unit, EKL/MCLA security for females.

| Class | Inst. | Custody Eligibility | % | Operational Capacity | Rated Capacity | Med. | MH | Description |
|-------|-------|---------------------|---|----------------------|----------------|------|------|-------------|
| 1C | EHCC | Maximum (administrative segregation, extended lockdown &working cellblock)  Medium - Minimum | 26%  74% | 2145 | 2333 | 1 | 1 | General population - 30 yrs. or less to earliest possible release date and the good time or full term date must not exceed 50 years, (except as described in "Special Functions"). |

**Special Functions:** Reception and Diagnostic Center responsible for regional pre-classification, reception and diagnostic processing, IMPACT, work release placement, transfers, escapes, apprehensions, extraditions and returns for male inmates/451 capacity(no waiver required). Disciplinary adjustment to maximum custody/extended lockdown or working cellblock, Protective Custody Level 1 (all male inmates-no waiver required), In-patient mental health - all levels, Medical/Mental Health - all male inmates (no waiver required), Orleans Blue Walters, HOSPICE Program, treatment site for Hepatitis C, MCLA Secure Ward, security, maintenance, and support of HDQ Complex.

| Class | Inst. | Custody Eligibility | % | Operational Capacity | Rated Capacity | Med. | MH | Description |
|-------|-------|---------------------|---|----------------------|----------------|------|------|-------------|
| 1C | DWCC | Maximum (administrative segregation, extended lockdown & working cellblock)  Medium - Minimum | 39%  61% | 1660  DWCC-1088  FWCC-572 | 1804 | 2 | 2 (Has authority for MH LOC 1A for N5 Protection Unit) | General population - 30 yrs. or less to earliest possible release date and the good time or full term date must not exceed 50 years, (except as described in "Special Functions"). |

**Special Functions:** Reception and Diagnostic Center responsible for regional pre-classification, reception and diagnostic processing, IMPACT, work release placement, transfers, escapes, apprehensions, extraditions and returns for male inmates/154 capacity (no waiver required). Disciplinary adjustment to maximum custody/extended lockdown or working cellblock, Protective Custody Level 1 (all male inmates-no waiver required), Protective Custody Unit (statewide application), Medical - all male inmates (no waiver required), Forcht Wade-Medical Special Needs Facility, coordination of sex offender programs, E.A. Conway Medical Unit administration.

| Class | Inst. | Custody Eligibility | % | Operational Capacity | Rated Capacity | Med. | MH | Description |
|-------|-------|---------------------|---|----------------------|----------------|------|------|-------------|
| 2A | DCI | Maximum (administrative segregation, extended lockdown & working cellblock)  Medium - Minimum  * Relates to assignment to Compound 3 only. | 7.5%  92.5% | 1410 | 1560 | 2 *3 | 2 *3 | General population - 30 yrs. or less to earliest possible release date and the good time or full term date must not exceed 50 years, (except as described in "Special Functions"). |

**Special Functions:** Disciplinary adjustment to maximum custody/extended lockdown or working cellblock, Medical-all male inmates profiled as chronic and convalescent (no waiver required), Unit 3 (See Appendix II for transfer criteria, Dialysis Unit (all male inmates-no waiver required), EKL Secure Ward, Baton Rouge Capitol Complex-Contractual Public Facilities Maintenance Crews (136 inmates).

| Class | Inst. | Custody Eligibility | % | Operational Capacity | Rated Capacity | Med. | MH | Description |
|-------|-------|---------------------|---|----------------------|----------------|------|------|-------------|
| 2B | WCI | Maximum (administrative segregation, extended lockdown & working cellblock)  Medium - Minimum | 20%  80% | 1132 | 1194 | 2 | 2 | General population - 30 yrs. or less to earliest possible release date and the good time or full term date must not exceed 50 years. |

Special Functions: Disciplinary adjustment to maximum custody/extended lockdown or working cellblock.

| Class | Inst. | Custody Eligibility | % | Operational Capacity | Rated Capacity | Med. | MH | Description |
|-------|-------|---------------------|---|----------------------|----------------|------|------|-------------|
| 2B | AVC | Maximum (administrative segregation & working cellblock)  Medium - Minimum | 10%  90% | 1538 | 1590 | 2 | 2 | General population - 30 yrs. or less to earliest possible release date and the good time or full term date must not exceed 50 years. |

Special Functions: Disciplinary adjustment to maximum custody/working cellblock.

