FILED
U.S. DIST COURT
UNITED STATES DISTRICT COURT MIDDLE DIST. OF LA

MIDDLE DISTRICT OF LOUISIANA 2004 NOV 22  P 2: 21

SIGN _____ DC
BY DEPUTY CLERK

| | | |
|---|---|---|
| ROBERT KING WILKERSON, ALBERT WOODFOX, and HERMAN WALLACE | * | CIVIL ACTION |
| | * | NUMBER 00-0304"C"M3 |
| VERSUS | * | JUDGE TYSON |
| RICHARD STALDER et al. | * | MAG. JUDGE DALBY |

*     *     *     *     *     *     *

## SUPPLEMENTAL MEMORANDUM IN OPPOSITION TO
## MOTION FOR PARTIAL SUMMARY JUDGMENT

**I.     Introduction.**

Plaintiffs, Robert King Wilkerson, Albert Woodfox and Herman Wallace, file this

Supplemental Memorandum in Opposition to the Partial Motion for Summary Judgment filed the

Richard Stalder, Secretary, Louisiana Department of Public Safety and Corrections; Burl Cain,

Warden, Louisiana State Penitentiary; Richard Peabody, Deputy Warden, Louisiana State

Penitentiary; Robert Rachal, former Major, Louisiana State Penitentiary; Sam Smith, Assistant

Warden, Louisiana State Penitentiary; Paul J. Myers, Major, Louisiana State Penitentiary; and

Tome Norris, former Classification Officer, Louisiana State Penitentiary ("State Officials").

This Memorandum is submitted in response to the Court's order to address: 1) whether or not an

examination of the factors set forth in *Sandin v. Conner*, 515 U.S. 472 (1995) is even triggered in

this case as the result of the Fifth Circuit's interpretation of that case; 2) if *Sandin* is triggered,

what factors should the court consider in order to determine whether or not the plaintiffs'



| INITIALS | DOCKET# |
|---|---|
| SH | 96 |

DLD

confinement in extended lockdown imposed atypical and significant hardships in relation to the ordinary incidents of prison life; and 3) even if plaintiffs are found to have a liberty interest, whether or not the lockdown reviews afforded plaintiffs during their confinement in extended lockdown amounted to due process under relevant law.

In order to understand how the Plaintiffs came to be placed in extended lockdown it is necessary to understand the historical context of the Louisiana State Penitentiary in the early 1970s. Then, as now, roughly three quarters of Angola's prisoners were African-American. The prison was racially segregated, meaning that black and white prisoners lived, ate, and worked separately. R. 1912. [1] The prison did not have a single African-American employee. R. 1916. Because budget constraints limited the number of paid staff, the prison was patrolled by a force of armed inmate guards. R. 1912. According to the warden at the time, C. Murray Henderson, "the only people carrying guns were the prisoners." R. 1912. Henderson has written that inmate guards "all too often . . . blazed away at each other from watchtowers or 'accidentally' settled old scores with bullets." Affidavit of Nick Trenticosta, Exhibit D, "Racist Pigs Who Hold Us Captive," from C. Murray Henderson et al., *Dying to Tell 2* (1992).

Angola was a cauldron of violence, racism, prostitution, and sexual slavery. Today, the Louisiana State Penitentiary states on its official website that, "[d]uring the late 1960's, Angola became known as the 'The Bloodiest Prison in the South' due to the number of inmate assaults." See www.corrections.state.la.us/lsp/history.htm. According the prison magazine, the *Angolite*,

---

[1] Trenticosta Affidavit, Exhibit "A." The citations refer to records introduced in the Post-Trial Relief Petition of Albert Woodfox, "R" refers to the Record on Appeal in *Woodfox v. Cain*, Docket No. 68933, 21st JDC l, and "Exh." refers to the other exhibits attached to Mr. Trenticosta's affidavit.



> [t]he fabric of life at Angola was woven by the thread of violence.
> The only law was that of the knife, and the only protection
> available to you was that you could acquire through sheer force of
> character and the ability to impose your will upon others . . . The
> pursuit of survival fueled a heated arms race among the prisoners
> for the superior weapon: a sword over a knife, a broad ax over a
> sword, and a gun over everything . . . the knife claimed the lives of
> 40 prisoners between 1972 and 1975 and left 350 more seriously
> injured.

Affidavit of Nick Trenticosta, Exhibit E, Wilbert Rideau, et al, *Life Sentences: Rage and Survival Behind Bars* 85-86 (1992).

