# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

**ROBERT KING WILKERSON, ET AL**                    **CIVIL ACTION**

**VERSUS**                                          **NUMBER 00-304-C-M3**

**RICHARD STALDER, ET AL**

## NOTICE

Please take notice that the attached Magistrate Judge's Report has been filed with the Clerk of the U.S. District Court.

In accordance with 28 U.S.C. § 636(b)(1), you have ten days from date of receipt of this Notice to file written objections to the proposed findings of fact and conclusions of law set forth in the Magistrate Judge's Report. A failure to object will constitute a waiver of your right to attack the factual findings on appeal.

**ABSOLUTELY NO EXTENSION OF TIME SHALL BE GRANTED TO FILE WRITTEN OBJECTIONS TO THE MAGISTRATE JUDGE'S REPORT.**

Baton Rouge, Louisiana, this _____ day of February, 2005.

_____
**MAGISTRATE JUDGE DOCIA L. DALBY**

**UNITED STATES DISTRICT COURT**

FILED
U.S. DIST COURT
MIDDLE DIST. OF LA

2005 FEB -1  P 12: 03

SIGN_____
BY DEPUTY CLERK

**MIDDLE DISTRICT OF LOUISIANA**

**ROBERT KING WILKERSON, ET AL**          **CIVIL ACTION**

**VERSUS**          **NUMBER 00-304-C-M3**

**RICHARD STALDER, ET AL**

### MAGISTRATE JUDGE'S REPORT

This prisoners' case filed pursuant to 42 U.S.C. § 1983 comes before the Court on defendants' motion for partial summary judgment (*rec. doc. no.* 73). Defendants seek dismissal of plaintiffs' due process claims[1] by claiming that plaintiffs do not have a liberty interest as the result of their being kept in extended lockdown for three decades.

Defendants' motion is the outgrowth of a directive issued by the Fifth Circuit in its most recent opinion dealing with this case, *Wilkerson v. Stalder*, 329 F.3d 431 (5th Cir. 2003). Defendants previously appealed this Court's earlier denial of their Rule 12(b)(6) motion to dismiss plaintiffs' procedural due process claims on the basis of qualified immunity. The Fifth Circuit affirmed the denial because the inmate plaintiffs' Complaint did not allege "whether their confinement in extended lockdown resulted from their initial classification *or* from violations of prison rules." *Id.* at 436. (Emphasis added.) Thus, the Fifth Circuit could not determine whether the plaintiff inmates asserted facts that would give rise to denial of a liberty interest. *Id.* This Court was assigned the task on remand of making such a determination if defendants presented a motion that went beyond the pleadings, as has now occurred.

---

[1] In their first and second Amended Complaints (*rec. doc. nos.* 20 and 36), plaintiffs also alleged cruel and unusual punishment in violation of the Eighth Amendment. However, those claims are not now before the Court.

The issues before the Court at this time are therefore (1) whether plaintiffs have a protectable liberty interest in their confinement in the "extended lockdown" unit of the Louisiana State Penitentiary ("LSP") at Angola, Louisiana during the time frame not excluded by the pertinent statute of limitations, and, if so,  (2) whether plaintiffs were afforded adequate due process.  In their present motion, defendants argue that plaintiffs do not have a protectable liberty interest, and therefore are not entitled to due process, because their respective 28 to 33 year confinements in the extended lockdown unit have been due solely to their initial custodial classifications.

Plaintiffs counter that there are material facts in dispute as to whether each plaintiff's initial and continuing confinement in extended lockdown has been because of his initial prisoner classification, and whether the 90-day classification reviews conducted by prison authorities have been sham proceedings.  Plaintiffs further contend that the prison's regulations did not even provide for a classification of permanent confinement in extended lockdown until they were revised in October 2001, *i.e.*, nearly 30 years after their original confinements in extended lockdown.  Each plaintiff argues that his original and continuing confinement in lockdown was not due to his initial classification, but rather was due to disciplinary/punitive action taken in response to the inmates' respective involvement in killing a prison guard or inmate and/or for violations of prison disciplinary rules.

### *Background*

The record shows that plaintiffs Herman Wallace and Albert Woodfox initially were classified as medium custody inmates upon their arrival at LSP in 1969 and 1971,

-2-

respectively; each man was housed with the general prison population.[2]    They were

placed in extended lockdown[3] on April 18, 1972,[4] immediately following a prison riot which

resulted in the death of a guard. Both men were later charged with and convicted of

murdering LSP correctional officer Brent Miller during the riot. Wallace has continuously

remained in extended lockdown since April 18, 1972. With the exception of a three-year

period he spent in a parish prison awaiting trial, Woodfox also has been continuously

confined in the extended lockdown unit.[5]

Plaintiff Robert King Wilkerson, on the other hand, began his stay in LSP's extended

lockdown on May 15, 1972,[6] more than a year prior to the date on which he was charged

with murdering a fellow inmate. Prior to his arrival at LSP, Wilkerson had been initially

incarcerated in Orleans Parish Prison following his conviction for armed robbery. After

---

[2] *See* Affidavit of Darrel Vannoy, Deputy Warden for Security at LSP, attached as an unnumbered Exhibit to defendants' original Memorandum in Support of Motion for Summary Judgment. *Rec. doc. no.* 75. In *Wilkerson v. Stalder, supra,* the Fifth Circuit mistakenly surmised, based on counsel's statements during oral argument, that Wallace and Woodfox were classified as maximum security prior to the time they were charged with killing one of the guards at LSP.

[3] Extended lockdown, also known as administrative segregation, is a form of incarceration at LSP that is similar to solitary confinement. The prisoners assigned thereto remain alone in cells approximately 55 to 60 square feet for 23 hours of each day. During the other hour, a prisoner may shower and walk along the tier on which his cell is located. Three times a week, the prisoner may use this hour to exercise alone in a fenced yard, if the weather permits. The prisoners in extended lockdown also face additional restrictions on privileges generally available to inmates such as personal property, reading materials, access to legal resources, work, and visitation rights. In contrast thereto, inmates in the general prison population live in a dormitory setting where they can interact with one another and take advantage of educational opportunities, training, and other privileges denied to those in extended lockdown. In *McCord v. Maggio,* 910 F.2d 1248, 1249 (5th Cir. 1990), the Fifth Circuit noted that placement in extended lockdown (also referred to as Closed Cell Reserve, or CCR) can be based on either classification or disciplinary reasons.

