UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| ROBERT KING WILKERSON, ET AL. | ) | CIVIL ACTION NUMBER 00-0304-C-M3 |
| | ) | |
| | ) | |
| Plaintiffs, | ) | CHIEF JUDGE TYSON |
| VS. | ) | |
| | ) | MAGISTRATE JUDGE DALBY |
| RICHARD STALDER, ET AL. | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
DISCOVERY REQUESTS**

**MAY IT PLEASE THE COURT:**

Pursuant to this Court's order dated December 18, 2009 (Doc. No. 348), Plaintiffs submit this memorandum which lists each document that remains in discovery dispute and which Defendants claim is privileged, and which explains Plaintiffs' position in favor of disclosure.

**I. The Applicable Legal Standards**

Plaintiffs do not believe that Defendants have met their burden of explaining how any of the documents described in their privilege log is protected by attorney-client privilege, work product protections, or law enforcement privilege. *See*, *Merrill v. Waffle House Inc.*, 227 F.R.D. 467, 470 (N.D. Tex. February 4, 2005) (holding that the burden to clarify, explain and provide support for objections rests with the party resisting discovery); *see also Doe v. Lexington-Fayette Urban County Gov't*, 407 F.3d 755, 766 (6th Cir. 2005) "[a] party or person seeking to obtain a protective order on the basis of an asserted privilege bears the burden of establishing the applicability of a privilege to the information sought.") (citations and internal quotations omitted.)  In the lengthy course of litigation over Defendants' opposition to producing communications with the Louisiana Attorney General's

office, Defendants have—at least until possibly today—failed to identify the scope of any privilege or protection they assert, or even to attempt to explain how relevant authorities are applicable in the instant case.[1]  (*See* Pls. Rule 37 Mem., Doc. No. 347 at 7.)

Attorney-client privilege guards, "[c]onfidential disclosures by a client to an attorney made in order to obtain legal assistance." *Fisher v. United States*, 425 U.S. 391, 403 (U.S. 1976).  The privilege should be strictly construed, and protects only those communications necessary to obtain informed legal advice.  *Id.*  There is no prohibition against obtaining discovery from adverse counsel regarding relevant, non-privileged information.  *Id.* (Citations and internal quotations omitted.)

Distinct from attorney-client privilege, the work-product doctrine protects communications made in anticipation of litigation.[2]  *In re Kaiser Aluminum & Chem. Co.*, 214 F.3d 586, 593 (5th Cir. 2000) (citing Fed. R. Civ. P. 26(b)(3)).  For example, work-product protections shield the fruits of an attorney's trial preparations from the discovery attempts of an opponent. *See Shields v. Sturm*, Ruger & Co., 864 F.2d 379, 382 (5th Cir. 1989) (citations omitted.) Moreover, "the only matters protected from disclosure by the work product doctrine are 'the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation.'" *Spivey v. Zant*, 683 F.2d 881, 885 (5th Cir. 1982) (citing Fed.R.Civ.P. 26(b)(3) and finding the plaintiff, "must be permitted to inspect the materials in counsel's possession which may bear on the factual issues before the court.").  Finally, the doctrine of work-product protection can be overcome upon a showing that

---

[1] With respect to burden, Plaintiffs also note the tension inherent in rebutting Defendants' assertions of privilege when Plaintiffs have not reviewed documents. *See In re United States Dep't of Homeland Sec.*, 2006 U.S. App. LEXIS 16976 (5th Cir. 2006) (noting that Plaintiffs cannot be required to show more than the relevance of requested documents since, "'the pertinence of [requested] reports […] cannot be demonstrated by one who does not have access to them.'") (citing *Swanner v. United States*, 406 F.2d 716, 718 (5th Cir. Ala. 1969)).

[2] In this Circuit, work-product protections are waived where an attorney requests that a witness disclose the information to a third party. *Fox v. Taylor Diving & Salvage Co.*, 694 F.2d 1349, 1356 (5th Cir.1983). As Plaintiffs have not seen the communications at issue, Plaintiffs are unable to assess whether such waiver may be applicable here.

the party seeking discovery "has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means." Fed. R. Civ. P. 26(b)(3).

The law enforcement privilege which Defendants now raise protects investigative materials related to an on-going criminal investigation. *See, e.g., In re: U.S. Dep't of Homeland Security*, 2006 U.S. App. LEXIS 16976, *10 (5th Cir. May 8, 2006). "To invoke the privilege, however, it must be established that the materials at issue relate to a *bona fide*, ongoing, law enforcement investigation." *Jabara v. Kelley*, 75 F.R.D. 475, 493 n.5 (E.D. Mich. 1977) (emphasis added). Even where a bona-fide, ongoing law enforcement investigation exists, the privilege is not absolute: "the court must balance the government's interest in confidentiality against the litigant's need for the documents." *In re: U.S. Dep't of Homeland Security*, 459 F.3d 565, 570 (5th Cir. 2006) (pointing courts to the balancing test established in *Frankhauser v. Rizzo*, 59 F.R.D. 339, 344 (E.D.Pa. March 13, 1973)[3].

## II.    The Relevant Documents

The Court has requested that the Parties list their position on privilege with respect to each document in Defendants' privilege log. (Doc. No. 348.) Plaintiffs do so here.

