UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| ROBERT KING WILKERSON, ET AL. | ) ) ) ) | CIVIL ACTION NUMBER 00-0304-C-M3 |
| Plaintiffs, | ) ) | CHIEF JUDGE TYSON |
| VS. | ) ) | MAGISTRATE JUDGE DALBY |
| RICHARD STALDER, ET AL. | ) ) | |
| Defendants. | ) ) | |

PLAINTIFFS' MEMORANDUM OF LAW IN REPLY TO DEFENDANTS'
RESPONSE TO THE COURT'S DECEMBER 21, 200 ORDER

**MAY IT PLEASE THE COURT:**

Pursuant to this Court's orders dated December 18, 2009 (Doc. No. 348), and January 14, 2010 (Doc. No. 357), Plaintiffs submit this memorandum in reply to Defendants' January 16, 2010 pleading, and in further support of Plaintiffs' request that the Court order the disclosure of communications between LSP representatives and the Louisiana Attorney General's Office.  Plaintiffs address in turn each of the grounds Defendants offer as to why they believe these documents are privileged.

### I.    Defendants' Claim that Plaintiffs Failed to Comply with the Court's Order

Defendants first argue that the documents listed on their privilege log are protected from disclosure because Plaintiffs' January 7, 2010 objections to the applicability of privilege were deficient and not in compliance with the Court's order.  According to Defendants, "as a result of the plaintiffs' failure to comply with this Court's order and identify any specific objections, the State Defendants are left to respond generally to the plaintiffs' objections."

(Doc. No. 361 at 3.)  Defendants further contend that they have the right to move to strike in the event that Plaintiffs file "specific objections" and/or to supplement their response.

Defendants appear to badly misapprehend the burden shifting rules that govern the discovery phase of litigation in this Circuit.  "A party asserting a privilege exemption from discovery bears the burden of demonstrating its applicability."  *In re Santa Fe Int'l Corp.*, 272 F.3d 705, 710 (5th Cir. 2001).  Nothing in the Court's order suggested a departure from this well-settled rule, or indicated that Plaintiffs were to bear the burden of setting forth objections in detail first.  (Doc. No. 348.)

Since at least as far back June and August of 2009, Plaintiffs have sought an articulation from Defendants as to how the privileges they assert have any bearing on the facts of this case.  (*See, e.g.*, Pls.' Letters dated June 9, 2009 and August 31, 2009, attached herein as Exhibit A.)  For months and months, Defendants have responded by conclusorily repeating their assertion of privilege without articulating precisely which privileges they asserted, or to explain how those privileges apply in this case.  As a result, Plaintiffs had to resort to filing a motion to compel under Rule 37 just to learn the particular types of privileges Defendants assert and to get a privilege log produced.

Even when responding to this Rule 37 motion on December 8, 2009, Defendants still did not meet their burden, requesting that this Court provide them with another opportunity "to fully brief the privileges."  (Doc. No. 342 at 6.)  As of January 7, 2010, when Plaintiffs advised Defendants of their objections as to each document described in Defendants' January 4, 2010 privilege log, Defendants had *still* never articulated an explanation or identified authorities for their declaration that communications between LSP and the Attorney General's office are privileged and protected from disclosure under attorney-client, work-product and law

2

enforcement doctrines.  On January 7, 2010, as directed by this Court, Plaintiffs notified

Defendants of "any objections" to the applicability of privilege as to each document identified

in Defendants' privilege log and offered the most robust basis for objections possible; namely,

that Defendants had failed to demonstrate how any of the privileges identified in their log is

applicable in this case.

Further, Plaintiffs note that Defendants' claim that the lack of specificity in Plaintiffs'

January 7, 2010 letter is the reason why Defendants can now still only offer "general

assertions" is belied by the reality that, between January 7, 2010 and January 15, 2010—the

date this Court originally set for the submission of a Joint Memorandum on Defendants'

privilege log—Plaintiffs repeatedly tried to work with Defendants to exchange drafts of the

Parties' arguments and authorities, and Defendants steadfastly refused.  (*See* Doc. No. 363.)

Thus, Defendants' first ground for resisting disclosure—that Plaintiffs' objections on

January 7, 2010 were too broad—plainly has no basis in law or in fact.  A motion to strike

Plaintiffs' objections would be frivolous.  Plaintiffs respectfully submit that Defendants have

had several bites at privilege apple and should be afforded no further supplementation.

## II.    Defendants' Claim that "All Communications Between the Attorney General Office and the State Defendants are Privileged or Protected."

Defendants' second argument against disclosure of the documents listed on their

privilege log is, again, a purely conclusory declaration that any communication between the

Attorney General and LSP is privileged.

Defendants appear to be standing by their position—one already set forth nearly

verbatim in their response to Plaintiffs' Rule 37 motion—that somehow any communication

with an attorney general is accorded absolute protection from discovery.  (*See* Doc. No. 342 at

5-6.)  As Plaintiffs have already pointed out, there is simply no authority to support the

proposition that the title of Attorney General permits counsel, or counsels' representatives, to waive a bigger attorney-client privilege stick. Nor is there support for Defendants' apparent contention that the Attorney General's office is to be accorded a broader scope of work-product protection, or that the Attorney General's office has a law-enforcement privilege is less qualified than that of any other lawyer or member of law enforcement. Plaintiffs respectfully assert that this second basis for resisting discovery is unavailing.

### III.    Defendants' Claim that Each and Every E-mail is Protected By the Work-Product Doctrine

Defendants' third ground for failing to disclose LSP-Louisiana Attorney General communications is that these communications comprise documents that were prepared "in anticipation of <u>this</u> litigation and trial in <u>this</u> matter." (Doc. No. 361 at 9.) (emphasis in original.) Plaintiffs do not agree that the specific documents in dispute constitute work product. Moreover, to the extent that they contain or constitute work product, Plaintiffs respectfully submit that Plaintiffs have made a showing of necessity and justification to overcome work-product protections.

As Defendants correctly observe, the work-product doctrine originally articulated by the Supreme Court in *Hickman v. Taylor*, 329 U.S. 495 (1947) and codified in Fed. R. Civ. P. 26(b)(3), protects material prepared by a party or representative of a party in anticipation of litigation. The work-product doctrine does *not* protect materials assembled for non-litigation purposes. *National Union Fire Ins. Co. of Pittsburgh, PA v. Murray Sheet Metal Co. Inc.,* 967 F.2d 980, 984 (4th Cir. 1992); *see also Guzzino v. Felterman,* 174 F.R.D. 59, 63 (W.D.La. 1997) (citing inter alia *United States v. El Paso Co.,* 682 F.2d 530 (5th Cir. 1982)). "'This is true even if the party is aware that the document may also be useful in the event of litigation.'"

*Conoco Inc. v. Boh Bros. Constr. Co.,* 191 F.R.D. 107, 117 (W.D.La. 1998) (citing *Pacamor Bearings v. Minebea, Co., Ltd.*, 918 F. Supp. 491, 513 (D. N.H. 1996)).

A party seeking to invoke the work-product doctrine as a basis for failing to disclose otherwise discoverable material must first prove that the documents were prepared in anticipation of litigation. *Hodges v. Grant & Kaufman v. U.S.*, 768 F.2d 719, 721 (5th Cir. 1985 [1]); *see also Conoco,* 191 F.R.D. at 117 (W.D.La. 1998). The widely accepted test for whether a document is prepared in anticipation of litigation is articulated in *United States v. Gulf Oil Corporation,* 760 F.2d 292, 296 (Temp. Emer. Ct. App. 1985):

> Our inquiry should be to determine the 'primary motivating purpose behind the creation of the document.' If the primary motivating purpose behind the creation of the document is not to assist in pending or impending litigation, then a finding that the document enjoys work product immunity is not mandated.

(citing *United States v. Davis,* 636 F.2d 1028, 1040 (5th Cir. 1981)). Another articulation of this test inquires into whether the document at issue was "created for use at trial or because a lawyer or party reasonably anticipated that specific litigation would occur and prepared [it] to advance the party's interest in the successful resolution of that litigation." *Willingham v. Ashcroft*, 228 F.R.D. 1, 4-5 (D.D.C. 2005). With respect to material prepared for more than one purpose, the work-product doctrine applies only if anticipation of litigation played a substantial role in its creation. *Id.* (citing *Jumpsport, Inc. v. Jumpking, Inc.*, 213 F.R.D. 329, 347-48 (N.D. Cal. 2003)).

Only if the party resisting discovery established that the documents in question constitute work product does the burden to show that the work-product should nonetheless be disclosed

---

[1] Defendants cite *Hodges*, 768 F.2d at 721 only insofar as that case applies a burden to the party *seeking* disclosure of work-product materials; Defendants leave out that part of the decision which sets forth that before this showing can be made, the party resisting discovery must establish that the withheld documents are in fact work-product. (Doc. No. 361 at 6.)

then shift to the party seeking production. *Hodge*, 768 F.2d at 721. This showing can be made by demonstrating necessity or justification. *Hickman*, 329 U.S. at 513-514.

In this case, Defendants have not met their burden of proving that communications between LSP and the Attorney General's Office constitute documents "prepared in anticipation of litigation" by any measure. At the outset, these documents were not prepared by an investigator acting in the course of counsel activities. They were prepared by an investigator who stepped far outside her role as an agent to legal counsel[2] and even outside her role as a law enforcement officer charged with investigating criminal conduct. Instead, to the extent that Ms. Carter contacted LSP officials to advise them of purported disciplinary rule violations, Ms. Carter stepped into the shoes of prison administrators. According to the vast majority of the documents descriptions provided by Defendants—17 out of 23 of them—these communications concern a purely prison disciplinary investigation into alleged three-way phone call violations and media calls.[3]

---

[2] It should be noted that the investigator was even farther afield her role as a representative of legal counsel in *this* case. (*See* Exh. B at 51, 3-8, eposition of Warden Cain) ("Now in this case, as long as Mr. Hicks and Mr. Curry have been involved, the Attorney General's office has played very little role in representing you and the other defendants in the civil case; is that true? Yes."); *see also* Exh. E at 49-50 (Deposition of Assistant Warden Vannoy).

[3] Deposition testimony in this case confirms that this conduct was far outside the normal role of the Attorney General's office. For his part, in response to a question as to whether there have been any other occasions where the Attorney General's office stepped in to apprise him of violations of internal LSP policy, Warden Cain has said, "I don't really know, I don't think so." (Exh. B at 56, 16-20.) LSP investigator Gary MacDonald testified that officials from the Attorney General's office are usually only involved in criminal investigations and "don't get involved with routine internal investigations, usually"; he further testified that he could not remember one other occasion where the Attorney General's office was involved in an internal investigation. (Exh. C. at 19, 4-25.) Neither could Investigator Bobby Achord. (Exh. D. at 24, 20-24.) Similarly, when asked: "Have there been other occasions when the Attorney General of the State has met with you to apprise you of prisoner activity that violated or might violate LSP policy," Warden Vannoy answered resolutely, "No." (Exh. E. at 58, 11-17.) Warden Vannoy, moreover, confirms that the Fall 2008 disciplinaries charged against Plaintiffs grew out of communications with the Attorney General's office. (*Id.* at 59, 1-7.) Investigator MacDonald also could not recall any other investigation in his experience where investigators hunted for additional rule violations after finding one. (Exh. C. at 50, 10-17.)

In addition, Defendants contend that these communications are work-product because Plaintiffs' conduct is a central issue in this case and, accordingly, any document that concerns Plaintiffs' conduct is "prepared in anticipation that these very issues will likely be considered at trial." (Doc. No. 361 at 9). If Defendants were correct, then work-product doctrine—which extends to a party and to his representatives—would shield all of Plaintiffs' disciplinary files and all of the documents attendant to disciplinary investigations from discovery. In fact, the work-product doctrine is not triggered simply because Defendants show that a document is *relevant* to litigation—if it were not relevant, then it would be beyond the scope of discovery for that reason. As discussed above, the work-product doctrine requires that Defendants show that the purpose of these communications was to assist in this pending litigation, or to advance LSP's interests in successfully resolving this litigation. In this case, the Attorney General office's investigator's primary purpose in communicating with LSP officials was to alert them to alleged violations of internal prison policy and rules, to urge them to look for such violations, and perhaps to advise LSP of how to charge and punish and incarcerate Plaintiffs in light of these purported disciplinary rule violations. Such conduct was not designed to help LSP defend itself in this litigation but is evidence that the Attorney General's office and Defendants participated in a successful effort to target Defendants and to inflict vastly disproportionate punishments on them.[4]

Moreover, the extent of protections afforded to the remaining six documents which are now described as purportedly transmitting information gathered through an Attorney General's

---

[4] In the alternative, if this conduct was designed to assist in this litigation by prompting Defendants to devise pretextual justifications for incarcerating Defendants in extended lockdown, then this conduct is plainly illegitimate and disclosure is warranted. *See, e.g., Conoco Inc. v. Boh Bros. Constr. Co.,* 191 F.R.D. 107, 118 (W.D. La. 1998)

criminal investigation[5] still turn on the same inquiry into the primary purpose for which these

documents were prepared.  If those documents were actually prepared in anticipation of bona-

fide criminal litigation, as part of a investigation into criminal conduct which has apparently

still—even over a year later—not been charged, then it may constitute work product.[6]  (As

explained below, however, Plaintiffs would nevertheless submit that necessity and justification

in this case compel disclosure and in any event dispute the existence of a bona fide criminal

investigation.)

