UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

ROBERT KING WILKERSON, ET AL.                    CIVIL ACTION

VERSUS                                            NO. 00-304-JJB

RICHARD STALDER, ET AL.

## RULING

These matters are before the Court on two motions brought by the Hunt/Wade Defendants.[1]  The first matter to be addressed is a Motion for Partial Summary Judgment Dismissing All Damages Claims (doc. 527).  Plaintiffs have filed an opposition (doc. 540), to which the Hunt/Wade Defendants have replied (doc. 544). The second matter before the Court is a Motion for Rule 7 Reply (doc. 512).  Plaintiffs have filed an opposition (doc. 540).  Discovery in this case has been stayed pending the Court's determinations on these matters (doc. 533).[2] Oral argument is unnecessary.  For the reasons stated herein, both of the Hunt/Wade Defendants' motions are DENIED.

## I.      Background

Litigation in this case brought under 42 U.S.C. § 1983 has proceeded in this Court for over thirteen years.  Originally, Plaintiffs Robert King Wilkerson, Albert Woodfox, and Herman Wallace[3] filed a complaint against the LSP Defendants[4] alleging that their decades' long

---

[1] The Hunt/Wade Defendants are: Howard Prince, Greg McKey, Betty Johnson, Kevin Durbin, and Jeffrey Gladney (the "Hunt Defendants") and Jerry Goodwin, James Arnold, Lonnie Nail, Chris Evans and Mark Hunter (the "Wade Defendants") (collectively referred to as the "Hunt/Wade Defendants" or "Defendants").

[2] Several motions (docs. 517 and 546) concerning the substitution of a proper party for the now deceased Plaintiff Herman Wallace are also implicated in the present stay on discovery.  A separate decision addressing this issue is forthcoming.

[3] Plaintiff Robert King Wilkerson was released from custody in 2001.  Plaintiff Herman Wallace was transferred to Elayn Hunt Correctional Center ("Hunt") in 2009 and passed away in October of 2013.  Plaintiff Albert Woodfox was transferred to David Wade Correctional Center ("Wade") in 2010 where he is currently being housed in CCR. Given that this motion concerns the Plaintiffs that were housed in Hunt and Wade respectively, "Plaintiffs" or "inmate Plaintiffs" refers to Plaintiffs Wallace and Woodfox.

[4] The LSP Defendants are: James LeBlanc, Burl Cain, Richard Peabody, Robert Rachal, Randy Ritchie, and Tom Norris (collectively referred to as the "LSP Defendants").

confinement in extended lockdown violated their First, Eighth, and Fourteenth Amendment rights.  Plaintiffs sought compensatory and punitive damages, as well as an injunction ordering that they be removed from extended lockdown, or closed cell restrictions ("CCR"), and housed with the general prison population.  The Hunt/Wade Defendants were not made parties to this litigation until earlier this year when the Plaintiffs filed their Fourth Amended Complaint. Doc. 483.

In their Fourth Amended Complaint, Plaintiffs assert identical claims against the Hunt/Wade Defendants and seek identical relief. Doc. 483.  The Hunt/Wade Defendants filed an Answer to the Complaint, asserting the defense of qualified immunity in their Fourth and Fifth Affirmative Defenses. Doc. 509.  Since filing their Answer, the Hunt/Wade Defendants have been working to familiarize themselves with the case's long and complicated history to prepare their defense.  To this end, they have filed several motions, including the two motions presently before the Court.  The Court will address each motion in turn, articulating relevant facts where appropriate.

## II.    Discussion
### A.      Qualified Immunity

Hunt/Wade Defendants' motion for partial summary judgment claiming an entitlement to qualified immunity is yet another example of "what's past is prologue." William Shakespeare, *The Tempest*, act 2, sc. 1.  Indeed, this Court has previously considered a similar motion asserting similar claims filed by the LSP Defendants.  The Court, adopting the Magistrate's Report and Recommendation (doc. 105), denied that motion finding that there were genuine issues of material fact which precluded a finding that qualified immunity applied. Doc. 116. Despite the Court's previous ruling, the Hunt/Wade Defendants now proffer this motion for the Court's consideration, averring that the factual and procedural backdrop in which the present

motion is before the Court is substantially different from that which existed at the time of the LSP Defendants' motion.  Specifically, Hunt/Wade Defendants explain that they housed the Plaintiffs in CCR based upon evaluations made at the initial classification stage rather than for disciplinary reasons.  They further argue that if the Court is inclined to find that there is a liberty interest, they were objectionably reasonable in housing Wallace and Woodfox in CCR given that the clearly established law at the time of their actions held that the initial classification of inmates did not implicate a liberty interest.  Finally, the Hunt/Wade Defendants argue that Wallace and Woodfox were given adequate periodic review of their housing, thereby protecting any due process right the Plaintiffs may have arguably had.

In response, Plaintiffs argue that there are material facts in dispute as to whether each Plaintiff's initial and continued confinement in extended lockdown was a result of his initial prison classification.  Plaintiffs contend that rather than conducting a sincere evaluation of whether or not Wallace and Woodfox should be housed in CCR, the Hunt/Wade Defendants continued to house Wallace and Woodfox in CCR based upon their respective classifications at LSP. Plaintiffs further argue that even if there was sincere consideration given to Plaintiffs' classification, there are genuine issues of material fact as to whether such housing was appropriate given their age, infirmity, and prior length of incarceration in extended lockdown. This argument appears to call into question the legitimacy of the inmate Plaintiffs' continued placement in CCR.  Finally, Plaintiffs assert that there is an issue of material fact as to whether the 90-day classification reviews conducted at Hunt and Wade respectively provided meaningful review, thus satisfying the requirements of due process.