| Class | Inst. | Custody Eligibility | % | Operational Capacity | Rated Capacity | Level of Care | | Description |
|---|---|---|---|---|---|---|---|---|
| | | | | | | Med. | MH | |
| 2B | ALC | Maximum (administrative segregation & working cellblock) | 10% | 1538 | 1590 | 2 | 2 | General population - 30 yrs. or less to earliest possible release date and the good time or full term date must not exceed 50 years. |
| | | Medium - Minimum | 90% | | | | | |
| **Special Functions: Disciplinary adjustment to maximum custody/working cellblock.** | | | | | | | | |
| 2B | WNC | Maximum (administrative segregation & working cellblock) | 10% | 1538 | 1590 | 2 | 2 | General population - 30 yrs. or less to earliest possible release date and the good time or full term date must not exceed 50 years. |
| | | Medium - Minimum | 90% | | | | | |
| **Special Functions: Disciplinary adjustment to maximum custody/working cellblock.** | | | | | | | | |
| 3A | PCC | Maximum (administrative segregation) | 7.8% | 860 | 944 | 2 | 2 | General population - 10 yrs. or less to earliest possible release date and the good time or full term date must not exceed 30 years. Inmates sentenced to Working Cellblock or Disciplinary Detention/ Extended Lockdown will be held in "Admin. Seg." pending transfer to a Class 1 or 2 institution. |
| | | Medium - minimum | 92.2% | | | | | |
| 4A | LDCC | Maximum (administrative segregation) | 1% | 500 | 517 | 3 | 3 | Pursuant to La. R.S. 15:893.1, 15:827(4) and Dept. Reg. No. B-02-001, specific inmates are ineligible for assignment to this institution. This and additional criteria are described in detail in Appendix II. |
| | | Minimum | 99% | | | | | |
| **Special Functions: Camp Beauregard/public service inmate work crews, Huey P. Long Secure Ward, central transfer staging facility.** | | | | | | | | |
| 4B | STATE POLICE BARRACKS | Minimum | 100% | 197 | | N/A | N/A | As requested. |
| | WORK RELEASE FACILITIES | Minimum | 100% | 1274 | | 3 | 5 | Inmates may be placed on work release upon certification that the inmate meets statutory and regulatory criteria. All assignments to work release must be approved by the Secretary or designee. More detail regarding this and other eligibility criteria are described in Appendix III. |
| 4C | RETURN TO LOCAL FACILITY | N/A | | N/A | | 3 | 5 | Detailed criteria pertaining to transfers and inmate eligibilities are described in Appendix IV. |

**Department Regulation No. B-02-001**
**01 October 2003**

## APPENDIX I

### Orleans Blue Walters Substance Abuse Program

A.    Criteria:

1)    The inmate has a substance abuse history;

2)    The inmate has been assessed by a Substance Abuse Coordinator (using the Orleans Blue Walters Pre-Release Substance Abuse Treatment Center Admission Policies and Procedures) and determined amenable to substance abuse treatment;

3)    The inmate must have an appropriate institutional work and disciplinary record and be recommended by the Warden (or Parole Board);

4)    The inmate must agree voluntarily to enter the program if selected.  A Voluntary Agreement Form (available at each institution or from the Parole Board) must be signed by the inmate prior to transfer to the Orleans Blue Walters Program (ORL BWP);

5)    No inmate shall have a significant medical problem (those who require hospitalization, frequent clinic visits or intensive medical management are inappropriate).  No inmate shall have a significant psychiatric problem that requires hospitalization, close medical management or psychiatric symptoms that would be disruptive to program participation.  If institutional screening personnel are unsure about the appropriateness of a recommendation,  they are encouraged to call the appropriate Regional Coordinator for clarification;

6)    No inmate shall have a felony detainer that may result in confinement upon release.

B.    Procedures:

1)    General:

-Inmates eligible for parole, work release, good time release, or full term release will be considered for placement in this program;

-Inmates may be assigned to the ORL BWP nine weeks prior to their release date;

-ORL BWP intake priority will be as follows:

•Inmates in local jail facilities recommended for ORL BWP by the Parole Board in lieu of revocation;

**Department Regulation No. B-02-001**
**01 October 2003**

•Inmates in local jail facilities or DPS&C facilities assigned to ORL BWP by the Parole Board as a condition of parole and not eligible for release until the program is completed; and

•Inmates in DPS&C facilities recommended by staff for participation but eligible for release even if unable to get into the program. This includes work release if not a condition of parole.

-The recommendation for assignment should be forwarded to the appropriate Regional Coordinator four months prior to the release date (or two months prior to eligibility). The Warden will ensure that his staff have appropriately screened those being recommended for the ORL BWP;

-If the Parole Board recommends an inmate for the ORL BWP, then Parole Board staff will be responsible for notifying the Blue Walters Program Coordinator at Orleans Parish Prison and the appropriate Regional Coordinator.