Violence by staff against prisoners was a central element of prison life. Hilton Butler, a former Angola warden who helped investigate the Brent Miller killing and testified against Mr. Woodfox, boasted to a newspaper that during his tenure at Angola, "I've got just about every finger broke on both hands from punching [prisoners]." Affidavit of Nick Trenticosta, Exhibit F. "Angola's Changing of the Guard," *New Orleans Times Picayune*, February 22, 1987. Butler, in fact, has proudly stated that he once tried to kill two of the plaintiffs, Wallace and Woodfox. During a taped interview conducted by Warden Henderson while researching his book, *Dying to Tell*, Butler discussed a 1973 incident during which the prisoners on Woodfox and Wallace's tier refused to return to their cells after their exercise period. Affidavit of Nick Trenticosta, Exhibit G, transcript of *Dying to Tell* interviews, 7. Butler rounded up an armed posse and headed for the CCR unit:

> I know that there was three pistols in the bunch – know now,
> wasn't supposed to be anything [firearms] go inside – cause I know
> I had my .38 and I know [officer] W.J. Norwood had his and I
> know [officer] Ray Dixon had his. So I went up there and Bert
> Dixon brought that big gas gun shoots those gas shells, and I told
> them to catch their cells . . . and ain't nobody moved, they was all
> bunched up back there. And I told the rest of them, I said now be

3

> ready, soon as it goes off, we're goint in there and get 'em.
> Everybody'd done went to arguing about who was gonna get
> Woodfox and Wallace. And as luck would have it, I guess the
> reason we're not all in the federal penitentiary today, that's the first
> time in history, and that was almost a brand new gun, it snapped . .
> . If that gun would've went off, we probably would've killed 'em
> that day.

*Id.*

Official corruption, at the expense of the inmate population, was similarly pervasive. For

example, "inmate canteens, where prisoners were supposed to purchase necessities with coupons

torn from individual books at the cash register, were mismanaged to the extent that correctional

officers rather than inmates were spending 'wads of coupons as big as your fist,' none of which

should have been in their possession." *Dying to Tell* at 2.

Life within the prison was essential controlled by the inmate power structure. As a

consequence, young and/or weak prisoners, on a shockingly widespread scale, were routinely

forced into sexual slavery or prostitution. James Dunn, a prisoner who suffered through many

years of enforced prison "marriage," described the conditions vividly:

> During my first week here, I saw fourteen guys rape one youngster
> 'cause he refused to submit. They snatched him up, took him to
> the TV room and, man, they did everything to him – I mean,
> *everything*, and they wouldn't even use no grease. When they
> finished with him, he had to be taken to the hospital where they
> had to sew him back up; then they had to take him to the nuthouse
> at Jackson 'cause he cracked up.

*Dying to Tell* at 77 (emphasis in original).

Former Corrections Secretary C. Paul Phelps acknowledged to the *Angolite* that the

corrections administration allowed these horrors to continue in order to facilitate the smooth

functioning of the institution:

> The formation of power groups or cliques is symptomatic of a high
> live level of homosexual activity and enslavement . . . during the
> ten years preceding 1976, the inmate power structure at Angola
> was very, very powerful.  And anytime that happens and a high
> level of homosexual rapes and enslavement is taking place, there
> has to be a tacit trade-off between the inmate power structure and
> the administration.

*Id* at 86.

Angola's prisoners, faced with literally life-threatening violence on a daily basis and
imprisoned by an administration that refused to intervene (or even benefitted from such
conditions), began seeking to improve conditions on their own.  Emulating the tactics of the Civil
Rights Movement in the "free world," Angola prisoners organized campaigns of non-violent civil
disobedience, which attracted wide support among the population.  In August 1971, for example,
African-American prisoners organized a seven-day dining hall strike.  Support among the
population was almost total, as only a dozen black prisoners patronized the dining hall during the
strike.  Affidavit of Nick Trenticosta, Exhibit H, "Angola Prisoners Boycott Mess Hall," *Baton
Rouge Sunday Advocate,* August 8, 1971.  The strikers pledge "no violence" and to obey all
orders "within reason."  Their demands would not have been out of place in a federal court order
– the prisoners asked for an end to racial segregation, better medical care, employment of
African-Americans in high-ranking Penitentiary positions, freedom from physical abuse, the
elimination of inmate guards, and the hiring of qualified personnel. *Id.*

The administration's response to the prisoners' appeals was comparable to the historic
reaction of white Souther officials to the demands of the Civil Rights Movement.  Warden
Henderson treated the protest not as a rational reaction to unspeakable conditions, but as the fault
of "outside agitators." *Id.* Instead of acceding to what were entirely reasonable demands,

Henderson blamed Rep. Dorothy Taylor, the only African-American member of the state legislature, who had taken up the cause of prison reform by meeting with Angola prisoners, speaking out against injustices, and leading public hearings into conditions in the Louisiana prison system. After a week, Henderson constructed what he described as a "prisoner-of-war-type compound," surrounded by a hurricane fence, in which eh segregated 300 men, forcing an end to the strike but doing nothing to improve the situation. Exhibit I, "Angola Inmate Protest Ended," *Baton Rouge State-Times*, August 13, 1971.