[4] *See* defendants' original Memorandum in Support of Motion for Summary Judgment, Exhibit 5 (Lockdown History Form AW 0332 dated July 6, 1972) and Exhibit 6 (Lockdown History Form HW 0406 dated July 6, 1972). *Rec. doc. no.* 75. The cited form numbers are to the Bates stamps affixed to those documents.

[5] *See Wilkerson v. Stalder, supra,* 329 F.3d at 433.

[6] Defendants' original Memorandum in Support of Motion for Summary Judgment, Exhibit 4 (Lockdown History Form RW 0502 dated May 15, 1972). *Rec. doc. no.* 75.

pleading guilty to aggravated battery on a prison deputy while in parish prison, Wilkerson was transferred to LSP some time around May 1972. Two weeks after his arrival, he appeared before the Classification Board at LSP, which placed him in extended lockdown, which was then known as Controlled Cell Reserve ("CCR"). *See Wilkerson v. Maggio*, 703 F.2d 909, 910 (5th Cir. 1983). By March of 1973 the Board wrote that the reason for his initial confinement was that he had stabbed a deputy while in Orleans Parish Prison, and the reason for his continued confinement was that Wilkerson himself requested that he remain in CCR while he worked on a writ. In June of 1973, he was accused of killing a fellow inmate, and he remained in extended lockdown the entire time that he was in LSP.

According to the record, the following events and dates are relevant to defendants' motion:

| ACTION | WALLACE | WOODFOX | WILKERSON |
|---|---|---|---|
| Initial imprisonment at LSP | 06/27/69 | 08/05/71 | 10/08/71 |
| Prison guard or inmate[7] killed | 04/17/72 | 04/17/72 | 06/10/73 |
| Convicted of killing guard or inmate | 01/10/74 | 03/07/73 | 02/20/75 |
| Placed in extended lockdown | 04/18/72 | 04/18/72 | 05/15/72 |

Thus, Herman Wallace has remained in extended lockdown for nearly 33 years, and Albert Woodfox for almost 29 years. Robert King Wilkerson remained in extended lockdown for approximately 28 years, *i.e.*, until his conviction was overturned in early 2001 and he was fully released from state custody.

---

[7] Wilkerson was originally charged with, and convicted of, murdering a fellow inmate, August Kelly. *See* Affidavit of Deputy Warden Darrel Vannoy, attached as an unmarked exhibit to defendants' motion for summary judgment. Wilkerson was released from LSP on February 8, 2001, after his original conviction for first degree murder was amended to a lesser charge and his sentenced was reduced. *Id.*

## LSP forms used for lockdown reviews

The principal summary judgment evidence submitted by both sides to this dispute are copies of LSP forms prepared by the Lockdown Review Board.[8] The Board is the prison administrative body which allegedly met at 90-day intervals to interview each plaintiff and to review his continued confinement in extended lockdown. There is no evidence in the record documenting any meeting or review in which a decision was made to *place* any of the three plaintiffs in extended lockdown. The evidence instead consists of LSP forms filled out by various members of Lockdown Review Boards over the subsequent years in which they checked off certain items to show the basis of the original placement and the reason(s) for continued confinement.

For a brief period in the 1970s, the Board recorded its findings on an LSP form entitled "Lockdown History" sheet. This particular form was approximately a half page in length and had sections with spaces for handwritten narratives on the *Reason For Lockdown*, the date of the interview, the *Action Taken*, and the *Reasons For Action Taken*. The Board used this form through the end of 1974.

Beginning in January 1975, the Board began to use a more detailed, full page form

---

[8] Since the Fifth Circuit's decision in *Wilkerson v. Stalder, supra*, was based upon a Rule 12(b)(6) motion, it did not have before it summary judgment evidence such as the lockdown review forms. The parties also submitted affidavits; however, the documents submitted were sufficient for the resolution of the motion.

The defendants attached the affidavit of Deputy Warden Darrel Vannoy, who stated that each of the inmates was placed in and remained in extended lockdown as the result of his initial classification; however, he makes these assertions based on his review of the documents submitted inasmuch as he has no personal knowledge of events transpiring before he was employed at LSP. Plaintiffs also submitted extensive background information largely in the form of excerpts from contemporaneous newspaper articles and an unpublished book, which are the subject of a motion to strike by defendants. That information likewise was not necessary for resolution of the motion.

called a "Lockdown Review Summary" that is more in the nature of a check-off form.[9]  The form is clearly divided into two sections.  The upper section, which is captioned *Reasons for Original Lockdown,* has three subsections.  The first subsection is called *Disciplinary Board Action,* which is further broken down into the sub-categories of *Rule Violation Report, Incident Report,* and *Investigation.*  The two other subsections, *Own Request* and *Initial Classification*, do not include subcategories.  As is evident on its face, this section of the form focuses on a single point in time, *i.e.*, the date on which the initial decision was made for an inmate's original placement in extended lockdown and the reason for that decision.    The reason for the initial placement fell under one of three categorizations: *Disciplinary Board Action, Own Request,* or *Initial Classification.*

The bottom section of the "Lockdown Review Summary" form, which pertains to the 90-day reviews that followed thereafter, is entitled *Action of Lockdown Review Board.*  The first subsection, simply entitled *Release*, is very brief, providing only a space in which to specify the prisoner's destination if released from extended lockdown, and the reason for his release.  The second subsection, entitled *Not Released – Reasons*, then offers nine options for the Board to select from: *Nature of Commitment Offense, Inmate's Request, Pending Felony Charges, Nature of Original Reason for Lockdown, Inmate's Protection, Physically Dangerous to Self or Others, Continuing Investigation, Escape Risk,* and *New Rule Infractions Since Last Review.*  A review of the Lockdown Review Summary forms attached to the parties' briefs shows that the Board sometimes checked off more than one

_____

[9] Defendants attached copies of both the Lockdown History forms and the subsequently used Lockdown Review Summary forms as Exhibit 4 (forms applicable to Wilkerson), Exhibit 5 (forms applicable to Woodfox), and Exhibit 6 (forms applicable to Wallace) to their original Memorandum in Support of Motion for Summary Judgment.  *Rec. doc. no.* 75.

-6-

of those nine options as the basis for keeping plaintiffs in extended lockdown, but usually chose *Nature of Original Reason for Lockdown* as the basis for their continuing confinement.