1.    Email dated December 12, 2008 from Sha Carter to Bobby Achord, relating to a "criminal investigation regarding individuals identified on Albert Woodfox's call list, and disciplinary violations for three-way and media calls." (Bates No. DPSC 019901 – 019902)

---

[3] The *Frankenhauser* test includes the following ten factors: The oft-cited *Frankenhauser* test consists of weighing the following ten factors: "(1) the extent to which disclosure will thwart governmental processes by discouraging citizens from giving the government information; (2) the impact upon persons who have given information of having their identities disclosed; (3) the degree to which governmental self-evaluation and consequent program improvement will be chilled by disclosure; (4) whether the information sought is factual data or evaluative summary; (5) whether the party seeking discovery is an actual or potential defendant in any criminal proceeding either pending or reasonably likely to follow from the incident in question; (6) whether the police investigation has been completed; (7) whether any interdepartmental disciplinary proceedings have arisen or may arise from the investigation; (8) whether the plaintiff's suit is non-frivolous and brought in good faith; (9) whether the information sought is available through other discovery or from other sources; (10) the importance of the information sought to the plaintiff's case. *See In re: U.S. Dep't of Homeland Security*, 459 F.3d at 570.

Plaintiffs' position with respect to this document and Defendants' assertion of attorney client privilege is that this document does not appear to contain communications which were necessary to obtain legal advice. As the above described authorities show, this privilege is intended to protect a client seeking legal advice from his attorney. In fact, this document appears to show that a representative of the Attorney General's office—an investigator and not an attorney—sought information from an LSP employee or gave instruction to that employee.[4] Defendants' assertion of attorney-client privilege is even more specious because retained counsel at the time this document was made is not even a party to the communication. To the extent that communications reflecting a client seeking legal advice exist in this document, Plaintiffs would request they be redacted, and the document produced.

Plaintiffs' position with respect to this document and Defendants' assertion of work-product protection is that this document does not appear to reflect counsel's legitimate preparation for litigation, or contain mental impressions, conclusions, opinions or legal theories about litigation. By Defendants' admission, it relates to Mr. Woodfox's phone list and three way phone call violations. Even if this document was prepared in anticipation of litigation, and contained such communications, Plaintiffs should be allowed to inspect the materials for information that may bear on the factual issues now before the Court in this case. Namely, whether LSP placed Plaintiffs' Wallace and Woodfox under extended lockdown conditions—after over three decades of such incarceration—for legitimate penological reasons. Plaintiffs have a substantial need to review evidence that could show that the

---

[4] Indeed, in deposition testimony, Bobby Achord testified that his communications with the Attorney General's office were comprised of solicitations from personnel in that office for information. Mr. Achord's testimony further suggests testified that his communications with the Attorney General's offices included prompts or directions from personnel in that office which instructed LSP to *look for* rule violations that could be used to charge Herman Wallace and Albert Woodfox administratively, and thereby return them to extended lock-down housing. (*See, e.g.,* Achord Dep. at 20-25, 49-50, 59-62, 71-72, 79-80 (for example, "I would want to say that the Attorney General's office probably told us you need to listen to this call because it's a three-way."), attached herein as Exh. A.)

Attorney General's office inappropriately orchestrated Plaintiffs' placement in extended lockdown, and that LSP participated in this orchestration with no legitimate penological grounds for doing so; there is no other way for Plaintiffs to acquire this evidence.  The authorities detailed *supra* at 2-3 stand for the proposition that the work product doctrine can be overcome by a showing of need.

Finally, it is Plaintiffs' position that Defendants have failed to establish that this document relates to an on-going, *bona-fide* criminal investigation.  This document supposedly arises out of "a criminal investigation regarding individuals identified on Mr. Woodfox's phone list and disciplinary rule violations for three way and media calls."  Such conduct does not even substantiate a criminal charge.  Even if it could, Plaintiffs respectfully submit that the government's interest in confidentiality in this instance does not outweigh Plaintiffs' need for the document; particularly not when, at this point, Plaintiffs would be willing to enter into a confidentiality order.

2.    Email dated December 11, 2008 from Sha Carter to Bobby Achord relating to a "criminal investigation regarding individuals identified on Albert Woodfox's call list, and disciplinary violations for three-way and media calls."
(Bates No. DPSC 019903)

This document is described in Defendants' privilege log with precisely the same language as the first document (hereinafter, "Document 1"); it includes the same parties, Sha Carter and Bobby Achord; and Defendants assert the same privileges and protections in defense of it.  Plaintiffs' position with respect to this document is therefore unchanged from the position that Plaintiffs take with respect to Document 1.

3.    Email dated December 8, 2008 from Bobby Achord to Sha Carter relating to a "criminal investigation regarding phone calls and interviews with the media and three-way call violations, particularly Bhalla."
(Bates No. DPSC 019904 – 019905)

Plaintiffs' position with respect to this document is essentially unchanged from the position that Plaintiffs take with respect to Document 1.  Plaintiffs add only that Mr. Bhalla is, upon information and belief, a Canadian documentary filmmaker who is working on or has worked on a documentary related to Mr. Wallace's dream home.[5]  Mr. Achord has no reason known to Plaintiffs to seek legal advice from Sha Carter regarding him; the Attorney General's office has no reason known to Plaintiffs to concern itself with him in preparation for litigation; and Mr. Bhalla has no criminal ties or record known to Plaintiffs' counsel.