However, deposition testimony and the factual circumstances of this case suggest that

this is simply not the case.  For example, Investigator Michael Vaughn testified that the Attorney

General requested that LSP turn over all telephone recordings of Plaintiffs' conversations for a

"criminal investigation" in early or mid-October of 2008.  (Exh. F. at 76-78.)  This testimony

starts the timeline for the Attorney General office's "criminal investigation" well before the

November 17, 2008 letter from the Twentieth Judicial District Attorney requesting a blanket

investigation into Plaintiffs Wallace and Woodfox[7]; the Attorney General's office could not

---

[5] Plaintiffs note that, according to Defendants' privilege log, *all* of the communications pertained to the Attorney General office's "criminal investigation."

[6] Plaintiffs note that a compelling argument could nevertheless be made that such preparation would part of the ordinary course of business for an Attorney General's office, and thus outside the scope of work-product privilege per se.  Further, in that circumstance, the Attorney General's office would be required to make the necessary showings under the d qualified law enforcement privilege.

[7] Article IV, Section 8 of the Louisiana Constitution provides that:

> As necessary for the assertion or protection of any right or interest of the state, the attorney general shall have authority (1) to institute, prosecute, or intervene in any civil action or proceeding; (2) **upon the written request of a district attorney, to advise and assist in the prosecution of any criminal case**; and (3) for cause, when authorized by the court which would have original jurisdiction and subject to judicial review, (a) to institute, prosecute, or intervene in any criminal action or proceeding, or (b) to supersede any attorney representing the state in any civil or criminal action.

(emphasis added).  Plaintiffs note that the November 17, 2008 letter from a district attorney utterly fails to identify what criminal charge is to be investigated, or to identify a factual predicate which would make out probable cause in support of a criminal charge.

possibly have been conducting a bona-fide criminal investigation within the scope of their legitimate authority before that date.[8]  Temporal circumstances suggest instead that the Attorney General office's unprecedented conduct in the Fall of 2008 was more likely connected to the September 25, 2008 federal court decision granting Plaintiff Woodfox habeas relief, *Woodfox v. Cain* (M.D. La.) Civ. A. No. 06-789, Doc. No. 50, and/or the October 14, 2008 hearing wherein a federal court indicated that it was seriously considering granting Mr. Woodfox bail.  *Id.* Docs. No. 61, 65.

Finally, Plaintiffs respectfully submit that, in the event this Court finds any of the documents which have been submitted to the Court for *in camera* review constitute—in whole or in part—work product, in this case, Plaintiffs have demonstrated the need and justification for disclosing these documents. Whether the work product in question constitutes opinion work-product or "ordinary" work-product, there could not be a higher showing of need.  This is not a case where Plaintiffs' counsel have ready access to witnesses and information—it is one where, prison officials have nearly unfettered and unilateral control over Plaintiffs.  *See, e.g., Hickman,* 329 U.S. at 392 (establishing the work-product doctrine under factual circumstances where "[Counsel] has sought discovery as right to oral and written statements of witnesses whose identity is well known and whose availability to petitioner appears unimpaired.")  In addition, this evidence—as it bears on Plaintiffs' conduct (which Defendants concede is "critical" in this case), on Plaintiffs' allegations that they have been targeted for placement in extended lockdown, and on Plaintiffs' Fall 2008 placement in extended lockdown having no legitimate penological basis—is crucial to Plaintiffs' case.  It would be unduly difficult for Defendants to acquire

---

[8] Even without considering Mr. Vaughn's testimony, there is no dispute that that Investigator Sha Carter was communicating with LSP officials as early as November 14, 2008—before any district attorney request was tendered.

evidence of this sort from any other source.  Further, to the extent these materials reflect the opinions or mental impressions of LSP or the Attorney General, Plaintiffs submit that this is a case where such opinions and mental impressions are at issue, and the need for disclosure is compelling.  *See Conoco Inc. v. Boh Bros. Constr. Co.,* 191 F.R.D. 107, 118 (W.D. La. 1998) (observing that opinion work product becomes subject to disclosure when (1) "mental impressions are at issue in a case and the need for the material is compelling;" and (2) "pursuant to the crime-fraud exception to discovery.") (citations and internal quotations omitted.)

Defendants have not met their burden of establishing that the communications in question are work-product.  In the alternative, if this Court concludes that Defendants have met their burden, Plaintiffs have shown compelling need and justification.  Accordingly, Plaintiffs respectfully request that the Court order disclosure.

### IV.    Defendants' Claim that E-mails in Which Legal Advice is Requested or Provided are Protected by Attorney-Client Privilege

Defendants' fourth reason for failing to disclose e-mail correspondence between LSP and the Attorney General's office is that these documents contain communications "in which legal advice is sought or obtained."  (Doc. No. 361 at 13.)

In order for the attorney-client privilege to apply, Defendants must demonstrate that the communications at issue are confidential in nature, made between a client and a lawyer or their representatives, and made for the purpose of "facilitating the rendition of professional legal services."  *Conoco,* 191 F.R.D. at 116 (internal quotations and citations omitted.)

As a threshold issue, retained counsel was not even a party to the communications at issue.  Indeed, deposition testimony suggests that Defendants did not understand themselves to be represented by the Attorney General's office in this suit.  (*See supra* at note 2.)  Further, while the communications were with an attorney's representative, an Attorney General's office

investigator, they do not appear to have been made when that representative was acting in a legitimate legal capacity. In addition, the communications at issue largely appear to have been initiated by the Attorney General's investigator. This fact suggests that they do not reflect a situation where Defendants sought out the rendition of legal services. *See Hodges*, 768 F.2d at 720-21 (observing that the privilege protects communications of a lawyer to his or her client only if they would tend to disclose the client's confidential communications) (citations omitted). Finally, even if Defendants can establish that certain communications were confidential and made for the purpose of obtaining legal advice, Defendants cannot maintain that attorney-client privilege protects the factual basis of these communications. *See United States v. Edwards*, 39 F. Supp. 2d 716, 736 (M.D. La. 1999) ("It is well-established that the attorney-client privilege only protects disclosure of communications; it does not protect disclosure of the underlying facts by those who communicated with the attorney.") (citations and internal quotations omitted.)

## V.    The Law Enforcement Privilege

Defendants do not address law-enforcement privilege in their briefing, but instead note that "[p]rivilege claims asserting the law enforcement privilege are separately addressed in a motion for protective order being filed by the Criminal Division of the Attorney General's office." (Doc. No. 361 at 14, n. 48.)

Plaintiffs interpret Defendants' omission of briefing on the law enforcement privilege as a concession that Defendants had no standing to assert the privilege in the first instance. *See Coughlin v. Lee*, 946 F.2d 1152, 1159 (5th Cir. 1991) ("The law enforcement privilege is a qualified privilege protecting investigative files in an ongoing criminal investigation.")

(internal quotations and citation omitted.)  Accordingly, Plaintiffs will likewise separately respond to the Attorney General's office's motion for a protective order.

**VI.      Redactions**

Plaintiffs note, for the record, an objection to the provision of any redacted information for *in camera* review to the Court.  Defendants have no basis for redacting any information from the Court's eyes, including witness names or any other identifying information.

**VII.     Conclusion**

For all of the foregoing reasons, the undersigned respectfully request that your Honor order the disclosure of the documents described in Defendants' privilege log.

Dated: January 19, 2010

Respectfully submitted,

George H. Kendall
Samuel Spital
Corrine Irish
Carine Williams
Squire, Sanders & Dempsey, LLP
30 Rockefeller Plaza
New York, NY 10112
212.872.9800

Nicholas J. Trenticosta
LSBA Roll No. 18475
7100 St. Charles Avenue
New Orleans, LA 70118
504.864.0700

Counsel for Plaintiffs

By: s/Nick Trenticosta /GK

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing memorandum was filed electronically with the Clerk of the Court using the CM/ECF system this 19th day of January, 2010.  Notice of this filing will be sent to Richard A. Curry, Esq. and M. Brent Hicks, Esq. by operation of the court's electronic filing system.

/s/ George H. Kendall

George H. Kendall
Squire, Sanders & Dempsey, LLP
30 Rockefeller Plaza
New York, NY 10112
212.872.9800

# Exhibit

# A

# Holland & Knight

Tel 212 513 3200
Fax. 212 385 9010

Holland & Knight LLP
195 Broadway, 24th Floor
New York, NY 10007
www.hklaw.com

George H. Kendall
212 513 3358
george.kendall@hklaw.com

June 9, 2009

M. Brent Hicks
Richard A. Curry
McGlinchey Stafford
Fourteenth Floor
One American Place
Baton Rouge, LA  70825

RE:     **Wilkerson et al v. Stalder et al**
        **Civil Action No. 00-304-C-M3**

*Via Electronic Mail*

Dear Rick and Brent:

We are in receipt of the discovery responses produced on May 22, 2009.  I am writing to address several problems Plaintiffs have with these responses in the hopes that we can resolve the issues in dispute.  As detailed herein, we view many of Defendants' answers to Plaintiffs' discovery requests as either non-responsive or as raising inadequately supported or improper objections.

## Defendants' Non-Responsive Answers

Defendants' answers to a significant portion of Plaintiffs' discovery requests are evasive and non-responsive.

Courts in this Circuit may weigh non-responsive answers to discovery requests in favor of a finding that the non-responsive party has willfully failed to comply with discovery rules and orders. *See e.g., Yazdchi v. American Honda Finance Corp.*, 217 Fed.Appx. 299, 303 (5th Cir. 2007).

1

Atlanta • Bethesda • Boston • Chicago • Fort Lauderdale • Jacksonville • Los Angeles
Miami • New York • Northern Virginia • Orlando • Portland
San Francisco • Tallahassee • Tampa • Washington, D.C. • West Palm Beach
Beijing • Caracas* • Helsinki* • Mexico City • Tel Aviv* • Tokyo • *Representative Office

Case 3:00-cv-00304-RET-DLD     Document 337-1     11/18/09     Page 49 of 122

Specifically, in this case, Defendants' answers to Request for Admission 11; Interrogatories 4-5; and Document Requests 6, 12-13, and 14 are non-responsive.

Defendants' answer to Request for Admission 11 is non-responsive because Plaintiffs asked whether Plaintiff Wallace suffered an adverse medical incident requiring emergency treatment. Instead of responding to this question, Defendants answer a different one—whether Plaintiff Wallace received "appropriate medical attention for any and all conditions [he] experienced." Please indicate if Defendants will respond to Request for Admission 11, and when Plaintiffs can expect to receive this response.

Defendants' responses to Interrogatories 4-6 are likewise evasive and non-responsive. Interrogatories 4 and 5 ask Defendants to identify all persons involved in "the investigation" for which Defendants Wallace and Woodfox are "currently placed" in a cell. Although the question on its face does not ask about "current investigations" Defendants merely respond to these interrogatories with the answer, "[t]here is no current investigation." Moreover, to the extent that Defendants need clarification of the definition of the term "currently," they should be advised that the question refers to Plaintiffs Wallace and Woodfox's placement in a cell as of the date that the interrogatories were propounded. Please indicate if Defendants will respond to Interrogatories 4 and 5, and when Plaintiffs can expect to receive this response.

Document Request 6 asks Defendants to identify the rules and policies, informal and formal, which governed the Camp D dormitory. To the extent that Defendants agree to produce the formal and informal rules and policies which are "specific" to the Camp D dormitory, Defendants answer to this request is only partially responsive. However, instead of plainly identifying which LSP and DOC rules and policies governed Camp D, Defendants generally aver that there are "many LSP and DOC rules and policies" which pertain to Camp D. As Defendants must be aware, "an evasive or incomplete disclosure must be treated as a failure to disclose, answer or respond." Federal Rule of Civil Procedure 37(a)(4). Please indicate if Defendants will identify which LSP and DOC rules and policies, formal and informal, governed the Camp D dormitory, and when Plaintiffs can expect to receive the production of this information.

Document Requests 12-13 ask Defendants to produce information pertaining to any disciplinary proceedings since March 2008 against Plaintiff Wallace or Plaintiff Woodfox, including correspondence between the disciplinary board members and any LSP officials or their representatives. Defendants indicate that they will produce updated inmate institutional records and any ARP's or disciplinary reports since March 2008 that have not already been produced. It is not clear to Plaintiffs that correspondence between the disciplinary board members and any LSP officials or their representatives—including e-discovery—would be included in inmate files, ARP's or disciplinary reports. Please indicate if this information will be produced, and when Plaintiffs can expect to receive it.