**1.      Prior Factual and Procedural Backdrop: The LSP Defendants**

The Plaintiffs were first placed in extended lockdown[5] at the Louisiana State Penitentiary ("LSP") at Angola, Louisiana in 1972. Plaintiffs Woodfox and Wallace were placed in extended lockdown immediately following a prison riot which resulted in the death of LSP correctional officer Brent Miller. Both men were later charged with and convicted of murdering LSP correctional officer Brent Miller. Up until his transfer to Hunt in 2009, Wallace was continuously housed in extended lockdown while at LSP. With the exception of a three-year period he spent in a parish prison awaiting trial, Woodfox was also continuously housed in extended lockdown while at LSP. Wilkerson, on the other hand, began his stay in extended lockdown two weeks after being transferred from Orleans Parish Prison following his guilty plea to the aggravated battery of an Orleans Parish Prison Deputy. In June of 1973, Wilkerson was accused of killing a fellow inmate and remained in extended lockdown the entire time that he was at LSP.

In 2001, Wilkerson was released from LSP after his original conviction for first degree murder was amended to a lesser charge and his sentence was reduced. In 2009, Wallace was transferred to Hunt, while Woodfox was transferred to Wade in 2010. Thus, at the time of their respective release and transfers, Wilkerson had remained in extended lockdown for approximately 28 years, Wallace for nearly 37 years, and Woodfox for almost 34 years.

---

[5] Based upon the Court's previous findings and the Court's present finding that with the exception of cell size and telephone privileges, the CCR tiers at Hunt and Wade are ran the same as the tier at LSP, the Court defines extended lockdown as follows:

> Extended lockdown, also known as closed cell restrictions or administrative segregation, is a form of incarceration at LSP, Hunt, and Wade that is similar to solitary confinement. The prisoners thereto assigned remain alone in cells approximately 23 hours each day. During the other hour, a prisoner may shower and walk along the tier in which his cell is located. Three times a week, the prisoner may use this hour to exercise alone in a fenced yard, if the weather permits. The prisoners in extended lockdown also face additional restrictions on privileges generally available to inmates such as personal property, reading materials, access to legal resources, work, and visitation rights. In contrast, inmates in the general prison population live in a dormitory setting where they can interact with one another, attend religious ceremonies and take advantage of educational opportunities, training, and other privileges denied to those in extended lockdown.

4

Based upon their prolonged incarceration in extended lockdown, Plaintiffs filed the present § 1983 action asserting that the LSP Defendants violated their First, Eighth, and Fourteenth Amendment rights.  In response, the LSP Defendants filed a Rule 12(b)(6) motion to dismiss on the basis of qualified immunity.  Docs. 4 and 24.  This Court, adopting the Magistrate's Report and Recommendation (doc. 46), denied the motion finding that the Plaintiffs had a clearly established liberty interest in their classification based upon their extensive time in extended lockdown. Doc. 50.  The LSP Defendants appealed the Court's decision.  On appeal, the Fifth Circuit affirmed the denial because the Plaintiffs' Complaint did not allege "whether their confinement in extended lockdown resulted from their initial classification or from violation of prison rules." *Wilkerson v. Stalder*, 329 F.3d 431, 436 (5th Cir. 2003).  Thus, the Fifth Circuit could not determine whether the Plaintiffs asserted facts that would give rise to denial of a liberty interest.  *Id.*  This Court was then assigned the task on remand of making such a determination if defendants presented a motion that went beyond the pleadings.  The LSP Defendants later presented such a motion. Doc. 73.

After considering the LSP Defendants motion for summary judgment on the basis of qualified immunity, the Court, adopting the Magistrate's Report and Recommendation (doc. 105), held that there were genuine issues of material fact which precluded a finding that qualified immunity applied.  Doc. 116.  A more thorough treatment of the Court's prior decision will be presented *infra*.

### 2.      Present Factual and Procedural Backdrop: The Hunt/Wade Defendants

The uncontested facts in the present matter show that Herman Wallace was first transferred to Hunt on March 19, 2009.  Upon his transfer, he was housed in CCR where he remained until his health required that he be reclassified as medical medium in 2013.  Wallace

remained in the medical wing until his conviction was overturned and he was released from prison. Albert Woodfox was transferred to Wade on November 1, 2010 and was immediately housed in CCR where he remains.

Defendants' summary judgment evidence consists of affidavits from several Hunt/Wade Defendants including Warden Howard Prince of Hunt and Warden Jerry Goodwin and Assistant Warden James Arnold of Wade, excerpts from the Plaintiffs deposition testimony, an Employee Policy Memorandum outlining Wade's Classification Program, and the intake forms of both Wallace and Woodfox. The principal piece of summary judgment evidence upon which the Defendants' argument that the Plaintiffs' do not have a cognizable liberty interest is the Plaintiffs' intake forms. The form concerning Wallace is a *HCC Cellblock Review Summary* which denotes that it is an "Initial Classification Board" and that the reason for placement is "Nature of original reason for lockdown." The form concerning Woodfox is not as clear as that concerning Wallace, but does note Woodfox's crime as being "2nd deg murder-murder of LSP correctional officer-Brent Miller."