2)   Work Release - General:

-Inmates who have been recommended for work release and have additionally been recommended for ORL BWP will normally be placed in the program nine weeks prior to their assignment to work release. Referrals must be submitted to the Office of Adult Services (OAS) according to Appendix III guidelines.

-An inmate eligible for work release who is incarcerated in a local jail facility may be considered for admission to the ORL BWP. The recommendation should be submitted to OAS for review. During this review, it may be determined that ORL BWP screening is necessary. If recommended by OAS and approved by the Secretary, the appropriate Regional Coordinator will coordinate screening and transfer.

3)   Parole Board Recommendations:

DPS&C Institution Cases:

-An inmate may become a candidate for admission to the ORL BWP through referral by the Parole Board. The Parole Board may recommend an inmate to be treated at the ORL BWP before he is paroled. The institution shall screen the inmate prior to the Parole Board hearing utilizing the Institutional Progress Report to determine if he meets the admission requirements for the ORL BWP.

Parish Prison or Other Local Jail Facility Cases:

-If the Parole Board recommends that an inmate housed in a local jail facility be

**Department Regulation No. B-02-001**
**01 October 2003**

treated at the ORL BWP before being paroled, Parole Board staff will notify the appropriate Regional Coordinator who will coordinate the transfer with the local jail facility. Appropriate medical, mental health, and classification/security review will be provided prior to reception. If found not suitable for the ORL BWP, the Regional Coordinator will notify the Parole Board in writing as to the reasons the inmate does not meet the criteria. The Parole Board will then reconsider the inmate's case.

If the Parole Board recommends that a parolee be treated at ORL BWP in lieu of revocation, Parole Board staff will notify the appropriate Regional Coordinator who will coordinate the transfer with the local jail facility and the Division of Probation and Parole District Office. Appropriate medical, mental health, and classification/security review will be provided prior to reception. If found not suitable for the ORL BWP, the Regional Coordinator will notify the Parole Board in writing as to the reasons the inmate does not meet the criteria. The Parole Board will then reconsider the inmate's case.

-Prior to any parole assignment to the ORL BWP, a viable parole plan should be submitted for approval. An inmate should not be transferred to the ORL BWP until the Residence Plan (which may include work release) and/or Interstate Compact Agreements are approved.

4)    Sheriff or Local Jail Administrator Recommendations:

-If the Sheriff or local jail administrator recommends that a state inmate housed in a local jail facility be treated at the ORL BWP before being discharged via good-time release or full-term release, the appropriate Regional Coordinator will coordinate the transfer into the program. Appropriate medical, mental health, and classification/ security review will be provided prior to reception. If found not suitable for the ORL BWP, the Regional Coordinator will notify the Sheriff or local jail administrator.

**Department Regulation No. B-02-001**
**01 October 2003**

## APPENDIX II

### Levy Dabadie Correctional Center and DCI-Unit 3

A.    Pursuant to La. R.S. 15:893.1, 15:827(4) and this regulation, the following are <u>ineligible</u> for assignment to these institutions:

1)    Inmates who have been convicted of first or second degree murder, manslaughter, attempted first or second degree murder, attempted manslaughter, aggravated rape, aggravated kidnaping, armed robbery, distribution of a controlled dangerous substance other than marijuana, except any person convicted of distribution of cocaine where the offense of conviction involves less than 28 grams, aggravated arson, or any provision of La. R.S. 14:41 through 43.5, 14:76 through 78.1, 14:80 through 81.2, and 14:89 through 89.1 (generally, this includes any sex related offense other than La. R.S. 14:82 through 86 and 14:93.5);*

2)    Inmates who have a balance of time extending beyond seven years to their earliest possible release eligibility date;

3)    Inmates sentenced pursuant to La. R.S. 15:529.1 et seq (HFC) if the instant offense is a third felony conviction or greater;

4)    Inmates with records, either arrest or institutional, which reveal compulsive or habitual use of violence against the person;

5)    Inmates who are currently under and/or who have demonstrated a need for extensive and/or intensive medical treatment, including mental health treatment;

6)    Inmates who do not qualify for minimum custody status (trusty);

7)    Inmates who have escaped, attempted to escape, or abetted an escape within the last seven years;

8)    Inmates who have demonstrated an overt-aggressive pattern of homosexual behavior to the extent that it would disrupt the smooth daily operation of the institution;

9)    Inmates whose institutional records reflect habitual and compulsive violent behavior, consistent signs of bad work habits, lack of cooperation or good faith, or other undesirable behavior;

10)    Inmates whose presence in the community may or does evoke adverse public reaction;

*Inmates assigned to DCI-Unit 3 on 11-20-95 who do not meet this criteria do not necessarily have to be removed, but their cases should be reviewed for continued suitability.