All three plaintiffs, Wilkerson, Woodfox and Wallace, were leaders among the prisoners who were attempting to bring an end to the horrors of 1970s Angola. Among other prisoners, the three of them help found an Angola chapter of the Black Panther Party for Self-Defense. Affidavit of Nick Trenticosta, Exhibit B, R. 2370. Their primary activity was a campaign to end rape at Angola. As Mr. Woodfox has testified, Thursday at Angola was known as "fresh fish day," because on Thursday newly-admitted prisoners would be assigned to the dormitories. R. 2363-64. Often young and inexperienced, the new prisoners were especially vulnerable to victimization by Angola's rape culture. R. 2364. The plaintiffs and other members of the Black Panther Party would escort the new prisoners to their dormitories, offer them protection, and give them advice – such as to avoid gambling or borrowing money or clothing – on how to prevent themselves from being victimized. R. 2364-65. Mr. Woodfox acknowledged that the Panthers carried knives on fresh fish day to protect themselves from prisoners who would attack them because they resented the changes they sought to make. R. 2363.

It is against this backdrop of upheaval and brutality that Brent Miller was killed. The day before the murder, on April 16, 1972, another security officer, Michael Gunnells, was dosed with

flammable liquid and set alight: a prisoner named Rory Mason was convicted of committing the

act. Affidavit of Nick Trenticosta Exhibit J, "Several Suspected in Killing at Angola," *Baton*

*Rouge Morning Advocate*, April 18, 1972, Affidavit of Nick Trenticosta, Exhibit K, "Militants

Blamed for Guard Death," *Baton Rouge State-Times*, April 18, 1972; Affidavit of Nick

Trenticosta Exhibit L, "Guard Death Pinned on Militants," *Baton Rouge Morning Advocate*,

April 18, 1972.  On the morning of the murder, the workers in Angola's dining hall, both black

and white, staged a work strike to protest their 16-hour-per-day, six-day-per-week shifts.  R.

1939. Trenticosta Affidavit, Exhibit "C".

Brent Miller was killed in an environment in which almost everyone was armed, everyone

was desperately angry, and in which attempts to seek redress by petitioning the administration

were doomed to failure.  Given this climate of violence and outrage, it is clear that any of the

5,000 prisoners at Angola on April 17, 1972, had a potential motive to strike out at the

administration that confined them.  Even more clear is the fact that Angola's administration had a

powerful motive to eliminate the plaintiffs from the prison population.

**II. Whether or Not an Examination of the Factors Set Forth in *Sandin* Is Even Triggered in this Case as the Result of the Fifth Circuit's Interpretation of That Case.**

    **A. *Sandin's "sliding scale" analysis.***

*Sandin* sets forth a "sliding scale" analysis which looks to the nature of the deprivation

and employs different tests depending upon the severity of the deprivation:

> Level 1.  Deprivations that are not severe or are closely related to
> the original terms of confinement will not be considered as
> impinging upon a liberty interest even though state law or
> regulations may contain "mandatory language." *Sandin*, 515 U.S.
> at 481, 482, 115 S.Ct. at 2297, 2298.



> Level 2.  Deprivations that impose "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life" may be considered as impinging upon a liberty interest provided that state law creates a liberty interest.  *Sandin*, 515 U.S. at 479, 115 U.S. at 2300.
>
> Level 3.  Deprivations that are so severe that they exceed the inmate's sentence "in such an unexpected manner as to give rise protection by the Due Process Clause of [their] own force" give rise to a liberty interest irrespective of state law.  *Sandin*, 515 U.S.at 484, 115 S.Ct. at 2300.