## Plaintiffs Wallace and Woodfox

Although the record shows that both Wallace and Woodfox were first placed in extended lockdown on April 18, 1972 (*i.e.*, after the prison riot and death of a guard), the earliest Lockdown History forms provided by either party are ones dated July 6, 1972, almost three months later.[10]  The July 6, 1972, form (HW 0406[11]) for plaintiff Herman Wallace states that he was placed in extended lockdown for the following reason: "Charged with the murder of Mr. Miller."  Similarly, the July 6, 1972, form (AW 0332) applicable to Albert Woodfox states that he was placed in extended lockdown for a similar reason: "Inmate locked up and charged with the murder of Mr. Miller."

With the advent of new, more detailed forms in 1975, the Board routinely checked off the *Reasons for Original Lockdown* for both Wallace and Woodfox as falling under *Disciplinary Board Action*.  Although the forms are not completely consistent, throughout almost thirty years of  forms the Board repeatedly described the reason for plaintiffs' original placement in lockdown as falling under either *Investigation* or *Rule Violation*, both

---

[10] Defendants included a chart in their original reply brief (*rec. doc. no.* 83, pp. 5-8) that summarized the reasons they contend plaintiffs were placed in extended lockdown; however, defendants only attached to their original brief Lockdown History forms and Lockdown Review Summary forms for the period of July 6, 1972, through October 3, 1979, *i.e.*, only for the 1970s, whereas the plaintiffs attached to their brief approximately 32 years' worth (through April 4, 2004) of the same forms (except for one form submitted by defendants with a missing date).

[11] Copies of the Lockdown History forms and Lockdown Review Summary forms are attached as exhibits to defendants' motion.  Unless otherwise indicated, the parenthetical references to those forms are the Bates stamp numbers affixed to those documents.

of which are subcategories of *Disciplinary Board Action* on the form. The Board did not choose either of the other available categories of *Initial Classification* or *Own Request* as a reason for original lockdown during decades of filling out the forms. Indeed, during the more than thirty years of forms submitted, only a few forms beginning in the late 1990's inexplicably show the checkmark by *Initial Classification* as the reason for original placement in lockdown, but the forms thereafter again show some form of disciplinary action as the cited reason for the initial placement in lockdown. As was noted earlier, neither Wallace nor Woodfox was classified as a maximum custody inmate prior to his transfer to extended lockdown following the prison riot and murder of a guard.

### Plaintiff Wilkerson

Plaintiff Wilkerson, on the other hand, had already been in extended lockdown since May 15, 1972, *i.e.,* for a little over a year, prior to the alleged killing of a fellow inmate on June 10, 1973. The evidence provided by the parties shows that for Wilkerson there were only two Lockdown History forms for 90-day reviews that occurred prior to that incident. The first of those two forms (RW 0502), which is dated December 13, 1972, states that Wilkerson was already in lockdown because he had stabbed a deputy in parish prison. The second (RW 0500) of the two, which is dated March 27, 1973, also states that Wilkerson was placed in lockdown because of that stabbing incident, but further notes that Wilkerson remained in lockdown at his own request because he had a writ pending. Beginning on October 11, 1973 (RW 0470), again on January 29, 1974(RW 0456), and on June 14, 1974(RW 0452), the remaining "Lockdown History" forms in the record state "detained for murder" as the reason Wilkerson is in lockdown. Presumably, the murder

-8-

referred to was that of his fellow inmate, for which he was ultimately convicted. That conviction, as stated earlier, was later overturned, and Wilkerson was released from extended lockdown when he was released from LSP in 2001.

When the forms were amended in 1975 to show more detail, the Board consistently stated that the reason for Wilkerson's initial placement in lockdown fell under *Disciplinary Board Action* in that he was under *Investigation*. Some twenty-two years after Wilkerson was first placed in extended lockdown, the Board in 1994 began checking off for the first time *Initial Classification* as the reason for his being placed in lockdown originally, yet stated in the same document that the reason he was not being released was because of "murder of inmate at LSP & violence against security" (presumably the stabbing of the deputy in Orleans Parish before arriving at LSP) (RW 0120, dated October 19, 1994). By 1999, the reasons cited on the forms for Wilkerson's original placement in lockdown had reverted once again to the disciplinary side to *Incident Report* and *Disciplinary Board action* (RW 0076, dated July 15, 1999).

#### Law

### Summary judgment standard

Summary judgment is appropriate when there are no genuine issues as to any material facts and the moving party is entitled to a judgment as a matter of law. Federal Rule of Civil Procedure 56.

When a motion for summary judgment is properly made and supported under Rule 56(c), the opposing party may not rest on the mere allegations of their pleadings, but rather must come forward with "specific facts" showing that there is a genuine issue for trial.

*Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); Fed.R.Civ.Pro. 56(e). The non-movant's evidence is to be believed for purposes of the motion and all justifiable inferences are to be drawn in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). However, summary judgment must be entered against the plaintiff herein, on a properly supported defense motion, if he fails to make an evidentiary showing in its opposition to the motion sufficient to establish the existence of an element essential to its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 2552-53, 91 L.Ed.2d 265 (1986).

The mere argued existence of a factual dispute does not defeat an otherwise properly supported motion for summary judgment. *American Machinery Movers, Inc. v. Machinery Movers of New Orleans, LLC*, 136 F.Supp.2d 599, 601 (E. D. La. 2001). If evidence is merely colorable, or is not significantly probative, summary judgment is appropriate. *Id.*, citing *Anderson v. Liberty Lobby, Inc.*, *supra*, 477 U.S. at 249-250. "Conclusory allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation are not adequate substitutes for specific facts showing that there is a genuine issue of fact." *Talamantez v. Corrections Corp. of America*, 202 F.Supp.2d 546, 552 (N.D. Tex. 2002), citing *Douglass v. United Servs. Auto. Ass'n.*, 79 F.3d 1415, 1428 (5th Cir. 1996) (en banc); *SEC v. Recile*, 10 F.3d 1093, 1097 (5th Cir. 1993). The opposing party must come forward with competent evidence, such as affidavits or depositions, to buttress his claims. Importantly, hearsay evidence and unsworn documents do not qualify as competent opposing evidence. *American Machinery Movers,*

-10-

*Inc., supra,* 136 F.Supp.2d at 602, citing *Martin v. John W. Stone Oil Distrib., Inc.,* 819 F.2d 547, 549 (5th Cir. 1987).

## Liberty interests of prisoners in extended lockdown

To articulate a claim under 42 U.S.C. § 1983 that alleges the violation of procedural due process, an inmate must first establish that he enjoyed a protectable liberty interest. *Kentucky Department of Corrections v. Thompson,* 490 U.S. 454, 460, 109 S.Ct. 1904, 1908, 104 L.Ed.2d 506 (1989).