4.      Email dated December 8, 2008 from Bobby Achord to Sha Carter relating to a "criminal investigation regarding individuals identified on call and visitor lists and three-way and media call violations, particularly Prison Radio."
        (Bates No. DPSC 019906 – 019922)

        Plaintiffs' position with respect to this document is essentially unchanged from the position that Plaintiffs take with respect to Document 1.  Plaintiffs add only that Prison Radio is, upon information and belief, a non-profit radio outlet operating in California.[6]  Mr. Achord has no reason known to Plaintiffs to seek legal advice from Sha Carter regarding Prison Radio; the Attorney General's office has no reason known to Plaintiffs to concern itself with Prison Radio in preparation for litigation; and Prison Radio has no criminal ties or record known to Plaintiffs' counsel.

5.      Email dated December 8, 2008 from Bobby Achord to Sha Carter relating to a "criminal investigation regarding three-way and media call disciplinary rule violations, specifically media interviews."
        (Bates No. DPSC 019923 – 019924)

        This document is described in Defendants' privilege log with essentially the same language as Document 1; it includes the same parties, Sha Carter and Bobby Achord; and Defendants assert the

---

[5] http://amdoc.org/archives/2007/11/american_docume_1.php

[6] http://www.prisonradio.org

same privileges and protections in defense of it.  Plaintiffs' position with respect to this document is

therefore unchanged from the position that Plaintiffs take with respect to Document 1.

6.    Email dated December 8, 2008 from Bobby Achord to Sha Carter relating to a "criminal
      investigation regarding number [sic] of three-way and media calls disciplinary rule violations."
      (Bates No. DPSC 019925 – 019927)

Plaintiffs' position with respect to this document is therefore unchanged from the position that

Plaintiffs take with respect to Document 1.  Plaintiffs note merely that the "number" of administrative

rule violations at issue can have no bearing on the applicability of the privileges and protections

Defendants assert as to this document.

7.    Email dated December 8, 2008 from Sha Carter to Bobby Achord relating to "a criminal
      investigation regarding three-way and media call disciplinary rule violations, specifically with
      Prison Radio."
      (Bates No. DPSC 019928 – 019929)

Plaintiffs' position with respect to this document is unchanged from the position that Plaintiffs

take with respect to Documents 1 and 4.

8.    Email dated December 8, 2008 from Sha Carter to Bobby Achord and Sha Carter relating to "a
      criminal investigation regarding the progress of three-way and media call disciplinary rule
      violations investigation."
      (Bates No. DPSC 019930)

Plaintiffs' position with respect to this document is unchanged from the position that Plaintiffs

take with respect to Document 1.  Plaintiffs add only that it is unclear how a criminal investigation into

the progress of an administrative investigation can exist.

9.    Email dated December 8, 2008 from Sha Carter to Bobby Achord relating to "a criminal
      investigation regarding inmate groups or gangs in violation of institutional rules."
      (Bates No. DPSC 019931 – 019932)

With respect to Defendants' assertion of attorney-client privilege and work product protection in defense of producing this document, Plaintiffs' position is unchanged from the position that Plaintiffs take with respect to Document 1.

With respect to Defendants' assertion of law-enforcement privilege, Plaintiffs again contend that Defendants have not established that there exists a bona-fide, ongoing criminal investigation into inmate groups or gangs that relates to Plaintiffs Wallace and Woodfox.  In fact, deponents in this case have repeatedly testified that there is no known gang problem at LSP.  (*See, e.g.,* Exh. A at 92-93 ("[We] have not detected any kind of gang activity in our prison.")

10.  Email dated December 7, 2008 from Sha Carter to Bobby Achord relating to "a criminal investigation regarding inmate groups or gangs in violation of institutional rules." (Bates No. DPSC 019933 – 019935)

Plaintiffs' position with respect to this document is unchanged from the position that Plaintiffs take with respect to Documents 1 and 9.

11.  Email dated December 7, 2008 from Sha Carter to Bobby Achord relating to "a criminal investigation regarding report on three-way and media call disciplinary rule violations." (Bates No. DPSC 019936 – 019937)

Plaintiffs' position with respect to this document is unchanged from the position that Plaintiffs take with respect to Document 1 and 8.

12.  Email dated December 7, 2008 from Sha Carter to Bobby Achord relating to "a criminal investigation regarding summaries of three-way and media call disciplinary rule violations." (Bates No. DPSC 019938 – 019939)

Plaintiffs' position with respect to this document is unchanged from the position that Plaintiffs take with respect to Document 1 and 8.

13.    Email dated December 7, 2008 from Sha Carter to Bobby Achord relating to "a criminal investigation regarding prohibited activities and disciplinary rule violations such as three-way calls, media calls and gang-related activity."
(Bates No. DPSC 019940)

Plaintiffs' position with respect to this document is unchanged from the position that Plaintiffs take with respect to Document 1, 8 and 9.  Plaintiffs do not know what further "prohibited activities" are referenced in this document, and respectfully submit that Plaintiffs cannot meaningfully respond to Defendants' claims regarding any such activities without further detail.  *See United States v. Construction Prods. Research*, 73 F.3d 464 (2d Cir. 1996) (holding that a privilege log should provide sufficient detail to permit a judgment as to whether the document is at least potentially protected from disclosure.)