Atlanta • Bethesda • Boston • Chicago • Fort Lauderdale • Jacksonville • Los Angeles
Miami • New York • Northern Virginia • Orlando • Portland
San Francisco • Tallahassee • Tampa • Washington. D.C. • West Palm Beach
Beijing • Caracas* • Helsinki* • Mexico City • Tel Aviv* • Tokyo • *Representative Office

Document Request 14 asks for copies of all calls that are or have been subject to investigation for disciplinary violations, not merely for those calls that were "relied upon by LSP investigators." In other words, Plaintiffs seek a listing of all calls that were listened to by investigators looking for disciplinary violations, and copies of those calls, not simply calls found to support a disciplinary violation. Please indicate if the copies of calls which have been produced is inclusive of all calls listened to by investigators looking for a disciplinary violation, and if not, when Plaintiffs can expect to receive the additional copies.

## Defendants' Inadequately Supported Objections

Defendants raise a number of inadequately supported or improper objections, on the grounds of vagueness and ambiguousness, burden, privilege, and/or irrelevance. As a threshold issue, these objections are overwhelmingly conclusory. "These types of boilerplate objections are meaningless and insufficient under the federal rules." *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Greystone Servicing Corp., Inc.*, No. 3-06-0575-P, 2007 WL 4179864, *2 (N.D. Tex. Nov. 26, 2007) (citation omitted). Indeed, the Fifth Circuit requires that a party who opposes his/her opponent's request for production of discovery, "show specifically how… each interrogatory is not relevant or how each question is overly broad, burdensome or oppressive." *McLeod, Alexander, Poel and Apffel, P.C. v. Quarles*, 894 F.2d 1482, 1485 (5th Cir. 1990) (citing *Josephs v. Harris Corp.*, 677 F.2d 985, 992 (3d Cir. 1982), internal quotations omitted); *see also* Fed. R. Civ. P. 36 ("The answer shall specifically deny the matter or set forth *in detail* the reasons why the answering party cannot truthfully admit or deny the matter.") (emphasis added); *and see* Fed. R. Civ. P. 33 ("The grounds for objecting to an interrogatory must be stated with specificity.").

### Defendants' "Vague and Ambiguous" Objections

Defendants' answers to several of Plaintiffs discovery requests object on the grounds that the question posed is "vague and ambiguous."

Discovery requests are not "vague and ambiguous" when they are sufficiently definite, clear, and concise as to "adequately advise the interrogated party of the information requested." *Krawczyk v. City of Dallas*, No. Civ.A. 3:03-CV-0584D, 2004 WL 614842, *4 (N.D. Tex. February 27, 2004) (citing *Capacchione v. Charlotte-Mecklenburg Schools*, 182 F.R.D. 486, 491 (W.D.N.C. 1998). "The inquiries need not be phrased in terms of technical precision." *Capacchione*, 182 F.R.D. at 491 (citing *Struthers Scientific & Int'l Corp. v. General Foods Corp.*, 45 F.R.D. 375, 379 (S.D. Tex. 1968). Courts routinely instruct answering parties to use "reason and common sense" to accord specific terms and phrases in a discovery request with their "ordinary" definitions, and if necessary, to include their own reasonable definition of such terms or phrases when clarifying their

3

Atlanta • Bethesda • Boston • Chicago • Fort Lauderdale • Jacksonville • Los Angeles
Miami • New York • Northern Virginia • Orlando • Portland
San Francisco • Tallahassee • Tampa • Washington, D.C. • West Palm Beach
Beijing • Caracas* • Helsinki* • Mexico City • Tel Aviv* • Tokyo • *Representative Office

answers. *See, e.g., Pulsecard, Inc. v. Discover Card Services, Inc.* 168 F.R.D. 295, 310 (D. Kan. 1996); *Coppola v. Arrow Financial Services, LLC.* No. Civ.3:02CV577, 2002 WL 32173704, *3 (D. Conn. Oct. 29, 2002) (finding an objection based of vagueness and ambiguousness without merit where the terms at issue could be attributed their ordinary meaning.) "An interrogatory is not objectionable merely because it asks for an opinion or contention that relates to fact or the application of law to fact." Fed. R. Civ. P. 33(a)(2).

Defendants object to each of Requests for Admissions 3-7 and Interrogatories 1-3, as "vague and ambiguous."

Requests for Admissions 3 and 4 ask Defendants whether affiliation with the Black Panther Party is an appropriate basis for continuing confinement in a lockdown facility. Defendants object, claiming that the meaning of the term "affiliation" is not clear and that "appropriate" calls for speculation. The terms "affiliation" and "appropriate" can be accorded their ordinary meanings in the context of this question. Moreover, Defendants can supply their own definitions of these terms if doing so is necessary to clarify their answer. In addition, these inquiries are not speculative merely because they call upon Defendants to consider a contention that relates to a fact at issue in this case. There is certainly a factual basis in this case for an inquiry into whether affiliation with the Black Panther Party is, in Defendants' opinion or contention, an appropriate reason for continuing Plaintiffs' confinement in lockdown conditions. Please indicate if Requests for Admissions 3 and 4 will be answered, and when Plaintiffs can expect to receive the answers.

Requests for Admissions 5-7 each ask Defendants to admit or deny that LSP administration officials know of no incidents of violence at LSP committed by or on behalf of the Black Panther Party, in the time periods of 2000-present, 1990-2000 and 1980-1990, respectively. With respect to any such incidents, Interrogatories 1-3 ask Defendants to identify and describe the date, time, people involved, resolution and basis for understanding that the acts were committed by or on behalf of the Black Panther party. Defendants conclusorily assert that these Requests for Admissions and Interrogatories are "vague and ambiguous" but provide no indication at all of why they believe these requests do not "adequately advise the interrogated party of the information requested." *See Krawczyk*, 2004 WL 614842, at *4. Instead, Defendants indicate that LSP "has no way of determining [this information] with certainty." Fed. R. Civ. P. 36(a)(4) clearly states, "the answering party may assert lack of knowledge or information as a reason for failing to admit or deny *only if* the party has made a reasonable inquiry and that the information it knows or can readily obtain is insufficient to enable it to admit or deny." (emphasis added). In addition, with respect to these requests, Defendants needlessly cavil that "[t]he Black Panther Party is an abstract entity that can not itself commit acts of violence." Defendants' objection is particularly trivial given that the questions clearly ask about acts committed "by *or on behalf of*" the Black Panther Party. Please indicate if Requests for Admissions 5-7 and

4

Atlanta • Bethesda • Boston • Chicago • Fort Lauderdale • Jacksonville • Los Angeles
Miami • New York • Northern Virginia • Orlando • Portland
San Francisco • Tallahassee • Tampa • Washington, D.C. • West Palm Beach
Beijing • Caracas* • Helsinki* • Mexico City • Tel Aviv* • Tokyo • *Representative Office

Interrogatories 1-3 will be answered, and when Plaintiffs can expect to receive the answers.

<u>Defendants' "Burdensome" Objections</u>

Defendants object to several of Plaintiffs discovery requests on the grounds that the question posed is overly burdensome.

"The objection that the request is overly broad and unduly burdensome is both a relevance objection  under Fed. R. Civ. P. 26(b)(1) and a proportionality objection under Fed. R. Civ. P. 26(b)(2)(C)." *In re Katrina Canal Breaches Consolidated Litigation*, No. 05-4182, 2007 WL 1959193 (E.D. La. June 27, 2007).  Defendants should be aware that their narrow view of relevance is contrary to the definition provided by the Fed. R. Civ. P. 26(b)(1).  Relevancy is broad for discovery purposes.  It includes any non-privileged matter that is relevant to either party's claim or defense, even if that information is inadmissible at trial, "so long as the discovery appears reasonably calculated to lead to the discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1). Fed. R. Civ. P. 26(b)(2)(C) enumerates factors to be considered when balancing the costs and potential benefits of discovery. Rule 26(b)(2)(C) provides that discovery must be limited if the trial court determines that:

> (i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive;
> (ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or
> (iii) the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues.

"Requiring a responding party to perform extensive research or to compile substantial amounts of data and information does not automatically constitute an undue burden," particularly not when, "the information sought is crucial to the ultimate determination of a crucial issue and where the location of the documents is best known by the responding party." *Capacchione v. Charlotte-Mecklenburg Schools*, 182 F.R.D. 486, 491 (W.D.N.C. 1998) (citations omitted).

Specifically, Defendants raise challenges on the ground of burdensomeness to Document Requests 1-4, 7, and 16-18.  Document Request 1 seeks documentation which describes Black Panther Party membership, affiliation, activities, and influences in LSP. The request further seeks documentation of any formal or informal LSP plans or policies relating to the Black Panther Party, and asks for any documentation of LSP administrators' formal or informal position regarding the Black Panthers.  Defendants

5

Atlanta · Bethesda · Boston · Chicago · Fort Lauderdale · Jacksonville · Los Angeles
Miami · New York · Northern Virginia · Orlando · Portland
San Francisco · Tallahassee · Tampa · Washington, D.C. · West Palm Beach
Beijing · Caracas* · Helsinki* · Mexico City · Tel Aviv* · Tokyo · *Representative Office

Case 3:00-cv-00304-RET-DLD    Document 337-1    11/18/09    Page 53 of 122

state that this information is irrelevant and burdensome because their records are not indexed or tracked to reflect Black Panther activity or membership. However, the information sought is clearly relevant, and crucial to Plaintiffs' claims that they are being incarceration under solitary confinement conditions for illegitimate penological justifications. Moreover, the fact that Defendants' records are not so conveniently indexed does not constitute a valid burden under the Federal Rules, nor does it excuse Defendants from their duty make a good faith effort to look through their records for the requested information. *See, e.g., Carlson v. Freightliner, LLC.*, 226 F.R.D. 343, 370 (D. Neb. 2004) (a claim that answering the discovery will require the objecting party to expend considerable time and effort analyzing "'huge volumes of documents and information'" is not a sufficient factual basis for sustaining the objection) (citing *Wagner v. Dryvit Systems, Inc.*, 208 F.R.D. 606, 610 and quoting *Roesberg v. Johns-Manville Corp.*, 85 F.R.D. 292, 296-97 (E.D. Pa. 1980). The information sought by Document Request 1 is not unreasonably cumulative, or duplicative; cannot be obtained from a more convenient, less burdensome or less expensive source; there has not been opportunity to obtain this information; and, considering the needs of this case, the importance of the issues at stake in this controversy, the parties' resources, and the importance of discovery in resolving the issues, the benefit of discovery here outweighs the burden or expense. Plaintiffs have not detailed *any* efforts to look for material in compliance with this discovery request. Please indicate what efforts were made to search through Defendants' records, whether material in compliance Document Request 1 will be produced, and when Plaintiffs can expect to receive the production.

Document Requests 2-4 ask Defendants to produce documents related to grievances filed alleging mistreatment or differential treatment on the basis of Black Panther Party affiliation, political organization affiliation or on the basis of race or ethnicity. While Defendants have appropriately agreed to make Administrative Remedy Procedures (ARPs) available for inspection, Defendants have not indicated if they have made reasonable efforts to look through other records for pertinent material, including e-discovery. Please indicate what efforts were made to search through Defendants' records, whether additional material in compliance Document Requests 2-4 will be produced, and when Plaintiffs can expect to receive the production.

Document Request 7 asks Defendants to produce personnel records of officers who were assigned to the Camp D dorm. Defendants object, asserting that this request is irrelevant, burdensome and calls for the production of confidential documents. These personnel records would contain documentation of not only who worked where and when, but of complaints and concerns handled by Camp D staff regarding the residents, the staff and the dorm itself. Thus, this request is clearly relevant to evidence regarding the treatment of Plaintiffs while they were in the dorm, as well as their conduct. This information is particularly important in this case because Plaintiffs were moved from the dorm back into solitary conditions on , allegedly, the basis of events that took place while they were in the dorm. Contrary to Defendants' claim that Plaintiffs are asking for "undifferentiated personnel records," the scope of the discovery is plainly limited to

6

officers who worked in the Camp D dorm. Defendants cite no valid basis under the Federal Rules for failing to disclose this information. *See, e.g., Coughlin v. Lee,* 946 F.2d 1152, 1160 (5th Cir. 1991) (reversing the district court's discovery rulings that barred discovery of personnel files and instructing that the district court should be "guided by the principle that the more important the information sought in discovery is to the case, the greater the burden the opposing party can be legitimately required to shoulder.") Please indicate whether material in compliance Document Request 7 will be produced, and when Plaintiffs can expect to receive the production.

Document Requests 16 and 17 asks Defendants to produce materials relating to the investigation of the murder of Officer Brent Miller, including personnel files of LSP and/or DOC staff who participated in that investigation. Defendants conclusorily object to these requests, stating that the information sought is irrelevant and overly burdensome. Defendants also object to Plaintiffs' request because personnel files are "highly privileged" and confidential. Plaintiffs submit that this information is relevant to the case now before the Court because there is a material issue of fact in this case as to whether the murder of Officer Miller is the reason that Plaintiffs have been incarcerated in solitary conditions. As discussed *supra,* the sensitive or confidential nature of personnel files is not itself a valid basis for failing to produce otherwise discoverable information. Indeed, Defendants have not cited a single legitimate ground under the Federal Rules that could weigh in favor of finding this request overly burdensome. Please indicate Defendants' detailed basis for objecting to this request as irrelevant and overly burdensome, indicate whether Document Requests 16 and 17 will be produced, and when Plaintiffs can expect to receive the production.