Plaintiffs' summary judgment evidence consists of the deposition testimony of Wardens Howard Prince and Burl Cain, and the Plaintiffs, as well as Hunt and Wade's institutional review board records. Plaintiffs' principal pieces of summary judgment evidence are the institutional review board records. The forms concerning Wallace are entitled *HCC Cellblock Review.* These forms allow the evaluator to place a check next to an applicable phrase. The upper section of the form is labeled *Date Assigned to Cellblock (Incident Date)* with a place to record the reasons for placement. An evaluator can select from among the following reasons: *Released from Extended Lockdown on* with a space for the date, *Initial Classification Board*, *Protection Court*, and *Disciplinary Court.* There is also a space for the evaluator to make comments. The lower

section is called *Action of Cellblock Review Board*. An evaluator can either select *Recommended Release To*, with a space to specify the recommended placement, or *Not Released* with a list of reasons to support this selection.  The form lists the following reasons under the *Not Released* selection: *Nature of the original reason for lockdown, Own Request, Poor conduct record since last hearing, Poor Attitude, Claims not ready to return to work, Not housed in this unit long enough to warrant release, May endanger own wellbeing or wellbeing of others* or *Other*.

With few exceptions, *Initial Classification Board* is selected as the reason why Wallace was assigned to his housing in the upper section of the *HCC Cellblock Review* form.  The lower section of the form consistently reports that he was *Not Released* based upon the *Nature of original reasons for lockdown*.  There was one occasion each when *Poor conduct record since last hearing*, *Not housed in this unit long enough to warrant release*, or *Other-Refuses* was selected in addition to *Nature of original reasons for lockdown*.  These forms are dated from June 2009 until May 2013

Similarly, the forms concerning Wallace, entitled *Classification Review Board* allow the evaluator the place a check in the box corresponding with the appropriate phrase.  The *Classification Review Board* forms are broken up into three sections: *Annual Review, Cellblocks,* and *Comments*.  Particularly relevant here is the *Cellblocks* section.  Under this section is the subsection *Not eligible for Reassignment at this time* which has the following reasons listed to support the abovementioned selection: *Poor Attitude, Serious nature of past offenses, Disciplinary reports received during current confinement, Pending street charges, Length/Number of times in Extended Lockdown, Other*.

On almost every *Classification Review Board* form, the box for *Not eligible for Reassignment at this time* is checked while on every form *Other-Continue CCR*, or some variant,

is marked to justify Woodfox's continued placement.  On one occasion, *Serious nature of past offenses* is checked in addition to *Other-Continue CCR*.  These forms are dated from January 2011 until May 2013.

### 3.    Summary Judgment Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact." FED. R. CIV. P. 56(a). The party seeking summary judgment carries the burden of demonstrating that there is an absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). When the burden at trial rests on the non-moving party, the moving party need only demonstrate that the record lacks sufficient evidentiary support for the non-moving party's case. *Id.* The moving party may do this by showing that the evidence is insufficient to prove the existence of one or more essential elements of the non-moving party's case. *Id.* A party must support its summary judgment position by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute." FED. R. CIV. P. 56(c)(1).

Although the Court considers evidence in a light most favorable to the non-moving party, the non-moving party must show that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248-49 (1986). Conclusory allegations and unsubstantiated assertions will not satisfy the non-moving party's burden. *Grimes v. Tex. Dep't of Mental Health*, 102 F.3d 137, 139–40 (5th Cir. 1996). Similarly, "[u]nsworn pleadings, memoranda or the like are not, of course, competent summary judgment evidence." *Larry v. White*, 929 F.2d 206, 211 n.12 (5th Cir. 1991). If, once the non-moving party has been given the opportunity to raise a genuine fact issue, no reasonable juror could find for the non-moving party, summary judgment will be granted for the moving party. *Celotex*, 477 U.S. at 322-23.

8

### 4.      Qualified Immunity Standard

Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The Fifth Circuit has continuously recognized a two-step analysis to determine whether a defendant is entitled to summary judgment on the basis of qualified immunity.  "First, viewing the facts in a light most favorable to the plaintiff, the court must determine if the plaintiff has alleged the violation of a constitutional right." *Barrow v. Greenville Independent School District*, 332 F.3d 844, 846 (5th Cir. 2003).  If the first step is met, the court must next consider whether the defendant's actions were objectively unreasonable in light of clearly established law at the time of the conduct in question. *Tarver v. City of Edna*, 410 F.3d 745, 750 (5th Cir. 2005). "The touchstone of this inquiry is whether a reasonable person would have believed that his conduct conformed to the constitutional standard in light of the information available to him and the clearly established law." *Glenn v. City of Tyler,* 242 F.3d 307, 312 (5th Cir. 2001) (quoting *Goodson v. Corpus Christi*, 202 F.3d 730, 736 (5th Cir. 2000)).

### 5.      Is there a Cognizable Liberty Interest?

To articulate a claim under 42 U.S.C. § 1983 that alleges the violation of procedural due process, an inmate must first establish that he enjoyed a protectable liberty interest.  *Kentucky Dept. of Corr. v. Thompson*, 490 U.S. 454, 460 (1989).