**Department Regulation No. B-02-001**
**01 October 2003**

       11)    Inmates who have been found under the influence or in possession of a controlled dangerous substance upon returning to a DPS&C facility from a furlough, escorted absence, outside work detail or job, or any other program, work; or recreational activity outside of the institution. (Note: Positive testing or refusal to test constitutes ineligibility.)

B.    Medical LOC 3 inmates are <u>eligible</u> for assignment to these institutions as follows:

       1)    Orthopedic or other injuries that do not require follow-up by specialty clinics;

       2)    Well controlled seizure disorders;

       3)    Apparently healthy inmates;

       4)    Hypertensive with normal blood pressure or who are stable and do not require medication adjustment;

       5)    Diabetics, insulin controlled, who can self-monitor;

       6)    Inmates with any disability, illness, or disease that does not require follow-up by specialty clinics (where there is documented evidence that the condition is well-controlled and stable and sick call patterns suggest stability).

C.    Mental health LOC 3 inmates are <u>eligible</u> for assignment to these institutions as follows (HRDC/WRDC staff may additionally review suitability based upon specific mental health codes):

       1)    Inmates who report some depression where medication has not been necessary;

       2)    Inmates who have had recent mental health intervention at a mental health center; however, medication was considered unnecessary;

       3)    Inmates who are currently not on medication; however, has had medication while in jail for mild depression or sleep disturbance (i.e. Sinequan, Benadryl, Elavil)--no neuroleptic medication while in a local jail facility;

       4)    Inmates who may experience mild adjustment problems;

       5)    Inmates who have no current need for mental health intervention; however, the need for counseling may arise in the future.

D.    Assignment of inmates to these institutions should reflect the priority this Department gives to the maintenance of a healthy and productive workforce for the National Guard. Inmates classified under Appendix II C. would therefore be considered most appropriate for internal and not external assignment at intake pending adjustment review.

E.    Recommendations for placement at these facilities will be forwarded to the appropriate Regional Coordinator. Assignment of inmates to these institutions will be the autonomy of the regional facility with statewide access.

**Department Regulation No. B-02-001**
**01 October 2003**

## APPENDIX III

**Adult Work Release Facilities**

A.   DPS&C Institutions:

1)   Inmates may be considered for work release upon certification to the Office of Adult Services (OAS) by the Warden that they meet all the statutory and regulatory criteria and are appropriate based upon subjective assessments of disciplinary history, criminal history, and other institutional adjustment factors (refer to the attached Work Release Recommendation Form). It is the responsibility of OAS to confirm technical eligibility only, and to coordinate final review and approval by the Secretary;

2)   Recommendations for work release participation may be made by the Parole Board. Such recommendations shall be reviewed by OAS for statutory and technical eligibility only. OAS will coordinate final review and approval by the Secretary.

B.   Parish and Local Jail Facilities:

1)   When state inmates in parish and local jail facilities are recommended for work release, it shall be the responsibility of OAS to ascertain statutory and technical eligibility and suitability based upon the inmate's criminal history and statutory and regulatory criteria. This includes state inmates who may be recommended for work release programs located at parish jail facilities. They must be eligible under the terms of this regulation. In addition, certification by the Sheriff or local jail administrator that all statutory requirements as outlined in La. R.S. 15:711 will be adhered to is required;

2)   OAS shall be responsible for the review of inmates housed and placed in non-contracted beds of designated work release facilities, and in beds approved through contract and cooperative endeavor agreements.

3)   Recommendations for work release participation may be made by the Parole Board. Such recommendations shall be reviewed by OAS for statutory and technical edibility only. OAS will coordinate final review and approval by the Secretary.

C.   Parole Violators:

Parole violators may be committed to a work release facility by the Parole Board as a condition of parole in lieu of revocation. Such commitment may be for a period of time not to exceed six months, without benefit of good time, provided that such commitment does not extend the period of parole beyond the full parole term.

**Department Regulation No. B-02-001**
**01 October 2003**

D.    General Conditions:

1)    <u>All</u> assignments to work release, except those made by the Parole Board in lieu of revocation, must be approved by the Secretary or his designee;

2)    No inmates assigned to the work release program shall be employed in a position which will necessitate their departure from the state.