*Sandin* further notes a deprivation "in either ***duration*** or degree of restriction" can give rise to protection by the Due Process Clause.  515 U.S. at 486, 115 S.Ct. at 2301. (Emphasis added).  There is, of course, a relationship between the duration of the deprivation and the degree of restriction.  With regard to the <u>degree of restriction</u>, this Court described the conditions of extended lockdown as follows:

> Extended lockdowns is the effective equivalent of solitary confinement.  Prisoners in extended lockdown remain alone in a cell approximately 55 to 60 square feet in size of 23 hours each day.  One hour each day, the prisoner may shower and walk along the tier on which his cell is located.  Three times a week, weather permitting, the prisoner may use this hour to exercise alone in a fenced exercise yard.  Additional restrictions are placed on generally available inmate privileges including those pertaining to personal property, reading materials, access to legal resources, work, and contact visitation.

As to <u>duration,</u> Wilkerson was in lockdown for approximately 28 years; Wallace has been in lockdown for over 32 years; and Woodfox (who had a three year hiatus in a parish jail) has been in lockdown for over 29 years.  There can be no doubt that the combination of the duration of the deprivation <u>and</u> the degree of restriction gives rise to a Level 3 deprivation, that is, plaintiffs' confinement is so severe that it exceeds their sentences "in such an unexpected manner

as to give rise protection by the Due Process Clause of its own force" thus giving rise to a liberty interest irrespective of state law. *Sandin*, 515 U.S.at 484, 115 S.Ct. at 2300.

As noted below, plaintiffs dispute as a matter of fact whether their respective decades-long confinements in Extended Lockdown were the result of their initial classifications. Nevertheless, even assuming that such is the case, plaintiffs submit that confinement resulting from an initial classification that at first does not violate due process can ripen over time into a due process violation. Here, the duration of confinement <u>combined</u> with the degree of restriction raises these particular confinements to a Level 3 deprivation even if the initial classifications themselves did not violate the Due Process Clause.

The Fifth Circuit's decision in this matter is not to the contrary. "This Circuit has continued to hold post-*Sandin* that an inmate has no protectable liberty interest in his classification. *See Harper v. Showers*, 174 F.3d 716, 719 (5th Cir. 1999)." Despite the apparent absoluteness of the Fifth Circuit's statement, the *Harpers* decision cited by the court noted notes that *Sandin* does admit the possibility of a liberty interest where there is "atypical, significant deprivation." *Id.* at n. 4. *Whitley v. Hunt*, 158 F.3d 577 (5th Cir. 1998) was not a case involving extended lockdown and therefore did not concern a significant degree or restriction nor did it concern a deprivation of significant duration as the plaintiff's total sentence was thirty months (as opposed to the thirty-year duration in the present case). [2]

Finally, if the plaintiffs do not have a protectable interest in being free of Extended Lockdown for the rest of lives, then why does the State give them any hearings at all? It would

---

[2] *McCord v. Maggio*, 910 So.2d 1248 (5th Cir. 1990) (30-month CCR confinement) and *Wilkerson v. Maggio*, 703 So.2d 909 (5th Cir. 1983) are both pre-*Sandin* decisions.



be better to eliminate this charade and spare the plaintiffs the false hope of ever being released into the general population.

### B. There Are Disputes of Material Fact as to Whether Plaintiffs Were Confined in Extended Lockdown as a Consequence of their Initial Classifications.

As noted in Plaintiffs' Original Memorandum, even if the State's regulations did provide for permanent confinement in Extended Lockdown,[3] there are substantial disputes of material fact as to whether the plaintiffs were placed in Extended Lockdown as a result of their crimes of conviction.

#### 1) Wilkerson

According to the State's documents, Wilkerson was first placed in Extended Lockdown on May 15, 1972, over a year <u>prior</u> to the murder of an inmate that occurred on June 10, 1973. This is confirmed by Wilkerson who states in his affidavit that he was originally placed in solitary confinement for "wanted to play lawyer" for another inmate, Vincent Bush, while still in the reception center.

---

[3]     The Department's regulations were apparently revised in October 2001 with language that, apparently for the first time, states that confinement in Extended Lockdown can be **permanent**:

> Maximum custody is generally defined as assignment of an inmate to a cell based housing area. This level is based upon the need to protect the inmate, other inmates, the public, staff, or the institution. This includes temporary assignment to Administrative Segregation or **permanent** assignment to Disciplinary Detention/Extended Lockdown. (Emphasis added).



### 2) Woodfox

According to the prison records produced by the State, Woodfox was first placed in Extended Lockdown on April 18, 1972 and that the first time that "Initial Classification" was listed as the "Reason for Original Lockdown" for Woodfox was March 22, 1999.