In *Luken v. Scott,* 71 F.3d 192, 193 (5th Cir. 1995), the Fifth Circuit noted that the Supreme Court's decision in *Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), narrowed the circumstances in which inmates had viable liberty interests entitled to due process protection. Under *Sandin,* the Fifth Circuit observed, a prisoner's liberty interest is "generally limited to freedom from restraint, which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." 71 F.3d at 193, *citing Sandin,* 515 U.S. at 484. The Fifth Circuit further stated that *"Sandin* establishes that administrative segregation, without more, does not constitute a deprivation of a constitutionally cognizable liberty interest." *Id.*

In *Orellana v. Kyle,* 65 F.3d 29, 32 (5th Cir. 1995), the Fifth Circuit additionally noted that the Supreme Court's holding in *Sandin* was primarily directed at "disciplinary" segregation. In other cases, the Fifth Circuit has stressed that "absent extraordinary circumstances, a prisoner does not have a constitutionally protected liberty interest in his

-11-

classification or in remaining free from administrative segregation." *See, e.g., Martinez v.*

*Johnson,* 2004 WL 1413862 (5th Cir. June 23, 2004).

With respect to the existence of a viable liberty interest, the proper focus for

determining whether or not a liberty interest has been established was further elaborated

upon by the Fifth Circuit in the instant matter when it affirmed the denial of defendants'

earlier Rule 12(b)(6) motion to dismiss:

> In resolving the nature of the liberty interest and the process
> that is due for confinement in extended lockdown, it is crucial
> to know whether, based on their crimes of conviction, the
> inmates' confinement is the result of an initial classification by
> prison officials as opposed to confinement for violations of less
> serious prison disciplinary rules. *Generally,* the courts are not
> concerned with a prisoner's initial classification level based on
> his criminal history *before his incarceration.* (Emphasis
> added.) This circuit has continued to hold post-*Sandin* that an
> inmate has no protectable liberty interest in his classification.

*Wilkerson v. Stalder,* 329 F.3d at 435-36.[12] *Accord Brown v. Cockrell,* 2002 WL 638584,

\*4 (N.D. Tex. 2002) ("Moreover, as a prisoner, Petitioner does not have a 'protectable

property or liberty interest in custodial classifications.'"), *citing Harper v. Showers,* 174 F.3d

716, 719 (5th Cir. 1999).

Thus, the Fifth Circuit seems to be saying that as a general rule, the *Sandin* test is

triggered when an inmate's confinement in extended lockdown is for reasons other than

---

[12] The Fifth Circuit has long held that classification of prisoners is a matter better left to the discretion of prison officials. See *McCord v. Maggio,* 910 F.2d 1248, 1250 (5th Cir. 1990), *citing Wilkerson v. Maggio,* 703 F.2d 909 (5th Cir. 1983). "Classification of inmates in Louisiana is the duty of the Louisiana Department of Corrections and an inmate has no right to a particular classification." *Id.* at 1251. In *McCord* and *Wilkerson,* the Fifth Circuit emphasized that prison officials must be afforded broad discretion, free from judicial intervention, in classifying prisoners in terms of their custodial status. *Id.* at 1250. The officials should also be accorded the widest possible deference in the application of prison policies and procedures designed to maintain security and preserve internal order. *Id.* at 1251, *citing Bell v. Wolfish,* 441 U.S. 520, 547, 99 S.Ct. 1861, 1878, 60 L.Ed.2d 447 (1979).

his initial "custodial classification," *e.g.*, for incidences of what the Fifth Circuit referred to

in *Wilkerson v. Stalder* as violations of prison disciplinary rules. *Id.* at 436.[13]

## Discussion

In their present motion for summary judgment, defendants argue that custodial

classification, rather than violations of prison disciplinary rules, is the sole reason that

plaintiffs were both originally placed in extended lockdown and kept there ever since (or

---

[13] Other Circuits do not worry so much about whether the prison officials characterize the deprivation as "administrative" or "disciplinary." *See, e.g., Jones v. Baker,* 155 F.3d 810, 816 (6th Cir. 1998) ("'But it makes little sense to hinge an individual's right to due process simply on the label prison officials choose to attach as the basis for the deprivation . . . . Similarly, a due process analysis that would allow correctional personnel to avoid the creation of 'liberty interests' by simply assigning misbehaving inmates to a segregated confinement unit for 'administrative' (as opposed to 'disciplinary') reasons seems to encourage the same 'standardless discretion' which the Supreme Court found offensive in Sandin. . . . . Whatever [an inmate's] due process rights may be, they should not be extinguishable simply by virtue of the fact that the confinement was labeled by prison officials as 'administrative.'") (Gilman, concurring, *citing McClary v. Kelly,* 4 F.Supp.2d 195, 199 (W.D. N.Y. 1998); *Tellier v. Scott,* 49 F.Supp.2d 607, 611-12 (S.D. N.Y. 1998) ("Nor has the Second Circuit Court of Appeals read *Sandin* to eliminate all due process claims based upon administrative segregation. . . . [T]he Second Circuit has repeatedly refused to rule as a matter of law that administrative segregation implicates no constitutionally protected liberty interest. This point was recently confirmed in *Brooks*, where the court emphasized that it had 'never held' that prisoners 'have no liberty interest in avoiding long-term administrative confinement.'" ); *Koch v. Lewis,* 216 F.Supp.2d 994, 1002 (D. Az. 2001) ("We hold that Koch's five and one-half years of confinement under the extreme conditions of SMU II, with no end in sight, gives rise to a protected liberty interest under *Sandin.*") The *Koch* Court emphasized that "Life in SMU II is grim." Koch had to remain in his cell 24 hours per day, except for one hour every other day to both exercise and shower, with only 8 minutes allowed for the latter. The prison placed Koch in SMU II solely because he was validated as a member of a prison gang called the Aryan Brotherhood. Under the prison's rules, Koch could never get out of this form of extended lockdown unless he renounced his membership in the Aryan Brotherhood and informed on his fellow gang members. "Therefore, unless he debriefs (*i.e.,* named names), Koch will remain in SMU II until he dies." *Id.* at 997-98. The Court found that Koch did have a liberty interest in his limitless segregated confinement in SMU II.