14.    Email dated December 7, 2008 from Bobby Achord to Sha Carter relating to a "criminal investigation regarding three-way and media call disciplinary rule violations."
(Bates No. DPSC 019941 – 019942)

Plaintiffs' position with respect to this document is unchanged from the position that Plaintiffs take with respect to Document 1.

15.    Email dated December 7, 2008 from Sha Carter to Bobby Achord relating to a "criminal investigation regarding three-way call, media call, and theft disciplinary rule violations."
(Bates No. DPSC 019943)

Plaintiffs' position with respect to this document is essentially unchanged from the position that Plaintiffs take with respect to Document 1.  Like Mr. Achord, Gary MacDonald is a member of LSP's investigative services team.  Plaintiffs add that Defendants have failed to establish an on-going, bona-fide criminal investigation into theft, and that, even if Defendants could establish the existence of such an investigation, the pertinence of this document to Plaintiffs' case outweighs Defendants' interests in confidentiality.

16.    Email dated December 7, 2008 from Sha Carter to Bobby Achord relating to a "criminal investigation regarding three-way and media call disciplinary rule violations." (Bates No. DPSC 019944)

Plaintiffs' position with respect to this document is essentially unchanged from the position that Plaintiffs take with respect to Document 1.

17.    Email dated November 26, 2008 from Sha Carter to Bobby Achord relating to a "criminal investigation regarding three-way and media call disciplinary rule violations involving Hinds and Sumell." (Bates No. DPSC 019945 – 019946)

Plaintiffs' position with respect to this document is essentially unchanged from the position that Plaintiffs take with respect to Document 1.  Plaintiffs add only that Ms. Hinds and Ms. Summel, upon information and belief, have personal relationships with Plaintiffs Wallace and Woodfox.  Mr. Achord had no reason known to Plaintiffs to seek legal advice from Sha Carter regarding either of them; the Attorney General's office has no reason known to Plaintiffs to concern itself with them in preparation for litigation, and neither Ms. Hinds nor Ms. Sumell have any criminal ties or criminal records known to Plaintiffs' counsel.

18.    Email dated November 21, 2008 from Sha Carter to Bobby Achord and copied to Kenny Norris relating to a "criminal investigation regarding three-way and media call disciplinary rule violations." (Bates No. DPSC 019947 – 019948)

Plaintiffs' position with respect to this document is unchanged from the position that Plaintiffs take with respect to Document 1.  Plaintiffs do not know who Kenny Norris is.

19.    Email dated November 18, 2008 from Bobby Achord to Sha Carter relating to a "criminal investigation regarding three-way and media call disciplinary rule violations, particularly with

NPR and Bhalla."
(Bates No. DPSC 019949 – 019950)

Plaintiffs' position with respect to this document is unchanged from the position that Plaintiffs take with respect to Documents 1 and 3. Upon information and belief, N.P.R. refers to National Public Radio. N.P.R. is a non-profit media outlet, and N.P.R. reporter did a feature article concerning the murder of Officer Brent Miller. Upon information and belief, LSP officials subsequently have denied Ms. Sullivan any access to the prison. (*See, e.g.,* Fontenot Dep. at 118-19 ("We get along fine but she won't be coming to do any stories, she definitely won't be getting an interview from the warden.") attached herein as Exh. B.)

20.   Email dated November 17, 2008 from Sha Carter, forwarded by Gary McDonald to Darryl Vannoy, Gary McDonald and Bobby Achord relating to a "criminal investigation regarding three-way and media call disciplinary rule violations, particularly with Bhalla."
(Bates No. DPSC 019950)

Plaintiffs' position with respect to this document is unchanged from the position that Plaintiffs take with respect to Documents 1 and 3.

21.   Email dated November 15, 2008 from Sha Carter to Darryl Vannoy and Gary McDonald relating to a "criminal investigation regarding multiple three-way and media call disciplinary rule violations."
(Bates No. DPSC 019951)

Plaintiffs' position with respect to this document is unchanged from the position that Plaintiffs take with respect to Documents 1 and 6.

22.   Email dated November 15, 2008 from Sha Carter to Darryl Vannoy and Gary McDonald relating to a "criminal investigation regarding additional three-way and media call disciplinary rule violations."
(Bates No. DPSC 019952)

Plaintiffs' position with respect to this document is unchanged from the position that Plaintiffs take with respect to Documents 1 and 6.

23.    Email dated November 14, 2008 from Sha Carter to Darryl Vannoy and Gary McDonald relating to a "criminal investigation regarding three-way and media call disciplinary rule violations' [sic] particularly to Noelle Hanrahan at Prison Radio." (Bates No. DPSC 019953)

Plaintiffs' position with respect to this document is unchanged from the position that Plaintiffs take with respect to Documents 1 and 4.

## III.    Conclusion

For all of the foregoing reasons, the undersigned respectfully request that your Honor order the disclosure of the documents described in Defendants' privilege log.