Document Request 18 asks Defendants to produce information regarding staff involvement in illegal activities between January 1, 1972 and December 31, 1980. Defendants again offer their boilerplate objection that this information is irrelevant and overly burdensome. The information sought by Document Request 18 is reasonably calculated to lead to the discovery of admissible evidence regarding the conditions at LSP in that time period. While Defendants indicate that LSP and DPSC do not "maintain" records dated from January 1, 1972 until December 31, 1980, the applicable discovery standards are whether such documents are in Defendants' *"possession, custody, or control." See* Fed. R. Civ. P. 34(a)(1) (emphasis added). Defendants also complain that their records are not organized or retrievable by the category of Document Request 18. As discussed *supra,* the fact that Defendants' records are not conveniently indexed does not constitute a basis for finding that the document request is overly burdensome. Please indicate whether records records dated from January 1, 1972 until December 31, 1980 are in the Defendants' possession, custody or control. Please also indicate Defendants' detailed basis for objecting to this request as irrelevant and overly burdensome, or indicate when Document Request 18 will be produced, and when Plaintiffs can expect to receive the production.

Atlanta • Bethesda • Boston • Chicago • Fort Lauderdale • Jacksonville • Los Angeles
Miami • New York • Northern Virginia • Orlando • Portland
San Francisco • Tallahassee • Tampa • Washington, D.C. • West Palm Beach
Beijing • Caracas* • Helsinki* • Mexico City • Tel Aviv* • Tokyo • *Representative Office

Defendants' "Privilege" Objections

According to the May 22, 2009 discovery responses, Defendants are asserting privilege and withholding information relating to Document Requests Numbered 5, 8, 9, 10, 11, and 17.

As Defendants must be well aware, Federal Rule of Civil Procedure 26(b)(5) requires that a party objecting to a discovery request on the grounds that information is protected by privilege must provide a privilege log. As stated in *First Savings Bank, F.S.B., v. First Bank System, Inc.*, 902 F.Supp. 1356, 1360 (D. Kansas 1995):

> When a party withholds information otherwise discoverable under these rules by claiming that it is privileged or subject to protection as trial preparation material, the party shall make the claim expressly and shall describe the nature of the documents, communications or things not produced or disclosed in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the applicability of the privilege or protection. Rule 26(b)(5) plainly contemplates that the required notice and information is due upon a party withholding the claimed privileged material. Consequently, reading Rules 26(b)(5) and 34(b) together, the producing party must provide Rule 26(b) 95) notice and information at the time it was otherwise required to produce the documents under Rule 34.

No privilege log detailing the nature of the documents, communications or tangible things withheld has been provided that enables Plaintiffs to assess these privilege claims.

Please advise Plaintiffs of when Defendants' privilege log will be produced.

**Defendants' Improper Objection to Document Request 15**

Document Request 15 asks Defendants to produce information, including correspondence, relating to Plaintiff Woodfox's petition for writ of habeas corpus. Defendants raise the improper objection that "State Defendants do not have documents relating to Woodfox's petition for habeas corpus." As discussed *supra*, the relevant discovery standard is whether such materials are in Defendants' *"possession, custody, or control." See* Fed. R. Civ. P. 34(a)(1). It is also not clear to Plaintiffs how Defendants know they have no materials responsive to this request. For example, Defendants do not indicate whether they have conducted even basic e-discovery to look though e-mail

8

Atlanta • Bethesda • Boston • Chicago • Fort Lauderdale • Jacksonville • Los Angeles
Miami • New York • Northern Virginia • Orlando • Portland
San Francisco • Tallahassee • Tampa • Washington, D.C. • West Palm Beach
Beijing • Caracas* • Helsinki* • Mexico City • Tel Aviv* • Tokyo • *Representative Office

Case 3:00-cv-00304-RET-DLD    Document 337-1    11/18/09    Page 56 of 122

correspondence that makes mention of Plaintiff Woodfox's habeas litigation. Please indicate what efforts were made to search through Defendants' records, including correspondence, in order to comply with this discovery request. Please also indicate whether Defendants' position is that no information relating to Plaintiff Woodfox's habeas suit is in the possession, custody or control of Defendants. Finally, indicate whether additional material in compliance Document Request 15 will be produced, and when Plaintiffs can expect to receive the production.

Please let me know when you will be available to discuss these issues further.

Sincerely,

George H. Kendall, Esq.

9

Atlanta · Bethesda · Boston · Chicago · Fort Lauderdale · Jacksonville · Los Angeles
Miami · New York · Northern Virginia · Orlando · Portland
San Francisco · Tallahassee · Tampa · Washington, D.C. · West Palm Beach
Beijing · Caracas* · Helsinki* · Mexico City · Tel Aviv* · Tokyo · *Representative Office

# Holland & Knight

Tel. 212 513 3200
Fax. 212 385 9010

Holland & Knight LLP
195 Broadway, 24th Floor
New York, NY 10007
www.hklaw.com

George H. Kendall
212 513 3358
george.kendall@hklaw.com

August 31, 2009

M. Brent Hicks
Richard A. Curry
McGlinchey Stafford
Fourteenth Floor
One American Place
Baton Rouge, LA 70825

RE: **Wilkerson et al v. Stalder et al**
     **Civil Action No. 00-304-C-M3**

*Via Electronic Mail*

Dear Rick and Brent:

We write in advance of our phone conference scheduled for this afternoon, at 2:30 PM CST. We anticipate that during this conference we will need to address some pending discovery issues and the filing our motion for an enlargement of time.

With respect to pending discovery, Plaintiffs have several matters to address. First, Plaintiffs have had time to finish reviewing the results of Defendants' August 4, 2009 pull of ARP summaries responsive to search terms. After completing that review, in addition to those files previously requested and produced, we request production of the following files:

| | | |
|---|---|---|
| 1. | 1993-94 | 3504 |
| 2. | 1997-148 | 3517 |

Atlanta • Bethesda • Boston • Chicago • Fort Lauderdale • Jacksonville • Los Angeles
Miami • New York • Northern Virginia • Orlando • Portland
San Francisco • Tallahassee • Tampa • Washington, D.C. • West Palm Beach
Beijing • Caracas* • Helsinki* • Mexico City • Tel Aviv* • Tokyo • *Representative Office

| 3.  | 1993-2233 | 3526 |
|-----|-----------|------|
| 4.  | 2004-3456 | 3529 |
| 5.  | 2004-3789 | 3533 |
| 6.  | 2004-2520 | 3535 |
| 7.  | 2004-2892 | 3539 |
| 8.  | 2005-2312 | 3543 |
| 9.  | 2003-1077 | 3557 |
| 10. | 2003-1047 | 3559 |
| 11. | 2003-2841 | 3568 |
| 12. | 2003-2782 | 3576 |
| 13. | 2002-4170 | 3946 |
| 14. | 2007-2275 | 3974 |
| 15. | 2008-2375 | 3812 |
| 16. | 2008-3005 | 3813 |
| 17. | 2009-1124 | 3830 |
| 18. | 2008-2404 | 3843 |
| 19. | 2008-2794 | 3864 |

In addition, in light of discovery produced thus far, Plaintiffs request that further searches through the summaries be run using each of the following terms: telephone, telephones, phone, phones, call violations, three-way, three way, third party, call privileges, Eagle 1, maximum security dorm, maximum security dorms, maximum security dormitory, maximum security dormitories, schedule of penalties, schedule of violations. Plaintiffs will review the summaries responsive to these requests and request relevant ARP files. Plaintiffs also request the production of the Schedule of Penalties and Schedule of Violations referred to in the deposition testimony of Defendant Norris. Plaintiffs continue to wait on the production of the remainder of material concerning any violations or alleged violations by plaintiffs Albert Woodfox and Herman Wallace of LSP or DOC rules from March 2008 to present, and regarding any related disciplinary board proceedings, including audio or videotapes and transcriptions of such audio and/or videotape, if such transcriptions exist. (*See* Doc. No. 269, Document Requests 10-13).

On our call, Plaintiffs would also like to address the "investigative privilege" which Defendants have indicated Attorney General Caldwell intends to raise as a challenge to any discovery that includes documents or information relating to their involvement in the disciplinary proceedings against Plaintiffs Woodfox and Wallace. It is not at all clear to Plaintiffs how Defendants can assert that the contours of this privilege are applicable here.

Further, on our call, the parties need to resolve logistics germane to the filing our motion for an enlargement of time. In light of the fact some of the depositions scheduled last week could not go forward, and because there is the possibility that the depositions of Plaintiffs Woodfox and Wallace may be ordered reopened, Plaintiffs propose pushing all of the previously proposed deadlines back by an

additional two weeks. The parties also need to decide upon a mutually agreed upon date for the conclusion of written discovery, in the event that a drop deadline which coincides with the conclusion of depositions is not agreeable to Defendants. To be clear, Plaintiffs thus propose that we move the Court to now set October 31, 2009 deadlines for written discovery and depositions.

Finally, Plaintiffs need to confirm with Defendants exactly which witnesses Defendants seek to depose.

Many thanks and we look forward to discussing these issues this afternoon.

Sincerely,

George M. Kendall, Esq.

Atlanta • Bethesda • Boston • Chicago • Fort Lauderdale • Jacksonville • Los Angeles
Miami • New York • Northern Virginia • Orlando • Portland
San Francisco • Tallahassee • Tampa • Washington, D.C. • West Palm Beach
Beijing • Caracas* • Helsinki* • Mexico City • Tel Aviv* • Tokyo • *Representative Office

# Exhibit

# B

Page 50

1   Todd Lee the serial killer, he killed seven people
2   but they only tried him for two, he got a death
3   penalty and a life sentence so they didn't try for
4   the rest.  So in Woodfox's case, the two rape
5   charges are in his record and I would look at it
6   myself as the same way I do the serial killer, they
7   may not have tried him for them because he already
8   had his murder charge for Brent Miller and he had
9   his other charge.
10      Q   If he's still charged, is he presumed
11  innocent or is he presumed guilty under our system?
12      MR. HICKS:
13          Object to the form but you can
14  answer.
15      A   It's what I'm presuming.
16      Q   And you're presuming he's guilty --
17      A   I know I have a lot of people here that's
18  got a lot of other charges that got a life sentence
19  for one that they didn't try for the rest, so
20  therefore, I can assume that he may or may not be
21  guilty, because that's how the system works, what
22  it does to me in my mind.
23      Q   Do you recall when you read those
24  statements that were attributed to Mr. Caldwell,
25  did you consider them appropriate?

Page 51

1   A   If he was arrested for it and he said it,
2   then I consider it appropriate.
3       Q   Now, in this case, as long as Mr. Hicks
4   and Mr. Curry have been involved, the Attorney
5   General's office has played very little role in
6   representing you and the other defendants in the
7   civil case; is that true?
8       A   Yes.
9       Q   Last fall you had occasion to meet with
10  Mr. Caldwell, --
11      A   I did.
12      Q   -- about Albert Woodfox and Herman
13  Wallace.
14      A   I did.
15      Q   Did the Attorney General express to you an
16  opinion as to where either Mr. Woodfox or
17  Mr. Wallace should be held at LSP?
18      MR. HICKS:
19          I'm going to object to this question.
20  Again, we can go forward on a question by question
21  basis, understanding we're not waiving privilege
22  with respect do any other questions.  Subject to
23  that objection and if counsel agrees, the witness
24  can answer.  Counsel, do you agree?
25      MR. KENDALL:

Page 52

1       That's fine.
2   BY MR. KENDALL:
3       Q   You can answer.
4       A   Ask me again.
5       Q   When you were with Mr. Caldwell, did he
6   express an opinion to you as to where either
7   Mr. Wallace or Mr. Woodfox should be held at
8   Louisiana State Prison?
9       A   Yes.
10      Q   And what was that opinion?
11      A   Woodfox's status had changed to where he
12  had a trial coming, potentially, so therefore, his
13  status changed in that he was going to court, so he
14  likes to keep people that are going to court and
15  being tried separate and apart from most anybody
16  else, and so he asked that we keep Woodfox and
17  Wallace from being together.
18      Q   And you agreed to do so?
19      A   Sure.
20      Q   Now, also last fall did the Attorney
21  General and his staff express an interest in
22  receiving recordings of phone conversations that
23  Mr. Woodfox and Wallace had made while at LSP?
24      A   I'm not really -- I can't answer exactly
25  because he has his staff that deals with my staff,

Page 53

1   Achord, who handles all the phone stuff out in
2   investigations and they're not going to call me and
3   ask me to ask them.  I'm out of that loop.  I think
4   we might have but I don't factually get involved in
5   that, it's not at my level.
6       Q   Would it be fair to say that you're under
7   the impression that a request was made by the
8   Attorney General's office for those materials and
9   that your staff complied and provided those
10  materials?
11      A   If they had asked them they would have
12  provided, and they might have asked them.
13      Q   So do you have any idea how much material
14  was provided?
15      A   No.
16      Q   Now, did there come a time in November
17  when the Attorney General and his staff came back
18  to LSP to report what they found in the tapes?
19      A   Let me qualify this coming back to LSP.
20  He lives in north Louisiana, he can come by Angola
21  and cross the ferry and cut his trip way short to
22  go to north Louisiana.  So I know on occasion he
23  was coming home or going home when he would come by
24  here and stop, it would just be a convenience for
25  him.  And Shea Carter, who assists him, also lives

Page 54

1   in north Louisiana and so they would ride together
2   on occasion. So some was not necessarily a
3   specific trip just to see us about this but it was
4   on their way, just to clear that up.
5       Q   But was there a meeting at LSP that you
6   attended where Mr. Caldwell and his staff reported
7   to you on what they had found after listening to
8   the tapes provided by LSP?
9       A   Yes.
10      Q   And what did they tell you?
11          MR. CURRY:
12              This is subject to our continuing
13      objection that we're allowing a question by
14      question response subject to an agreement that
15      there's no waiver, correct?
16          MR. KENDALL:
17              That's correct.
18  BY MR. KENDALL:
19      Q   You can answer.
20      A   So what did they ask me about what?
21      Q   What did they tell you they had heard in
22  the tapes?
23      A   He made a three-way call and he did a
24  newspaper -- he did a report on the air.
25      Q   Okay. And who was at that meeting?