In *Luken v. Scott*, 71 F.3d 192, 193 (5th Cir. 1995), the Fifth Circuit noted that the Supreme Court's decision in *Sandin v. Connor*, 515 U.S. 472 (1995), narrowed the circumstances in which inmates had a viable liberty interest entitled to due process protection. Under *Sandin*, the Fifth Circuit observed that a prisoner's liberty interest is "generally limed to

freedom from restraint, which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Luken*, 71 F.3d at 193 (quoting *Sandin*, 515 U.S. at 484).  The Fifth Circuit further stated that "*Sandin* establishes that administrative segregation, without more, does not constitute a deprivation of a constitutionally cognizable liberty interest." *Id.*

In *Orellana v. Kyle,* 65 F.3d 29, 32 (5th Cir. 1995), the Fifth Circuit additionally noted that the Supreme Court's holding in *Sandin* was primarily directed at "disciplinary" segregation. In other cases, the Fifth Circuit has stressed that "[a]bsent extraordinary circumstances, a prisoner does not have a constitutionally protected liberty interest in his classification or in remaining free from administrative segregation." *See Martinez v. Johnson¸* 103 Fed. Appx. 531, 532 (5th Cir. 2004).

With respect to the existence of a viable liberty interest, the proper focus for determining whether or not a liberty interest has been established was further elaborated upon by the Fifth Circuit in the instant matter when it affirmed the denial of LSP Defendants' Rule 12(b)(6) motion to dismiss:

> In resolving the nature of the liberty interest and the process that is due for confinement in extended lockdown, it is crucial to know whether, based on their crimes of conviction, the inmates' confinement is the result of an initial classification by prison officials as opposed to confinement for violations of less serious prison disciplinary rules.  *Generally*, the courts are not concerned with a prisoner's initial classification level based on his criminal history before his incarceration. (Emphasis added).  This circuit has continued to hold post-*Sandin* that an inmate has no protectable liberty interest in his classification.

*Wilkerson v. Stalder*, 329 F.3d at 435-436.[6] *Accord Brown v. Cockwell*, 2002 WL 638584, *4 (N.D. Tex. Apr. 17, 2002) ("Moreover, as a prisoner, Petitioner does not have a 'protectable property or liberty interest in custodial classifications.'") (citing *Harper v. Showers*, 174 F.3d 716, 719 (5th Cir. 1999)).

Thus, the Fifth Circuit has asserted that as a general rule, the *Sandin* test is triggered when an inmate's confinement in extended lockdown is for reasons other than his initial "custodial classification," such as violations of prison rules.  That said however, the circuit has created an exception to the general rule when there are extraordinary circumstances.[7]  Citing *Sandin*, the Fifth Circuit articulated this exception in *Hernandez v. Velasquez,* 522 F.3d 556, 552-53 (5th Cir. 2008) stating,

> Only when a prisoner demonstrates "extraordinary circumstances" may he maintain a due process challenge to a change in his custodial classification. In other words, segregated confinement is not grounds for a due process claim unless it "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." (citation omitted).

In previously considering the applicability of qualified immunity in this case, the Court addressed whether the Plaintiff's placement in extended lockdown should be labeled "initial

---

[6] The Fifth Circuit has long held that classification of prisoners is a matter better left to the discretion of prison officials.  *See McCord v. Maggio*, 910 F.2d 1248, 1250 (5th Cir. 1990) (citing *Wilkerson v. Maggio*, 703 F.2d 909 (5th Cir. 1983)).  "Classification of inmates in Louisiana is the duty of the Louisiana Department of Corrections and an inmate has no right to a particular classification."  *Id.* at 1251.  In *McCord* and *Wilkerson*, the Fifth Circuit emphasized that prison officials must be afforded a broad discretion, free from judicial intervention, in classifying prisoner in terms of their custodial status. *Id.* at 1250.  The officials should also be accorded the widest possible deference in the application of prison policies and procedures designed to maintain security and preserve internal order. *Id.* at 1251 (citing *Bell v. Wolfish*, 441 U.S. 520, 547 (1979)).

[7] Fifth Circuit jurisprudence has long tempered the general rule with mitigating language.  *See e.g. Martinez,* 103 Fed. Appx. at 532 (stating that a prisoner does not have a constitutional protected liberty interest in remaining free from administrative segregation "[a]bsent extra ordinary circumstances."); *Gabriel v. Fleming*, 106 Fed. Appx. 290, 291 (5th Cir. 2004) (noting that inmates have no liberty interest in their custodial classification, "[a]bsent an abuse of discretion."); *Pichardo v. Kinker*, 73 F.3d 612, 613 (5th Cir. 1996) .(quoting *Luken*, 71 F.3d at 193) (finding that "administrative segregation *without more*, simply does not constitute deprivation of a protected liberty interest) (Emphasis added).  Indeed in the present case, the Fifth Circuit attached the important caveat stating that it is only "generally" that courts do not recognize a liberty interest based upon an inmate's custodial classification. *Wilkerson*, 329 F.3d at 435.

classification" or "disciplinary action". After reviewing voluminous records of the LSP Lockdown Review Board, which repeatedly selected *Disciplinary Board Action* based upon killing a prison guard as the reason for the Plaintiffs' original placement, the Court found that,

> Whether labeled "disciplinary" or "hybrid," however, the defendants have not met their burden of persuasion with regard to showing that the plaintiffs were placed in extended lockdown as the result of their initial classification.  The plaintiffs clearly have raised issues of material fact with regard to the defendants' contention that the plaintiffs' original placement in extended lockdown was due solely to their initial classification.