E.    Selection Criteria:

1)    Unless precluded by law (see Section 2) below),  inmates within two years of their discharge date or six months of their parole eligibility date are eligible for work release;

2)    Inmates convicted of the following crimes are not eligible for participation in work release programs except in the last six months of their sentence and may not be suitable at any time during their period of incarceration.  A thorough review of suitability is mandatory regardless of sentence length:  first or second degree murder; attempted murder; manslaughter or attempted manslaughter*; aggravated or attempted aggravated rape; forcible rape; aggravated kidnapping; aggravated arson; armed robbery or attempted armed robbery; producing, manufacturing, distributing, dispensing, or possession with intent to produce, manufacture, distribute or dispense a controlled dangerous substance classified in Schedule I or Schedule II of La. R.S. 40:964, except any person convicted of distribution or possession with intent to distribute cocaine where the offense involves less than 28 grams of cocaine or any person convicted of distribution or possession with intent to distribute marijuana where the offense involves less than one pound of marijuana; any provision of La. R.S. 14:41 through 43.5, 14:76 through 78, 14:80 through 81.2, and 14:89 through 89.1 (generally, this includes any sex related offense other than La. R.S. 14:82 through 86 and 14:93.5); and persons sentenced as habitual offenders under La. R.S. 15:529.1.

Before the Parole Board recommends work release to the Secretary for these inmates, the Board must render a decision which grants parole on a specific date that is no more than six months from the date of the hearing.  This formally establishes that the inmate is within the last six months of his term and validates the work release recommendation.

3)    Inmates with arrests or institutional records which reveal habitual or compulsive use of violence against persons should be considered as not suitable;

4)    Inmates requiring extensive medical treatment are not eligible;

5)    Inmates undergoing mental health treatment are not eligible;

6)    Inmates found guilty by a court or institutional disciplinary board of escape or attempted escape within the last seven years are not eligible;

**Department Regulation No. B-02-001**
**01 October 2003**

    7)    Inmates who have demonstrated an overt-aggressive pattern of homosexual behavior to the extent that it would disrupt the smooth daily operation of the program are not eligible;

    8)    Inmates whose institutional records reflect consistent signs of bad work habits, lack of cooperation or good faith, or other undesirable behavior are not eligible;

    9)    Inmates with pending felony charges or detainers are not eligible.

# WORK RELEASE
# RECOMMENDATION FORM

DATE:

TO:

FROM:        WARDEN _____
             FACILITY _____

RE:          WORK RELEASE RECOMMENDATIONS

The below listed inmates meet all statutory and regulatory requirements for work release participation. I have reviewed their files and their work and conduct records indicate that they should be able to conform to the rigid standards expected of work release participants:

| NAME/NO. | W/R TYPE | PED/GTD | PARISH OF CONVICTION | DNA SAMPLE | COMMENTS |
|----------|----------|---------|----------------------|------------|----------|
|          |          |         |                      |            |          |

_____
Warden's Signature

**Department Regulation No. B-02-001**
**01 October 2003**

## APPENDIX IV

### Return of State Inmates
### to Custody of Local Jail Facilities

A.    It is the goal of the Department to place an inmate into a local jail facility in the parish of conviction proximate to his home community when the inmate nears the end of his sentence or as otherwise in the best interest of the Department and/or the local jail facility. Such placement may facilitate reintegration through increasing family contacts, employment contacts, possible work release participation and development of an individualized community support structure, in addition to supporting the partnership between state and local government established through the Basic Jail Guidelines. The criteria listed below provides general guidelines regarding such transfers whether initiated by the Department or by the local jail facility:

1)    The inmate should be assigned to medium or minimum custody in a dormitory housing area;

2)    Pending felony charges or detainers should be closely evaluated;

3)    The inmate should not have any extensive medical or mental health problems;

4)    An inmate whose record reflects consistent signs of bad work habits, a propensity for escape, lack of cooperation or good faith, or other undesirable behavior would generally not be considered appropriate;

5)    In order to be transferred to a local jail facility, the Sheriff of the parish must not object to the transfer;

6)    The inmate must not have been convicted of a crime of notoriety, and his presence in the community should not evoke adverse public reaction;

7)    Wardens will forward the names of appropriate inmates to the appropriate Regional Coordinator, who will then confirm technical eligibility (and ensure there are no objections from appropriate officials).

B.    The priority established for the maintenance of capacity populations at LDCC and DCI-Unit 3 is such that inmates considered for transfer under the provisions of A. above would generally not have been eligible.

C.    Participation in public service work programs or work release is governed by state statute and department regulation.  Strict compliance is anticipated.

# Regional Facility