As noted in Woodfox's affidavit, Woodfox was originally convicted of armed robbery. He was confined in Orleans Parish Prison whereupon he was transferred to the Louisiana State Prison at Angola in June/July 1971.

Upon reaching Angola, Woodfox was placed in Camp RC (Reception Center) which is located at the entrance to Angola. The orientation program lasted 30 days and, based upon a number of factors, inmates were placed at a security level, given a job assignment, or assigned to the agriculture farms, and a living quarter. Woodfox's initial classification was medium security, main prison, hickory #4.

On April 17, 1972, correctional officer Brent Miller was found dead in Pine #1 Dormitory. Within hours, after questioning by prison officials and members of the West Feliciana Sheriff's Department, affiant was marched under gun to isolation for suspicion of the murder of Officer Miller. On April 18, 1972, Woodfox was informed by various prison warders that affiant was being placed in CCR for the murder of Brent Miller and that he would remain there until convicted and executed. Woodfox remained in CCR as punishment for Brent Miller's death until April 29, 1996, the discharge date for his original sentence for armed robbery.

Upon the discharge for armed robbery (April 29, 1996), Woodfox was turned over to the custody of the West Feliciana Sheriff's Department and transferred to the authorities of the City

11

Jail of Amite, Louisiana, Tangipahoa Parish. Woodfox remained in the Amite City Jail until March 1996, at which time he was returned to the custody of the Department of Corrections.

After being processed into the Amite City Jail, Woodfox was placed in an isolation cell (E-11) based upon information sent by prison officials at Angola. However, after 6 months of observation by city jail officials, Woodfox was transferred into the general population (West Wing, B-1) where he remained until being returned to the custody of the Department of Corrections in March 1996.

While in the Amite City Jail, Woodfox was involved in one incident in which he was attacked by a mentally disturbed inmate. However, Woodfox was cleared of any wrongdoing by the disciplinary court based upon signed statements of other prisoners who had witnessed the incident. Woodfox's tenure at the Amite City Jail otherwise was without incident.

Woodfox was returned to the Angola State Prison on March 22, 1999, and sent back to CCR even though he had been in the general population at the Amite City Jail where he had a record of excellent conduct. Since his return to Angola, Woodfox has had a record of excellent conduct.

Woodfox's three-year hiatus at the Amite City Jail is critically important because it demonstrates that Woodfox can be safely released into the general prison population. Further, it demonstrates that the determination to once again place Woodfox in Extended Lockdown in 1999 was a reclassification, not an initial classification.



### 3) Wallace

According to the prison records produced by the State, Wallace was first placed in Extended Lockdown on April 18, 1972 and that the first time that "Initial Classification" was listed as the "Reason for Original Lockdown" for Wallace was on January 4, 2001, nearly twenty-eight years after Wallace had first been placed in Extended Lockdown.

Thus, there exist substantial questions of material fact on the following issues: 1) whether Wilkerson's initial classification included permanent confinement to extended lockdown; 2) whether Woodfox's initial classification included permanent confinement to extended lockdown; and 3) whether Wallace's initial classification included permanent confinement to extended lockdown.

### III. If *Sandin* is Triggered, What Factors Should the Court Consider in Order to Determine Whether or Not the Plaintiffs' Confinement in Extended Lockdown Imposed Atypical and Significant Hardships in Relation to the Ordinary Incidents of Prison Life.

In 1964, Justice Potter Stewart explained "hard-core" pornography by saying, "I shall not today attempt further to define the kinds of material I understand to be embraced . . . [b]ut I know it when I see it . . . " *Jacobellis v. Ohio*, 378 U.S. 184, 197 (1964) (Stewart, J., concurring).

The hardships suffered by the plaintiffs is not simply the degree of deprivation, but the duration that the plaintiffs have suffered the degree of deprivation. Thus, this Court must consider both the <u>degree of deprivation</u> relative to the ordinary incidents of prison life and the <u>duration of deprivation.</u>   But this Court is not faced with the question as to what point confinement in extended lockdown ripens into a due process violation. Clearly, the plaintiffs'

13



decades-long confinement shocks the conscious of a modern civilized western society and violates the Due Process Clause.