*See also, Shoats v. Horn*, 213 F.3d 140 (3rd Cir. 2000), a Third Circuit case that involved an inmate who had participated in an attack on a police guardhouse while a member of a black revolutionary group. He was convicted of first degree murder and sentenced to life imprisonment. Seven years later, he and several other inmates took over a cell block as part of an escape attempt. While at large, Shoats kidnapped a prison guard and his family, then was recaptured, escaped again, and was again recaptured. He was then placed and kept in administrative custody because he was considered a remorseless sociopath and "a significant danger to institutional safety and security." *Id.* at 141-43. The opinion indicates that violations of prison disciplinary rules were not the reason for Shoats' permanent placement in administrative custody, where he had been for over eight years by the time his case reached the Third Circuit. The Court, which described his confinement as "an extraordinarily long period in administrative custody," held that Shoats did have a protected liberty interest that had been "adversely affected by his indefinite segregation in administrative custody." *Id.* at 144.

-13-

in the case of plaintiff Wilkerson, until he was released from prison).  Thus, defendants contend, the *Sandin* test is never triggered as a matter of law, and plaintiffs therefore do not have a protectable liberty interest.

## **Plaintiffs' Liberty Interests**

The initial task for this Court thus is to determine whether the *Sandin* test was in fact triggered and, if so, whether plaintiffs' confinement in extended lockdown at LSP has constituted an atypical and significant hardship in relation to the ordinary incidents of prison life.

Both plaintiffs and defendants mostly agree about when and why plaintiffs were placed in extended lockdown.  Their disagreement is over how to characterize or label that placement.  Is it called "initial classification," or is it called "disciplinary action"?

Defendants' argument that a liberty interest has not attached is based in large part upon the Fifth Circuit's language in *Wilkerson v. Stalder, supra.*  However, the Fifth Circuit clearly stated in that opinion that the general principles it cited applied to cases involving a prisoner's initial classification based on his criminal history "*before* his incarceration." 329 F.3d at 435-36.  (Emphasis added.)  At the time the Fifth Circuit decided *Wilkerson v. Stalder*, it was dealing solely with a Rule 12(b)(6) motion that was decided on the pleadings.  The Court wrote: "The prison officials' 12(b)(6) motion was, of course, presented to the district court without contextual facts concerning the reasons the inmates were *initially* confined to extended lockdown or why they *remained* confined in extended lockdown for *such an inordinate period of time.*"  *Wilkerson v. Stalder, supra*, 329 F.3d at 435.  (Emphasis added.)  The Fifth Circuit therefore did not have before it the voluminous

-14-

lockdown review forms and other evidence now before this Court on remand.

The Fifth Circuit also did not have before it the contemporaneous characterization by LSP itself of the reason plaintiffs were placed in extended lockdown. Both sides cite the then alleged crimes committed by the plaintiffs as the precipitating events for their being placed in lockdown, but while defendants place the label of "initial classification" on that resulting placement, plaintiffs call it "discipline" or "punishment." If a label or characterization of the action taken is important, which it appears to be, then the prison's own characterization of its actions at a time and place when there was no advantage to labeling its actions one thing or another would seem to be the most probative evidence available. An examination of the voluminous records of the Lockdown Review Board clearly shows that the prison itself through the Board repeatedly characterized the nature of all three of the plaintiffs' confinement in extended lockdown as arising out of *Disciplinary Board Action* and not out of *Initial Classification*. Year after year the Board listed the reason for the original placements in lockdown as falling under the *Disciplinary Board Action*. So if labels are important in this analysis, LSP clearly labeled the killing of a guard and an inmate (as well as stabbing a deputy) as calling for disciplinary action and falling under the characterization of *Disciplinary Board Action*.

Moreover, the evidence shows that plaintiffs were placed in extended lockdown (or kept there, in the case of plaintiff Wilkerson[14]) based upon their criminal history *after* their

---

[14] The record indicates that Wilkerson was initially placed in extended lockdown based on crimes he committed before he was incarcerated at LSP, had subsequently become eligible for a transfer to the general population, but had requested to remain in extended lockdown for an unspecified amount of time while working on a writ application. However, his voluntary stay in extended lockdown subsequently became an involuntary and indefinite stay when he was then charged with a post-incarceration crime, *i.e.*, the killing of fellow inmate August Kelly. At that point, an analysis of Wilkerson's liberty interest closely parallels that applicable to Wallace and Woodfox.

-15-

incarceration rather than before. Thus, this case involves at best a "re-classification" based upon crimes that took place in prison rather than an "initial classification" based upon a crime that took place *before* plaintiffs were incarcerated at LSP. Again, if labels rule, the Court is faced with a "hybrid" situation since the killing of a prison guard and inmate while incarcerated necessarily is also a violation of prison disciplinary rules. Whether labeled "disciplinary" or "hybrid," however, the defendants have not met their burden of persuasion with regard to showing that the plaintiffs were placed in extended lockdown as the result of their initial classifications. The plaintiffs clearly have raised issues of material fact with regard to the defendants' contention that the plaintiffs' original placement in extended lockdown was due solely to their initial classification.

Moreover, Fifth Circuit law is, despite its scarcity and seeming emphasis on the label placed on the original reason for confinement, not entirely dismissive of the possibility of a liberty interest arising from administrative segregation as opposed to disciplinary segregation. For example, in *Martinez v. Johnson*, 2004 WL 1413862, *1 (5th Cir. June 23, 2004), the Fifth Circuit stated that a prisoner does not have a constitutionally protected liberty interest in remaining free from administrative segregation, "[a]bsent extraordinary circumstances." In *Gabriel v. Fleming*, 2004 WL 1836001, *2 (5th Cir. August 17, 2004), the Fifth Circuit noted that inmates have no liberty interests in their custodial classification,"[a]bsent an abuse of discretion." In *Pichardo v. Kinker, supra*, 73 F.3d at 613, the Fifth Circuit noted that "administrative segregation, *without more*, simply does not constitute deprivation of a protected liberty interest." (Emphasis added.) Also, as was noted earlier, the Fifth Circuit attached the important caveat in *Wilkerson v. Stalder, supra*,

-16-

that it is only "generally" that courts do not recognize a liberty interest based on an inmate's custodial classification. 329 F.3d at 435.