Dated: January 15, 2010

Respectfully submitted,

George H. Kendall
Samuel Spital
Corrine Irish
Carine Williams
Squire, Sanders & Dempsey, LLP
30 Rockefeller Plaza
New York, NY 10112
212.872.9800

Nicholas J. Trenticosta
LSBA Roll No. 18475
7100 St. Charles Avenue
New Orleans, LA 70118
504.864.0700

Counsel for Plaintiffs

By: s/Nick Trenticosta /GK

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing memorandum was filed electronically with the Clerk of the Court using the CM/ECF system this 15th day of January, 2010.  Notice of this filing will be sent to Richard A. Curry, Esq. and M. Brent Hicks, Esq. by operation of the court's electronic filing system.

/s/ George H. Kendall

George H. Kendall
Squire, Sanders & Dempsey, LLP
30 Rockefeller Plaza
New York, NY 10112
212.872.9800

# Exhibit

# A

```
 1        some other administrative type functions.
 2             Q    Do you work with her frequently on your
 3        investigations?
 4             A    Not frequently.
 5             Q    Have you worked with her on your
 6        investigations?
 7             A    Yes.
 8             Q    What about Dana Cummings?
 9             A    Dana Cummings?
10             Q    Yes.
11             A    I've heard that name but I don't really
12        know that person.
13             Q    What about Shea Carter?
14             A    I know Shea Carter.
15             Q    And how do you know Shea Carter?
16             A    I met Shea Carter, I think I met her
17        several years ago when she worked for a DA's office
18        and requested some information from us.  That's
19        been several years ago.  She now works for the
20        Attorney General's office.
21             Q    When have you worked with her most
22        recently?
23             A    The most recent thing is when we began the
24        investigation with Herman Wallace, offender, and
25        offender Albert Woodfox.  The Attorney General's
```

1    office had requested all of their telephone calls.

2    They had some type of investigation going, I didn't

3    really know what it was and I was so busy I didn't

4    really -- felt like I needed to know.

5        Q    When did that happen?

6        A    I really can't recall.  It was sometime

7    prior to the date that we started this

8    investigation with offender Wallace and offender

9    Woodfox.  Probably sometime within that year of

10   2008.

11       Q    Within the year of 2008, do you remember

12   what season it was, was it the winter of 2008?

13       A    No.  As I said earlier, I got so much

14   plugged in my brain from literally hundreds of

15   investigations that I just can't remember.  And

16   when I skimmed it this morning, I didn't see

17   anything that just jumped out at me about that, and

18   I don't think I got it exactly when, but I may have

19   but I don't remember seeing it.

20       Q    In that investigation, did you work with

21   Buddy Caldwell?

22       A    No.  I've seen Mr. Caldwell a couple of

23   times but I didn't work with him.

24       Q    Did you ever speak with him?

25       A    Not really.

COL. BOBBY ACHORD

10/21/2009

Page 22

```
 1          Q     E-mail with him?

 2          A     No.

 3          Q     How often do your investigations involve

 4     outside authorities?

 5          A     We do close to a thousand investigations a

 6     year.  The majority of them come from within the

 7     prison.  I can't really give you a specific number

 8     of outside law enforcement agencies that we work

 9     with, but we set up -- if an outside law

10     enforcement agency wants to come interview a

11     convict, and they do that fairly regularly, three

12     or four times a month, we'll get a request from

13     someone to come interview a convict and it has to

14     go through our office and we set it up.

15               If we pick up something in a phone call

16     that might interest some law enforcement agency,

17     we'll call them.  If we have an escape like we had

18     back in September, then we coordinate very closely

19     with outside law enforcement agencies, U.S. Marshal

20     service.

21               We normally handle all of the

22     investigations that's done here in the prison.

23     Some of those investigations go beyond simple

24     assault on an officer, beyond to inmates simple

25     fighting and we do use the West Feliciana Sheriff's
```

1        Office to come in and actually work a criminal

2        investigation and we assist them in serious

3        incidents.

4            Q    So if during the course in your

5        investigation you come across something that would

6        be criminal, would be a violation of criminal code,

7        you involve the West Feliciana Sheriff's Office?

8            A    Not all the time.

9            Q    When would you do that and when would you

10       not do it?

11           A    If, for instance, we seize more than, I

12       think it's three grams of marijuana for instance,

13       then we contact the sheriff's office, narcotics

14       unit and let them know what we have.  If we get

15       beyond that, we may get into say an ounce or half

16       an ounce or something, we'll call and they'll come

17       assist us with that, and they've actually charged

18       offenders with it.  We've charged visitors with

19       bringing drugs in and the sheriff's office have

20       charged them.  If we have an officer that say

21       abuses an offender, we'll call the sheriff's office

22       in and work with them and they will probably

23       finally arrest, they have arrested officers.