Page 55

1       A   That's going to be Shea Carter and
2   Attorney General Caldwell and myself and Vannoy and
3   probably Bruce Dodd, he's also an attorney as well
4   as one of our wardens, and that's probably it.
5       Q   Now, before that meeting when you learned
6   about this call, did you have any prior information
7   that Mr. Woodfox had made that call?
8       A   No.
9       Q   So no one else had provided you with that
10  information?
11      A   No, because we was trusting he was calling
12  who he was calling on his list.
13      Q   In the wake of that information that you
14  got, what did you do?
15      A   I don't remember what I did but I remember
16  I might have suspended his phone calls and all
17  because I consider that a real violation and I
18  consider it very sneaky that he would put that
19  personally to friends and it would be also to a
20  radio station, and then I was alarmed at what he
21  said in the report.
22          I don't do interviews without talking to
23  the Secretary of Corrections, and inmates can't do
24  interviews with the press without approval, and he
25  just slipped right under the radar and did it.

Page 56

1       Q   So you initiated an investigation at LSP.
2       A   I'm sure I did. I don't remember the
3   outcome though.
4       Q   Now, this meeting that you had with
5   Mr. Caldwell and Carter, that concerned primarily
6   this issue of what they heard in the tapes?
7       A   Two concerns: He's sneaky and it
8   concerned me about his tape, about what he said.
9       Q   But that was the purpose of the meeting?
10      A   The purpose of the meeting was for them to
11  show me that he was doing the press thing.
12      Q   There were possible charges that he was
13  violating LSP policy?
14      A   Yes. When they caught it it would have
15  been wrong not to tell us.
16      Q   Right. Have there been other occasions
17  where the Attorney General's office has apprised
18  you of violations of internal policy while you've
19  been warden?
20      A   I don't really know, I don't think so.
21      Q   Warden, let me tender to you Exhibit #8.
22          (Whereupon the document referred to by
23          Counsel was marked for identification as
24          Exhibit #8.)
25  BY MR. KENDALL:

Page 57

1       Q   I'll ask you if you can review this for a
2   moment and identify it when you're ready.
3       A   (Witness examines document.)
4       Q   Do you know what that document is?
5       A   Yes.
6       Q   What is that, sir?
7       A   It's a transcript of that press interview
8   he gave.
9       Q   Were you apprised of this charge before it
10  was made by Mr. Achord?
11      A   I don't think so.
12      Q   So you would have asked Mr. Achord in
13  November to investigate?
14      A   What I knew about it, I asked him to
15  investigate it and I asked him to listen to the
16  calls because there wasn't much trust.
17      Q   Okay. And did you have any further
18  discussions or conversations with the Attorney
19  General's office about those charges?
20      A   No.
21      Q   Did you receive any e-mails about these
22  charges?
23      A   I don't recall any e-mails about this. I
24  don't do e-mails, my secretary does.
25      Q   But you receive e-mails through your

# Exhibit

# C

Page 18

1    A   He was in Warden Cain's office.
2    Q   Was that at the meeting that pertains to
3  this investigation?
4    A   Yes.
5    Q   What about before that, you said you've
6  seen him twice?
7    A   I think that Sha Carter and, if I recall
8  they were brought to our office, the two of them,
9  the attorney general and Sha Carter by Warden
10  Vannoy or Warden Cain and just introduced to us
11  upstairs. We have an upstairs office and
12  downstairs. That was, I don't know, a couple or
13  two or three weeks, a month before that. I don't
14  recall. It was just an introduction.
15    Q   You didn't know why they were there?
16    A   No.
17    Q   Was Ms. Dana Cummings there when they were
18  introduced?
19    A   I don't know who that is.
20    Q   So it was just Attorney General Caldwell
21  and Sha Carter?
22    A   That's the only two I recall, remember.
23    Q   And the meeting in Warden Cain's office,
24  that took place on November 13; is that correct?
25    A   If you say so. I'm really not sure. I

Page 19

1  was filling in that day is the reason I was called
2  down to the office, that's all, and I just don't
3  know what day it was.
4    Q   How often does Investigative Services work
5  with outside authorities on an investigation?
6    A   Depending on what it is, we work with the
7  FBI, we work with West Feliciana Sheriff's Office,
8  we work with a lot of different agencies all over
9  the state. A lot of people want to come and
10  interview inmates about crimes that they're
11  investigating, we're involved with all of that in
12  that we set them up and we accompany them. But I
13  guess in a year's time it's pretty often.
14    Q   When are outside authorities involved,
15  under what circumstances?
16    A   Repeat that again.
17    Q   Under what circumstances would outside
18  authorities be involved in an investigation?
19    A   Usually with criminal violations of some
20  kind. They don't get involved with our internal
21  investigations, normally.
22    Q   Do you recall any other incidents besides
23  this one where the Attorney General's office was
24  involved in an internal investigation?
25    A   I don't' recall any, no.

Page 20

1    Q   How many investigations have you worked on
2  which involved Mr. Woodfox?
3    A   Me?
4    Q   Yes.
5    A   None.
6    Q   What about Mr. Wallace?
7    A   None.
8    Q   Have you ever done any investigations
9  which involved Robert King Wilkerson?
10    A   No.
11    Q   Prior to this investigation in the fall of
12  2008, were you aware of who Albert Woodfox was?
13    A   I knew who all of them were.
14    Q   When did you first learn about them?
15    A   In the '70s.
16    Q   And you weren't working here at that
17  point?
18    A   No, I was with state police.
19    Q   You just heard about them through state
20  police?
21    A   Yes.
22    Q   And when you came to LSP, did you learn
23  any new information about either of them?
24    A   (Witness shakes head negatively.)
25        The only thing was the deal with that

Page 21

1  officer, I don't remember --
2    Q   Officer Brent Miller?
3    A   Yes, that's all.
4    Q   In your experience on the Investigative
5  Services team, would you say that three-way phone
6  call violations are common at LSP?
7    A   I would think that they are, when you pull
8  them up and look at the screen you'll see the ones
9  that are in red and gold, it tells you it's
10  three-ways. Most inmates, they don't do a lot of
11  them, there's some that do that more than others.
12  But it's common for inmates to do it once in awhile
13  and some of them are perfectly legitimate, they
14  want to talk to a niece that's not on their
15  telephone list, something like that. It's illegal.
16    Q   What do you mean by legitimate, you mean
17  that they're not doing anything improper?
18    A   Nothing nefarious or illegal, not trying
19  to do criminal stuff.
20    Q   You said that most inmates don't do a lot
21  of three-way phone call violations, how many three-
22  way phone call violations a month would you say is
23  a lot?
24    A   Per inmate?
25    Q   Yes. If an inmate did say three three-way

GARY MCDONALD

11/12/2009

Pages 22 to 25

## Page 22

1  phone call violations in a month, would you
2  consider that to be a lot?
3      A   Three?
4      Q   Yes.
5      A   I can only give you my opinion.  My
6  opinion, I wouldn't fool with it unless it was
7  something other than -- I'd listen to them and see
8  if it was something other than just common
9  communication.  If it was something other than that
10  I would look at it, but myself, no, I wouldn't for
11  three violations.
12      Q   What about improper media statements, in
13  your experience with Investigative Services, is
14  that an uncommon or common violation?
15      A   It's probably an uncommon violation.
16      Q   Do you know of any other media statements
17  that have been given by LSP inmates in the last
18  five years?
19      A   Other than, I'm thinking they caught, not
20  caught, they found that we had a guy from the press
21  that was here that killed his wife, he was I think
22  talking to the media.  I don't remember what his
23  name was.  Other than that that's the only one I
24  recall.
25      Q   Is that Vince Marinello?

## Page 23

1      A   Yeah.
2      Q   Do you know how many times he spoke to the
3  media?
4      A   I do not.
5      Q   Did you investigate that?
6      A   No.
7      Q   Do you know what he was sentenced to?
8      A   No, I don't know, I really don't.  I don't
9  know whether he was even sentenced to tell you the
10  truth, I don't know.
11      Q   In your experience as an investigator, is
12  a change in quarters sentence for a rule violation,
13  is that a lenient punishment or is that a severe
14  punishment?
15      A   I wouldn't consider it a severe
16  punishment, no.  I wouldn't say it's quite common
17  but it's not rare by any means.
18      Q   Do you think it's a common punishment for
19  three-way phone call violations?
20      A   Depending on the numbers, yeah, I think
21  you need to make a point at times and that's one
22  way to make a point.  Just taking his phone calls
23  away for a weak or two doesn't do any good, you
24  make a point by disrupting his life a little bit,
25  which is moving him to another facility.

## Page 24

1      Q   What about for media statements, do you
2  think that's a proper --
3      A   I would think that would be, yeah.
4      Q   Now, you mentioned that you met
5  Mr. Caldwell at a meeting in Warden Cain's office
6  on November 13?
7      A   I didn't meet him there, he was there when
8  I came into the office.
9      Q   Do you remember what time of day that was
10  that you were called into the office?
11      A   If I remember correctly it was late
12  afternoon.  Strictly a guess, but 3:00, somewhere
13  in that area.
14      Q   And do you remember who called you to tell
15  you to come to Warden Cain's office?
16      A   I don't remember but it's usually the
17  warden's executive assistant, which would be
18  Stephanie LaMartiniere.
19      Q   Did she tell you at that point what the
20  meeting was regarding?
21      A   No, she just asked me, the warden would
22  like me to step down into his office, that's what
23  she asked.
24      Q   So you went right away?
25      A   Yes, you don't keep the warden waiting.

## Page 25

1      Q   And when you got there who was in the room
2  besides Warden Cain and Attorney General Caldwell
3  and Sha Carter?
4      A   Sha Carter, the Attorney General, Warden
5  Cain, I'm thinking Warden Vannoy but I'm not sure,
6  and I'm also thinking Warden Norris but I'm not
7  sure, I think Lieutenant Colonel Temple was there
8  with me, I think she came down with me.  To tell
9  you the truth, that's all that I remember.  I'm not
10  sure about two of those.
11      Q   Who was the first person you spoke to when
12  you arrived?
13      A   I don't know that I spoke to anybody.
14  When I came in they were listening to a phone call,
15  it seems to me they were listening to a phone call
16  on Warden Cain's computer.  Now that was between
17  Woodfox and that lady in California.
18      Q   Did you at that point start listening to
19  the phone call as well?
20      A   Well, I could hear it, I wasn't paying a
21  lot of attention to it because nobody said anything
22  to me.  At that point I didn't know what I was
23  there for.  And at some point Warden Cain said
24  something about we need to investigate this, and I
25  asked Warden Cain, do you want them locked up and

PH: 225-201-9650
E-transcripts * Video Depositions

Court Reporters of Louisiana, LLC
www.courtreportersla.com

FX: 225-201-9651
Realtime Transcripts * Deponent Photo ID

Page 26

1  he said yes. So I called upstairs and called for
2  Mike Vaughn, and I can't remember whether I talked
3  to him on the phone and told him what I wanted or
4  he came down, I think he came downstairs and met me
5  right outside the warden's office and I told him to
6  lock Woodfox and Wallace up on a 30 W and put them
7  in admin seg and defer it for investigation, which
8  is our normal practice.
9     Q   When they finished listening to that call,
10  did they replay it for you?
11    A   No. That's all stuff we can do later,
12  there was no need in me being involved at that
13  point.
14    Q   And Warden Cain said that the call needed
15  to be investigated, did he say that right after he
16  finished listening to the call?
17    A   While they were listening to it. I don't
18  know how many times they had listened to it, I
19  don't know how long the attorney general and Sha
20  had been there, I don't have any idea what
21  transpired before I got there. At some point,
22  being that I was there, he said this needs to be
23  investigated and he's talking to me, I asked him do
24  you want them locked up and he said yes. And I
25  think he told Ms. Temple -- now this I'm trying to

Page 27

1  recall, but I think he told Ms. Temple to block
2  their calls or don't allow any calls except legal
3  calls until we have some determination or whatever.
4  I think that's why Ms. Temple was there, because
5  she handles our phone system. I'm just trying to
6  recall that.
7     Q   Did he say anything to you about what he
8  thought the rule violation was?
9     A   No, he did say something about talking to
10  the media, that's all I can recall.
11    Q   Did Attorney General Caldwell speak at
12  all?
13    A   I don't recall him saying anything.
14    Q   What about Sha Carter?
15    A   I don't recall her saying anything.
16    Q   How long do you think you were in the
17  room?
18    A   I don't know, maybe ten minutes.
19    Q   And after you stepped outside to meet with
20  Mr. Vaughn and told him to lock up Mr. Woodfox and
21  Mr. Wallace, did you step back into the room?
22    A   No, once we did what we did, our part was
23  through, I went back upstairs. I mean, there was
24  no need for us being there. He wanted it
25  investigated, I wasn't going to investigate it, I'm

Page 28

1  pretty sure Bobby was, so my part was over.
2     Q   How did Mr. Achord find out about the
3  investigation?
4     A   I can't recall. I may have called him or
5  Sandra may have called him. Somebody notified
6  him but I don't remember when. It's usually pretty
7  soon after something transpires we'll get
8  immediately on a cell phone or somewhere and notify
9  him. If Colonel Norris was there or Warden Norris
10  was there he could have very well called him, I
11  don't know. I know he was notified shortly after.
12    Q   Did you know even then that you would not
13  be doing the investigation yourself?
14    A   I don't do any long term investigations so
15  I knew I wasn't.
16    Q   You said you work part-time, how often do
17  you work here?
18    A   How often?
19    Q   Yes.
20    A   Usually Mondays and Tuesdays, sometimes
21  I'll fill in on Thursdays and Fridays filling in
22  for Bobby. Really, a lot of my job is just
23  reviewing reports, grammatical errors and things
24  like that, which is pretty well a full time job.
25  We generate ten or fifteen cases a week I guess.