Moreover, though unclear where to situate this inquiry, the Court found that the *Sandin* inquiry did not end with the prison's justifications for the original placement.  Instead, the Court found that "there is also the issue of the inmate's *continuing* confinement in extended lockdown." The Court reasoned that "[i]f…the label attached to the original reason for confinement trumps all other facts, one could be faced with the potential and anomalous situation of finding no liberty interest despite the existence of atypical and significant hardship when compared to the original incidents of prison life." *Id.* at fn. 16. Therefore, after reviewing Fifth Circuit precedent and persuasive decisions from sister courts, the Court found that, "plaintiffs' indefinite stay in extended lockdown (of a 28 to 33 years duration thus far, with no apparent end in sight)…is just such an extraordinary circumstance" which triggered the *Sandin* test.  *Id.* at 22.

In the present matter, the Hunt/Wade Defendants attempt to distinguish their motion from that which was previously filed by the LSP Defendants.  They contend that the factual and procedural backdrop in which they bring their current motion is completely different from that which existed at the time that the LSP Defendants asserted their qualified immunity defense. Hunt/Wade Defendants argue that they are entitled to a qualified immunity on the Plaintiff's Fourteenth Amendment claim because there was not a deprivation of a protected liberty interest when the Hunt/Wade Defendants "set and maintained [the Plaintiffs'] custody level based on

their initial classification at Hunt and Wade" as opposed to being based upon disciplinary action. *Motion for Summary Judgment*, Doc. 527-3 at 9. Hunt/Wade Defendants aver that the evidence makes clear that the Plaintiffs' assignment to CCR resulted from a determination during initial classification and not as a result of a disciplinary action.

As opposed to the LSP Defendants who produced for the Court voluminous institutional records in support of their motion, the Hunt/Wade Defendants have produced a modicum of evidence to prove that the Plaintiff's assignment was based upon their respective initial classification. Specifically, they have produced a form concerning Wallace entitled *HCC Cellblock Review Summary*, a form concerning Woodfox entitled *Initial Classification Board*, the *Wade Employee Policy Memorandum: DWCC Classification Program* #03-01-001 (Apr. 16, 2010), and the affidavit of several individual Hunt/Wade Defendants including Wardens Jerry Goodwin and Howard Prince who both aver that no inmate has ever been housed in CCR for disciplinary reasons.

The Plaintiffs respond that there are genuine issues of material fact as to whether their original placement was solely due to their initial classification. To support this contention, Plaintiffs provide evidence showing that there was not a CCR tier at Hunt or Wade prior to the Plaintiffs' transfer; and at the time of transfer, there was no intention to house Plaintiffs other than at CCR. Furthermore, Plaintiffs suggest that it is highly unlike that an independent and sincere review of their records, age, and infirmity would lead a review board to find that they, like gang members or other dangerous inmates, should be housed in isolation. Therefore, such a decision tends to suggest that their placement was not solely due to an independent initial classification. Finally, picking up on the Court's previous language regarding labeling, Plaintiffs point out that the Hunt/Wade Defendants, having the benefit of pending litigation to inform what

13

they reflect in their record, "had every advantage to [use] certain labels over others." *Opposition*, Doc. 540, at 18.

The paucity of the evidence aside, the Court finds that the Hunt/Wade Defendants have not met their burden of persuasion with regard to showing that the Plaintiffs were placed in CCR as the result of their initial classification, particularly in light of the evidence offered by and reasons articulated by the Plaintiffs.   Additionally, the forms submitted by the Defendants, especially the one pertaining to Wallace which marks *Nature of original reason for lockdown* and makes the comment "From LSP," appear to undercut the Defendants' assertion that there were independent evaluations conducted.   Therefore, the Plaintiffs have raised issues of material fact with regard to the Defendants' contention that the plaintiffs' original placement in extended lockdown was due solely to their initial classification.[8]

However, as mentioned earlier, the inquiry need not stop here.   Taking together, as the Court did previously, whether the "extraordinary circumstances" exception applied due either to the abnormally long duration of the Plaintiffs' time in extended lockdown or the fact that their stay was indefinite, the Court finds that the *Sandin* test has been triggered.   A relatively recent Supreme Court case applying *Sandin* is particularly instructive.

---

[8] Though the Court has conducted an inquiry into whether the Plaintiffs' placement was a result of initial classification or disciplinary sanctions, it is unclear if this inquiry has been rendered unnecessary in light of *Wilkerson v. Austin*, 545 U.S. 209 (2005) discussed further *infra*.  In that case, the Supreme Court held that an inmate had a liberty interest in not being housed in a supermax facility without drawing a distinction between whether placement in such a facility was due to initial classification or disciplinary action for engaging in specific conduct, despite being presented with both scenarios. *Id.*  Instead, that holding applied uniformly, regardless of the reason for the placement. *Id.*  Moreover, the Fifth Circuit, while discussing this case, ignored their directive to this Court to decide whether placement was based on initial classification or disciplinary reasons, characterizing their instruction instead as "remanding for determination whether such confinement was 'atypical' under *Sandin*." *Hernandez v. Velasquez*, 522 F.3d 556, 563 (5th Cir. 2008).  Indeed, as this Court has already noted, "[o]ther Circuits do not worry so much about whether the prison officials characterize the deprivation as "administrative" or disciplinary." Doc. 105, at 13 fn. 13 (citing several opinions from sister circuit courts).  It appears as though the Supreme Court and the Fifth Circuit are not aligned with the Court's previous observation.