**IV.  If Plaintiffs Are Found to Have a Liberty Interest, Whether or Not the Lockdown Reviews Afforded Plaintiffs During Their Confinement in Extended Lockdown Amounted to Due Process under Relevant Law.**

The lockdown review proceedings do not amount to due process because they are a sham. Affidavit of Albert Woodfox; Affidavit of Herman Wallace; Affidavit of Robert Wilkerson. When the review board comes to the CCR units, it meets with 6 units consisting of 15 men per unit, totaling 90 men per review.  These reviews may begin around 8 a.m. and end before noon. Affidavit of Herman Wallace.  The Board sets a table at the end of each unit, Unit A, Unit B, Unit C, Unit D, Unit E and Unit F. *Id.*  Each inmate is singularly let out of his cell and walks to the front of the unit and is simply given a summary sheet without any consideration of the inmate's conduct while in the CCR. *Id.*

The officers assigned to the classification board do not make any attempt to have a meaningful dialog, do not attempt to determine the inmate's state of mind, and do not make any attempt to determine whether the inmate affiant should be released from CCR to a non-punishable cellblock or dormitory. *Id.* Usually, the inmate's classification sheet has already been signed or is in the process of being signed by the time affiant reaches the board coming from his cellblock. *Id.*

This case presents the unique circumstance of inmates being kept continuously in extended lockdown for decades at a time. The annals of American jurisprudence do not provide

any guidelines as there do not appear to be any cases that even remotely approach the length of time that the plaintiffs have spent in extended lockdown.

The requirements of the Due Process Clause call for a <u>meaningful</u> hearing to be held for inmates for continued confinement. The issue is the balance the right of an inmate has a meaningful hearing while not burdening the prison officials or interfering with the maintenance of order in the prison. Plaintiffs do not suggest that there be judicial review for every 90 day review proceeding. Such a remedy would burden both the prison officials and the courts. At the same time, prison officials should not be given carte blanche authority to keep inmates in extended lockdown indefinitely because of a lack of any judicial review because that would mean that the state official's actions would be unreviewable thereby violating due process. *See Wolff v. McDonnell*, 418 U.S. 539 (1974); *Ponte v. Real*, 471 U.S. 491 (1985),

Therefore, plaintiffs suggest that an order issue requiring the recording of all all reclassification boards and that the recordings be held for at least two years as evidence in case the inmate wants to seek judicial review. After a certain period of time of extended lockdown (e.g. one year), an inmate be granted  judicial review to determine whether cause exists for continued confinement in extended lockdown. If the inmate does not meet the criteria for continued confinement, then an order should issue to release him to the general population.

## V.    CONCLUSION

In light of the foregoing, the Motion for Partial Summary Judgment filed on behalf of the State Officials should be denied.

Respectfully submitted,



Thomas W. Milliner (La. Bar No. 9580)
Cooperating Attorney
ACLU Foundation of Louisiana
One Canal Place, Suite 2800
365 Canal Street
New Orleans, LA 70130
(504) 524-5297

Nicholas J. Trenticosta (La. Bar No. 18475)
Cooperating Attorney
ACLU Foundation of Louisiana
7100 St. Charles Avenue
New Orleans, Louisiana 70118
(504) 864-0700

Charles Delbaum (La. Bar No. 22035)
General Counsel
ACLU Foundation of Louisiana
144 Elks Place
New Orleans, LA 70112

## CERTIFICATE OF SERVICE

I certify that I served a copy of the foregoing Memorandum by deposit in the U.S. mail, properly addressed and postage prepaid, this 19th day of November, 2004.

Thomas W. Milliner

16



# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| ROBERT KING WILKERSON, ALBERT WOODFOX, and HERMAN WALLACE | * | CIVIL ACTION |
| | * | NUMBER 00-0304"C"M3 |
| VERSUS | * | JUDGE TYSON |
| RICHARD STALDER et al. | * | MAG. JUDGE DALBY |

\*     \*     \*     \*     \*     \*     \*

## <u>AFFIDAVIT</u>

**State of Louisiana**
**Parish of Orleans**

**BEFORE ME**, the undersigned Notary Public, personally came and appeared

### NICK TRENTICOSTA

who after being first duly sworn by me, did depose and state the following:

1.   He is a Cooperating Attorney for the ACLU which is the counsel for plaintiffs in the above-captioned matter, and he is a counsel of record in this case.

2.   That affiant is also counsel of record for Mr. Woodfox in the matter entitled: Woodfox v. Cain, Docket No. 68933, 21st JDC. (just denied, no app notice or #)

3.   That in connection with the course of his representation of Mr. Woodfox in the proceedings identified in Paragraph 2, he obtained certain exhibits which are attached to this affidavit.

4.   That attached as Exhibit "A," are certain record excerpts in from the Record on Appeal in the proceedings identified in Paragraph 2.