In this case, the issues of "extraordinary circumstances" and "atypical and significant hardship when compared to the ordinary incidents of prison life" tend to blur. As the Fifth Circuit noted in this case, it is not just the moment of placement that raises questions, there also is the issue of the inmate's *continuing* confinement in extended lockdown. Just where in the analysis this issue falls is unclear in the sparse jurisprudence in this circuit.[15] The Fifth Circuit did not elaborate or discuss the issue further, other than to comment on plaintiffs' confinement as being "*such an inordinate amount of time*"[16] (emphasis added); but in *Kelly v. Brewer*, 525 F.2d 394, 400 (8th Cir. 1975), the court addressed the problem of unending confinement. *Kelly* involved the killing of a prison guard that took place while the inmate was *already* in administrative segregation:

> It goes without saying that a prison warden may not constitutionally put an inmate in administrative segregation, involving solitary confinement or other rigorous conditions of imprisonment, simply because he dislikes the inmate or desires to punish him for past misconduct. Morever, it should be emphasized that the reasons for the segregation *must not only be valid at the outset but must continue to subsist during the period of the segregation.* (Emphasis added.) Conditions in prisons change as they do everywhere else, and a reason for administrative segregation of an inmate that is valid today

---

[15] If, as defendants contend, the label attached to the original reason for confinement trumps all other facts, one could be faced with the potential and anomalous situation of finding no liberty interest despite the existence of atypical and significant hardship when compared to the ordinary incidents of prison life.

[16] *Wilkerson, supra,* 329 F.3d at 435. Since plaintiffs in the present matter allege that the approximately 120 lockdown reviews afforded them by LSP staff were sham proceedings, it is worth noting that the plaintiff in *Kelly* also received monthly evaluations regarding his confinement in administrative segregation. However, the appeals court affirmed the district court's holding "that the monthly evaluations were mere shams and were of no practical value to the inmates involved." Notably, Kelly was only in administrative segregation for approximately 3 years, versus 28 to 33 years for the present plaintiffs.

> may not necessarily be valid six months or a year in the future.
>
> Since there must be a valid and subsisting reason for holding an inmate in segregation, we agree with the district court that where an inmate is held in segregation *for a prolonged or indefinite period* of time due process requires that his situation be *reviewed periodically in a meaningful way* and by relevant standards to determine whether he should be retained in segregation or returned to population. . . . . (Emphasis added.)

*Id.*

Certainly the issue of being placed indefinitely in extended lockdown at a time during which there was no such "classification" even available in the LSP regulations[17] raises at the least the issue of whether such lengthy confinement presented atypical and significant hardship when compared to the ordinary incidents of prison life. In a very recent unpublished[18] decision, the Fifth Circuit suggested that a 10-year confinement in extended lockdown gives rise to a liberty interest:

> Colgrove argues that prison officials have violated his rights under both the Due Process Clause and the Cruel and Unusual Punishment Clause by keeping him confined in administrative segregation for more than a decade. It is debatable whether the district court erred in concluding that such confinement did not present an 'atypical and significant hardship . . . in relation to the ordinary incidents of prison life,' so as to constitute a liberty interest in the Due Process Clause.

*Colgrove v. Williams*, 2004 WL 1567117, *2 (5th Cir. June 29, 2004). Of particular interest, in *Colgrove* the Fifth Circuit cited with approval both *Wilkerson v. Stalder, supra*, and *Shoats v. Horn, supra*, fn. 13, as support for its observation that the trial court in that case

---

[17] *See, e.g.,* Exhibit 1 attached to defendants' Reply Memorandum In Support of Motion for Partial Summary Judgment (*rec. doc. no.* 83), Penitentiary Directive No. 13, revised March 8, 1973.

[18] Rule 47.5.4 of the Fifth Circuit's Rules of Court states that unpublished opinions issued after January 1, 1996, are not precedent but "may, however, be persuasive."

may have erred[19] in failing to find that a 10-year confinement in extended lockdown presented an atypical and significant hardship that gave rise to a liberty interest under *Sandin. Id.* In *Shoats*, which was decided as recently as the year 2000, the Third Circuit described Shoats' eight-year confinement in such custody as "an extraordinary long period." *Shoats, supra,* 213 F.3d at 142. A high ranking official in the state's Department of Corrections ("DOC") admitted that he had "never witnessed one example of such permanent solitary confinement in his 22 years with the DOC." *Id.* at 144. Notably, that official admitted that "he would be concerned about the psychological damage to an inmate after *only 90 days* of such confinement and would generally recommend transfer to the general population after 90 days as a consequence." *Id.* (Emphasis supplied.)

Of further note, the conditions of Shoats' confinement in administrative segregation were very similar to those of the plaintiffs in this case. He was confined to his cell 23 hours a day for five days a week, and 24 hours a day on the other two days each week. He ate his meals alone and was prohibited from participating in any educational, vocational, or other organizational activities. Based on that record, the Third Circuit concluded that "we have no difficulty concluding that eight years in administrative custody, *with no prospect of immediate release in the future,* is 'atypical' in relation to the ordinary incidents of prison life." (Emphasis added.) *Id. Accord Koch v. Lewis, supra,* fn. 6, 216 F.Supp.2d at 1001-1002: "A short stay under the severe conditions of SMU II may not raise due process concerns. But here, Koch, has been confined to SMU II for five and one-half years. This clearly is long enough to trigger a liberty interest. . . . We hold that Koch's five and one-half

---

[19] The language in *Colgrove* indicates that the Fifth Circuit did not make a conclusive holding on this issue because the plaintiff submitted only conclusory allegations rather than properly raising the issue. *Id.*

years of confinement under the extreme conditions of SMU II, *with no end in sight*, gives

rise to a protected liberty interest under *Sandin*."[20]   (Emphasis added.)

At least one Court within the Fifth Circuit has gone even further than the Third

Circuit in *Shoats* and the Fifth Circuit in *Colgrove*. In *Beene v. Hammer*, 2003 WL

21673456, *4 (N.D. Tex. July 15, 2003), the Court held that even a *six-month* stay in

lockdown could give rise to a liberty interest: "Whether a six-month period is atypical or

significant depends on the particular facts of plaintiff's incarceration." [21]

This Court additionally finds particularly salient the manner in which the Court in

*Koch, supra*, framed the issue at hand:

> This brings us to the heart of the liberty inquiry – whether
> Koch's *indefinite placement* in SMU II constitutes an 'atypical
> and significant hardship . . . in relation to the ordinary
> incidents of prison life. The *Sandin* test requires a case-by-
> case examination of both the conditions of the inmate's
> confinement *and the duration* of the deprivation at issue.
> *Sandin*, 515 U.S. at 486, 115 S.Ct. 2293; *Keenan v. Hall*, 83
> F.3d 1083, 1089 (9th Cir. 1996), *amended by* 135 F.3d 1318
> (9th Cir. 1998); *see Sealey v. Giltner*, 197 F.3d 578, 586 (2d
> Cir. 1999)." (Emphasis added.)