24           Q    So would you say it depends on how serious

25       the violation is?

```
 1        A    That's correct.

 2        Q    How often are the outside authorities that

 3   they cooperate with the Attorney General's office?

 4        A    Are you asking how often do we work with

 5   the Attorney General's office?

 6        Q    Yes.

 7        A    Not very often.

 8        Q    Do you remember any other examples of

 9   working with the Attorney General's office besides

10   the investigation from November and December of

11   2008?

12        A    I'm sure that we've passed them some

13   information.  We've worked with like the Internal

14   Revenue when we have offenders violating federal

15   laws, we've worked with the FBI in like Katrina

16   fraud.  The Attorney General has investigators who

17   do Internet fraud or Internet pornography and that

18   sort of thing, but I don't recall us ever working

19   with them.

20        Q    Do you recall any other examples of the

21   Attorney General's office passing you information

22   about violations going on at LSP?

23        A    They could have but other than this case

24   here, I can't recall.

25        Q    How many investigations have you done
```

```
 1      which involve Mr. Woodfox?

 2           A     I'm going from memory so I may not be

 3      entirely correct.  There was a demonstration at the

 4      front gate in 2002, which was set up by supporters

 5      of Mr. Woodfox and Mr. Wallace.  It was a peaceful

 6      demonstration and we were there.  There was a

 7      demonstration I think in 2003 very similar, and I

 8      forget what the point is that they were trying to

 9      make.  The only other time that I worked, when

10      Mr. Woodfox was in this case here.

11           Q     The 2003 demonstration that you remember,

12      was that also peaceful?

13           A     Yes.

14           Q     So other than those three investigations,

15      you don't recall being involved?

16           A     No, I don't recall any more for

17      Mr. Woodfox.

18           Q     What about with respect to Mr. Wallace,

19      what investigations do you recall with him?

20           A     The same two demonstrations.  There was an

21      incident, I pulled the case this morning, I didn't

22      look at it, I don't recall a lot of it, but they

23      found a piece of Plexiglass in Mr. Wallace's cell.

24      And then I worked a case with Mr. Wallace where he

25      worked a scheme to buy some jewelry for a lady on
```

```
 1      office is, nothing goes out of the office unless me

 2      or Colonel McDonald has looked at it, proofed it

 3      and signed by their name.  So that occupies a lot

 4      of my time, assisting them and proofing their

 5      reports.  I'd have to say I spent -- that probably

 6      would have been the major investigation that I

 7      worked on while I wasn't proofing and helping the

 8      other people with their reports.  I can't give you

 9      an exact amount of hours per day, some days I may

10      not have been able to work on it at all.

11           Q     Did anyone from outside the Investigative

12      Services unit assist you in listening to calls?

13           A     Assist us in what?

14           Q     In listening to calls.

15           A     They did.

16           Q     And who is that?

17           A     Attorney General's office, they had all

18      the calls in their criminal investigation and as

19      they would, and I don't know how many people in the

20      Attorney General's office listened to the calls,

21      but if they uncovered -- it seems like in the

22      beginning that I told Ms. Shea Carter what some of

23      the possible rule violations may be, like three-way

24      phone calls, talking about drugs, talking about

25      rule violations, those sort of things, and she
```

```
 1      would, as they heard a phone call that had

 2      something like a rule violation in it, she would --

 3      most of the time she e-mailed that to me or she

 4      might call.

 5          Q    You said that you broke up the calls

 6      according to specific numbers, did you take out

 7      legal attorney numbers from those numbers?

 8          A    I did.

 9          Q    So how would it be that legal calls were

10      listened to if attorney numbers were removed from

11      that?

12          A    I would want to say that the Attorney

13      General's office probably told us you need to

14      listen to this call because it's a three-way.

15          Q    On the disciplinary reports for

16      Mr. Wallace and Mr. Woodfox, which I'm going to ask

17      to have marked as Exhibit 9 and 10, Mr. Wallace

18      being 9 and Mr. Woodfox being 10, there's a

19      transcribed call attached as an exhibit.  Were

20      there any other calls that were transcribed besides

21      the ones that's attached?

22          A    To the best of my recollection, these were

23      the -- I think there's three phone calls here

24      that's transcribed.

25              (Whereupon the document referred to by
```

```
 1      write-up I was referring to, so that they would
 2      know that that refers to the write-up on November
 3      13.  Major Vaughn wrote it and placed them in
 4      administrative segregation for 30 W, pending
 5      investigation.  But no, I don't know what Colonel
 6      McDonald -- if he told me I've forgotten.
 7          Q    And you indicated that they were placed
 8      there pending a possible violation of a 30 W.
 9          A    Yes.
10          Q    What was the earliest point in the
11      investigation that you became certain that there
12      was a rule violation?
13          A    When we use the 30 W to place an offender
14      in administrative segregation in the beginning, we
15      generally use terms like possible, because if we
16      get to the end of the investigation and there's no
17      rule violation, then we ask them to turn the
18      offender lose.  There was evidence of a rule
19      violation on day one when phone calls were listened
20      too.
21          Q    Do you remember when the Attorney
22      General's office requested all copies of the phone
23      calls, do you remember when his request was?
24          A    No.  As I said earlier, it was sometime
25      obviously before November 13, and I'm thinking it's
```

COL. BOBBY ACHORD

```
1        sometime in that year of 2008 but I can't plug a

2        date in.

3            Q    Did that request come directly to you?

4            A    I don't recall.  It either came to me or

5        it came to somebody above me and they gave it to

6        me.

7            Q    Who would have given it to you if it

8        wasn't something directly --

9            A    It could have came from Warden Cain,

10       Warden Vannoy, Warden Norris, Warden Dupont, Warden

11       Peabody, Warden Jett.

12           Q    Do you know what that investigation

13       pertained to?

14           A    No.

15           Q    Do you know how long that investigation

16       lasted?

17           A    No.  I don't know when it started and I

18       don't know if it's ended now.

19           Q    Do you know whether phone calls, recorded

20       phone calls are still being turned over to the

21       Attorney General's office?

22           A    We haven't turned any phone calls over to

23       them in awhile.

24           Q    When is the last time?

25           A    I want to say several months at least,
```

1    maybe longer than that.