Page 29

1     Q   And you requested that Major Vaughn issue
2  these disciplinary reports that were issued against
3  Albert Woodfox and Mr. Wallace, right?
4     A   Right, just write them up, 30 W, defer for
5  investigation.
6     Q   And the reason why you had them sent to
7  administrative segregation was at the request of
8  Warden Cain?
9     A   No, we do that, that's normal practice, we
10  put them -- admin seg is a normal procedure, we
11  separate, we don't want the persons to gather if
12  there's more than one, but admin seg, that's not a
13  punitive deal, that's just a single cell is what it
14  is.
15    Q   But you said earlier that you asked Warden
16  Cain, do you want them locked up?
17    A   Right.
18    Q   Does that mean, do you want them to go to
19  administrative segregation?
20    A   It's always administrative segregation,
21  that's where we put them when we lock them up.
22    Q   So what time do you think it was when you
23  asked Major Vaughn to issue the disciplinary
24  reports?
25    A   It was at the time he came down and met

## Page 50

1  included in the investigative report?

2      A    Not to my knowledge, no.

3      Q    And do you know who decided that all

4  recorded phone calls of Mr. Woodfox and Mr. Wallace

5  should be listened to to look for further

6  violations?

7      A    Do I know who decided that?

8      Q    Yes.

9      A    No, ma'am, I don't.

10     Q    Do you recall any other investigation in

11  your experience where investigators went to look

12  for additional rule violations after finding one

13  violation?

14     A    No, I don't.  Usually when you're doing an

15  investigation, others will come up sometimes when

16  you're doing that investigation, but I don't recall

17  anybody ever going and looking for others.

18         MS. WILLIAMS:

19             All right, thank you very much.

20  That's it.

21  (Thereupon, the witness' testimony was concluded.)

22                  * * * * *

23

24

25

## Page 51

1      R E P O R T E R ' S   C E R T I F I C A T E

2          I, Janice Welch, a Certified Court

3  Reporter, Certificate #87172, in good standing with

4  the State of Louisiana, do hereby certify that the

5  foregoing 50 pages constitute the transcript of the

6  deposition of GARY MCDONALD, taken on November 12,

7  2009, in the above-entitled and numbered cause;

8  that the said witness was duly sworn by me upon

9  authority of R.S. 37:2554 and thereafter testified

10  as hereinbefore set forth;

11          That the proceedings were reported by me

12  in stenographic machine shorthand by Computer-Aided

13  Transcription, transcribed by me, and is a true and

14  correct transcript to the best of my ability and

15  understanding;

16          That I am not of Counsel nor related to

17  any person participating in this cause and am in no

18  way interested in the outcome of this event.

19          This certification is valid only for a

20  transcript accompanied by my handwritten original

21  signature and the image of my State-authorized seal

22  on this page.

23  SIGNED:  DECEMBER 1, 2009

24

25          Janice Welch, CCR  #87172

# Exhibit

# D

Page 18

1     A    The Pam LaBorde that I know is employed at
2   headquarters and I think she's a public information
3   officer, among other things.
4     Q    Did you work with her when you were
5   working at headquarters?
6     A    No.
7     Q    Have you worked with her while working
8   here at LSP?
9     A    No.
10    Q    What about Bruce Dodd?
11    A    Bruce Dodd is an attorney who is also one
12  of the assistant wardens here.
13    Q    Is he counsel for the prison?
14    A    He was, they hired another lady, Teri
15  Cannon that does it now and I think he probably
16  assists her but I'm not sure about that.
17    Q    Is Teri Cannon also an assistant warden?
18    A    No.
19    Q    What does he do in his capacity as an
20  assistant warden now?
21    A    Mr. Dodd?
22    Q    Yes.
23    A    He's assigned to the business office.
24    Q    Do you know what that means?
25    A    They oversee all of the budgets, financial

Page 19

1   aspects of the prison.
2     Q    What about Warden Vannoy?
3     A    Warden Vannoy is the deputy warden in
4   charge of security.
5     Q    Do you work with him a lot in your
6   investigations?
7     A    I do.
8     Q    What about Warden Cain?
9     A    Warden Cain is the warden.
10    Q    I'm sorry, do you work with him a lot in
11  your investigations as well?
12    A    Well, every report that we generate is
13  directed to his attention and then we cc copies to
14  other wardens that need to know.
15    Q    Does he see the report before other
16  wardens see the report?
17    A    Generally, no.
18    Q    At the same time?
19    A    They're all distributed at the same time.
20    Q    What about Kathy Fontenot?
21    A    Ms. Fontenot is an assistant warden.
22    Q    And what does she do in her capacity as
23  assistant warden?
24    A    I don't follow the exact job descriptions
25  on them but I think she handles classification and

Page 20

1   some other administrative type functions.
2     Q    Do you work with her frequently on your
3   investigations?
4     A    Not frequently.
5     Q    Have you worked with her on your
6   investigations?
7     A    Yes.
8     Q    What about Dana Cummings?
9     A    Dana Cummings?
10    Q    Yes.
11    A    I've heard that name but I don't really
12  know that person.
13    Q    What about Shea Carter?
14    A    I know Shea Carter.
15    Q    And how do you know Shea Carter?
16    A    I met Shea Carter, I think I met her
17  several years ago when she worked for a DA's office
18  and requested some information from us.  That's
19  been several years ago.  She now works for the
20  Attorney General's office.
21    Q    When have you worked with her most
22  recently?
23    A    The most recent thing is when we began the
24  investigation with Herman Wallace, offender, and
25  offender Albert Woodfox.  The Attorney General's

Page 21

1   office had requested all of their telephone calls.
2   They had some type of investigation going, I didn't
3   really know what it was and I was so busy I didn't
4   really -- felt like I needed to know.
5     Q    When did that happen?
6     A    I really can't recall.  It was sometime
7   prior to the date that we started this
8   investigation with offender Wallace and offender
9   Woodfox.  Probably sometime within that year of
10  2008.
11    Q    Within the year of 2008, do you remember
12  what season it was, was it the winter of 2008?
13    A    No.  As I said earlier, I got so much
14  plugged in my brain from literally hundreds of
15  investigations that I just can't remember.  And
16  when I skimmed it this morning, I didn't see
17  anything that just jumped out at me about that, and
18  I don't think I got it exactly when, but I may have
19  but I don't remember seeing it.
20    Q    In that investigation, did you work with
21  Buddy Caldwell?
22    A    No.  I've seen Mr. Caldwell a couple of
23  times but I didn't work with him.
24    Q    Did you ever speak with him?
25    A    Not really.

COL. BOBBY ACHORD                                10/21/2009

Pages 22 to 25

Page 22

1    **Q    E-mail with him?**
2    A    No.
3    **Q    How often do your investigations involve**
4    **outside authorities?**
5    A    We do close to a thousand investigations a
6    year.  The majority of them come from within the
7    prison.  I can't really give you a specific number
8    of outside law enforcement agencies that we work
9    with, but we set up -- if an outside law
10   enforcement agency wants to come interview a
11   convict, and they do that fairly regularly, three
12   or four times a month, we'll get a request from
13   someone to come interview a convict and it has to
14   go through our office and we set it up.
15        If we pick up something in a phone call
16   that might interest some law enforcement agency,
17   we'll call them.  If we have an escape like we had
18   back in September, then we coordinate very closely
19   with outside law enforcement agencies, U.S. Marshal
20   service.
21        We normally handle all of the
22   investigations that's done here in the prison.
23   Some of those investigations go beyond simple
24   assault on an officer, beyond to inmates simple
25   fighting and we do use the West Feliciana Sheriff's

Page 23

1    Office to come in and actually work a criminal
2    investigation and we assist them in serious
3    incidents.
4    **Q    So if during the course in your**
5    **investigation you come across something that would**
6    **be criminal, would be a violation of criminal code,**
7    **you involve the West Feliciana Sheriff's Office?**
8    A    Not all the time.
9    **Q    When would you do that and when would you**
10   **not do it?**
11   A    If, for instance, we seize more than, I
12   think it's three grams of marijuana for instance,
13   then we contact the sheriff's office, narcotics
14   unit and let them know what we have.  If we get
15   beyond that, we may get into say an ounce or half
16   an ounce or something, we'll call and they'll come
17   assist us with that, and they've actually charged
18   offenders with it.  We've charged visitors with
19   bringing drugs in and the sheriff's office have
20   charged them.  If we have an officer that say
21   abuses an offender, we'll call the sheriff's office
22   in and work with them and they will probably
23   finally arrest, they have arrested officers.
24   **Q    So would you say it depends on how serious**
25   **the violation is?**

Page 24

1    A    That's correct.
2    **Q    How often are the outside authorities that**
3    **they cooperate with the Attorney General's office?**
4    A    Are you asking how often do we work with
5    the Attorney General's office?
6    **Q    Yes.**
7    A    Not very often.
8    **Q    Do you remember any other examples of**
9    **working with the Attorney General's office besides**
10   **the investigation from November and December of**
11   **2008?**
12   A    I'm sure that we've passed them some
13   information.  We've worked with like the Internal
14   Revenue when we have offenders violating federal
15   laws, we've worked with the FBI in like Katrina
16   fraud.  The Attorney General has investigators who
17   do Internet fraud or Internet pornography and that
18   sort of thing, but I don't recall us ever working
19   with them.
20   **Q    Do you recall any other examples of the**
21   **Attorney General's office passing you information**
22   **about violations going on at LSP?**
23   A    They could have but other than this case
24   here, I can't recall.
25   **Q    How many investigations have you done**

Page 25

1    **which involve Mr. Woodfox?**
2    A    I'm going from memory so I may not be
3    entirely correct.  There was a demonstration at the
4    front gate in 2002, which was set up by supporters
5    of Mr. Woodfox and Mr. Wallace.  It was a peaceful
6    demonstration and we were there.  There was a
7    demonstration I think in 2003 very similar, and I
8    forget what the point is that they were trying to
9    make.  The only other time that I worked, when
10   Mr. Woodfox was in this case here.
11   **Q    The 2003 demonstration that you remember,**
12   **was that also peaceful?**
13   A    Yes.
14   **Q    So other than those three investigations,**
15   **you don't recall being involved?**
16   A    No, I don't recall any more for
17   Mr. Woodfox.
18   **Q    What about with respect to Mr. Wallace,**
19   **what investigations do you recall with him?**
20   A    The same two demonstrations.  There was an
21   incident, I pulled the case this morning, I didn't
22   look at it, I don't recall a lot of it, but they
23   found a piece of Plexiglass in Mr. Wallace's cell.
24   And then I worked a case with Mr. Wallace where he
25   worked a scheme to buy some jewelry for a lady on

Page 50

1  would, as they heard a phone call that had
2  something like a rule violation in it, she would --
3  most of the time she e-mailed that to me or she
4  might call.
5      Q   You said that you broke up the calls
6  according to specific numbers, did you take out
7  legal attorney numbers from those numbers?
8      A   I did.
9      Q   So how would it be that legal calls were
10  listened to if attorney numbers were removed from
11  that?
12      A   I would want to say that the Attorney
13  General's office probably told us you need to
14  listen to this call because it's a three-way.
15      Q   On the disciplinary reports for
16  Mr. Wallace and Mr. Woodfox, which I'm going to ask
17  to have marked as Exhibit 9 and 10, Mr. Wallace
18  being 9 and Mr. Woodfox being 10, there's a
19  transcribed call attached as an exhibit.  Were
20  there any other calls that were transcribed besides
21  the ones that's attached?
22      A   To the best of my recollection, these were
23  the -- I think there's three phone calls here
24  that's transcribed.
25          (Whereupon the document referred to by