In *Wilkinson v. Austin*, 545 U.S. 209 (2005), the Supreme Court held that inmates had a liberty interest in avoiding placement in Ohio's supermax prison, Ohio State Penitentiary ("OSP").  The Court noted that the conditions of confinement in OSP were comparable to those associated with solitary confinement.  *Id.* at 214.  Inmates were confined alone to their cells for 23 hours a day with one hour allotted for time outside of the cell. *Id.*  They ate their meals alone and had rare opportunities for visitation.  *Id.*  In making its determination that such placement gave rise to a liberty interest, the Court considered the "severity of the conditions" in isolation, as well as the additional facts that the inmates were confined in OSP for an indefinite amount of time and the supermax confinement eliminated the possibility of parole for otherwise eligible inmates.  *Id.* at 223-224.  The Court concluded by stating, "While any of these conditions standing alone might not be sufficient to create a liberty interest, taken together, they impose an atypical and significant hardship within the correctional context."  *Id.* at 224.

Here, there are similar severe conditions of confinement.  Like the conditions at OPS, inmates housed in Hunt and Wade's CCR unit are confined alone to their cells for 23 hours per day with one hour designated for exercise and a shower period.  Inmates on the CCR unit are not afforded the same ability to partake in religious or educational opportunities or to enjoy other privileges as those housed in general population.  These conditions take a detrimental toll on the health and well-being of the average inmate.  *See* Stuart Grassian, *Psychiatric Effects of Solitary Confinement*, 22 Wash. U. J.L. & Pol'y 325, 333 (2006) (observing that "incarceration in solitary caused either severe exacerbation or recurrence of preexisting illness, or the appearance of an acute mental illness in individuals who had previously been free of any such illness.").  The

Court can only imagine how much more of an acute effect these conditions would have on elderly men in failing health. [9]

Additionally, as this Court has previously found the Plaintiffs' placement in CCR was and remains indefinite. When determining that the Plaintiffs' placement in CCR was indefinite at LSP, the Court observed,

> In the present matter, the Review Board's rote repetition of the reason for the inmates continued confinement as being the same reason they were initially placed in lockdown effectively eliminates any possibility of release, regardless of their current situation and behavior while in lockdown. The original reason for placement in lockdown can never change; thus plaintiffs' current situation of "indefinite placement" in lockdown is static, with no hope of release other than by death or release from the prison entirely, as was the case for plaintiff Wilkerson.

Doc. 105 at 20. As the evidence in the present matter demonstrates, this practice of rote repetition has continued at Hunt and Wade.

Finally, while there are no apparent parole implications or any other analogous considerations, the unparalleled amount of time that the inmate Plaintiffs have been living in isolation is more than enough to give rise to an atypical and significant hardship. In fact, Plaintiffs' approximately forty-year length of incarceration in extended lockdown is so atypical that the Court is unable to find another instance of an inmate spending even close to that much time in isolation. *See Silverstein v. Fed. Bureau of Prisons*, 704 F. Supp. 2d 1077 (D. Colo.

---

[9] Indeed, this Court has previously considered the testimony of both the Plaintiffs' and Defendants' experts who have reported on the health and psychological effects that long-term isolation have had on Wallace and Woodfox. *See Wilkerson v. Stalder*, 639 F. Supp.2d 654, 663-66 (M.D. La. 2007). Dr. Williams, the Plaintiffs' expert, opined as to Wallace that, "[c]ontinuation of 23-hour confinement in CCR poses medical risks to Herman Wallace including future functional decline, worsening hypertension and mortality." *Id.* at 663. As to Woodfox, Dr. Williams opined that "[c]ontinuation of 23-hour confinement in CCR poses medical risks to Albert Woodfox including worsening hypertension, progression to renal failure, and mortality." *Id.* As it pertains to their mental health, the Plaintiffs' retained expert, Dr. Haney, testified by way of deposition that "plaintiffs are at risk of developing—or have developed—serious psychological damage caused by their long stay in lockdown, such as paranoia, claustrophobia, anxiety, problems with their mental abilities, discomfort around people and depression." *Id.* at 665. LSP Defendants' expert, Dr. Dvoskin, found that prolonged isolation had caused Wallace to feel anxious, depressed, and angry, while it caused Woodfox to suffer from claustrophobia. *Id.* at 665-66. Dr. Dvoskin concluded that, "In general, there is little doubt that living in a single cell for three decades is an extremely difficult human experience." *Id.* at 666.

2010) (involving an inmate that had been incarcerated in isolation for twenty-eight years). Finally, Fifth Circuit precedent gives further support for the Courts finding.  In *Hernandez v. Velasquez*, 522 F.3d 556, 563 (5th Cir. 2008), the court pointed to the present matter as an instance where the extraordinary circumstances exception could apply.  It follows that if the Fifth Circuit was persuaded that thirty years of incarceration in extended lockdown triggered the exception, then the court would be even more persuaded after approximately forty years of such incarceration.[10]

While the Court is unable to determine an appropriate baseline as directed by the Fifth Circuit in the present case, the Court is satisfied that the Plaintiffs' confinement in CCR at Hunt and Wade under these circumstances "imposes an atypical and significant hardship under any plausible baseline."  *Wilkinson*, 545 U.S. at 223.