Page 1 of  3



5.   That attached as Exhibit "B" are are certain record excerpts in from the Record on Appeal in the proceedings identified in Paragraph 2

6.   That attached as Exhibit "C", are excerpts are certain record excerpts in from the Record on Appeal in the proceedings identified in Paragraph 2.

7.   That attached hereto as Exhibit "D" are excerpts from C. Murray Henderson et al., *Dying to Tell 2* (1992).

8.   That attached hereto as Exhibit "E" are excerpts from Wilbert Rideau, et al, *Life Sentences: Rage and Survival Behind Bars* 85-86 (1992).

9.   That attached hereto as Exhibit "F" is an article from *New Orleans Times Picayune*, February 22, 1987 entitled "Angola's Changing of the Guard,"

10.  That attached hereto as Exhibit "G" is an excerpt from the a taped interview of Hilton Butler made in connection with *Dying to Tell*.  During the pre-trial proceedings identified in Paragraph 2, the Trial Court authenticated the transcripts attached as Exhibit "G."

11.  That attached hereto as Exhibit "H" is an article from the *Baton Rouge Sunday Advocate*, August 8, 1971 entitled:  "Angola Prisoners Boycott Mess Hall."

12.  That attached hereto as Exhibit "I" is an article from the *Baton Rouge State-Times*, August 13, 1971 entitled: "Angola Inmate Protest Ended."

13.  That attached hereto as Exhibit "J" is an article from *Baton Rouge Morning Advocate*, April 18, 1972 entitled: "Several Suspected in Killing at Angola,",

14.  That attached hereto as Exhibit "K" is an article from the *Baton Rouge State-Times*, April 18, 1972 entitled:"Militants Blamed for Guard Death."

15.  That attached hereto as Exhibit "L" is an article from the *Baton Rouge Morning*




*Advocate*, April 18, 1972 entitled: "Guard Death Pinned on Militants.".

_____
NICK TRENTICOSTA

SWORN TO and subscribed before
me this 18th day of November, 2004

Thomas W. Milliner, Notary Public
Louisiana Bar number 19508
Notary Public
My commission expires at death

Page 3 of 3

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| ROBERT KING WILKERSON, ALBERT WOODFOX, and HERMAN WALLACE | * | CIVIL ACTION |
| | * | NUMBER 00-0304"C"M3 |
| VERSUS | * | JUDGE TYSON |
| RICHARD STALDER et al. | * | MAG. JUDGE DALBY |
| *     *     *     *     *     *     * | | |

## **AFFIDAVIT**

PARISH OF ORLEANS
STATE OF LOUISIANA

BEFORE ME, the undersigned authority, personally came and appeared,

ROBERT KING WILKERSON

who, after first being duly sworn by me, did depose and say:

1. That affiant was repeatedly told by defendants that he would never be released.

2. That affiant was originally placed in solitary confinement for "wanted to play lawyer" for another inmate, Vincent Bush, while affiant was still in the reception center.

3. That the classification board hearings are a sham. The officers assigned to the classification board do not make any attempt to have a meaningful dialog, do not attempt to determine affiant's state of mind, and do not make any attempt to determine whether affiant should be released from CCR to a non-punishable cellblock or dormitory. Usually, affiant's classification sheet has already been signed or is in the process of being signed by the time affiant reaches the board coming from his cellblock.

4. The above statements are made to the best of affiant's information, knowledge, and belief.

ROBERT KING WILKERSON

Sworn to and subscribed
before me, Notary Public,
this _18th_ day of November, 2004.

NOTARY PUBLIC

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| ROBERT KING WILKERSON, ALBERT WOODFOX, and HERMAN WALLACE | * * | CIVIL ACTION NUMBER 00-0304"C"M3 |
| VERSUS | * | JUDGE TYSON |
| RICHARD STALDER et al. | * | MAG. JUDGE DALBY |

\* \* \* \* \* \* \*

## **AFFIDAVIT**

PARISH OF WEST FELICIANA
STATE OF LOUISIANA

BEFORE ME, the undersigned authority, personally came and appeared,

ALBERT WOODFOX

who, after first being duly sworn by me, did depose and say:

1. That affiant was originally convicted of armed robbery. Affiant was confined in Orleans Parish Prison whereupon he was transferred to the Louisiana State Prison at Angola in June/July 1971.

2. That upon reaching Angola, affiant was placed in Camp RC (Reception Center) which is located at the entrance to Angola. The orientation program lasted 30 days and, based upon a number of factors, inmates were placed at a security level, given a job assignment, or assigned to the agriculture farms, and a living quarter.