216 F.Supp.2d at 1000. In the present matter, the Review Board's rote repetition of the

reason for the inmates' continued confinement as being the same reason they were initially

placed in lockdown effectively eliminates any possibility of release, regardless of their

current situation and behavior while in lockdown. The original reason for placement in

---

[20] Notably, the *Koch* Court emphasized that "Life in SMU II is grim."

[21] Interestingly, the Court in *Beene*, citing *Wilkerson v. Stalder*, further stated as follows: "This case
is unlike *Wilkerson* in that plaintiff was not placed in 'extended lockdown for approximately thirty years.' *See*
329 F.3d 433. The Fifth Circuit found that such a lengthy lock-down period is atypical and significant *as a
matter of law*." (Emphasis added.)

lockdown can never change; thus plaintiffs' current status of "indefinite placement" in lockdown is static, with no hope of release other than by death or release from the prison entirely, as was the case for plaintiff Wilkerson.

The emphasis noted in *Koch* on the indefinite duration of an inmate's stay in extended lockdown was particularly well articulated by Judge Gilman in his concurring opinion in a Sixth Circuit case, *Jones v. Baker, supra,* fn. 6:

> [T]he core issue in this case centers on the degree and *duration* of the hardships imposed upon him by the administrative segregation. *See Arce v. Walker*, 139 F.3d 329, 334-35 (2d Cir. 1998) (*Sandin* 'established an analysis under which the degree and *duration* of an inmate's restraint are the key considerations to determine the existence of a state-created liberty interest.') . . . In determining whether particular restraints impose atypical and significant hardships, the *duration* of the confinement is a "critical factor in the *Sandin* analysis."

155 F.3d at 814. (Emphasis added.) In *Jones*, Judge Gilman observed that confinement in administrative lockdown for a period of over two and a half years "is clearly a rare occurrence,"[22] and therefore sufficient to give rise to a liberty interest. The present matter, of course, involves confinements of 28 to nearly 33 years, durations so far beyond the pale that this Court has not found anything even remotely comparable in the annals of American jurisprudence.

The foregoing cases, taken together with the Supreme Court's decision in *Sandin*, establish that a disciplinary or administrative segregation will give rise to a liberty interest only in the most exceptional of cases. The decisions further establish that a liberty interest

---

[22] Perhaps explaining why such confinements are "rare occurrences," the Court in *Morris v. Travisono*, 499 F.Supp. 149, 158 (D. R.I. 1980), referred to confinement of an inmate in segregated confinement for a period of seven years without any systematic plan for rehabilitation as "the epitome of warehousing."

will be created where the segregation imposes, "in either duration or degree of restriction," an "atypical and significant hardship . . . in relation to the ordinary incidents of prison life," or as the Fifth Circuit phrased it in *Pichardo, supra*, in "extraordinary circumstances."

Applying the foregoing to the present matter, this Court finds that plaintiffs' indefinite stay in extended lockdown (of a 28 to 33 years duration thus far, with no apparent end in sight), and bas ed upon crimes that occurred *during* incarceration, is just such an extraordinary[23] circumstance. The Court therefore finds that *Sandin* was triggered during plaintiffs' extraordinarily long stay in extended lockdown at LSP. [24]

## Plaintiffs' Due Process

Defendants make the alternative argument that even if plaintiffs have a liberty interest, they received adequate due process as a result of their appearances (or opportunities to appear) before the Lockdown Review Board every 90 days. Plaintiffs counter that the reviews conducted by that Board were nothing more than sham proceedings in which Board members ignored the merits of plaintiffs' cases and instead devoted their attention to immaterial matters such as hunting and fishing.

The primary evidence submitted by defendants to support their argument that

---

[23] *See Morris v. Travisono*, 549 F.Supp. 291 (D. R.I. 1982), discussed *infra* herein. The Court in that case described an eight and one-half year confinement in administrative segregation as "barbarous."

[24]The Court is not called upon to decide the precise point in time at which *Sandin* was first triggered. The record shows that plaintiffs filed their lawsuit in state court on or about March 30, 2000 (defendants removed the case to this Court on April 27, 2000). *Rec. doc. no.* 1. In *Jacobsen v. Osborne*, 133 F.3d 315, 319 (5th Cir. 1998), the Fifth Circuit held that a one year statute of limitations applies to Section 1983 actions against Louisiana state officials. *See also, Elzy v. Roberson*, 868 F.2d 793, 794 (5th Cir. 1989). Furthermore, plaintiffs stated as follows in their brief filed in opposition to a Rule 12(b)(6) motion to dismiss: "Defendants assert prescription as to only those claims that arose prior to March 30, 1999. Plaintiffs bring no claims that arose prior to that date." *Rec. doc. no. 30*, p.2. Notably, by the time that date arrived, plaintiff Woodfox had spent nearly 24 years in extended lockdown, and plaintiffs Wallace and Wilkerson have spent nearly 27 years in extended lockdown.

-22-

plaintiffs received adequate due process consists of approximately 30 years worth of the "Lockdown Review Summary" forms described earlier. The Court has thoroughly reviewed the forms but does not find that they constitute either competent or significantly probative evidence sufficient to overcome the material facts placed into dispute as a result of the plaintiffs' extraordinarily long duration in extended lockdown coupled with plaintiffs' affidavits describing the proceedings.  Indeed, the forms themselves rarely give information or a reason beyond referring back to the crimes of 30 years ago, and are evidence more of a lack of contemporaneous review than of a current review.

A similar conclusion was reached by the Court in *Morris v. Travisono*, 549 F.Supp. 291 (D. R.I. 1982).  Like two of the plaintiffs in the present matter, the plaintiff in *Morris* (John Carillo) was placed in administrative segregation after his conviction for murdering one of the prison guards.  He was similarly confined to his cell 23 to 24 hours per day, was denied educational and work opportunities, and was given 90-day reviews during his eight and one-half years in such confinement.  The defendants argued that Carillo's continuing confinement in lockdown was necessary because his criminal record and his disciplinary record (while in lockdown) established that he was still dangerous.  The Court rejected those arguments, noting that Carillo's record was no worse than many others in the prison's general population, and his disciplinary record did not show any violations of a violent nature during the most recent three years.  Although Carillo was given 90-day reviews, the Court determined that they were not meaningful reviews designed to evaluate whether he could adjust to the general prison population.  The Court therefore concluded that the defendants' argument, based on the 90-day reviews, that Carillo was too dangerous to be returned to the general population was nothing more than a "mere pretext

-23-

for unduly punishing him for his 1973 murder conviction" for killing a prison guard. 549 F.Supp. at 296. The Court went on to describe Carillo's confinement in lockdown for eight and one half years as "barbarous."[25] *Id.* at 297.