2        Q    You referred to a mail watch, was mail

3    being turned over to the Attorney General's office

4    as well?

5        A    Yes.  I can't remember when they asked for

6    it or when we started, but we did, we turned some

7    mail over to them.

8        Q    When is the last time you remember turning

9    mail over?

10       A    The rodeo has got my brain messed up a

11   little bit, we had a rodeo Sunday, it was either

12   Monday or Tuesday of this week.  I want to say

13   Monday because today is Wednesday.

14       Q    Did any members of the Investigative

15   Services unit here assist the Attorney General's

16   office in their investigation?

17       A    Not to my knowledge, except for giving

18   them phone calls.

19       Q    Who authorized the release of the phone

20   calls to the Attorney General's office?

21       A    I do it.  I used to check with the

22   attorney, the attorney told me that if it was a

23   member of law enforcement or the District

24   Attorney's office, to release it to them.

25       Q    So in this case did you check with the

1    attorney, the LSP attorney?

2        A    I don't recall, I don't recall.

3        Q    But you are the person who authorized the

4    release of those calls to the Attorney General's

5    office?

6        A    Yes.

7        Q    And the calls that were turned over to the

8    Attorney General's office did not excerpt legal

9    calls?

10        A    Did what?

11        Q    Did not excerpt, like the legal calls were

12    not taken out of the recorded calls given to the

13    Attorney General's office.

14        A    I'm pretty sure we gave them all of them,

15    all calls, including legal.

16        Q    Now the report says that Noelle Hanrahan

17    was listed as a friend to Mr. Woodfox and

18    Mr. Wallace.  In the course of your investigation

19    did you find any evidence to indicate that she was

20    not friends with Mr. Wallace or Mr. Woodfox?

21        A    You said that the report, the first part

22    of it you faded on me a little bit.

23        Q    All right.  Take a look here in the second

24    paragraph, it says, "Inmate Woodfox showed that

25    phone number on his approved telephone list as

1    principles of the Black Panther Party, is there

2    something wrong with them?

3        A    I couldn't say that just because it's the

4    Black Panther Party, I couldn't say that you could

5    judge someone from that.  I think you'd have to

6    look at other factors, their conduct, things they

7    say, the way they act, things they do.

8        Q    And you also wrote that Mr. Woodfox and

9    Mr. Wallace apparently knew that their comments

10    would go out all over the country and

11    internationally.  What was it that made it apparent

12    that Mr. Woodfox had such knowledge?

13        A    The fact that they're giving it to a

14    public media source indicates to me that they knew

15    that it was going to be sent out, probably, at

16    least, at least in the United States and maybe

17    internationally.

18            MR. CURRY:

19                If you're almost done I need a break.

20            (A short break was taken.)

21    BY MS. WILLIAMS:

22        Q    You recognize that Mr. Woodfox is alleging

23    the Attorney General's office was engaged in a

24    smear campaign against him and that he made

25    derogatory remarks about the New Orleans police

```
 1        department?

 2             A     Yes, yes, I see that.

 3             Q     What was wrong with saying the Attorney

 4        General's office was engaged in a smear campaign

 5        against him?

 6             A     Well, when you read that whole little

 7        section, not just that little sentence there, "He

 8        alleged a smear campaign being conducted by the

 9        AG's office using Countel Pro techniques and

10        tactics of lies, deceptions, missing information

11        and character assassination.  He made derogatory

12        comments about the New Orleans Police Department

13        and District Attorney's office alleging that they

14        connected to other crimes doing what was common

15        practice against African men in those times and is

16        still going on now."  Those comments appear to be

17        designed to provoke -- both of those comments, a

18        smear campaign by the Attorney General and the

19        derogatory comments about the police department and

20        the DA's office, "appear to be designed to provoke

21        racial problems between black offenders and

22        correctional officers who are associated with

23        authority.  The comments also appear to be designed

24        to deliberately provoke unfavorable public opinion

25        toward the Attorney General's office and the
```

```
 1          A    I don't know.

 2          Q    There's also a sentence in the report that

 3     says, "Woodfox acknowledgement of hatred toward

 4     himself and Mr. Wallace created concern for their

 5     safety and well-being."  In the course of your

 6     investigation did you do anything to determine

 7     whether that was true, whether other inmates and

 8     security at LSP hate Mr. Wallace and Mr. Woodfox

 9     today?

10          A    No, I went strictly by his statement.

11          Q    And you understood his statement to be

12     talking about today, that they're hated today?

13          A    Yes.  He didn't qualify it with, this used

14     to be, he made the statement as if it is a current

15     statement.

16          Q    And is this why they were placed in

17     administrative segregation for their safety?

18          A    I don't know.  We put them in

19     administrative segregation pending investigation.

20     As an investigator, we didn't do it for their

21     safety.

22          Q    At one point in the report you note, as we

23     discussed earlier, that officials from the Attorney

24     General's office, personnel from the Attorney

25     General's office and investigative personnel here
```

```
 1        immediately begin monitoring the recorded calls.

 2        Did the personnel from the Attorney General's

 3        office, did they come here to LSP to monitor those

 4        calls?

 5             A    No.

 6             Q    The rule violations number one for

 7        Mr. Wallace indicates that Major Vaughn was there

 8        with Warden Cain, discussed his phone call

 9        violations from June 2008.  Were you there when

10        that discussion took place?

11             A    No.

12             Q    What do you know about that June 2008

13        incident?

14             A    Are you speaking of the whole incident or

15        just this meeting that they had?

16             Q    The whole incident.

17             A    I actually worked the case involving

18        Mr. Wallace and submitting a false withdrawal to

19        send sixty dollars to a lady on the street, written

20        on a withdrawal for legal services, I think,

21        something about legal services.  She turned around

22        and sent the sixty bucks back to the convict that

23        made the jewelry that Mr. Wallace gave her, and

24        that's a violation of our rules for him to do that.

25             Q    Do you consider that a serious violation?
```