Page 51

1          Counsel were marked for identification as
2          Exhibit 9 and Exhibit 10.)
3  BY MS. WILLIAMS:
4      Q   I believe you're right, there are three
5  calls on there that are transcribed.  Are those the
6  only calls that were listened to during the course
7  of the investigation?
8      A   I think so.  We do excerpts of calls in a
9  lot of my investigations, excerpts being part of
10  it.  I think in this investigation these would be
11  the only three that we actually did transcribe.  It
12  takes a lot of time to do that.
13      Q   And when would you transcribe a call, when
14  would you transcribe an excerpt or a call?
15      A   I'm sorry?
16      Q   Under the circumstances would you decide
17  that it was important enough to transcribe a
18  portion of a call or a specific call?
19      A   In relation to this case or in relation to
20  cases in general?
21      Q   Let's start with cases in general.
22      A   Cases in general, if an offender is
23  talking to someone and they're using code words
24  like, give me some green, you know, be sure you
25  wrap it up tight, insert it where they can't find

Page 52

1  it and get it to me, that's code words for drugs,
2  so we're going to pull that out of that
3  conversation and put that excerpt.  If he's telling
4  someone, I'm working the rodeo this weekend, bring
5  me a pair of tennis shoes, size nine and a half
6  Nike's, black and white and I'll trade you out,
7  that would be the types of excerpts in general
8  cases.
9          In this case here we transcribed those
10  phone calls because they were all made on the same
11  day, November 3, and we wanted it for the purpose
12  of the Disciplinary Board, for the Disciplinary
13  Board to see the whole phone call.  The offender
14  gets a copy of the report too so that gives the
15  offender the whole phone call.
16      Q   Is my understanding correct that portions
17  of the calls are transcribed when the substance of
18  what is discussed is itself a rule violation or
19  some sort of nefarious conduct?
20      A   I'm sorry?
21      Q   I just want to make sure I understand this
22  right.  The portions of calls that are transcribed
23  are transcribed because they reflect prohibited
24  conduct?
25      A   Correct.

Page 53

1      Q   Is that right?
2      A   Correct.
3      Q   But this was the only transcription in all
4  the calls that were listened to?
5      A   To the best of my recollection.
6      Q   What else was involved in the course of
7  the investigation besides listening to phone calls?
8      A   We put the offenders on mail watch because
9  a lot of times, once an offender is locked down,
10  particularly if they don't know the real reason why
11  they're locked down, like a 30 W, that they will
12  reveal information in letters going out that we can
13  use.
14          I would have researched posted policies,
15  penitentiary directives and departmental regs for
16  possible rule violations.  I did some Internet
17  research because I wasn't familiar with the people
18  involved or Prison Radio or any of those type
19  people.
20      Q   Did you conduct any interviews?
21      A   I don't recall conducting any interviews.
22      Q   Are you aware of any other witnesses that
23  were involved in these violations?
24      A   No, I don't think so, I think we pretty
25  well worked this one from what we were able to

# Exhibit

# E

1       Q      Can you read that?

2       A      "A properly placed telephone call to an

3   attorney will not be monitored or recorded."   So

4   we're not recording.   "Unless reasonable suspicion

5   of illicit activity has resulted in a formal

6   investigation and such action has been authorized

7   by Secretary or designee."

8       Q      So you understand that policy to say you

9   don't record legal phone calls.

10      A      Right.

11      Q      Unless the Secretary authorizes.

12      A      Exactly.

13      Q      And can I ask you to look at Exhibit 6,

14   which is T-31.

15      A      Okay.

16      Q      And if I can ask you to go to page 8, and

17   under F, paragraph 3, can I ask you to read that

18   sentence.

19      A      "A properly placed telephone call to an

20   attorney will not be monitored and/or recorded."

21      Q      So what you just read out of T-31 is

22   consistent with the policy in Exhibit 5.

23      A      Yes, it is.

24      Q      Now, in this lawsuit that we're talking

25   about, for the past several years you've been

Page 50

1   represented by Mr. Hicks and Mr. Curry; is that
2   correct?
3       A   Yes.
4       Q   And you found them to be able lawyers?
5       A   Yes.
6       Q   So in addition to these proceedings,
7   you're aware that Mr. Woodfox has a proceeding
8   attacking his conviction?
9       A   Yes.
10      Q   And do you know who represents the
11  interest of the state in that proceeding?
12      A   Yes, I do.
13      Q   Who is that?
14      A   The attorney general.
15      Q   And who within the Attorney General's
16  office represents the state in that lawsuit?
17      A   I don't know.  I know Buddy Caldwell is
18  the Attorney General.
19      Q   Mr. Caldwell, do you know, has he been
20  active in that case?
21      A   Yes.
22      Q   And how do you know that?
23      A   I've met with him.
24      Q   About that case?
25      A   Not about that case, he's talked about

Page 51

1   that case in front of me.
2       Q   And are there other lawyers on his staff
3   who are involved as well in that case?
4       A   I don't know.
5       Q   And do you know whether Mr. Wallace also
6   has a lawsuit that attacks his conviction as well?
7       A   I know that he was over turned by the
8   Louisiana Supreme Court on a case.
9       Q   And do you know who represents the state's
10  interest in that proceeding?
11      A   No.
12      Q   Okay, last fall did you have an occasion
13  to attend any meetings with Mr. Caldwell about
14  Mr. Woodfox's lawsuit attacking his conviction?
15      A   Yeah, I met with him.
16      Q   And what was the point of that meeting?
17      MR. HICKS:
18          I'm going to object as being
19  attorney-client privilege to the extent you're
20  asking him what was discussed at the meeting with
21  the Attorney General.
22      BY MR. KENDALL:
23      Q   Let me rephrase the question.
24          You attended such a meeting?
25      A   Yes.

Page 52

1       Q   Was there only one meeting?
2       A   That I can recall, last fall, yes.
3       Q   And was the topic of Mr. Woodfox's release
4   on bail discussed?
5       MR. HICKS:
6           Objection, attorney-client privilege.
7       MR. KENDALL:
8           That's a request of historical fact,
9   nothing about legal strategy.
10      MR. HICKS:
11          The substance of the conversation
12  between counsel and client are privilege and I
13  object to that question and I'm instructing my
14  client not to answer.
15      MR. KENDALL:
16          We will object to that.
17      BY MR. KENDALL:
18      Q   Did you see any media coverage of any
19  events in Mr. Woodfox's habeas corpus case last
20  year?
21      A   Yes.
22      Q   And what did you see?
23      A   I recall an article in the newspaper where
24  he was trying to go live in an area in New Orleans
25  with his niece, I believe.

Page 53

1       Q   And do you recall seeing any comments in
2   the media made by Mr. Caldwell about that?
3       A   Yes.
4       Q   And what do you recall?
5       A   I don't remember what he said.  He was
6   opposing him being released on bail, but I don't
7   remember his exact words.
8       Q   Do you recall how many stories you saw
9   about that?
10      A   Only that one that I can remember.
11      Q   Do you recall any specific remarks that
12  Mr. Caldwell made about that?
13      A   No.
14      Q   Now, with regard to this matter, you have
15  been represented principally by Mr. Hicks and
16  Mr. Curry?
17      A   Yes.
18      Q   Did there come a time last fall when Mr.
19  Caldwell also became involved in this case in a way
20  that he hadn't been previously?
21      MR. HICKS:
22          Object to the form.  To the extent
23  you know, you can answer.
24      A   No, not that I know of.
25      Q   So there were no discussions about this

WARDEN DARREL VANNOY                                    10/22/2009

Pages 54 to 57

Page 54

1  particular case with Mr. Caldwell?
2     A   He talked about the --
3        MR. HICKS:
4           I'm going to object, attorney-client
5  privilege to the extent you're asking about
6  conversations between the Attorney General and I'm
7  instructing my client not to answer.
8        MR. KENDALL:
9           We object to that.
10  BY MR. KENDALL:
11     Q   In the course of any conversation you had
12  with Mr. Caldwell, did he express an opinion on
13  where Mr. Woodfox or Mr. Wallace ought to be
14  housed?
15        MR. HICKS:
16           Objection, instructing my client not
17  to answer.  Attorney-client privilege.
18        MR. KENDALL:
19           I object.
20  BY MR. KENDALL:
21     Q   Did there come a time last fall when the
22  Attorney General expressed interest in receiving
23  phone conversations that LSP had recorded that
24  concerned either Mr. Woodfox or Mr. Wallace?
25     A   Yes, I believe so.

Page 55

1     Q   What do you know about that?
2     A   I know we requested Investigations to send
3  him a copy of anything he had recorded.
4     Q   And do you know what Investigations did?
5     A   I didn't see them send it to him but I'm
6  sure they did.
7     Q   And do you know what was sent?
8     A   No.
9     Q   Did anyone in Investigations ask you what
10  should be sent or what not should be sent?
11     A   No.
12     Q   Now, do you recall in November of last
13  year the Attorney General meeting here to discuss
14  what they had learned from reviewing the tapes?
15     A   Yes.
16     Q   Did you attend that meeting?
17     A   Yes.
18     Q   Who else attended that meeting?
19     A   Warden Cain, Shea Carter.
20     Q   Who is Shea Carter?
21     A   She works for the Attorney General, she's
22  with him.
23     Q   Who else?
24     A   Colonel Achord probably was there.  That's
25  all I can remember.

Page 56

1     Q   Mr. Dupont?
2     A   I don't think he was there.
3     Q   Anyone from Camp D?
4     A   Not that I can remember.
5     Q   And was the Attorney General there?
6     A   Yes.
7     Q   Was there anyone else from the Attorney
8  General's office beside Mr. Caldwell and Ms.
9  Carter?
10     A   Not that I can recall.
11     Q   Was Mr. Hicks or Mr. Curry there?
12     A   I don't remember.
13     Q   Those are the only --
14     A   That's the ones I can remember.
15     Q   That you remember, okay.  And you learned
16  in this meeting that the Attorney General and staff
17  had listened to these tapes?
18     A   Yes.
19     Q   And you learned also that they reported
20  that Mr. Woodfox had made calls to the media?
21     A   Yes.
22     Q   Did you learn anything else about what was
23  on the tapes?
24     A   I don't recall.  I recall him, I don't
25  know if it was that -- I recall that Woodfox had

Page 57

1  said something that the employees and the inmates
2  hated him, I remember that part.
3     Q   And would it be fair to say at least one
4  purpose of this meeting was to apprise, was to
5  inform you, meaning LSP, of the events on these
6  tapes for what purpose?
7        MR. HICKS:
8           Object to the form but you can
9  answer.
10        THE WITNESS:
11           I'm sorry?
12        MR. HICKS:
13           I objected to the question but you
14  can answer.
15     A   Repeat the question again for me.
16        MR. KENDALL:
17           Could you read the question back,
18  please.
19     (The last question was read back.)
20     A   Are you asking me why he wanted to inform
21  us?
22     Q   That's correct.
23        MR. HICKS:
24           I object to that question, to the
25  extent you're asking what the intention of the

Page 58

1  Attorney General was.  I instruct him not to
2  answer.
3  BY MR. KENDALL:
4     Q   Let me ask another question.  One thing
5  that you learned during this meeting was that there
6  were possible violations of LSP policy on those
7  tapes?
8     A   Yes.
9     Q   Now, you've been here since 1975?
10    A   Yes.
11    Q   Have there been other occasions when the
12  Attorney General of the state has met with you to
13  apprise you of prisoner activity that violated or
14  might violate LSP policy?
15    A   No.
16    Q   That was the first time?
17    A   Yes.
18    Q   Warden Vannoy, let me tender to you our
19  Exhibit 8, and ask you to look at this and see if
20  you can recognize it, please.
21    A   (Witness examine document.)
22        This is an investigation from Colonel
23  Bobby Achord to the DB office, disciplinary office,
24  dated December 17, 2008, regarding inmate Albert
25  Woodfox.

Page 59

1     Q   And is it fair to say that this
2  investigation grew out of the meeting that you had
3  with the Attorney General?
4     A   I'll have to read it.
5        (Witness examines document.)
6        Yes.
7     Q   Now, were you advised of these charges
8  being filed before they were filed?
9     A   I don't know.  I was advised, I don't know
10  whether it was before he wrote him up or after, I
11  don't know.
12    Q   Let me ask you, did you meet with Mr.
13  Achord or did Mr. Achord talk to you anytime
14  between November 17 and the filing of these charges
15  in late December, to the best of your recollection?
16    A   He could have but I don't really recall, I
17  don't remember.
18    Q   Do you recall getting any e-mail from
19  Mr. Achord about this?
20    A   No, I know I would have gotten a copy of
21  that report probably.
22    Q   Did you receive any communication from the
23  Attorney General's office about this investigation?
24    A   Me personally?
25    Q   Yes.