Accordingly, the Court finds that the *Sandin* test was triggered during Plaintiffs' extraordinarily long stay in extended lockdown.

## 6.    Were Plaintiffs Afforded Adequate Due Process?

The Defendants argue that the review boards at Hunt and Wade were nothing like those purported to take place at LSP in that the Plaintiffs were given the full opportunity to speak and be heard.  Therefore, they aver that the Plaintiffs were afforded adequate due process.  Plaintiffs counter that a reasonable fact finder could find that like the review boards at LSP, the review boards at Hunt and Wade were sham proceedings.

In previously evaluating this argument when it was presented by the LSP Defendants, the Court found that there were genuine issues of material fact as to whether the process given to the

---

[10] As the Plaintiffs have articulated, "[i]f lockdown confinement in durations ranging from 28 to 38 years was sufficiently atypical and rare to generate a liberty interest in 2005, that liberty interest is only heightened 8 years later."  *Opposition*, Doc. 540, at 15.

Plaintiffs was constitutionally adequate. Doc. 105, at 23.   The Court reasoned that the voluminous record of the review board's "Lockdown Review Summary," did not present sufficient information to show that the Plaintiffs' were given a meaningful and substantive review. *Id.*  Rather, the submitted records perfunctorily checked a box without giving much, if any, reasons for the selection. *Id* .at 25.  In making its decision, the Court relied upon two court decisions.  The first was *Morris v. Travisono*, 549 F. Supp. 291 (D. RI. 1982), which held that although the inmate was given 90-day reviews, such reviews were not meaningful reviews designed to evaluate whether the inmate could adjust to the general prison population.  *Id.*  The second was *Shoats v. Horn*, 213 F.3d 140 (3rd Cir. 2000), which held that the due process requirement had been met when the inmate was given a thorough well-documented hearing.  *Id.* at 24.

The Hunt/Wade Defendants rely upon Plaintiffs' own deposition testimony to support their argument that Wallace and Woodfox were given adequate due process.  Specifically, they point out that Wallace stated that he had no objection to his review board at Hunt pointing the following exchange:

Q:     Are you contenting that the review you received at Hunt was somehow defective of inadequate?

A:     No, I'm not saying that at all, I'm saying what took place at Hunt, according to the board, the procedures of it was adequate.

Q:     Do you think that you got a fair hearing at Hunt?

A:     In the sense of speaking, by me just coming to Hunt, yes; in order for Hunt to understand who I am and what type of person I am and where they want to place me at, yes.

*Wallace Deposition,* Doc. 527-4*, Ex. 2,* at 80.  As to Woodfox, Hunt/Wade Defendants point to his deposition testimony in which he testified that unlike the review boards at LSP, the Hunt/Wade Review Boards did not discuss hunting and fishing. *Woodfox Deposition*, Doc. 527-

4, *Ex. 1*, at 90.  Instead, the boards had his institutional record before them, gave Woodfox the opportunity to address the board and be heard, and the board listened to his responses.  *Id.* at 90-91.  Finally, they point to the fact that Woodfox never attempted to state reasons why he should be released from CCR. *Id.* at 90.

Plaintiffs respond by arguing that the available evidence suggests that the Hunt and Wade review boards never gave sincere evaluation as to whether Wallace and Woodfox should remain in CCR.  Plaintiffs note their age, infirmity, and clean institutional record to suggest that there was no reason to maintain their isolation in extended lockdown.  Moreover, Plaintiffs point to the deposition testimony of Warden Prince, who testified that the review boards operated no differently than the LSP review boards and that there are no criteria for how the reviews at Hunt are conducted. Therefore, "[a]ny reasonable factfinder could conclude from this evidence that there was never any sincere evaluation by Hunt or Wade officials whether indefinite housing in CCR was appropriate…" *Opposition*, Doc. 540, at 18.

Unlike the LSP Defendants who submitted the institutional review board's review forms to support their contention that due process was adequate, the Hunt/Wade Defendants rely upon the deposition testimony of Woodfox and Wallace.  Plaintiffs submit these institutional review board review forms and point to the rote checking of a box that the Court previously found fatal to the LSP Defendants' contention that the Plaintiffs received adequate due process.  After reviewing the evidence submitted, the Court does not believe that the Hunt/Wade Defendants' evidence is significantly probative evidence to overcome the material facts placed into dispute as a result of the plaintiffs' extraordinarily long duration in extended lockdown.  The Hunt/Wade Defendants attempt to set a very low bar indeed of what is constitutionally due in due process.  Reserving conversations about hunting and fishing expeditions for intermissions rather than

during a hearing does not constitute due process. Moreover, while adequate procedures are a part of the equation, they are not the end in and of themselves. To be adequate, an inmate must be given *meaningful* review. *See Toevs v.* Reid, 646 F. 3d 752, 758 (10th Cir. 2011) *amended and superseded on reh'g,* 685 F.3d 903 (10th Cir. 2012) ("the review must be meaningful; it cannot be a sham or pretext."); *see also Sourbeer v. Robinson*, 791 F.2d 1094, 1101-02 (affirming the lower court determination that the inmate housed in administrative segregation had been denied a meaningful opportunity to be heard).