3. That affiant's initial classification was medium security, main prison, hickory #4.

4. That on April 17, 1972, correctional officer Brent Miller was found dead in Pine #1

Page 1 of 3

Dormitory. Within hours, after questioning by prison officials and members of the West Feliciana Sheriff's Department, affiant was marched under gun to isolation for suspicion of the murder of Officer Miller.

5. That on April 18, 1972, affiant was informed by various prison warders that affiant was being placed in CCR for the murder of Brent Miller and that affiant would remain there until convicted and executed. Affiant remained in CCR as punishment for Brent Miller's death until April 29, 1996, the discharge date for his original sentence for armed robbery.

6. That upon the discharge for armed robbery (April 29, 1996), affiant was turned over to the custody of the West Feliciana Sheriff's Department and transferred to the authorities of the City Jail of Amite, Louisiana, Tangipahoa Parish. Affiant remained in the Amite City Jail until March 1996, at which time affiant was returned to the custody of the Department of Corrections.

7. That after being processed into the Amite City Jail, affiant was placed in an isolation cell (E-11) based upon information sent by prison officials at Angola. However, after 6 months of observation by city jail officials, affiant was transferred into the general population (West Wing, B-1) where affiant remained until being returned to the custody of the Department of Corrections in March 1996.

8. That while in the Amite City Jail, affiant was involved in one incident in which affiant was attacked by a mentally disturbed inmate, however, affiant was cleared of any wrongdoing by the disciplinary court based upon signed statements of other prisoners who had witnessed the incident. Affiant's tenure at the Amite City Jail otherwise was without incident.

9. That affiant was returned to the Angola State Prison on March 22, 1999, and sent back to CCR even though affiant had been in the general population at the Amite City Jail where

Page 2 of 3

affiant had a record of excellent conduct.  Since his return to Angola, affiant has had a record of excellent conduct.

10.  That the classification board hearings are a sham. The officers assigned to the classification board do not make any attempt to have a meaningful dialog, do not attempt to determine affiant's state of mind, and do not make any attempt to determine whether affiant should be released from CCR to a non-punishable cellblock or dormitory. Usually, affiant's classification sheet has already been signed or is in the process of being signed by the time affiant reaches the board coming from his cellblock.

11.  The above statements are made to the best of affiant's information, knowledge, and belief.

_____
ALBERT WOODFOX

Sworn to and subscribed
before me, Notary Public,
this _____ day of November, 2004.

_____
NOTARY PUBLIC

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| ROBERT KING WILKERSON, ALBERT WOODFOX, and HERMAN WALLACE | * | CIVIL ACTION |
| | * | NUMBER 00-0304"C"M3 |
| VERSUS | * | JUDGE TYSON |
| RICHARD STALDER et al. | * | MAG. JUDGE DALBY |
| *   *   *   *   *   *   * | | |

## **AFFIDAVIT**

PARISH OF WEST FELICIANA
STATE OF LOUISIANA

      BEFORE ME, the undersigned authority, personally came and appeared,

HERMAN WALLACE

who, after first being duly sworn by me, did depose and say:

      1.That when affiant was initially placed in the CCR, he did not go before a classification board or a disciplinary board.  He was placed in CCR without any review whatsoever.

      2.  There are a number of other prisoners in the CCR (including Kenneth Wittmore, William Hall, Lee Ione, Dennis Lennon, John Simmonis and Frederick Lyons) who have exemplary disciplinary records but who have remained in CCR for fifteen (15) to twenty (20) years and have never been seriously considered for release into the general prison population.

      3.  That if affiant refuses to meet with the disciplinary board, he is threatened with disciplinary action.

      4.  That when the review board comes to the CCR units, it meets with 6 units consisting

Page 1 of 2

of 15 men per unit, totaling 90 men per review. These reviews may begin around 8 a.m. and end before noon. The Board sets a table at the end of each unit, Unit A, Unit B, Unit C, Unit D, Unit E and Unit F. Each inmate is singularly let out of his cell and walks to the front of the unit and is simply given a summary sheet without any consideration of the inmate's conduct while in the CCR.

5. There are no policies, nor criteria that informs an inmate as to what is expected of him to be released from the CCR, and since there are no tapes of these hearings, inmates are denied the right speak freely on this own before and are simply given summary sheet denials.

6. The above statements are made to the best of affiant's information, knowledge, and belief.

_____
HERMAN WALLACE

Sworn to and subscribed
before me, Notary Public,
this ____ day of November, 2004.

_____
NOTARY PUBLIC