This Court further notes the thin veneer of the evidence offered by defendants, particularly in comparison to that presented in the *Shoats, supra*, case. Although the Third Circuit held in that case that Shoats did have a liberty interest as a result of his eight-year confinement in administrative segregation, it ultimately rejected his claim that he had been deprived of due process. The Court noted that Shoats was given a very well documented hearing every thirty days regarding his confinement in administrative segregation. During the hearings, the Program Review Committee (PRC) read aloud and explained to an inmate the rationale for his continuing confinement in administrative custody, the inmate was allowed to respond either orally or in writing, and a committee member drafted a written record of the inmate's response. Moreover, a written summary of the entire hearing was then prepared. The summary included the reasons relied upon by the PRC in reaching its decision, and a copy of the summary was given to the inmate. With respect to Shoats' claims, the Third Circuit emphasized that Shoats did not argue that the PRC "otherwise dealt with his case in a perfunctory fashion." *Shoats, supra,* 213 F.3d at 146.

The plaintiffs in the present matter, on the other hand, have argued that their lockdown reviews were sham proceedings, noting among other things that the forms generated by Board members at the reviews show that the proceedings were a sham. Moreover, unlike the PRC's very detailed and well documented records of the *substance*

---

[25] Although the *Morris* case involved an Eighth Amendment claim, its analysis of a pretext factor is equally apposite to the present matter.

of the hearings afforded Shoats in that case, the record in the present matter shows that the LSP lockdown review boards produced little more than superficial forms that appear to be conclusory and self-serving, and possibly checked off in a rote fashion for 28 to 33 years.  For example, the lockdown review summary forms prepared during the actionable period of March 31, 1999, forward, show that the review boards repeatedly checked off the option stating that plaintiffs were kept in extended lockdown solely due to the *original* reasons they were placed in lockdown, *i.e.*, the two killings that took place nearly 30 years earlier, rather than based on the merits of their conduct in extended lockdown during the long interim since then.  Notably, the forms during that relevant period do not show major disciplinary infractions that by themselves would have justified keeping plaintiffs in extended lockdown.

The record also shows that plaintiffs Wallace and Woodfox have submitted affidavits regarding the manner in which the review sessions were conducted.  *See rec. doc. no.* 104.  According to the Wallace affidavit, there are no policies or criteria provided in advance to inmates in extended lockdown that inform them of what is expected of them in order to be released to the general population.  Nor is a transcript or recording made of the hearings.  According to Wallace, the board reviews the approximately 90 inmates who are confined to lockdown in less than a four hour period, which averages out to about 22 reviews per hour, or less than three minutes per review.  Woodfox similarly states in his affidavit that the Board does not make a meaningful attempt to conduct an actual review of the merits of plaintiffs' continuing confinement in lockdown.  According to Woodfox, the inmates' classification sheets were already signed, or in the process of being signed, by the time plaintiffs were brought from their cellblock to the room where the board met, thus

-25-

demonstrating that the reviews were a preordained conclusion and a sham.

Thus, not only does the unparalleled duration of plaintiffs' stay in extended lockdown give rise to material facts in dispute regarding the legitimacy of the process afforded plaintiffs, but so do the Lockdown Review Summary forms themselves as well as the manner in which the Board conducted the reviews. The Court therefore finds that there are material facts in dispute regarding defendants' alternative argument that plaintiffs have been afforded adequate due process.

## Res Judicata

Defendants cite three previous Fifth Circuit opinions to support their additional argument that plaintiffs' present claims are barred by the doctrine of *res judicata*[26]. Each of those cases involved one or more of the three plaintiffs in the present matter. In the first of those cases, *Wilkerson v. Maggio*, 703 F.2d 909 (5th Cir. 1983), the Fifth Circuit clearly stated in its opinion that the only claim raised on appeal was an Eighth Amendment claim. The present matter, by contrast, involves only a due process claim under the Fourteenth Amendment. Furthermore, the Fifth Circuit issued *Wilkerson v. Maggio* long before the Supreme Court rendered its decision in *Sandin*, which is now the touchstone opinion for deciding due process issues in prisoner cases.

Defendants also cite *Wilkerson v. Stalder, supra*, the Fifth Circuit opinion that remanded this matter to this Court. Defendants' reliance on that case is similarly misplaced. The Fifth Circuit clearly stated in its opinion that the principles of law

---

[26] In *Russell v. SunAmerica Securities, Inc.*, 962 F.2d 1169, 1172 (5th Cir. 1992), the Fifth Circuit held that each of the following elements must be satisfied for *res judicata* to apply: (1) the parties must be identical or in privity; (2) the prior judgment must have been rendered by a court of competent jurisdiction; (3) there must have been a final judgment on the merits; and (4) the same cause of action must have been involved in the prior case as in the present matter.

enunciated therein were of a general nature and only applied to crimes committed by inmates prior to their incarceration. Furthermore, the Fifth Circuit specifically remanded the case to this Court for the precise purpose of determining whether those rules of law were applicable to the particular facts of this case. Thus, there is no merit to defendants' citation to *Wilkerson v. Stalder* as support for its *res judicata* argument.

Lastly, defendants cite the Fifth Circuit's unreported opinion in *Wallace, et al. v. Phelps, et al.*, No. 86-3623 (5th Cir. 1987). A review of that opinion shows that it does nothing more than cite *Wilkerson v. Maggio* as support for its very broad statement that the law generally "does not provide a prisoner with a liberty interest in any particular classification." Notably, the *Wallace* opinion also was issued long before *Sandin* and *Wilkerson v. Stalder*, both of which held that inmates do in fact have liberty interests in their classification in certain circumstances (*e.g.*, when an inmate is placed in lockdown for violations of prison disciplinary rules). The Court further notes that Robert Wilkerson, one of the plaintiffs herein, was not a party to that lawsuit.

The Court therefore does not find any merit in defendants' argument that plaintiffs' present claims are barred by the doctrine of *res judicata*.

## *RECOMMENDATION*

Accordingly, for the reasons assigned, it is the recommendation of the Magistrate Judge that defendants' Rule 56 motion for partial summary judgment (*rec. doc. no.* 73) dismissing plaintiffs' due process claims should be **DENIED**.

Baton Rouge, Louisiana, this 1st day of February, 2005.

Docia L. Dalby

**MAGISTRATE JUDGE DOCIA L. DALBY**