COL. BOBBY ACHORD

```
 1        Q     Prison gangs.

 2        A     Prison gangs, yeah, I am.

 3        Q     Have you gotten any particular training

 4   about prison gangs here?

 5        A     When I was with the State Police for a

 6   while I was a supervisor in the Criminal

 7   Investigative Bureau and we had some people in

 8   there that monitored gangs.  I've done some pretty

 9   extensive reading on the Internet about gangs and

10   stuff, particularly about tattoos.

11             It's been my experience that when an

12   offender gets to prison they don't fly their

13   colors, so to speak, then I got to tell you that

14   they're gang members or have been gang members.  A

15   lot of times you can tell from tattoos if they've

16   ever been associated with a gang.

17             It's really hard to believe that the

18   typical prison gangs that they have around the

19   country, we don't have that here, Aryan Nations,

20   White Supremacy Group.  Do we have offenders here

21   that subscribe to that?  Probably.  Do they get

22   radical at times?  No.

23             There's a Mexican gang that's MS 13, I

24   think it's predominantly in Texas and California

25   and Florida.  We have a lot of Hispanics coming in
```

1    our prison now; have not detected any kind of gang

2    activity in our prison.

3        Q    How many investigations since you've been

4    here have involved working at Hunt?

5        A    At Hunt?

6        Q    Yes.

7        A    I remember the last one, we went down a

8    couple of years ago and investigated the death of

9    four inmates, four offenders down there.  When I

10   worked at headquarters I did a couple of

11   investigations at Hunt when we were doing the state

12   and I may have done one or two more.  That's been a

13   long time ago.

14       Q    Are you doing any investigations now at

15   Hunt?

16       A    No, not at Hunt.

17       Q    When you were a police officer did you

18   have any experience working any cases that involved

19   Black Panthers, when you were a police officer?

20       A    At one time when I worked for Criminal

21   Investigative Bureau I had a group of analysts that

22   worked for me, and what they did, they provided

23   analytical services to troopers throughout the

24   state.  I'm sure that they have done research and

25   stuff on gangs and gang members and I probably

# Exhibit

# B

1    a lot with Janet.

2         Q    You said you work a lot with her?

3         A    She's a frequent A.P. reporter that calls

4    us.  There's only three or four that we deal with

5    from the A.P.

6         Q    Are there reporters that you refuse to

7    work with?

8         A    No, not unless they come and violate

9    something, but I don't refuse to work with any

10   reporter.

11        Q    They would have to violate --

12        A    They would have to break a rule or

13   something or not do what they said, misrepresent

14   themselves or their story.  There was a reporter

15   that came from NPR, I'm sure you're going to ask me

16   about.  But I've actually had good conversations

17   with her about doing other stories.

18        Q    Who are you referring to?

19        A    I don't remember her name, I just remember

20   she came in saying she wanted to do one story and

21   it was all about the Angola 3 when we sat down

22   before the warden.  And it was like -- and that's

23   where it ended.  Sullivan, Sullivan maybe.

24        Q    Laura Sullivan?

25        A    Laura Sullivan, that's her.  We get along

```
 1      fine but she won't be coming to do any stories, she

 2      definitely won't be getting an interview from the

 3      warden.  It was a good story too, actually.

 4           Q     This is Exhibit 17.

 5           A     (Witness examines document.)

 6                 Yes.

 7                 (Whereupon the document referred to by

 8                 Counsel was marked for identification as

 9                 Exhibit 17.)

10      BY MS. IRISH:

11           Q     The top e-mail is from you to a Joli

12      Darbonne regarding James Ridgeway at Mother Jones

13      magazine?

14           A     Right.

15           Q     And the top of the e-mail it says, "No

16      working with him, he's the Angola 3 writer."  Did

17      you write that?

18           A     Yes, and I meant for that particular

19      request that he was asking for, not permanently for

20      the record.  I mean, he could have asked about

21      other things but the reason we didn't approve this

22      was because this is the phone call that was made,

23      the three-way call that was made to an attorney

24      where he said how many pushups he could do and all

25      of this stuff.  It was unauthorized while they were
```