Page 60

1     A   No.
2     Q   Now, do you have any knowledge as to
3  whether during the course of this investigation
4  that phone calls made to attorneys, tapes of phone
5  calls to attorneys were listened to?
6     A   I don't have any knowledge of that.
7        (Whereupon the document referred to by
8        Counsel was marked for identification as
9        Exhibit 8.)
10  BY MR. KENDALL:
11    Q   Warden, could I ask you to look at Exhibit
12  4.
13    A   Okay.
14    Q   And if I could direct your attention to
15  paragraph number one, "Mr. Woodfox participated in
16  ten three-way phone calls between the time frame of
17  11-16-07 and 9-15-08."  If we could go to number
18  five, and for purposes of this deposition, if you
19  could accept the fact that the number there,
20  504-864-0700, is the office number of Nick
21  Trenticosta, would that indicate to you that one of
22  the calls that was listened to was a call made to
23  Attorney Nick Trenticosta?
24        MR. HICKS:
25            Object to the form.  You're asking

Page 61

1  him to assume the call was made to Nick Trenticosta
2  and ask him if it was made?
3  BY MR. KENDALL:
4     Q   If that number, 504-864-0700, is
5  Mr. Trenticosta's office number, does this report
6  indicate that that was a call that was listened to,
7  a call made to that number?
8        MR. HICKS:
9            You're asking him to interpret the
10       report?
11       MR. KENDALL:
12           Yes.
13    A   Yes.
14    Q   Now, would listening to the tape of that
15  call, would that be consistent with the policy, the
16  phone policy that we reviewed not long ago?
17    A   Yes.
18    Q   And why would it be consistent?
19    A   If that's his attorney of record, he's
20  allowed to call his attorney.
21    Q   But would it be allowable for that phone
22  call to his attorney to be taped and then listened
23  to, pursuant to the policy that we went over, your
24  policy G-31.
25    A   Only if it was approved by the warden and

# Exhibit

# F

MICHAEL VAUGHN                                    10/21/2009

Pages 60 to 63

---

Page 60

1      Q    And if you know, how did the phone
2  violations that were an issue in these
3  investigations, how did they come to the attention
4  of the Investigative Services team?
5      A    The way I can appreciate it, ma'am, is
6  that we had gotten instructed or informed by a
7  higher authority that the Attorney General wanted
8  -- his office was doing an investigation and they
9  wanted copies of phone calls and we were instructed
10  to cooperate with the Attorney General's office in
11  making copies on discs of phone calls.  And
12  somewhere down the road we would get information,
13  maybe listen to certain phone calls, and that's how
14  I can appreciate the investigation got started.
15  But it might have been something else altogether,
16  but that's my understanding of that right there.
17      Q    Do you know what the technology, what
18  technology was used to record the phone calls in
19  the first instance?
20      A    Sure, yes, ma'am, I'm familiar with the
21  laser voice system.
22      Q    It's called a laser voice system, is that
23  a special technology or is it what's used to record
24  all inmate phone calls?
25      A    All inmate phone calls.  Right now it's

Page 61

1  maintained by Global Tell at this time as the
2  corporation, it's called laser voice system.
3      Q    And is the practice here to record every
4  inmate's call that's made?
5      A    Yes, ma'am, every inmate call that is made
6  on that system is recorded.
7      Q    Is there a way for an inmate to make a
8  call not on that system?
9      A    Yes, ma'am.
10      Q    How would an inmate do that?
11      A    On special occasions, special deals,
12  emergencies, different things like that they'll use
13  a state phone, they're allowed to use a state phone
14  which is not recorded.
15      Q    Which is not recorded?
16      A    It's not recorded, no.  The camp might be
17  in some kind of an emergency at night that this
18  inmate needs to call home or something and the
19  warden will authorize them to use the state phone
20  for a few minutes to call home to make this person
21  feel better or whatever.
22      Q    So other than those types of calls, every
23  call is recorded, other than those emergency type
24  of phone calls?
25      A    Every call that is made on that system,

Page 62

1  that system is recorded.
2      Q    Do you know how long the calls are saved
3  on that system?
4      A    Yes, ma'am, they're saved for one year.
5      Q    And if you wanted to go back and listen to
6  a call that happened nine months ago, how would you
7  do that, would you have to put in a request to
8  Global Tell?
9      A    No, ma'am, you can go right to our
10  machine.
11      Q    To sort of a data base?
12      A    I have a computer right there and I can go
13  right to it and go straight to that call.
14      Q    In that data base is there a way to take
15  notes on that call?
16      A    Sure.
17      Q    So you can go see someone else's notes on
18  a call for example?
19      A    Right, it's possible, if anybody wrote
20  notes in them you can.  Also, lock the call, you
21  can lock the call.
22      Q    What does that mean to lock it?
23      A    Lock it, it's locked forever, unless
24  somebody with authority unlocks it.
25      Q    So that means it can never be deleted?

Page 63

1      A    Well, I can't say that, the system could
2  crash, something or another could happen.  It
3  happened to me at Hunt and lose all the calls, but
4  technically it's supposed to be there forever.
5      Q    So in an ordinary course of business,
6  calls are saved for one year but if somebody
7  directs it to be locked, it can be saved for
8  longer than a year?
9      A    Theoretically forever.
10      Q    Are you aware of whether or not the calls
11  in this investigation have been locked?
12      A    Can't say for sure, no, ma'am.
13      Q    Do you think they have been locked?
14      A    There's some of them I hope that have been
15  locked, some of them I hope have been locked.  But
16  me saying for certain, I cannot.
17      Q    Which ones do you hope have been locked?
18      A    The ones that specifically violated the
19  policies.
20      Q    The ones referenced in the report?
21      A    Yes.
22      Q    Do you know in the course of this
23  investigation how many of the saved phone calls
24  were listened to?
25      A    No, ma'am.  I don't know how many.

---

MICHAEL VAUGHN                                                10/21/2009
Pages 64 to 67

## Page 64

1    Q   Do you know overall in the course of the
2  investigation how many hours were invested in
3  listening to calls?
4    A   No, ma'am, I don't.
5    Q   Do you know how many people listened to
6  the calls?
7    A   I told you, people in our office there and
8  that's all that I know of.
9    Q   So to your knowledge, no one from outside
10  the office listened to the calls?
11    A   Well, no, remember I told you that the
12  Attorney General got a disc, so I'm assuming they
13  had to listen to the calls, they had some kind of
14  investigation going on.  I don't know, I'm not
15  privileged to that investigation.
16    Q   Some of the calls on the investigation
17  were transcribed?
18    A   Yes, ma'am.
19    Q   How are calls transcribed, is there a
20  computer?
21    A   I had to do it, I did a couple of them, or
22  one at least, I don't know how many I did to tell
23  you the truth, but you just sit right there and --
24    Q   Just manually?
25    A   Manually do it, just like they -- I don't

## Page 65

1  know how this lady is going to do this, but slow,
2  it's done very slow.
3    Q   And in this investigation, if you know,
4  were there any other calls transcribed besides the
5  ones attached to the report?
6    A   I do not know.
7    Q   In the course of the investigation,
8  besides listening to calls and making copies of
9  calls, were there any other investigative
10  techniques used, for example, were there any
11  interviews taken?
12    A   Interviews, I'm sure there were
13  interviews, somebody interviewed someone I imagine
14  but I'm not positive.
15    Q   Do you know if there were any witnesses
16  involved in the investigation?
17    A   No, ma'am.
18    Q   What's your appreciation of why the
19  Attorney General's office was involved in the
20  investigation?
21    A   They weren't involved in the investigation
22  from what I understand, they have or had a parallel
23  investigation going on, they had something going on
24  prior to our investigation from what I appreciate.
25  They discovered policy and rule violations during

## Page 66

1  their investigation.  They notified my supervisor,
2  Colonel Achord, or somebody with authority higher
3  than me and told us that we have these, we started
4  looking into them.  I saw we, as a unit looking
5  into them at the direction of Colonel Achord and
6  come up with these, whatever number there is.
7    Q   So from your understanding, from the point
8  when the Attorney General's office advised prison
9  officials of the rule violations, they were not
10  involved in any part of the investigation going
11  forward here?
12    A   Investigative Services?
13    Q   Yes, the investigation that was written up
14  in that report.
15    A   Would you ask that one more time, I want
16  to make certain that I understand what you're
17  saying.
18    Q   I'm just trying to clarify that, I'm just
19  trying to make sure I understand what you're
20  saying.  So from the point at which -- I understand
21  you to say that someone in the Attorney General's
22  office advised prison officials that there were
23  rule violations on these phone calls that they were
24  listening to; is that correct?
25    A   That's correct.

## Page 67

1    Q   And then at that point prison officials
2  engaged Investigative Services in exploring these
3  rule violations.
4    A   That's correct.
5    Q   From that point going forward, your
6  understanding is that the Attorney General's office
7  had nothing to do with the investigation?
8    A   No, ma'am, as far as I'm aware the
9  Attorney General's office has nothing to do with
10  our investigation at all.
11    Q   In the course of investigations where
12  recorded phone calls are listened to, are legal
13  calls listened to?
14    A   No.  Normally, no, ma'am, normally they're
15  not.
16    Q   But sometimes they are?
17    A   Well, no, normally they're not.  Now, if
18  you were listening to a call and you don't know
19  it's an attorney, you might listen to part of it
20  and then you find out that the person is talking to
21  an attorney and you cease your listening to it.
22  But now, if they call their mother, brother,
23  sister, whoever, and they three way the call to an
24  attorney, from what I have and the understanding is
25  that we can listen to that call since the phone

Page 76

1  disciplinary report and all Schedule B penalties
2  except for forfeiture of good time.
3      Q   I hear what they say but what I'm trying
4  to appreciate is how they're different from each
5  other.
6      A   Do what, ma'am?
7      Q   How are they different from each other?
8      A   They're different from each other because
9  30 W is a catch-all and 30 C is a specific
10  violation.
11      Q   And 30 C, a specific violation is that you
12  conspire to violate any of the list of rules?
13      A   That's right, conspiracy.
14      Q   Do you know why the change was made from a
15  30 W to 30 C?
16      A   Yes, ma'am, it was a specific rule
17  violation.  We do that a lot, we lock inmates up a
18  lot on 30 W pending investigation, then after we
19  find out what specific rule they violated, then we
20  contact the D.B. office and have them to change the
21  rule violation to a specific number.
22      Q   To just be more specific.
23      A   Yes, ma'am.
24      Q   Now, the first sentence of the second
25  paragraph says that the Attorney General had

Page 77

1  requested all copies of the recorded phone calls of
2  Mr. Wallace and Mr. Woodfox as part of an
3  investigation they were involved with.
4      A   That's correct.
5      Q   And you've indicated already that you know
6  that to be true.
7      A   Yes, ma'am, they allegedly were involved
8  in an investigation.  I have really no knowledge
9  what their investigation was.
10      Q   And you have no knowledge of when they
11  made that request?
12      A   Not a specific date, I know it was prior
13  to this date here because I remember it was
14  sometime before this date, November 13.
15      Q   Do you remember the season, was it winter
16  time?
17      A   It was probably around, it was more than
18  likely in October, first of October, mid of
19  October, somewhere in that area there, a few weeks
20  before this.  Like I say, I can't remember the
21  exact dates but somewhere in October.
22      Q   Do you know what that investigation was
23  pertaining to?
24      A   No, ma'am.  No.
25      Q   Do you know when that investigation ended?

Page 78

1      A   No, ma'am.
2      Q   Were personnel from Investigative Services
3  here assisting in that investigation?
4      A   Yes, ma'am, we assisted.  We made copies
5  of the phone calls.
6      Q   Apart from that, apart from the logistical
7  and --
8      A   No, ma'am, no, not that I know of.  The
9  only thing we did was like making copies of the
10  phone calls.
11      Q   And do you know when the AG's office or
12  the Attorney General's office requested these
13  calls, who authorized the release of them?
14      A   I specifically don't know who told us, I
15  can only imagine but I don't know for sure.
16      Q   Can anyone authorize that?
17      A   No, ma'am.
18      Q   Could you authorize that?
19      A   No, ma'am, I would not.
20      Q   When those calls were turned over, did
21  they include legal phone calls?
22      A   Yes, ma'am.  They asked for every phone
23  call.
24      Q   The next sentence says on November 13,
25  which you indicated before in your testimony,

Page 79

1  representative of the Attorney General's office
2  advised Warden Cain of an interview Mr. Woodfox
3  gave to a radio station.  Do you know specifically
4  who those representatives were?
5      A   Representatives of the Attorney General's
6  office on November 13?
7      Q   Yes.
8      A   I know who was in the office when I went
9  there, yes, I know who was there.
10      Q   Who was there?
11      A   It was Mr. Caldwell and Sha Carter and
12  Warden Cain, Gary McDonald, and there was other
13  representatives of LSP, I think Vannoy was there,
14  those four people for sure.
15      Q   Where were they?
16      A   Warden Cain's office.
17      Q   And what time of day was this?
18      A   I know it was getting off time because I
19  think it was getting dark.
20      Q   And were you called to Warden Cain's
21  office to speak with the group of folks who were in
22  the room?
23      A   No, ma'am, I was called down there and
24  instructed to write them up by Gary McDonald.
25      Q   Gary McDonald was in the room at the time?