Notably, there is an absence of evidence tending to show that the review boards evaluated whether or not Plaintiffs should remain in CCR especially given their age, infirmity, and unparalleled duration housed in extended lockdown. Not a single review form from either Hunt or Wade has any annotations or written reasons assigned in the comments section. Finally, Woodfox's account of his hearings does not give the impression that they were meaningful. *See Woodfox Deposition*, Doc. 540-2, *Ex. F* at 89. Rather, they appear to be perfunctory exchanges which concluded with "We're not going to release you this time." *Id.* There is no wonder why a person who has consistently and unwaveringly heard those words uttered over an almost forty year time span would become disillusioned and therefore disengage with the process.

Thus, the Court concludes that there are material facts in dispute regarding the legitimacy of the process afforded to the Plaintiffs. Accordingly, the Court finds that there are material facts in dispute regarding Hunt/Wade Defendants' alternative argument that plaintiffs have been afforded adequate due process.

### 7.   Was the Liberty Interest Clearly Established at the Time of the Relevant Conduct?

The Hunt/Wade Defendants make the alternative argument, that even if there is a liberty interest implicated, it was not clearly established at the time of classification. Finding as the

Court has, that the Plaintiffs offered enough evidence for a reasonable fact finder to find that a constitutional violation occurred, the Court now addresses the second step in the qualified immunity test.  Specifically, the Court must determine whether the Hunt/Wade Defendants' actions were objectively unreasonable in light of clearly established law at the time of the conduct in question.  *Tarver v. City of Edna*, 410 F.3d 745, 750 (5th Cir. 2005)

Defendants rely upon the Fifth Circuits' decision in the present case to support their argument that they acted consistently with, and not in violation of, clearly established law.  They contend that the controlling decision in this very case demonstrates that the clearly established law held that an inmate does not have a liberty interest in being released from extended lockdown if there placement was based upon initial classification. While this is true, the Hunt/Wade Defendants ignore that clearly established law as outlined *supra* also created an exception to this general rule for "extraordinary circumstances," even in the Fifth Circuit's *Wilkerson* decision upon which they rely. Additionally,  the dispositive decisions of this Court in this very litigation, which both thoroughly outlined controlling and persuasive precedent and held itself that there was a liberty interest, put an objectively reasonable officer on notice that such a liberty interest would be implicated by their actions. *See* Docs. 46 and 105.  Indeed, as the Court previously found,

> If this case involved solitary confinements of only one, two, or even three years duration, the defendants' entitlement to qualified immunity might be a foregone conclusion….An objectively reasonable officer arguably could conclude…that such relatively short duration solitary confinements did not give rise to a liberty interest.  But this case is far beyond that pale, *nearly ten times* longer.  No objectionably reasonable officer could believe in the circumstances alleged that a solitary confinement approaching *three decades* duration was not atypical or extraordinary under established Supreme Court and Fifth Circuit standards.

Doc. 46, at 16-17.  The Court's previous conclusion is even more appropriate as Plaintiffs' confinement in extended lockdown has approached *four decades*.

Accordingly, the Court holds that the liberty interest was clearly established at the time of the conduct in question, in that an objectively reasonable officer could not conclude under the law in force at the time that continued incarceration in extended lockdown after already having served 33 to 37 years did not give rise to a liberty interest.

### B.    Rule 7 Reply

Defendants seek to have the Plaintiffs reply to their qualified immunity defense pursuant to Rule 7 of the Federal Rules of Civil Procedure.  Defendants argue that the Plaintiffs' Complaint does not assert a viable claim against the newly added defendants.  Furthermore, the Plaintiffs' deposition testimony demonstrates that they themselves are not aware why certain newly added defendants have been made parties to the suit.  In response, the Plaintiffs argue that the Hunt/Wade Defendants motion is moot and/or meritless.

A district court "may, in its discretion, insist that a plaintiff file a reply tailored to an answer pleading the defense of qualified immunity."  *Schultea v. Wood*, 47 F.3d 1427, 1433-34 (5th Cir. 1995) (en banc).  The purpose of such a reply is to ensure that officials are not needlessly subjected to burdensome discovery or trial proceedings. *Crawford-El v. Britton*, 523 U.S. 574, 598 (1998); *see also Schultea*, 47 F.3d at 1442 ("Qualified immunity's limit upon access to the discovery process create a new and large role for the Rule (7)(a) reply…").  However, finding as the Court has, that there are genuine issues of material fact, further discovery and continuation of the litigation proceedings will not be needless.  Furthermore, by filing its motion for summary judgment while the motion for a Rule 7 Reply was pending, the Defendants all but concede that the Fourth Amended Complaint is sufficiently detailed enough for them to submit a dispositive motion, "fairly engaging" its allegations.  Accordingly, the Defendants' motion is denied.

**III.   Conclusion**

Accordingly, for the reasons stated herein, the Hunt/Wade Defendants' motion for summary judgment (doc. 527) is DENIED.  Furthermore, the Hunt/Wade Defendants' motion for a rule 7 reply (doc. 512) is DENIED.

The stay on discovery (doc. 533) is lifted.

Signed in Baton Rouge, Louisiana, on December 16, 2013.

_____
**JUDGE JAMES J. BRADY**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**