UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA


ROBERT KING WILKERSON        :    CIVIL ACTION

VERSUS                        :    NO. 00-304

RICHARD L. STALDER          :    HON. JAMES J. BRADY

                                   :    NOVEMBER 13, 2013

================================================================

PRELIMINARY INJUNCTION

================================================================

A P P E A R A N C E S

FOR THE PETITIONERS:
      MR. SHERIDAN ENGLAND, ESQ.
      MR. GEORGE H. KENDALL, ESQ.
      MR. NICHOLAS J. TRENTICOSTA, ESQ.

FOR THE DEFENDANTS:
      MR. MICHAEL BRENT HICKS, ESQ.
      MR. RICHARD A. CURRY, ESQ.


REPORTED BY:    SHANNON L. THOMPSON, CCR

---

UNITED STATES COURTHOUSE
777 FLORIDA STREET
BATON ROUGE, LOUISIANA 70801
(225) 389-3567

1                        I N D E X

2    PETITIONER'S WITNESSES:

3     MATTHEW D. ELMORE

4      EXAMINATION BY ENGLAND . . . . . . . . . 4, 20, 24

5      EXAMINATION BY CURRY . . . . . . . . . 19, 22, 23, 27

6     ALBERT WOODFOX

7      EXAMINATION BY ENGLAND . . . . . . . . . 30, 64

8      EXAMINATION BY CURRY . . . . . . . . . . 43

9    RESPONDENT'S WITNESSES:

10    WARDEN JERRY GOODWIN

11      EXAMINATION BY CURRY . . . . . . . . . 71, 143

12      EXAMINATION BY ENGLAND . . . . . . . . 150

13    PATRICK W. KEOHANE

14      EXAMINATION OF QUALIFICATIONS BY CURRY . . . 90

15      EXAMINATION BY CURRY . . . . . . . . . 90, 133, 184

16      EXAMINATION BY ENGLAND . . . . . . . . 96, 138

17

18

19

20

21

22

23

24

25

1    **11-13-2013 - WILKERSON V. STALDER - 00-304**

2    **REPORTER'S NOTE:**   (ALL PARTIES PRESENT IN COURT.)

3    **THE COURT:**   BE SEATED, PLEASE.   GOOD MORNING TO ALL

4    OF YOU.

5    **IN CONCERT:**   GOOD MORNING.

6    **THE COURT:**   THE COURT IS HERE THIS MORNING IN THE

7    MATTER OF STALDER VERSUS WILKERSON AND OTHERS ON A MOTION FOR

8    A PRELIMINARY INJUNCTION.

9    ARE THE MOVERS READY?

10   **MR. ENGLAND:**   YES, YOUR HONOR, WE ARE.

11   **THE COURT:**   ALL RIGHT.   WOULD YOU COME FORWARD,

12   PLEASE, AND IDENTIFY YOURSELVES.

13   **MR. ENGLAND:**   YOUR HONOR, SHERIDAN ENGLAND FOR MR.

14   WOODFOX.   I'M JOINED BY NICK TRENTICOSTA, GEORGE KENDALL, AND

15   MR. WOODFOX IS HERE.

16   **THE COURT:**   ALL RIGHT.   GOOD MORNING TO ALL OF YOU.

17   THE RESPONDENTS?

18   **MR. CURRY:**   RICHARD CURRY REPRESENTING THE STATE

19   DEFENDANTS, JOHN WEEKS, BRENT HICKS, WE'RE ALL HERE.

20   **THE COURT:**   ALL RIGHT.   GOOD MORNING TO YOU.

21   **MR. HICKS:**   GOOD MORNING, JUDGE.

22   **THE COURT:**   ALL RIGHT.   PROCEED, MR. ENGLAND.

23   **MR. ENGLAND:**   MAY IT PLEASE THE COURT, I CALL

24   LIEUTENANT ELMORE TO THE STAND.

25   **THE COURT:**   ALL RIGHT.

1          (WHEREUPON, **MATTHEW D. ELMORE**, HAVING BEEN DULY

2    SWORN, TESTIFIED AS FOLLOWS.)

3          **THE COURT:**   GOOD MORNING.

4          **THE WITNESS:**   GOOD MORNING.

5    **EXAMINATION**

6    **BY MR. ENGLAND:**

7          Q.    GOOD MORNING, LIEUTENANT ELMORE.

8          A.    HOW YOU DOING?

9          Q.    FINE, THANK YOU.   PLEASE STATE YOUR FULL NAME FOR

10   THE RECORD.

11         A.    MATTHEW DALE ELMORE.

12         Q.    AND YOU'RE A CORRECTIONAL OFFICER AT WADE

13   INSTITUTION; ISN'T THAT RIGHT?

14         A.    RIGHT.

15         Q.    OKAY.

16         **MR. ENGLAND:**   YOUR HONOR, PERMISSION TO TREAT AS

17   HOSTILE?

18         **THE COURT:**   WELL, LET'S SEE WHERE YOU GO.

19   **BY MR. ENGLAND:**

20         Q.    ALL RIGHT.   LIEUTENANT ELMORE, HOW LONG HAVE YOU

21   WORKED AT DAVID WADE?

22         A.    ALMOST SIX WEARS.

23         Q.    AND DO YOU DO YOUR JOB TO THE BEST OF YOUR ABILITY?

24         A.    YES, SIR.

25         Q.    YOU ALWAYS FOLLOW THE RULES?

1       **A.**    YES, SIR.

2       **Q.**    THE RULES THAT ARE ARTICULATED TO YOU BY YOUR

3   SUPERIOR AND RANKING OFFICERS?

4       **A.**    TRY TO.

5           **THE COURT:**    LIEUTENANT, IF YOU WOULD, SPEAK INTO

6   THAT MICROPHONE.

7           **THE WITNESS:**    YES, SIR.

8           **THE COURT:**    THANK YOU.

9   BY MR. ENGLAND:

10      **Q.**    DO YOU EVER DISOBEY THOSE ORDERS?

11      **A.**    I TRY NOT TO.

12      **Q.**    YOU KNOW MR. WOODFOX; ISN'T THAT RIGHT?

13      **A.**    RIGHT.

14      **Q.**    AND THAT'S BECAUSE YOU GUARD HIM; ISN'T THAT RIGHT?

15      **A.**    YES, SIR.

16      **Q.**    ON THE CCR TIER; ISN'T THAT RIGHT?

17      **A.**    YES, SIR.

18      **Q.**    AND ON OR ABOUT MAY OF 2013, YOU AND OTHER GUARDS

19   BEGAN STRIP SEARCHING MR. WOODFOX AS A DAILY MATTER OF

20   ROUTINE; ISN'T THAT RIGHT?

21      **A.**    CORRECT.

22      **Q.**    AND IS THAT BECAUSE YOU RECEIVED GUIDANCE FROM YOUR

23   SUPERIOR OFFICERS TO DO SO?

24      **A.**    WELL, THEY SHOULD HAVE BEEN DOING IT THE WHOLE TIME,

25   BUT I WAS JUST TRYING TO TAKE SHORT CUTS BECAUSE OF THE HEAVY

1  WORKLOAD.

2  **Q.**   BUT MY QUESTION TO YOU IS:   DID YOU BEGIN STRIP

3  SEARCHING MR. WOODFOX BECAUSE YOU RECEIVED INSTRUCTIONS FROM

4  YOUR SUPERIOR OR RANKING OFFICERS?

5  **A.**   NO, IT'S SUPPOSED TO ALWAYS BE DONE.

6  **Q.**   IS THERE A POLICY OR A LEGAL BASIS FOR YOU TO ALWAYS

7  STRIP SEARCH MR. WOODFOX?

8  **A.**   YES, SIR.

9  **Q.**   AND WHAT IS THAT?

10  **A.**   IT'S A POLICY ON SEARCHES.

11  **Q.**   AND WHAT POLICY IS THAT?

12  **A.**   I DON'T KNOW THE NUMBER RIGHT OFF.

13  **Q.**   BUT THERE IS A POLICY THAT AUTHORIZES YOU TO STRIP

14  SEARCH MR. WOODFOX EVERY DAY; IS THAT YOUR TESTIMONY?

15  **A.**   YES, SIR.

16  **Q.**   WOULD YOU PLEASE DESCRIBE FOR THE COURT, WHEN STRIP

17  SEARCHING MR. FOX, WHAT DO YOU DO?

18  **A.**   WELL, I GO DOWN THERE AND EVERYTHING HE'S GOING TO

19  WEAR, HE PASSES UP.  I CHECK HIM AND MAKE SURE THEY DON'T HAVE

20  CONTRABAND.  I CONDUCT A VISUAL BODY CAVITY SEARCH ON HIM AND

21  THEN PASS EVERYTHING BACK TO HIM.  HE'LL GET DRESSED, AND THEN

22  HE'LL BE RESTRAINED AND GO WHEREVER HE'S GOING TO GO.

23  **Q.**   ALL RIGHT.  SO LET'S BE CLEAR, WHEN DO YOU STRIP

24  SEARCH MR. WOODFOX?

25  **A.**   ANY TIME HE LEAVES THE BUILDING.

1    **Q.**    THE BUILDING, THE JAIL?

2    **A.**    THE CELL BLOCK.

3    **Q.**    OKAY.  ANY TIME MR. WOODFOX LEAVES THE CELL; IS THAT

4    RIGHT?

5    **A.**    THE CELL BLOCK.  IF HE'S JUST GOING TO STAY INSIDE

6    THE CELL BLOCK FOR A HAIR CUT OR SOMETHING, NO.

7    **Q.**    OKAY.  AND YOU SAID YOU PERFORM A VISUAL BODY CAVITY

8    SEARCH; IS THAT RIGHT?

9    **A.**    YES, SIR.

10   **Q.**    PLEASE DESCRIBE THAT FOR THE COURT.

11   **A.**    WELL, OPEN UP HIS MOUTH, RAISE HIS TONGUE, RAISE HIS

12   ARMS, RAISE HIS GENITALS AND TURN AROUND, BEND OVER AT THE

13   WAIST SO I CAN CHECK THE ANAL CAVITY, MAKE SURE THERE'S

14   NOTHING IN THERE, AND THEN HE'LL GET DRESSED.

15   **Q.**    AND WHEN YOU PERFORM THAT PROCEDURE, IS THERE ANYONE

16   ELSE WITH YOU?

17   **A.**    SOMETIMES THERE IS.

18   **Q.**    AND WHO WOULD THAT OTHER PERSON BE?

19   **A.**    JUST THE OTHER OFFICER THAT'S DOWN THERE.

20   **Q.**    SO IS IT YOUR TESTIMONY THAT AT ALL TIMES, AT LEAST

21   ONE TO TWO GUARDS OBSERVES A STRIP SEARCH OF MR. WOODFOX

22   ANYTIME THAT HE LEAVES THE CELL BLOCK?

23   **A.**    YES, SIR.

24   **Q.**    ISN'T IT TRUE THAT MR. WOODFOX ONLY LEAVES HIS CELL

25   BLOCK IF HE'S GOING TO THE INFIRMARY, TO CALL HIS LAWYERS, TO

1    GO TO REC TIME?

2        A.    YES, SIR.

3        Q.    IS THERE ANY OTHER SCENARIO IN WHICH HE LEAVES HIS

4    CELL BLOCK?

5        A.    UNLESS HE GOES OUT ON A TRIP OR SOMETHING.

6        Q.    LIKE TO COURT HERE TODAY?

7        A.    RIGHT.

8        Q.    AND YOU STRIP SEARCH HIM EVERY TIME HE GOES TO THE

9    INFIRMARY; RIGHT?

10       A.    SOMEBODY DOES.  I'M NOT DOWN THERE EVERY TIME, BUT

11   SOMEBODY DOES.

12       Q.    OKAY.  HAVE YOU EVER STRIP SEARCHED MR. WOODFOX WHEN

13   HE WAS GOING TO THE INFIRMARY?

14       A.    MOST OF THE TIME I'M JUST RELIEF FOR REC, BUT I

15   COULD HAVE BEEN DOWN THERE WHILE HE GOES TO THE INFIRMARY.

16       Q.    HAVE YOU EVER STRIP SEARCHED MR. WOODFOX WHEN HE

17   WENT FOR AN ATTORNEY PHONE CALL?

18       A.    YEAH.

19       Q.    HAVE YOU EVER STRIP SEARCHED MR. WOODFOX WHEN HE'S

20   GOING TO COURT?

21       A.    NOT COURT.

22       Q.    OKAY.  SO AFTER YOU STRIP SEARCH MR. WOODFOX, I

23   BELIEVE YOU TESTIFIED YOU PUT HIM IN CHAINS; IS THAT RIGHT?

24       A.    YES, SIR.

25       Q.    CAN YOU DESCRIBE THE CHAINS THAT YOU PUT HIM IN?

1    **A.**    WAIST CHAINS THAT GOES AROUND HIS WRISTS AND WRAPPED

2    AROUND HIS BACK WITH A LOCK AND LEG IRONS.

3    **Q.**    CAN YOU SEE MR. WOODFOX FROM WHERE YOU'RE SITTING?

4    **A.**    YES, SIR.

5    **Q.**    ARE THE CHAINS THAT MR. WOODFOX IS WEARING RIGHT NOW

6    SIMILAR OR THE SAME AS THE CHAINS THAT YOU PUT ON HIM?

7    **A.**    NOT WHEN HE GOES TO THE REC SIDE YARD, NO.

8    **Q.**    OKAY.  WHEN YOU DO PUT CHAINS ON HIM, ARE THEY

9    SIMILAR TO THE ONES THAT HE'S WEARING HERE TODAY?

10    **A.**    NOT THE BLACK BOX, NO.

11    **Q.**    OKAY.  CAN YOU EXPLAIN THE DIFFERENCE?

12    **A.**    IT JUST GOES AROUND HIS HANDS AND AROUND HIS WAIST,

13    IT'S NOT LIKE THIS.

14    **Q.**    OKAY.  SO THE CHAINS THAT YOU PUT ON MR. WOODFOX

15    ATTACH HIS HANDS TO THE SIDES OF HIS WAIST, AS OPPOSED TO

16    BEING TOWARDS THE CENTER OF HIS WAIST; IS THAT FAIR TO SAY?

17    **A.**    YES.

18    **Q.**    OKAY.  AND THIS IS HANDS, WAIST AND ANKLE CHAINS;

19    ISN'T THAT RIGHT?

20    **A.**    RIGHT.

21    **Q.**    AND AFTER YOU PUT THOSE CHAINS ON MR. WOODFOX, YOU

22    ESCORT HIM TO WHEREVER HE'S GOING, RIGHT?

23    **A.**    YES, SIR.

24    **Q.**    AND WHEN YOU'RE ESCORTING MR. WOODFOX TO WHEREVER

25    HE'S GOING, DO YOU ALLOW HIM TO PASS ANY ITEMS TO ANY INMATES?

1    **A.**   NO.

2    **Q.**   DO YOU ALLOW ANY INMATES TO PASS ANY ITEMS TO HIM?

3    **A.**   NO.

4    **Q.**   DO YOU ALLOW ANY INMATES TO TOUCH MR. WOODFOX?

5    **A.**   NO.

6    **Q.**   DO YOU ALLOW MR. WOODFOX TO TOUCH ANY OTHER INMATES?

7    **A.**   NO.

8    **Q.**   AND YOU ARE WITH HIM THE ENTIRE TIME HE'S BEING

9    ESCORTED TO WHEREVER HE'S GOING; ISN'T THAT RIGHT?

10   **A.**   YES, SIR.

11   **Q.**   YOU AND SOMEONE ELSE, RIGHT?

12   **A.**   YES.

13   **Q.**   ANOTHER GUARD, RIGHT?

14   **A.**   RIGHT.

15   **Q.**   ANOTHER TRAINED AND SEASONED GUARD, RIGHT?

16   **A.**   RIGHT.

17   **Q.**   AND YOU KEEP AN EYE ON HIM THE ENTIRE TIME, RIGHT?

18   **A.**   YEAH.   I'M WITH HIM THE WHOLE TIME, BUT OTHER STUFF

19   HAPPENS IN YOUR SURROUNDINGS, YOU CAN'T ALWAYS HAVE 100

20   PERCENT EYES ON HIM.

21   **Q.**   OKAY.   WELL, OUTSIDE OF SOME EMERGENCY HAPPENING,

22   YOU KEEP YOUR EYES ON HIM THE ENTIRE TIME, RIGHT?

23   **A.**   RIGHT.

24   **Q.**   AS YOU SIT HERE TODAY, CAN YOU TESTIFY ABOUT ANY

25   SITUATION WHERE YOU HAD TO TAKE YOUR EYES OFF MR. WOODFOX WHEN

1  YOU WERE ESCORTING HIM SOMEWHERE ELSE?

2       **A.**   NOT REALLY, NO.

3       **Q.**   NOT REALLY OR NO?

4       **A.**   NO.

5       **Q.**   OKAY.   AND WHEN YOU WALK THROUGH THE FACILITIES WITH

6  MR. WOODFOX, WHEN YOU'RE ESCORTING HIM, ISN'T IT TRUE THAT

7  THERE'S A YELLOW LINE THAT HE'S NOT SUPPOSED TO CROSS TO KEEP

8  HIM ON THE SIDE OF THE HALLWAY?

9       **A.**   YES, SIR.

10       **Q.**   AND DO YOU MAKE SURE THAT MR. WOODFOX STAYS WITHIN

11  THAT YELLOW LINE?

12       **A.**   RIGHT.

13       **Q.**   ALL THE TIME, RIGHT?

14       **A.**   YES, SIR.

15       **Q.**   AND YOU DON'T ALLOW ANY OTHER INMATES TO CROSS THAT

16  LINE EITHER; ISN'T THAT RIGHT?

17       **A.**   NO.

18       **Q.**   AND THAT YELLOW LINE IS DESIGNED TO BE A BARRIER TO

19  KEEP INMATES FROM TOUCHING EACH OTHER OR PASSING EACH OTHER

20  THINGS, RIGHT?

21       **A.**   RIGHT.

22       **Q.**   AND WHEN YOU GET TO WHEREVER YOU'RE GOING WITH MR.

23  WOODFOX, DO YOU EVER LEAVE HIM UNATTENDED?

24       **A.**   NO.

25       **Q.**   SO YOU STAY WITH HIM THE ENTIRE TIME, RIGHT?

1      **A.**    THERE'S ALWAYS GOING TO BE SOMEBODY WATCHING HIM.

2      **Q.**    ALL RIGHT.   BUT I'M JUST ASKING YOU ABOUT WHEN

3   YOU'RE WITH HIM; YOU DON'T LEAVE HIM UNATTENDED, RIGHT?

4      **A.**    SOMETIMES.   IF THERE'S ANOTHER OFFICER THERE.

5      **Q.**    ALL RIGHT.   ISN'T IT TRUE THAT YOU'VE ATTENDED

6   ATTORNEY PHONE CALLS WITH MR. WOODFOX?

7      **A.**    RIGHT.

8      **Q.**    AND SO YOU STRIP SEARCH HIM, YOU ESCORT HIM TO TAKE

9   A PHONE CALL WITH HIS ATTORNEY, AND YOU SIT IN THE ROOM WITH

10   HIM, RIGHT?

11      **A.**    NOT EVERY TIME.   AS LONG AS THERE'S AN OFFICER

12   THERE, I'LL GO DO SOMETHING ELSE.

13      **Q.**    OKAY.   BUT YOU HAVE DONE THAT BEFORE, RIGHT?

14      **A.**    RIGHT.

15      **Q.**    OKAY.   AND YOU CAN HEAR WHAT HE'S SAYING TO HIS

16   ATTORNEYS; ISN'T THAT RIGHT?

17      **A.**    RIGHT.

18      **Q.**    AND YOU'RE WATCHING HIM THE ENTIRE TIME, RIGHT?

19      **A.**    RIGHT.

20      **Q.**    AND THE SAME WOULD BE TRUE IN THE INFIRMARY, WHEN HE

21   GOES AND HE TALKS TO NURSES OR DOCTORS, IF YOU WERE ON DUTY,

22   YOU WOULD SIT THERE WITH HIM IN THE ROOM WITH THE DOCTORS AND

23   YOU WOULD WATCH HIM THE ENTIRE TIME, RIGHT?

24      **A.**    RIGHT.

25      **Q.**    AND WOULD YOU TAKE THE IRONS OFF AT ANY POINT IN

1   TIME WHEN HE'S IN THE INFIRMARY?

2      **A.**   NO.

3      **Q.**   AND AFTER THESE TRIPS, YOU WOULD TAKE MR. WOODFOX

4   BACK TO HIS CELL, RIGHT?

5      **A.**   SOMETIMES, YES.

6      **Q.**   AND YOU WOULD FOLLOW ALL THE PROCEDURES THAT YOU

7   TESTIFIED ABOUT EARLIER, RIGHT?

8      **A.**   RIGHT.

9      **Q.**   YOU WOULD BE WATCHING HIM THE ENTIRE TIME, RIGHT?

10     **A.**   RIGHT.

11     **Q.**   YOU AND POTENTIALLY ANOTHER GUARD, RIGHT?

12     **A.**   RIGHT.

13     **Q.**   AND YOU WOULD MAKE SURE THAT HE STAYS WITHIN THE

14  YELLOW LINES SO HE DOESN'T TOUCH OTHER INMATES, RIGHT?

15     **A.**   RIGHT.

16     **Q.**   AND YOU MAKE SURE THAT HE'S NOT PASSING ANYTHING TO

17  INMATES OR THEY'RE NOT PASSING ANYTHING TO HIM, RIGHT?

18     **A.**   RIGHT.

19     **Q.**   AND THEN WHEN YOU GET HIM BACK TO HIS CELL, YOU

20  STRIP SEARCH HIM AGAIN, RIGHT?

21     **A.**   RIGHT.

22     **Q.**   DESCRIBE THAT PROCESS FOR THE COURT.

23     **A.**   SAME PROCESS.  PUT HIM IN THE CELL.  TAKE THE

24  RESTRAINTS OFF.  PASSES ALL HIS CLOTHES UP, CHECK IT, CONDUCT

25  A SEARCH, AND THEN GO ON ABOUT MY BUSINESS.

1    **Q.**   ALL RIGHT.  SO WHEN HE GETS BACK TO HIS CELL TO BE

2    CLEAR, YOU HAVE HIM TAKE HIS CLOTHES OFF AGAIN, RIGHT?

3    **A.**   RIGHT.

4    **Q.**   YOU INSPECT HIS MOUTH?

5    **A.**   RIGHT.

6    **Q.**   YOU INSPECT HIS GENITALS?

7    **A.**   RIGHT.

8    **Q.**   YOU INSECT HIS ANUS?

9    **A.**   RIGHT.

10   **Q.**   AND THEN YOU PUT HIM BACK IN THE CELL, RIGHT?

11   **A.**   WELL, HE'S IN THE CELL.

12   **Q.**   YOU LOCK THE CELL?

13   **A.**   RIGHT.

14   **Q.**   HOW MANY TIMES WOULD YOU SAY THAT YOU'VE STRIP

15   SEARCHED MR. WOODFOX?

16   **A.**   DURING A DAY, PROBABLY MAYBE JUST A COUPLE OF TIMES.

17   IF HE'S ON THE YARD, IT'D JUST BE TWICE.

18   **Q.**   OKAY.  BUT OVER THE COURSE OF THE TIME THAT YOU'VE

19   BEEN GUARDING MR. WOODFOX, HOW MANY TIMES WOULD YOU SAY THAT

20   YOU'VE STRIP SEARCHED HIM?

21   **A.**   OH, 20, 30 TIMES, PROBABLY.

22   **Q.**   AND IN THE 20, 30 TIMES YOU'VE STRIP SEARCHED MR.

23   WOODFOX, HOW MANY TIMES HAVE YOU FOUND CONTRABAND UNDERNEATH

24   MR. WOODFOX'S GENITALS?

25   **A.**   I HAVEN'T.

1    **Q.**    HOW ABOUT IN HIS ANUS; HOW MANY TIMES HAVE YOU FOUND

2  CONTRABAND IN MR. WOODFOX'S ANUS?

3    **A.**    NONE.

4    **Q.**    HAS ANY OFFICER REPORTED TO YOU THAT THEY FOUND

5  CONTRABAND IN MR. WOODFOX'S ANUS?

6    **A.**    NO.

7    **Q.**    HOW ABOUT UNDER HIS GENITALS?

8    **A.**    NO.

9    **Q.**    AND YET YOU KEEP STRIP SEARCHING HIM, RIGHT?

10    **A.**    RIGHT.

11    **Q.**    BECAUSE THOSE ARE THE RULES?

12    **A.**    RIGHT.

13    **Q.**    AND THAT'S WHAT YOU'RE SUPPOSED TO DO?

14    **A.**    RIGHT.

15    **Q.**    ALL RIGHT.  YOU TESTIFIED EARLIER THAT YOU DON'T

16  REMEMBER THE RULE OR THE POLICY THAT AUTHORIZED YOU TO STRIP

17  SEARCH MR. WOODFOX EVERY DAY, RIGHT?

18    **A.**    CORRECT.

19    **Q.**    BUT DO YOU UNDERSTAND THAT POLICY?

20    **A.**    YES, SIR.

21    **Q.**    DOES THAT POLICY REQUIRE YOU TO HAVE PROBABLE CAUSE

22  TO STRIP SEARCH MR. WOODFOX?

23    **A.**    IT SAYS ANY TIME THEY LEAVE THE AREA.

24    **Q.**    SIR, ANSWER MY QUESTION:  DOES THE POLICY REQUIRE

25  YOU TO HAVE PROBABLE CAUSE TO STRIP SEARCH MR. WOODFOX?

1   **A.**   NO.

2   **Q.**   DOES THE POLICY REQUIRE YOU TO HAVE REASONABLE

3   SUSPICION TO STRIP SEARCH MR. WOODFOX?

4   **A.**   NO.

5   **Q.**   DOES THE POLICY ARTICULATE ANY REASON WHY YOU MAY OR

6   MAY NOT HAVE AUTHORITY TO STRIP SEARCH MR. WOODFOX?

7   **A.**   NO.

8   **Q.**   BUT YOU FOLLOW IT ALL THE SAME, RIGHT?

9   **A.**   RIGHT.

10   **Q.**   AND SO DO THE OTHER GUARDS WHO GUARD MR. WOODFOX;

11   ISN'T THAT RIGHT?

12   **A.**   YES, SIR.

13   **Q.**   NOW, YOU'VE SEEN THE INSIDE OF MR. WOODFOX'S CELL;

14   ISN'T THAT RIGHT?

15   **A.**   YES, SIR.

16   **Q.**   WHAT'S IN THERE?

17   **A.**   JUST HIS PROPERTY:   BEDS, SHEETS, CLOTHES, FOOD.

18   **Q.**   ANYTHING ELSE?

19   **A.**   HYGIENE ITEMS, STUFF LIKE THAT.

20   **Q.**   YOU EVER HEAR OF AN INMATE CONCEALING A BED UNDER

21   HIS GENITALS OR IN HIS ANUS?

22   **A.**   NO, SIR.

23   **Q.**   WHAT ABOUT BOOKS OR PAPER; DOES MR. WOODFOX HAVE

24   THAT?

25   **A.**   RIGHT.

1    **Q.**    HAVE YOU EVER SEEN AN INMATE OR ANYONE PLACE LEGAL

2    PAPERS OR BOOKS UNDER THEIR GENITALS?

3    **A.**    NO, SIR.

4    **Q.**    THE POLICY THAT YOU REFERRED TO EARLIER, DOES IT

5    REQUIRE YOU AND YOUR OTHER OFFICERS TO PROVIDE A LOG OF EACH

6    TIME YOU STRIP SEARCH MR. WOODFOX?

7    **A.**    NO, SIR.

8    **Q.**    SO YOU HAVE NO RECORDS OF WHEN YOU STRIP SEARCH HIM,

9    BUT YOU DO ADMIT THAT YOU DO STRIP SEARCH HIM EVERY DAY, YOU

10   OR SOMEONE?

11   **A.**    RIGHT.

12   **Q.**    OKAY.  ISN'T IT TRUE THAT FROM THE CCR TIER,

13   SPECIFICALLY MR. WOODFOX'S CELL, YOU SHAKE HIS CELL DOWN; HOW

14   MANY TIMES DO YOU DO THAT?

15   **A.**    ANY TIME YOU GO IN THERE.

16   **Q.**    SO EVERY TIME YOU GO IN HIS CELL, YOU SHAKE IT DOWN;

17   IS THAT RIGHT?

18   **A.**    IT HAS TO BE SHOOK DOWN, BUT I DON'T USUALLY SHAKE

19   IT DOWN.  IT'S WHOEVER WORKING DOWN THERE DOES.

20   **Q.**    ALL RIGHT.  SO WOULD IT BE FAIR TO SAY THAT SOMEONE

21   IS ALWAYS SHAKING DOWN MR. WOODFOX'S CELL?

22   **A.**    RIGHT.

23   **Q.**    ALL RIGHT.  AND IN THE HISTORY OF THOSE SHAKEDOWNS,

24   LET'S SAY SINCE MAYBE MAY OF 2013, HAS ANYBODY FOUND ANY

25   CONTRABAND IN MR. WOODFOX'S CELL?

1    **A.**   NOT THAT I'M AWARE OF.

2    **Q.**   YOU WOULD BE AWARE OF IT, THOUGH, IF IT HAD

3    HAPPENED, RIGHT?

4    **A.**   RIGHT.

5    **Q.**   THERE WOULD BE A REPORT ABOUT IT, RIGHT?

6    **A.**   RIGHT.

7    **Q.**   BECAUSE THOSE ARE THE RULES, RIGHT?

8    **A.**   RIGHT.

9    **Q.**   AND THERE IS NO REPORT ABOUT FINDING CONTRABAND IN

10   MR. WOODFOX'S CELL; ISN'T THAT RIGHT?

11   **A.**   RIGHT.

12   **Q.**   AND YOU ALSO HAVE METAL BATON HAND WANDS, RIGHT?

13   **A.**   RIGHT.

14   **Q.**   DOES ANYBODY USE THE METAL BATON HAND WANDS ON MR.

15   WOODFOX?

16   **A.**   AS FAR AS I'M CONCERNED, THEY DO.

17   **Q.**   AND ARE YOU AWARE IF THE METAL BATONS HAVE EVER, YOU

18   KNOW, HIT FOR ANY METAL OBJECTS OR CONTRABAND ON MR. WOODFOX'S

19   PERSON?

20   **A.**   NO.

21   **Q.**   UNLESS YOU RECEIVE INSTRUCTION TO THE CONTRARY, DO

22   YOU INTEND TO CONTINUE STRIP SEARCHING MR. WOODFOX EVERY DAY

23   AS CONSISTENT WITH WHAT YOU'VE TESTIFIED TO TODAY?

24   **A.**   YES, SIR.

25   **Q.**   AND DO YOU EXPECT YOUR OTHER OFFICERS TO DO THE

1  SAME?

2          **A.**    YES, SIR.

3          **Q.**    THANK YOU.   NOTHING FURTHER.

4                 **THE COURT:**   ANY CROSS?

5                 **MR. CURRY:**   VERY BRIEFLY.

6  EXAMINATION

7  BY MR. CURRY:

8          **Q.**    LIEUTENANT ELMORE, IS MR. WOODFOX TREATED ANY

9  DIFFERENTLY FROM ANY OTHER INMATE ON HIS TIER?

10         **A.**    NO, SIR.

11         **Q.**    TO YOUR KNOWLEDGE, IS HE TREATED ANY DIFFERENTLY

12  FROM ANY OTHER MAXIMUM SECURITY INMATE AT WADE?

13         **A.**    NO, SIR.

14         **Q.**    WHEN YOU TAKE MR. WOODFOX TO THE YARD, DO YOU

15  NORMALLY STAY WITH HIM, OR DO YOU CONTINUE TRANSPORTING OTHER

16  INMATES?

17         **A.**    I'LL GO BACK AND GET OTHER INMATES.

18         **Q.**    BUT A GUARD IS THERE TO WATCH WHOEVER IS IN THE

19  EXERCISE YARDS?

20         **A.**    YES, SIR.

21         **Q.**    AND HOW MANY INMATES MIGHT BE IN THOSE YARDS AT ANY

22  ONE TIME?

23         **A.**    UP TO 21.

24         **Q.**    YOU SAID HIS CELL IS ALWAYS SHAKEN DOWN.   DO OTHER

25  OFFICERS PERFORM THE SHAKEDOWNS?

1     A.    YES, SIR.

2     Q.    IT'S NOT LIKE THEY'RE NOT DOING IT CONSTANTLY?

3     A.    RIGHT.

4     Q.    IS IT SOMETHING THEY DO ROUTINELY?

5     A.    RIGHT.

6     Q.    TO YOUR KNOWLEDGE, DO THEY SHAKE DOWN MR. WOODFOX'S

7  CELL MORE THAN ANYONE ELSE'S?

8     A.    NO, SIR.

9     Q.    YOU DESCRIBED A YELLOW LINE.  THAT YELLOW LINE IS

10 ONLY IN THE CCR TIER; ISN'T THAT RIGHT?

11    A.    YES, SIR.

12    Q.    THERE'S NOT A YELLOW LINE IN THE REST OF THE

13 BUILDINGS?

14    A.    NO, SIR.

15    Q.    AND ISN'T IT TRUE THAT INMATES GIVE ICE, READING

16 MATERIAL AND STUFF TO EACH OTHER DURING THE DAY?

17    A.    YES, SIR.

18    Q.    THAT'S ALL I HAVE.

19          THE COURT:  REDIRECT?

20          MR. ENGLAND:  ONE MOMENT, YOUR HONOR.

21 EXAMINATION

22 BY MR. ENGLAND:

23    Q.    WHEN MR. WOODFOX IS ON THE YARD, ARE ANY GENERAL

24 POPULATION OR OTHER INMATES ALLOWED TO APPROACH MR. WOODFOX?

25    A.    NO, SIR.

1    Q.    TOUCH HIM?

2    A.    NO, SIR.

3    Q.    OKAY.   AND THERE ARE CAMERAS OUT THERE ON THE YARD

4    AS WELL, RIGHT?

5    A.    THEY HAVE THEM OUT ON THE PERIMETER.

6    Q.    AND PEOPLE ARE WATCHING THE CAMERAS?

7    A.    YES, SIR.

8    MR. ENGLAND:   ALL RIGHT.   NOTHING FURTHER.

9    THE COURT:   ALL RIGHT.   IS HE STILL SHACKLED WHEN HE

10   IS OUT ON THE YARD?

11   THE WITNESS:   NO, SIR.   NOT ONCE HE'S IN THE REC

12   CAGE.

13   THE COURT:   HOW IS HE RESTRAINED?

14   THE WITNESS:   SAME WAY.   JUST HANDS DOWN BY HIS

15   WAIST, WRAPPED AROUND HIS BACK, LEG IRONS.

16   THE COURT:   HE HAS CHAINS ON?

17   THE WITNESS:   RIGHT.   YES, SIR.

18   THE COURT:   SO HE'S CONSTRAINED?

19   THE WITNESS:   YES, SIR.

20   THE COURT:   ALL RIGHT.   NOW, I'M CONCERNED ABOUT YOU

21   ALL OF A SUDDEN WOKE UP ONE MORNING AND DECIDED TO ENFORCE A

22   POLICY THAT YOU'RE NOT SURE WHAT THE POLICY IS?

23   THE WITNESS:   WELL, I'M NOT SURE WHAT THE NUMBER IS,

24   BUT IT SHOULD HAVE BEEN DONE THE WHOLE TIME.

25   THE COURT:   I MEAN, BUT WHAT MADE YOU SOME BRIGHT

1    MORNING JUST DECIDE TO DO THAT?

2              **THE WITNESS:**  WELL, IT WAS REITERATED TO MAKE SURE

3    THAT WE WERE DOING IT.

4              **THE COURT:**  I MEAN, WHO REITERATED IT TO YOU?

5              **THE WITNESS:**  MY SUPERVISORS.

6              **THE COURT:**  AND WHERE DID HE GET -- WHO IS YOUR

7    SUPERVISOR?

8              **THE WITNESS:**  COLONEL NAIL.

9              **THE COURT:**  AND WHO TOLD HIM; DO YOU KNOW?

10             **THE WITNESS:**  THE WARDEN.

11             **THE COURT:**  ALL RIGHT.  DO YOU KNOW WHO TOLD THE

12   WARDEN?

13             **THE WITNESS:**  NO, SIR.

14             **THE COURT:**  ALL RIGHT.  DOES ANYONE HAVE ANY

15   QUESTIONS TO FOLLOW-UP ON MY QUESTIONS?

16             **MR. CURRY:**  I DO, JUDGE.  I THINK THERE'S CONFUSION

17   ABOUT WHETHER THE INMATE IS RESTRAINED WHILE HE'S INSIDE THE

18   REC YARD.

19   **EXAMINATION**

20   **BY MR. CURRY:**

21        **Q.**   YOU TAKE HIM TO THE REC YARD IN RESTRAINTS, CORRECT?

22        **A.**   CORRECT.

23        **Q.**   AND THEN HE GOES INSIDE THE REC YARD?

24        **A.**   CORRECT.

25        **Q.**   ARE HIS RESTRAINTS REMOVED AT THAT POINT?

1    **A.**    YES, ONCE HE'S LOCKED IN.

2    **Q.**    AND ONCE HE'S INSIDE THE REC YARD, HE'S FREE -- HIS

3    HANDS AND LEGS ARE FREE UNTIL HE'S TRANSPORTED BACK TO THE

4    CELL?

5    **A.**    CORRECT.

6    **THE COURT:**    BUT HE'S STILL ALLOWED NO CONTACT?

7    **THE WITNESS:**    YES, SIR.

8    **THE COURT:**    AND YOU'RE WATCHING HIM OR SOMEONE'S

9    WATCHING HIM THE WHOLE TIME?

10    **THE WITNESS:**    YES, SIR.

11    **THE COURT:**    AND CAMERAS ARE THERE?

12    **THE WITNESS:**    YES, SIR.

13    **THE COURT:**    HAVE YOU EVER SEEN MR. WOODFOX APPROACH

14    ANYBODY?

15    **THE WITNESS:**    NO, SIR.

16    **THE COURT:**    HAS ANYONE EVER APPROACHED MR. WOODFOX?

17    **THE WITNESS:**    NO, SIR.

18    **THE COURT:**    HAVE YOU EVER REVIEWED THE CAMERAS TO

19    SEE IF ANYTHING OUT OF THE ORDINARY HAS EVER HAPPENED?

20    **THE WITNESS:**    NO, SIR.

21    **THE COURT:**    ANY FOLLOW-UP?

22    **MR. CURRY:**    YES, YOUR HONOR.

23    EXAMINATION

24    BY MR. CURRY:

25    **Q.**    THE EXERCISE YARDS, ARE THEY IMMEDIATELY ADJACENT TO

1  ONE ANOTHER?

2      **A.**   YES, SIR.

3      **Q.**   WOULD IT BE POSSIBLE FOR AN INMATE TO PUT AN ITEM IN

4  THE ADJACENT CELL, FOR EXAMPLE?

5      **A.**   YES, SIR.

6      **Q.**   AND IF ONE OFFICER IS WATCHING 21 INMATES, ASIDE

7  FROM OTHER DISTRACTIONS IN THE OPEN AREA THERE, COULD INMATES

8  TOUCH EACH OTHER WITHOUT HIS KNOWLEDGE?

9      **A.**   YES, SIR.

10      **MR. ENGLAND:**  OBJECTION.

11      **MR. CURRY:**  THAT'S ALL I HAVE, YOUR HONOR.

12      **THE COURT:**  ANY QUESTIONS?

13  **EXAMINATION**

14  **BY MR. ENGLAND:**

15      **Q.**   MR. CURRY JUST ASKED YOU IF IT'S POSSIBLE FOR

16  INMATES TO PASS EACH OTHER ITEMS IN THE REC YARD; DO YOU

17  REMEMBER THAT QUESTION?

18      **A.**   YES, SIR.

19      **Q.**   ALL RIGHT.  SO LET'S GO BACK AND DESCRIBE THE REC

20  PENS.  CAN YOU DESCRIBE THE REC PENS?

21      **A.**   WELL, THERE ARE TWENTY-ONE OUT THERE AND THERE'S

22  SEVEN THAT -- SEVEN HERE, SEVEN HERE, AND SEVEN HERE.  SO

23  WHOEVER IS IN -- IF THERE IS SOMEBODY IN THE CAGE ON EACH SIDE

24  OF THEM, THEY COULD PASS SOMETHING THEN.

25      **Q.**   OKAY.  SO IS IT LIKE A CHICKEN WIRE FENCE, OR WHAT

1  IS IT?

2       A.   YEAH, IT'S -- THERE'S A HOLE IN IT.  I MEAN, IT'S

3  HARD TO ANALYZE IT.

4       Q.   HOW BIG ARE THE HOLES?

5       A.   THEY'RE BIG ENOUGH TO GET SOMETHING THROUGH THERE.

6       Q.   SOMETHING LIKE WHAT?

7       A.   I DON'T KNOW.  A LIGHTER, A PAPER ROLLED UP.

8       Q.   OKAY.  SO A PIECE OF PAPER COULD FIT THROUGH THE

9  HOLES IN THE BARRIERS; IS THAT YOUR TESTIMONY?

10      A.   RIGHT.  YOU COULD GET A LIGHTER THROUGH THERE.

11      Q.   LIKE A CIGARETTE LIGHTER?

12      A.   RIGHT.

13      Q.   OKAY.  AND HAS MR. WOODFOX EVER FOUND ANY CIGARETTE

14  LIGHTERS?

15      A.   NO, SIR.

16      Q.   AND IF TWO INMATES WERE STANDING UP ON THE WALL

17  FORCING A CIGARETTE LIGHTER THROUGH THE WALL, SOMEBODY WOULD

18  SEE THAT, RIGHT?

19      A.   NOT NECESSARILY.  IF THERE'S 21 PEOPLE OUT THERE,

20  THEY CAN'T WATCH EVERYBODY AT ONCE.

21      Q.   OKAY.  WELL, WHEN MR. WOODFOX GOES OUT ON THE REC

22  YARD, ARE THERE 21 INMATES GOING OUT AT THE SAME TIME?

23      A.   NO.  YOU TAKE SEVEN OUT, GO GET ANOTHER SEVEN, AND

24  THEN GO BACK AND GET ANOTHER SEVEN.

25      Q.   OKAY.  SO WHEN MR. WOODFOX IS OUT THERE, THERE'S

1  ONLY SEVEN, RIGHT, SEVEN INMATES?

2      **A.**   AT ONE PARTICULAR -- FOR THAT SPLIT SECOND OR

3  HOWEVER LONG IT TAKES TO GO BACK AND GET MORE.

4      **Q.**   OKAY.  ALL RIGHT.  AND HAVE CIGARETTE LIGHTERS BEEN

5  A CONTRABAND PROBLEM IN THE CCR TIER FOR AS LONG AS YOU'VE

6  WORKED THERE?

7      **A.**   NO.

8      **Q.**   AND DO YOU HAVE ANY EVIDENCE OF ANY CONTRABAND BEING

9  PASSED BETWEEN CCR INMATES WHILE THEY'RE ON THE REC YARD?

10      **A.**   NO.

11      **Q.**   YOU'VE NEVER HEARD OF THAT, HAVE YOU?

12      **A.**   NO.

13      **Q.**   NEITHER HAS ANY OF THE OTHER GUARDS, AS TO THE BEST

14  OF YOUR KNOWLEDGE, RIGHT?

15      **A.**   RIGHT.

16      **Q.**   AND TO BE CLEAR, AND YOU TESTIFIED EARLIER THAT MR.

17  WOODFOX HAS MATTRESSES, PAPERS.  YOU CAN'T FIT A MATTRESS

18  THROUGH THOSE HOLES, CAN YOU?

19      **A.**   NO.

20      **Q.**   AND THE GUARDS ARE SHAKING DOWN HIS CELL WHEN THEY

21  TAKE HIM OUT, RIGHT?

22      **A.**   RIGHT.

23      **Q.**   AND THEY'RE STRIP SEARCHING HIM, TOO, RIGHT?

24      **A.**   YES.

25      **Q.**   SO YOU WOULD AGREE THAT MR. WOODFOX, OR ANY OTHER

1    INMATE OUT ON THAT REC YARD, DOES NOT HAVE A LIGHTER ON THEIR

2    PERSON WHEN THEY GET THERE, RIGHT?

3        **A.**    RIGHT.   RIGHT.

4        **Q.**    THANK YOU.   NOTHING FURTHER.

5            **THE COURT:**   ALL RIGHT.

6    **EXAMINATION**

7    **BY MR. CURRY**:

8        **Q.**    LIEUTENANT ELMORE, DO OFFICERS COME IN AND SHAKE

9    DOWN MR. WOODFOX'S CELL EVERY TIME YOU TAKE HIM TO THE REC

10   YARD?

11       **A.**    NO.

12       **Q.**    WHEN MR. ENGLAND SAID -- ASKED YOU HOW MANY INMATES

13   MIGHT BE IN THE 21 EXERCISE YARDS AT THE TIME MR. WOODFOX IS

14   OUT THERE, WAS THE ANSWER THAT ONLY SEVEN COULD BE IN THE

15   SEVEN ADJACENT ONES ON HIS TIER -- I'LL RESTATE THE QUESTION.

16       COULD 21 INMATES BE OUT THERE WHILE MR. WOODFOX IS IN HIS

17   EXERCISE YARD?

18       **A.**    YES.

19       **Q.**    THE YARDS ARE SEPARATED BY A CHAIN LINK FENCE?

20       **A.**    WELL, THE SEVEN THEY GO IN IS OVER HERE, AND THEY

21   HAVE FOURTEEN THAT'S OVER HERE.

22       **Q.**    AND THE SEVEN CELLS, THE SEVEN RECREATION YARDS ARE

23   SEPARATED BY A CHAIN LINK FENCE?

24       **A.**    I DON'T UNDERSTAND.

25       **Q.**    MR. WOODFOX AND THE INMATES IN THE ADJACENT

1  RECREATION YARD, THEY'RE SEPARATED WHILE THEY ARE IN THERE BY

2  A CHAIN LINK FENCE?

3      **A.**   RIGHT.  YOU'RE TALKING ABOUT ON THE SIDES OF IT?

4      **Q.**   YES.

5      **A.**   YEAH.

6      **Q.**   AND COULD ONE PASS A HANDCUFF KEY THROUGH THAT CHAIN

7  LINK FENCE?

8      **A.**   YES.

9      **Q.**   THANK YOU.

10         **THE COURT:**  WHERE WOULD THEY GET A HANDCUFF KEY?

11         **THE WITNESS:**  SOMETIMES THEY CAN MAKE ONE.

12         **THE COURT:**  HOW ARE THEY GOING TO MAKE ONE?

13         **THE WITNESS:**  WELL, I DON'T KNOW.  IT'S BEEN DONE.

14         **THE COURT:**  HAVE YOU EVER HAD ANY OF THESE 21

15  INMATES MAKE A HANDCUFF KEY?

16         **THE WITNESS:**  I HAVEN'T.

17         **THE COURT:**  YOU EVER HEARD OF IT?

18         **THE WITNESS:**  I'VE HEARD OF HANDCUFF KEYS BEING

19  MADE.

20         **THE COURT:**  WHERE?

21         **THE WITNESS:**  DOWN IN THE CELL BLOCKS.

22         **THE COURT:**  NOT WITH THESE GUYS, THOUGH?

23         **THE WITNESS:**  NOT CCR, NO.

24         **THE COURT:**  NOW, HOW MANY PEOPLE COULD MR. WOODFOX,

25  WHEN HE IS IN THE REC YARD, POSSIBLY PASS ANYTHING TO; HOW

1  MANY PEOPLE DOES HE HAVE CONTACT WITH IN HIS LITTLE AREA?

2         **THE WITNESS:**  JUST THOSE SEVEN OR HOWEVER MANY CCRS

3  GOES OUT.

4         **THE COURT:**  JUST SEVEN?

5         **THE WITNESS:**  THEY ARE NOT GOING TO LET ANYBODY COME

6  UP THERE FROM AROUND AMONGST THEM.  THE OFFICERS OUT THERE ARE

7  NOT GOING TO LET JUST SOMEBODY WALK UP.

8         **THE COURT:**  THE WAY IT IS CONFIGURED, HE IS IN KIND

9  OF A LITTLE CAGE, RIGHT?

10        **THE WITNESS:**  YES, SIR.

11        **THE COURT:**  AND HOW MANY PEOPLE WOULD HE -- DOES IT

12  HAVE FOUR SIDES?

13        **THE WITNESS:**  NO, JUST ONE ON EACH SIDE OF HIM.

14        **THE COURT:**  ONE ON EACH SIDE.  SO THERE WOULD ONLY

15  BE TWO PEOPLE HE COULD POSSIBLY HAVE ANY CONTACT WITH?

16        **THE WITNESS:**  YES, SIR.

17        **THE COURT:**  ALL RIGHT.  THANK YOU.

18     YOU MAY STEP DOWN, SIR.

19     NEXT WITNESS?

20        **MR. ENGLAND:**  THE PLAINTIFF CALLS MR. WOODFOX TO THE

21  STAND.

22        (WHEREUPON, **ALBERT WOODFOX**, HAVING BEEN DULY SWORN,

23  TESTIFIED AS FOLLOWS.)

24        **THE COURT:**  GOOD MORNING.

25     MR. ENGLAND, IF YOU WOULD GO AND ADJUST THAT MICROPHONE,

1  PLEASE.

2            **THE WITNESS:**  ALBERT WOODFOX.

3  **EXAMINATION**

4  **BY MR. ENGLAND:**

5        Q.    EVEN THOUGH YOU JUST DID, PLEASE STATE YOUR NAME FOR

6  THE RECORD.

7        A.    ALBERT WOODFOX.

8        Q.    ARE YOU A PLAINTIFF IN THIS LAWSUIT?

9        A.    YES, I AM.

10        Q.    AND ARE YOU THE PERSON SEEKING RELIEF FROM

11  DEFENDANT'S DAILY STRIP SEARCHING OF YOU?

12        A.    YES, I AM.

13        Q.    PLEASE DESCRIBE FOR THE COURT THE NATURE OF YOUR

14  COMPLAINT.

15        A.    WELL, THE NATURE OF MY COMPLAINT IS -- THE NATURE OF

16  MY COMPLAINT IS --

17        Q.    IT'S HARD WITH THESE HANDCUFFS.

18        A.    THE NATURE OF MY COMPLIANT IS THAT I'M BEING FORCED

19  TO ENDURE STRIP SEARCHES ON A DAILY BASIS, NOT AS A MATTER OF

20  SECURITY BUT AS A MATTER OF PROCEDURE.

21        Q.    ALL RIGHT.   WHERE DO YOU LIVE?

22        A.    DAVID WADE CORRECTIONAL CENTER, N1 CELL BLOCK, A

23  TIER.

24        Q.    HOW LONG HAVE YOU LIVED THERE?

25        A.    SINCE NOVEMBER 1ST, 2010.

1      **Q.**    AND WHERE YOU LIVE IS KNOWN AS THE CCR UNIT; IS THAT

2  RIGHT?

3      **A.**    YES.

4      **Q.**    PLEASE DESCRIBE FOR THE COURT THE CCR UNIT.

5      **A.**    CCR IS A MAXIMUM-SECURITY CELL BLOCK THAT CONSISTS

6  OF 16 CELLS.  EACH CELL IS OCCUPIED BY ONE INMATE.  THE CELLS

7  CONSIST OF A CONCRETE BUNK AT THE BOTTOM, A METAL BUNK AT THE

8  TOP, TWO METAL LOCKER BOXES, A TOILET AND SINK COMBINATION,

9  METAL COMBINATION ATTACHED TO THE BACK WALL, AND THERE'S A

10  FOOD SLOT IN THE DOOR.

11      **Q.**    AND CAN YOU PLEASE DESCRIBE THE DIMENSIONS OF YOUR

12  CELL?

13      **A.**    I'M NOT QUITE SURE, BUT APPROXIMATELY SIX BY NINE.

14      **Q.**    DO YOU HAVE ANY PROPERTY IN YOUR CELL?

15      **A.**    YES.  I HAVE BOOKS, MAGAZINES, NEWSPAPERS AT VARIOUS

16  TIMES, PERSONAL ITEMS OF CLOTHING SUCH AS UNDERWEAR, SOCKS,

17  SWEATPANTS, SWEATSHIRT, TENNIS SHOES, PERSONAL HYGIENE AND

18  FOOD ITEMS THAT I PURCHASED FROM THE CANTEEN.

19      **Q.**    WHAT OPPORTUNITY, IF ANY, DO YOU HAVE TO CONGREGATE

20  WITH OTHER INMATES?

21      **A.**    NONE.

22      **Q.**    DO YOU HAVE ANY GROUP INTERACTION WITH ANY OTHER

23  INMATES?

24      **A.**    NO.

25      **Q.**    WHY NOT?

1  **A.** WE'RE NOT ALLOWED.  WE'RE IN THE CELL 23 HOURS AND

2 SOMETIMES 45 MINUTES A DAY.

3  **Q.** WHAT ABOUT FOR RELIGIOUS WORSHIP, ARE YOU ALLOWED

4 GROUP INTERACTION THERE?

5  **A.** NO.

6  **Q.** HOW ABOUT FOR RECREATION TIME; ARE YOU ALLOWED GROUP

7 INTERACTION THERE?

8  **A.** TO THE EXTENT THAT WE ALL GO ON THE YARD TOGETHER

9 AND PLACED IN INDIVIDUAL EXERCISE YARDS.

10  **Q.** WHAT ABOUT FOR EDUCATIONAL SERVICES; ANY GROUP

11 INTERACTION WITH OTHER INMATES THERE?

12  **A.** WE DON'T HAVE ANY.

13  **Q.** WHAT ABOUT FOR MEDICAL HEALTHCARE; ANY GROUP

14 INTERACTION THERE?

15  **A.** OTHER THAN MYSELF AND EITHER THE NURSE OR THE

16 DOCTOR, NO.

17  **Q.** MR. WOODFOX, WHAT, IF ANY, OPPORTUNITY DO YOU HAVE

18 TO TALK TO OTHER INMATES?

19  **A.** NOT VERY MUCH SINCE WE'RE ONLY ALLOWED 15-MINUTE

20 SHOWERS EACH DAY.

21  **Q.** WHAT, IF ANY, OPPORTUNITY DO YOU HAVE TO TOUCH ANY

22 OTHER INMATES?

23  **A.** NEVER.

24  **Q.** I'M SORRY?

25  **A.** NEVER.  WE ARE NEVER ALLOWED TO TOUCH.  THEY HAVE A

1    YELLOW LINE DRAWN DOWN THE TIER, AND IF YOU CROSS THAT LITTLE

2    YELLOW LINE WHEN YOU'RE IN THE HALL, THE TIER OFFICER WILL

3    TELL YOU THAT, GET BACK ON THE OTHER SIDE, AND IF YOU CROSS

4    THAT YELLOW LINE AGAIN, YOU'RE GOING TO THE DUNGEON OR YOU'RE

5    GOING TO GET A WRITE-UP, OR BOTH.

6         Q.    PLEASE DESCRIBE FOR THE COURT A STRIP SEARCH.

7         A.    A STRIP SEARCH IS A OFFICER -- TWO OFFICERS ALWAYS

8    COME TO YOUR CELL, AND THEY MAKE YOU TAKE OFF ALL YOUR CLOTHES

9    AND HAND THEM OUT TO THEM, AND THEY SEARCH YOUR CLOTHES.   AND

10   THEN THEY MAKE YOU RAISE YOUR ARMS, OPEN YOUR MOUTH, RAISE

11   YOUR TONGUE, RAISE YOUR GENITALS, TURN AROUND, RAISE BOTH

12   FEET, ONE AT A TIME, AND THEN BEND OVER AND SPREAD YOUR

13   BUTTOCKS.

14        Q.    AND HOW MANY GUARDS ARE PRESENT WHEN YOU ARE STRIP

15   SEARCHED?

16        A.    TWO.

17        Q.    AND AFTER YOU ARE STRIP SEARCHED, WHAT HAPPENS NEXT?

18        A.    WELL, THEY HAND YOU YOUR CLOTHES BACK, YOU GET

19   DRESSED, YOU STICK YOUR HANDS OUT THE FOOD SLOTS, THEY PUT THE

20   RESTRAINTS ON YOUR HANDS, ON YOUR WRISTS AND THEY LOCK THEM,

21   AND THEN YOU PULL THE CHAIN THROUGH, THEY OPEN YOUR DOOR.   ONE

22   OFFICER WILL STAND BY THE DOOR AND THE OTHER OFFICER WILL COME

23   IN AND THEY WILL PUT THE LEG RESTRAINTS ON, AND THEN THEY WILL

24   WRAP THE CHAIN AROUND YOU AND PUT A LOCK ON IT.

25        Q.    AND YOU SAID YOU PUT YOUR CLOTHES ON.   WHAT CLOTHES

1  DO YOU WEAR, MR. WOODFOX?

2  **A.**   WELL, WHEN YOU GO ON THE YARD, A JUMPSUIT LIKE THIS.

3  AND SINCE THE WEATHER HAS TURNED COLD, YOU KNOW, USUALLY A

4  SWEATSHIRT, SWEATPANTS, UNDERWEAR, T-SHIRT, SOCKS, TENNIS.

5  **Q.**   WOULD YOU PLEASE DESCRIBE YOUR JUMPSUIT YOU'RE

6  WEARING FOR THE COURT?

7  **A.**   IT'S A ONE-PIECE JUMPSUIT.   IT BUTTONS DOWN THE

8  FRONT.   IT HAS A POCKET ON THE LEFT BREAST.

9  **Q.**   I'D LIKE TO DIRECT YOUR ATTENTION TO SCENARIOS IN

10  WHICH YOU ARE STRIP SEARCHED.   LET'S TALK ABOUT THE REC YARD

11  FOR A MOMENT.   AFTER YOU'RE STRIP SEARCHED YOU PUT YOUR

12  CLOTHES BACK ON.   CAN YOU DESCRIBE TO THE COURT WHAT HAPPENS

13  NEXT?

14  **A.**   WELL, AFTER THEN, WE ARE INSTRUCTED TO PROCEED TO

15  WHAT'S CALLED A BRIDGE AREA WHERE ANOTHER OFFICER MAKES US

16  LINE-UP AGAINST THE WALL, WHAT'S CALLED THE KEY, WHICH IS THE

17  ROOM WHERE THE OFFICER OPERATE THE VARIOUS GATES AND DOORS ON

18  THE TIER.   WHEN THE LAST MAN ON THE TIER HAS BEEN STRIP

19  SEARCHED AND, YOU KNOW, CHAINED AND EVERYTHING, HE WILL COME

20  OFF THE TIER WITH THE REC OFFICER AND WHATEVER OFFICER IS ON

21  THE TIER WITH HIM, AND THEY WILL THEN TAKE US OUTSIDE OF

22  THE -- IN ONE CELL BLOCK, THEY WILL MAKE US GET IN A LINE OF

23  TWO, AND WE WILL MARCH TO THE CELLS, AND THEY WILL PUT US ON

24  EACH YARD AND LOCK THE YARD, AND THEN THEY WILL REMOVE THE

25  RESTRAINTS.

1   **Q.** WHERE DID THEY REMOVE THE RESTRAINTS?

2   **A.** THERE IS A SLOT SIMILAR TO THE FOOD SLOT ON THE CELL

3 DOORS IN THE CELL BLOCK, AND THERE IS A SLOT AT THE BOTTOM

4 WHERE YOU STICK YOUR LEG THROUGH AND THEY REMOVE THE

5 RESTRAINTS.

6   PRIOR TO THOSE SLOTS, THEY PUT ON -- AT THE BOTTOM, THEY

7 USED TO MAKE YOU GET DOWN ON YOUR KNEES, TO PUT THE RESTRAINTS

8 ON AND TAKE THEM OFF OF YOU WHEN YOU GO IN THE YARD.

9   **Q.** WOULD YOU PLEASE DESCRIBE THE REC YARD FOR THE

10 COURT?

11   **A.** IT'S ABOUT SEVEN PENS.  THEY'RE MADE OUT OF VARIOUS

12 TYPES OF WIRE, AND THAT'S ABOUT IT.

13   **Q.** IS THERE ANYTHING IN THOSE PENS?

14   **A.** ABSOLUTELY NOTHING.

15   **Q.** WEIGHTS?

16   **A.** NO.

17   **Q.** EXERCISE MACHINES?

18   **A.** NO.

19   **Q.** BALLS OF ANY KIND?

20   **A.** NO.

21   **Q.** JUMP ROPE?

22   **A.** NO.

23   **Q.** NOTHING?

24   **A.** NOTHING.

25   **Q.** AND ARE YOU EVER PLACED IN ONE OF THOSE CAGES WITH

1    ANY OTHER INMATE?

2         **A.**    NO.

3         **Q.**    AND HOW LONG ARE YOU IN ONE OF THOSE REC CAGES?

4         **A.**    IT VARIES TO WHOEVER IS RUNNING THE YARD THAT DAY,

5    WHATEVER REC OFFICER YOU HAVE.   THEY HAVE A MINIMUM OF 45

6    MINUTES AND A MAXIMUM OF 60 MINUTES, AND ANYWHERE IN BETWEEN

7    THOSE TWO.

8         **Q.**    AND HOW MANY GUARDS, IF ANY, ARE WATCHING YOU WHILE

9    YOU ARE IN THAT REC CAGE?

10        **A.**    INITIALLY, THERE'S TWO GUARDS.   THERE IS AN OFFICER

11   THERE ON -- BY THE EXERCISE YARDS, AND THEN THE REC OFFICER

12   WILL BRING YOU OUT THERE.   AFTER THEY REMOVE THE RESTRAINTS

13   OFF OF EVERYBODY ON THE YARD, THEN THE REC OFFICER WILL GO AND

14   GET ANOTHER GROUP OF GUYS, AND THE OTHER OFFICER WILL STAY

15   THERE AND MONITOR EVERYBODY IN THE YARDS.

16        **Q.**    AND AFTER YOU FINISH YOUR TIME IN THE REC PEN, ARE

17   YOU ALLOWED TO DO ANYTHING ELSE BEFORE RETURNING TO YOUR CELL?

18        **A.**    NO.

19        **Q.**    PLEASE DESCRIBE FOR THE COURT HOW YOU'RE RETURNED TO

20   YOUR CELL.

21        **A.**    THEY REPLACE THE RESTRAINTS ON US AND MAKE US GET IN

22   A LINE OF TWO, AND THEY MARCH US BACK TO THE CELL BLOCK AND,

23   AGAIN, WE STAND UP AGAINST THE WALL OF THE KEY, AND THEY

24   WILL -- USUALLY, THEY START FROM THE LAST CELL ON THE TIER,

25   AND THEY WILL PLACE THAT MAN BACK IN THE CELL, AND THEY WILL

1    THEN MAKE YOU STRIP AGAIN, AND YOU WILL GO THROUGH THE SAME

2    ROUTINE:   RAISE YOUR ARMS, OPEN YOUR MOUTH, RAISE YOUR

3    GENITALS, RAISE YOUR FEET, TURN AROUND, BEND OVER, SPREAD YOUR

4    CHEEKS.

5         Q.   OKAY.   LET'S TALK ABOUT WHEN YOU GO TO THE

6    INFIRMARY.   CAN YOU DESCRIBE FOR THE COURT WHAT HAPPENS WHEN

7    YOU GO TO GET MEDICAL CARE?

8         A.   USUALLY, THE OFFICER WORKING THE TIER, IT'S WHAT

9    THEY CALL A CALL-OUT SHEET.   HE WILL COME DOWN, HE WILL TELL

10   YOU THAT YOU GOT A CALL-OUT AT A CERTAIN TIME, AND AROUND THAT

11   TIME, SOMETIME, YOU KNOW, 15 MINUTES BEFORE THAT TIME, TWO

12   OFFICERS WILL COME TO YOUR CELL, USUALLY CAPTAINS OR A CAPTAIN

13   AND A LIEUTENANT, THEY WILL MAKE YOU TAKE ALL YOUR CLOTHES OFF

14   AND HAND THEM THROUGH THE BARS.   THEY WILL SEARCH THROUGH

15   THEM, THEN THEY WILL MAKE YOU OPEN YOUR MOUTH, RAISE YOUR

16   ARMS, RAISE YOUR TONGUE, RAISE YOUR GENITALS, TURN AROUND,

17   RAISE YOUR FEET, BEND OVER, SPREAD YOUR CHEEKS.

18        Q.   THEN WHAT HAPPENS?

19        A.   THEN THEY HAND YOUR CLOTHES BACK, YOU GET DRESSED,

20   THEY PUT RESTRAINTS ON YOU, STICK YOUR HANDS THROUGH THE BARS,

21   THEY PUT THE RESTRAINTS ON YOUR WRISTS AND LOCK THEM, YOU PULL

22   THEM IN.   THEY OPEN YOUR DOOR.   ONE OF THE OFFICERS COME IN

23   AND PUT RESTRAINTS ON YOUR LEGS, AND THEN THEY WRAP THE CHAIN

24   AROUND YOU AND PADLOCK IT, AND THEN BOTH OFFICERS WILL TAKE

25   YOU TO THE CLINIC.

1    **Q.** WHEN YOU GET TO THE CLINIC, DO THE OFFICERS TAKE THE

2    RESTRAINTS OFF OF YOU?

3        **A.** EXCUSE ME?

4        **Q.** WHEN YOU GET TO THE CLINIC, DO THE OFFICERS TAKE THE

5    RESTRAINTS OFF OF YOU?

6        **A.** NO.

7        **Q.** ARE THE OFFICERS IN THE ROOM WITH YOU WHILE YOU'RE

8    RECEIVING MEDICAL CARE FROM A DOCTOR OR A NURSE?

9        **A.** YES.  WE'RE NEVER OUT OF THE EYESIGHT OF THE ESCORT

10   OFFICERS.

11       **Q.** AND THOSE OFFICERS, DO THEY HEAR WHAT YOU'RE SAYING

12   TO THE DOCTORS AND WHAT THE DOCTORS ARE SAYING TO YOU?

13       **A.** YES.

14       **Q.** AND WHEN YOU FINISH WITH THE INFIRMARY AND THEY TAKE

15   YOU BACK TO THE CELL, PLEASE DESCRIBE FOR THE COURT THE

16   PROCEDURES THAT YOU GO THROUGH.

17       **A.** WELL, WHEN THE MEDICAL STAFF FINISH, THE OFFICERS

18   ESCORT YOU BACK TO YOUR CELL, AND YOU HAVE TO TAKE OFF ALL

19   YOUR CLOTHES AGAIN, HAND IT TO THEM, THEY GO THROUGH YOUR

20   CLOTHES, AND THE SAME THING:  OPEN YOUR MOUTH, RAISE YOUR

21   TONGUE, RAISE YOUR ARMS, RAISE YOUR GENITALS, TURN AROUND,

22   RAISE YOUR FEET ONE AT A TIME, AND BEND OVER, SPREAD YOUR

23   CHEEKS, THEN THEY HAND YOU YOUR CLOTHES AND LEAVE.

24       **Q.** WHAT ABOUT WHEN YOU TALK TO YOUR LAWYERS; CAN YOU

25   DESCRIBE THE PROCESS THEN?

1    **A.**    PRETTY MUCH THE SAME PROCEDURE.  THEY COME TO YOUR

2    CELL, ALWAYS TWO OFFICERS.  YOU HAND THEM YOUR CLOTHES, THEY

3    GO THROUGH YOUR CLOTHES, RAISE YOUR ARMS, OPEN YOUR MOUTH,

4    RAISE YOUR TONGUE, RAISE YOUR GENITALS, TURN AROUND, RAISE

5    YOUR FEET ONE AT A TIME, BEND OVER, SPREAD YOUR CHEEKS.

6    **Q.**    THEN THEY TAKE YOU TO TALK TO YOUR ATTORNEYS ON A

7    PHONE CALL?

8    **A.**    THE SAME PROCEDURE; NOTHING CHANGES.

9    **Q.**    IS THERE A GUARD WITH YOU WHILE YOU'RE TALKING TO

10   YOUR ATTORNEYS?

11   **A.**    WHEN CCR LEAVE OUR CELLS AND LEAVE THAT UNIT, WE ARE

12   NEVER OUT OF THE EYESIGHT OF A SECURITY GUARD, AND WE ARE

13   ALWAYS IN RESTRAINTS.

14       WHEN WE GO TO THE MEDICAL CLINIC SOMETIMES THE DOCTOR OR

15   THE NURSE MAY NEED ONE OF THE RESTRAINTS REMOVED FOR A MEDICAL

16   EXAMINATION, AND THEY WILL DO THAT, BUT BOTH OFFICERS ARE

17   RIGHT THERE.

18   **Q.**    AND WHEN YOU RETURN FROM A PHONE CALL WITH YOUR

19   ATTORNEY, CAN YOU DESCRIBE FOR THE COURT THE PROCEDURES?

20   **A.**    PRETTY MUCH THE SAME.  YOU HAND THE OFFICER YOUR

21   CLOTHES, THEY MAKE YOU RAISE YOUR ARMS, OPEN YOUR MOUTH, RAISE

22   YOUR TONGUE, RAISE YOUR GENITALS, TURN AROUND, RAISE ONE FOOT

23   AT A TIME, BEND OVER AND SPREAD YOUR CHEEKS.

24   **Q.**    IN THE PRELIMINARY INJUNCTION MOTION YOU ALLEGE THAT

25   YOU HAVE BEEN STRIP SEARCHED UP TO SIX TIMES A DAY; ARE YOU

1  AWARE OF THAT?

2       **A.**    YES.

3       **Q.**    CAN YOU PLEASE DESCRIBE FOR THE COURT A SCENARIO OR

4  THE TIME WHEN YOU WERE STRIP SEARCHED SIX TIMES IN ONE DAY?

5       **A.**    WELL, CCR ALWAYS GO ON THE YARD FIRST.   AT ONE TIME

6  WE WERE GOING ON THE YARD BEFORE BREAKFAST.   THEY EVENTUALLY

7  CHANGED THAT TO WHERE WE START GOING OUT AFTER BREAKFAST.   THE

8  SAME PROCEDURE, THEY WILL TAKE YOUR CLOTHES AND SHAKE THEM

9  DOWN.   YOU RAISE YOUR ARM, YOU OPEN YOUR MOUTH, RAISE YOUR

10  TONGUE, YOU TURN AROUND, RAISE ONE FEET AT A TIME, BEND OVER,

11  SPREAD YOUR CHEEKS, THEY GIVE YOU YOUR CLOTHES, YOU GET

12  DRESSED.   THEY WOULD TAKE YOU TO WHAT'S CALLED SOUTHSIDE

13  SECURITY, AND EVENTUALLY YOU WILL TALK TO YOUR ATTORNEY, AND

14  WHEN YOU FINISH, THEY WILL BRING YOU BACK, AND THE WHOLE WHILE

15  YOU'RE ON THE PHONE WITH YOUR ATTORNEY, SOME OFFICER IS

16  SITTING THERE, AND THEY WOULD BRING YOU BACK TO YOUR CELL, AND

17  REPEAT THE SAME PROCEDURE AS WHEN THEY TOOK YOU OUT THE CELL.

18       **Q.**    OKAY.   SO THAT WAS -- I DON'T WANT TO --

19       **A.**    IT HAPPENS --

20       **Q.**    -- PUT WORDS IN YOUR MOUTH, BUT IT'S REC AND

21  THEN ATTORNEY CALLS --

22       **A.**    AND I HAD A MEDICAL CLINIC ALL IN ONE DAY.

23       **Q.**    SO IF YOU RECEIVE RECREATION, TALK TO YOUR ATTORNEY

24  AND SEE THE DOCTOR, YOU'RE GOING TO BE STRIP SEARCHED SIX

25  TIMES IN ONE DAY; IS THAT RIGHT?

1      **A.**    I HAVE BEEN STRIP SEARCHED SIX TIMES SEVERAL TIMES.

2      **Q.**    HOW LONG HAVE THESE STRIP SEARCHES BEEN GOING ON,

3   MR. WOODFOX?

4      **A.**    MAY OF 2013.

5      **Q.**    DO YOU KNOW WHY THE STRIP SEARCHES STARTED HAPPENING

6   IN MAY OF 2013?

7      **A.**    WE WERE NEVER TOLD WHY.  I EVEN WROTE A LETTER TO

8   COLONEL NAIL ASKING FOR AN EXPLANATION, AND I NEVER RECEIVED A

9   RESPONSE.

10      **Q.**    HAVE YOU BEEN THE SUBJECT OF A DISCIPLINARY ACTION

11   THAT INVOLVED CONTRABAND SINCE MAY OF 2013?

12      **A.**    NO, I HAVE NOT.

13      **Q.**    HAVE YOU EVER PLACED CONTRABAND IN YOUR ANUS, MR.

14   WOODFOX?

15      **A.**    NO, I HAVE NOT.

16      **Q.**    WHAT ABOUT UNDER YOUR GENITALS?

17      **A.**    NO, I HAVE NOT.

18      **Q.**    MR. WOODFOX, WHEN YOU'RE IN IRONS, CAN YOU REACH THE

19   INSIDE OF YOUR ANUS?

20      **A.**    IT'S IMPOSSIBLE.

21      **Q.**    HOW ABOUT UNDERNEATH YOUR GENITALS, CAN YOU REACH

22   THERE?

23      **A.**    IN RESTRAINTS?

24      **Q.**    WHEN YOU ARE IN RESTRAINTS?

25      **A.**    NO.

1    **Q.**    ARE YOU BEING STILL STRIP SEARCHED TODAY IN THE

2    MANNERS YOU HAVE JUST DESCRIBED?

3    **A.**    YES.

4    **Q.**    HOW DOES BEING STRIP SEARCHED LIKE THAT EVERYDAY

5    MAKE YOU FEEL?

6    **A.**    WELL, IT'S HUMILIATING AND IT'S STRESSFUL, A LOT OF

7    ANXIETY INVOLVED, YOU KNOW.   YOU KNOW, YOU FEEL HOPELESS,

8    HELPLESS BECAUSE YOU CAN'T DO ANYTHING ABOUT IT, AND IF YOU

9    DO, THEN YOU WILL -- YOU KNOW, THEY WILL CALL OTHER OFFICERS

10   THERE, AND THEY WILL PHYSICALLY FORCE YOU TO DO IT, AND IN

11   SOME INSTANCES THEY WILL USE GAS.   SO YOU JUST GO THROUGH ALL

12   THOSE DIFFERENT EMOTIONS, AND YOU JUST DO IT.

13   **Q.**    DID YOU EVER FILE ANY ADMINISTRATIVE GRIEVANCES TO

14   ASK THE DEFENDANTS TO STOP STRIP SEARCHING YOU EVERY DAY?

15   **A.**    WELL, WE HAD THE SAME ISSUE WHEN I WAS HOUSED AT

16   LOUISIANA STATE PENITENTIARY AT ANGOLA, AND WE HAD FILED A

17   SUIT, MYSELF AND MY CO-DEFENDANT NAMED CHARLES NOLAND, ABOUT

18   THESE SAME ISSUES.   AND THE COURT RULED THAT D.O.C. COULD ONLY

19   STRIP SEARCH INMATES HOUSED IN MAXIMUM-SECURITY CELL BLOCKS,

20   OR LIKE CONDITIONS, IF THEY HAD -- AFTER CONTACT VISITS OR ANY

21   OUTSIDE TRIPS OR ANY UNSUPERVISED CONTACT WITH INMATES IN

22   INMATE POPULATION.

23      OTHER THAN THAT, THEY HAD TO USE PAT-DOWNS OR METAL

24   DETECTORS, AND IF THERE WERE FIRSTHAND PROBABLE CAUSE, THEY

25   COULD CALL A SUPERVISOR AND DO A STRIP SEARCH, AND FROM THAT,

1  IF THEY HAD REASON TO BELIEVE YOU WERE CONCEALING SOMETHING IN

2  YOUR ANUS, THEY HAD TO BRING YOU TO A MEDICAL CLINIC OR

3  WHATEVER, IN A MEDICAL FACILITY, WHO WOULD PERFORM AN INTERNAL

4  SEARCH.

5       Q.    AND DID YOU TELL THE DEFENDANTS WHAT YOU JUST

6  TESTIFIED TO TODAY?

7       A.    WELL, I ASKED MY LAWYERS WHO HAD COPIES OF ALL

8  OF THE -- ALL THE MOTIONS THAT WERE FILED, THE JUDGE'S ORDER,

9  THE CONSENT DECREE THAT THE DEPARTMENT OF CORRECTIONS HAD

10  SIGNED.  AND I FILED A ARP, AND I ATTACHED ALL THESE MOTIONS

11  AND SENT IT TO WARDEN GOODWIN.

12       Q.    AND WHAT WAS THE RESULT OF THAT ARP?

13       A.    THE ARP WAS DENIED.

14       Q.    ALL RIGHT.  NOTHING FURTHER.

15            **THE COURT:**  ANY CROSS?

16            **MR. CURRY:**  YES, YOUR HONOR.

17  EXAMINATION

18  BY MR. CURRY:

19       Q.    MR. WOODFOX, NO ONE HAS PHYSICALLY FORCED YOU TO --

20  OR USED GAS ON YOU AT WADE, HAVE THEY?

21       A.    I HAVEN'T RESISTED ANY ORDERS SINCE I'VE BEEN THERE.

22       Q.    SO THE ANSWER IS NO?

23       A.    NO.

24       Q.    HAVE YOU EVER BEEN SUBJECTED TO A FULL BODY CAVITY

25  SEARCH AT WADE?

1    **A.**    NO, THEY NEVER FOUND PROBABLE CAUSE FOR ONE.

2    **Q.**    HAVE THE SECURITY OFFICERS WHO PERFORMED THE

3    SEARCHES ON YOU EVER BEEN PHYSICALLY OR VERBALLY ABUSIVE TO

4    YOU IN ANY WAY DURING THESE SEARCHES?

5    **A.**    NO.

6    **Q.**    WHERE ARE THE SEARCHES PERFORMED?

7    **A.**    IN MY CELL.

8    **Q.**    OUTSIDE OF THE VIEW OF ANY OTHER INMATES?

9    **A.**    YEAH.   BUT, YOU KNOW, SOMETIMES OFFICERS SHOW UP I

10   HAVE NEVER EVEN SEEN BEFORE SINCE I'VE BEEN AT WADE.

11   **Q.**    NEVER BEEN SUBJECTED TO A VISUAL BODY CAVITY SEARCH

12   BY A FEMALE, HAVE YOU?

13   **A.**    NO.

14   **Q.**    ISN'T IT TRUE THAT FOR MUCH OF THE YEAR, INMATES ON

15   THE TIER PRETTY MUCH LIVE IN THEIR UNDERWEAR OR SHORTS?

16   **A.**    WELL, IN THE SUMMERTIME, IT'S SO HOT.

17   **Q.**    IN THOSE INSTANCES, THE STRIP SEARCH ESSENTIALLY

18   INVOLVES DROPPING YOUR DRAWERS AND TURNING AROUND AND

19   SPREADING YOUR CHEEKS; ISN'T THAT TRUE?

20   **A.**    YEAH, OR TAKE THEM OFF AND HAND THEM TO THE OFFICER.

21   **Q.**    RIGHT.   WHICH WOULD TAKE --

22   **A.**    AND TENNIS AND YOUR SOCKS.

23   **Q.**    -- 15 SECONDS; THAT OPERATION MIGHT TAKE 15 SECONDS?

24   **A.**    I DON'T KNOW THE EXACT.   IT FEEL LIKE IT'S FOREVER.

25   **Q.**    ARE ALL INMATES ON YOUR TIER SUBJECTED TO THE SAME

1   TYPE OF SEARCH?

2        **A.**   YES.

3        **Q.**   AND TO THE BEST OF YOUR KNOWLEDGE, IS EVERY ONE IN

4   MAXIMUM SECURITY AT WADE SUBJECTED TO THE SAME TYPE OF SEARCH?

5        **A.**   I CAN ONLY TESTIFY TO WHAT HAPPENED ON MY TIER.

6        **Q.**   ALL RIGHT.   DID OFFICER ELMORE PERFORM ALL THE

7   VISUAL BODY CAVITY SEARCHES ON YOU?

8        **A.**   NOT ALL, BUT HE HAS STRIP SEARCHED ME MANY TIMES FOR

9   EITHER A YARD, CLINIC OR LEGAL CALLS, OR MY ATTORNEYS WOULD

10  COME AND SEE ME TO DISCUSS CASES THEY REPRESENTING ME ON.

11       **Q.**   WHAT ABOUT LIEUTENANT HILL; HASN'T HE PERFORMED

12  VISUAL BODY CAVITY SEARCHES ON YOU?

13       **A.**   YES, HE HAS.

14       **Q.**   AND ISN'T IT TRUE THAT HE PERFORMED VISUAL BODY

15  CAVITY SEARCHES ON YOU EVEN BEFORE MAY OF THIS YEAR?

16       **A.**   NO.

17       **Q.**   HE NEVER DID?

18       **A.**   NO.

19       **Q.**   NO ONE HAS EVER -- IT'S YOUR --

20       **A.**   THEY ONLY STARTED STRIP SEARCHING CCR IN MAY OF THIS

21  YEAR.

22       **Q.**   SO IT'S YOUR TESTIMONY UNDER OATH THAT NO ONE AT

23  WADE PERFORMED A VISUAL BODY CAVITY SEARCH ON YOU BEFORE MAY

24  OF THIS YEAR?

25       **A.**   AFTER CONTACT VISITS, YES.

1    **Q.**    OKAY.  JUST NOT WHEN YOU WENT TO THE REC YARD?

2    **A.**    NO.

3    **Q.**    AND JUST TO BE CLEAR, WHEN YOU EXIT THE CELL TO DO

4    YOUR SHOWER, 15 MINUTES ON THE TIER TO GET A HAIRCUT, ALL OF

5    THOSE SORTS OF THINGS, YOU'RE NOT SEARCHED -- YOU'RE NOT

6    SUBJECTED TO THIS TYPE OF SEARCH AT THAT TIME, ARE YOU?

7    **A.**    EXCUSE ME.  YOU SAID HAIRCUTS?

8    **Q.**    RIGHT.  HAIRCUTS?

9    **A.**    WELL, WHEN THEY FIRST STARTED THIS POLICY OF STRIP

10   SEARCHING, THE FIRST TIME THEY DID HAIRCUTS, I WAS FORCED TO

11   STRIP SEARCH TO GO OUT ON THE BRIDGE AND GET MY HAIRCUT.

12   BUT...

13   **Q.**    SO THAT HAPPENED ONE TIME?

14   **A.**    YES, AND IT STOPPED.

15   **Q.**    HAVE YOU HAD A HAIRCUT SINCE THEN?

16   **A.**    YES.

17   **Q.**    AND WERE YOU STRIP SEARCHED AT THE TIME YOU HAD YOUR

18   HAIR CUT AFTERWARDS?

19   **A.**    THEY DON'T STRIP SEARCH YOU IF YOU'RE NOT GOING OUT

20   THE BUILDING.

21   **Q.**    OKAY.  I BELIEVE YOU TESTIFIED THAT YOU HAD

22   VIRTUALLY NO CONTACT WITH OTHER INMATES; IS THAT YOUR

23   TESTIMONY?

24   **A.**    I THINK HE ASKED ME DO I CONGREGATE WITH THEM.

25   **Q.**    I SEE.

1    **A.**   NOT DO I HAVE CONTACT.  I MEAN, I'M ON A TIER WITH

2    15 OTHER MEN.

3    **Q.**   AND YOU DO HAVE CONTACT WITH THEM?

4    **A.**   WELL, I MEAN, WHEN I'M GOING TO THE SHOWER, BUT THEY

5    ARE IN THEIR CELLS, I'M IN THE HALL ON THE OTHER SIDE OF THE

6    YELLOW LINE.

7    **Q.**   WELL, DON'T YOU --

8    **A.**   AND WHEN I'M RETURNING TO MY CELL.

9    **Q.**   DON'T YOU SOMETIMES GIVE THEM ICE OR HAND THEM

10   READING MATERIALS?  DON'T THEY HAND YOU READING MATERIALS AND

11   ICE?

12   **A.**   THERE WAS A TIME WHEN THE ICE CHEST AND THE

13   MICROWAVE WAS ON THE TIER, AND WE HAD AN OPTION OF TAKING

14   EXERCISE ON THE YARD OR IN THE HALLWAY.  DURING THAT TIME,

15   YES, YOU KNOW, I WOULD HAVE GOTTEN ICE FOR GUYS, PUT STUFF IN

16   THE MICROWAVE FOR THEM AND STUFF LIKE THAT.  BUT --

17   **Q.**   AND THEY DO THAT FOR YOU AS WELL?

18   **A.**   -- THAT STOPPED.  WE NO LONGER HAVE OPTIONS.  WE

19   EITHER GO ON THE YARD OR WE ONLY GET 15 MINUTES TO SHOWER FOR

20   FIVE DAYS A WEEK, AND ON SATURDAYS AND SUNDAYS, THEY STOPPED,

21   EVEN THOUGH THEY DON'T OFFER YARD, THEY STOPPED GIVING US AN

22   HOUR IN THE HALL, YOU ONLY GET A 15-MINUTE SHOWER.

23   **Q.**   DURING THE 15 MINUTES, ISN'T IT TRUE THAT YOU

24   SOMETIMES GIVE ICE, MICROWAVED ITEMS, TO OTHER INMATES ON THE

25   TIER?

1    **A.**    NO, WE ARE NOT ALLOWED TO DO THAT ANY MORE.

2    **Q.**    SINCE WHEN?

3    **A.**    THE OFFICER HAVE TO DO IT.  SINCE COLONEL NAIL

4    STOPPED IT.

5    **Q.**    IN MAY?

6    **A.**    LONG BEFORE THAT.  I THINK IT STARTED IN FEBRUARY OF

7    2013.

8    **Q.**    SO IT'S YOUR TESTIMONY TODAY UNDER OATH THAT SINCE

9    FEBRUARY, NONE OF THE INMATES ON YOUR TIER EVER BRING ICE OR

10   READING MATERIALS TO EACH OTHER WHILE THEY WERE ON THE WALK?

11   **A.**    THERE WAS A TIME --

12   **MR. ENGLAND:**  OBJECTION.  THAT'S SPECULATION AS TO

13   WHATEVER OTHER INMATES DO.

14   **THE COURT:**  WELL, I AM GOING TO ALLOW THE QUESTION.

15   GO AHEAD.  YOU CAN ANSWER, MR. WOODFOX.

16   **A.**    THERE WAS A TIME WHEN -- AFTER THEY TOOK THE ICE,

17   THE ICE CHEST AND THE MICROWAVE OFF THE TIER, WE USED TO HAVE

18   TO PUSH OUR CONTAINER UNDER THE DOOR AT THE FRONT OF THE TIER,

19   AND THE OFFICER WOULD -- YEAH, AT THAT TIME, BUT INMATES WERE

20   COMPLAINING ABOUT HAVING TO PUT THEIR FOOD ON THE FLOOR AND

21   PUSH IT UNDER THE DOOR OR THE ICE CONTAINER ON THE FLOOR AND

22   PUSH IT UNDER THE DOOR TO GET THESE SERVICES.  SO COLONEL NAIL

23   SAID FROM THEN ON, THAT THE OFFICER WOULD MAKE A ICE RUN EVERY

24   HOUR AND A MICROWAVE SEVERAL TIMES A DAY.  SO THAT'S HOW IT'S

25   DONE NOW.

1  BY MR. CURRY:

2      **Q.**    THE INMATES HAVE HAD OPEN FOOD SLOTS ON THE TIER FOR

3  YEARS NOW, HAVEN'T THEY, SINCE --

4      **A.**    YEAH.   BUT THE MICROWAVE AND ICE CONTAINER IS

5  OUTSIDE THE TIER NOW.   THE ONLY WAY WE CAN GET ICE OR GET

6  SOMETHING PUT IN THE MICROWAVE, WE HAD TO PUT IT ON THE FLOOR,

7  THERE'S A DOOR AT THE FRONT OF THE TIER, AND SLIDE IT UNDER

8  THE DOOR TO THE OFFICER.   HE WOULD HEAT IT UP, SLIDE IT BACK,

9  AND YOU WOULD GIVE IT TO WHOEVER IT'S FOR.   THE SAME THING

10  WITH THE ICE.

11      **Q.**    MY QUESTION IS:   WHEN YOU GET THE ICE OR THE

12  MICROWAVED ITEM, DO YOU OR DO YOU NOT HAND IT TO ANOTHER

13  INMATE ON OCCASION?

14      **A.**    WHEN IT WAS ALLOWED, YES.   IT'S NOT ALLOWED ANYMORE.

15      **Q.**    AS OF WHEN HAS IT NOT BEEN ALLOWED?

16      **A.**    FEBRUARY OF 2013.   WHEN COLONEL NAIL, BECAUSE OF

17  ANOTHER INCIDENT THAT HAD NOTHING TO WITH THE MICROWAVE OR THE

18  ICE CHEST REMOVED THOSE -- THOSE THINGS FROM THE TIER.

19      **Q.**    AGAIN, MY QUESTION, THOUGH, IS:   SINCE FEBRUARY OF

20  THIS YEAR, IS IT YOUR TESTIMONY THAT NONE OF THE INMATES ON

21  YOUR TIER, TO YOUR KNOWLEDGE, THAT NONE OF THE INMATES ON YOUR

22  TIER PASS READING MATERIALS, ICE, MICROWAVED ITEMS THROUGH THE

23  FOOD SLOT WHEN THEY'RE ON THEIR 15-MINUTE BREAK?

24      **A.**    NO.

25      **Q.**    THAT'S NOT YOUR TESTIMONY?

1          **A.**    THAT'S NOT WHAT I SAID.

2          **Q.**    SO THEY DO --

3          **A.**    I SAID IT WAS ALLOWED UNTIL COLONEL NAIL STOPPED IT.

4          **Q.**    BUT IT'S STILL BEING DONE?

5          **A.**    AND IT WAS STILL BEING DONE, BUT YOU HAD TO SHOVE

6    YOUR FOOD UNDER THE DOOR OR YOUR ICE CONTAINER UNDER THE DOOR.

7          **Q.**    UNDER THE DOOR AT THE END OF THE TIER?

8          **A.**    AT THE FRONT OF THE TIER.

9          **Q.**    BUT THEN ONCE YOU GOT IT, YOU COULD HAND IT THROUGH

10    --

11         **A.**    YES.

12         **Q.**    AND TO YOUR KNOWLEDGE, HAVE YOU OR ANY OTHER INMATES

13    BEEN PUNISHED FOR HANDING MATERIALS TO EACH OTHER THROUGH THE

14    FOOD SLOTS SINCE FEBRUARY OF 2013?

15         **A.**    NOT IF YOU DIDN'T STEP ACROSS THE YELLOW LINE.

16         **Q.**    SO YOU CAN HAND THINGS TO OTHER INMATES IF YOU DON'T

17    STEP ACROSS THE LINE?

18         **A.**    YEAH, UP UNTIL COLONEL NAIL STOPPED IT.

19         **Q.**    IN FEBRUARY OF THIS YEAR?

20         **A.**    NO.  LATER.

21         **Q.**    WHEN DID HE STOP IT?

22         **A.**    I THINK IT MAY HAVE BEEN -- THEY HAD A RE-CLASS

23    BOARD, IT MAY HAVE BEEN JUNE OR JULY OR SOMEWHERE IN THERE,

24    AND AS EACH GUY OFF THE TIER WENT BEFORE THE REVIEW BOARD,

25    THEY WOULD COMPLAIN TO COLONEL NAIL ABOUT HAVING TO PUT THEIR

1  FOOD ON THE FLOOR AND SHOVE IT UNDER THE DOOR OR THE ICE

2  CONTAINER ON THE FLOOR AND SHOVE IT UNDER THE DOOR TO GET

3  THOSE SERVICES.   AND SO COLONEL NAIL SAID FROM NOW ON, YOU

4  CAN'T PUT NOTHING UNDER THE DOOR, THE OFFICER MUST MAKE A ICE

5  RUN AND A MICROWAVE RUN EVERY HOUR.

6      Q.   OKAY.  SO WHAT ABOUT READING MATERIAL; DO YOU EVER

7  PASS READING MATERIAL TO OTHER INMATES?

8      A.   YES.

9      Q.   EVEN TODAY; EVEN RECENTLY?

10     A.   YEAH.  AS LONG AS I DON'T STEP OVER THAT LINE.

11     Q.   AND THEY CAN PASS IT TO YOU?

12     A.   YES.

13     Q.   AND THAT HAPPENS ALL THE TIME, DOESN'T IT?

14     A.   YEAH.  IF SOMEBODY HAS, YOU KNOW, WITH ME, IT'S

15  NEWSPAPERS OR MAGAZINES; OTHER GUYS, I COULDN'T TELL YOU WHAT

16  THEY ARE PASSING BACK AND FORTH.

17     Q.   RIGHT.  YOU HAVE CONTACT WITH INMATES FROM -- THAT

18  ARE NOT LIVING ON YOUR TIER TOO, DON'T YOU?

19     A.   YEAH, INMATE COUNSEL, LIBRARIAN, INMATE MINISTERS.

20     Q.   AND INMATES SERVE YOUR THREE MEALS, DON'T THEY?

21  OTHER INMATES FROM OUTSIDE OF YOUR TIER, THREE TIMES A DAY?

22     A.   LATELY, THEY STARTED THAT.  THERE WAS A TIME WHEN

23  ONLY THE OFFICERS WERE ALLOWED ON CCR TIER.

24     Q.   INMATES ORDERLIES SERVE YOUR FOOD OF LATE; IS THAT

25  TRUE?

1        **A.**   BUT THOSE GUYS ARE STRIP SEARCHED AS WELL WHEN THEY

2    COME IN TO WORK THERE.

3        **Q.**   NOW, JUST TO BE CLEAR FROM YOUR EARLIER TESTIMONY,

4    WHEN THEY ARE SERVING YOUR FOOD IN YOUR CELL, THEY DON'T SHOVE

5    IT UNDER THE BARS, YOU HAVE A FOOD SLOT?

6        **A.**   YEAH, THERE'S A FOOD SLOT.

7        **Q.**   RIGHT.   AND INMATE ORDERLIES GIVE YOU HAIRCUTS,

8    LIBRARY SERVICES, RELIGIOUS MATERIALS?

9        **A.**   AND A SECURITY OFFICER IS RIGHT THERE THE WHOLE

10   WHILE.

11       **Q.**   YES.

12       **A.**   THEY ARE NEVER ALLOWED -- NO INMATE IS ALLOWED DOWN

13   THAT TIER, UNESCORTED BY SECURITY.

14       **Q.**   INMATE ORDERLIES ALSO CLEAN YOUR CELL, DON'T THEY?

15       **A.**   NO, WE CLEAN OUR OWN CELLS.

16       **Q.**   DO THEY BRING YOU MATERIALS TO CLEAN THE CELL?

17       **A.**   THE OFFICER BRINGS THAT.   THEY NOT ALLOWED TO GIVE

18   US ANY KIND OF CHEMICALS.

19       **Q.**   WHO CLEANS THE TIER ITSELF?

20       **A.**   THE ORDERLIES MOP THE TIER AND CLEAN THE SHOWERS AND

21   STUFF.

22       **Q.**   OKAY.   YOU EARLIER DESCRIBED AN ARP THAT YOU FILED

23   IN THIS CASE.   I'D LIKE TO IDENTIFY THAT.   I'M GOING TO MARK

24   IT STATE-1, AND ASK YOU TO --

25       **MR. CURRY:**   MAY I APPROACH THE WITNESS, YOUR HONOR?

1          THE COURT:  YES.

2    BY MR. CURRY:

3          Q.    COULD YOU FLIP THROUGH THAT AND TELL ME IF YOU

4    RECOGNIZE THAT DOCUMENT.

5          A.    YEAH, THIS IS THE ARP I FILED.

6          Q.    EARLIER THIS YEAR?

7          A.    YES.

8          Q.    AND AS YOU TESTIFIED EARLIER, YOU ATTACHED A NUMBER

9    OF DOCUMENTS TO THAT ARP, DIDN'T YOU?

10         A.    ALL OF THE DOCUMENTS FROM THE PREVIOUS LAWSUIT THAT

11   WAS FILED IN THE 19TH JUDICIAL DISTRICT IN 1977, I THINK.

12         Q.    LET ME TALK ABOUT THE 1978 PETITION THAT YOU FILED

13   IN STATE COURT.  IT'S ONE OF THE ATTACHMENTS TO THAT ARP,

14   ISN'T IT?

15         A.    YES.

16         Q.    AND IN PARAGRAPH ONE OF THAT 1978 PETITION --

17         A.    EXCUSE ME.  I CAN'T MANEUVER THIS WITH THESE

18   LOCKBOXES ON ME.  I NEED SOME ASSISTANCE.

19         WHICH ONE ARE YOU TALKING ABOUT?

20              MR. CURRY:  COULD MR. HICKS HELP HIM MANEUVER THE

21   DOCUMENT, YOUR HONOR?

22              THE COURT:  YES.

23   BY MR. CURRY:

24         Q.    THE '78 PETITION, PARAGRAPH 1.

25         A.    OKAY.

1        **Q.**   WHERE YOU CONTEND THAT YOUR CONSTITUTIONAL RIGHTS

2    WERE VIOLATED, AND YOU ASSERT A 1983 CLAIM; ISN'T THAT RIGHT?

3        **A.**   YES.

4            **MR. ENGLAND:**   YOUR HONOR, NO OBJECTION.   I DON'T

5    KNOW IF MR. CURRY WANTS TO RE-LITIGATE THE 1978 DOCUMENT.

6            **MR. CURRY:**   HE INTRODUCED IT, YOUR HONOR.   HE TALKED

7    ABOUT IT.   HE WAS ASKING HIM QUESTIONS ABOUT IT.

8            **THE COURT:**   HOLD ON.   LET HIM MAKE HIS OBJECTION.

9            **MR. ENGLAND:**   I CERTAINLY UNDERSTAND IF MR. CURRY

10   WANTS TO TALK ABOUT THE 1978 PETITION, BUT I JUST PLACE AN

11   OBJECTION ON SCOPE.   I DON'T KNOW IF HE WANTS TO READ THROUGH

12   THE WHOLE DOCUMENT AND --

13           **THE COURT:**   I DON'T KNOW WHAT HE WANTS, BUT I'M

14   GOING TO ALLOW HIM TO PROCEED, AND THEN WE'LL GO FROM THERE.

15       I'M GOING TO TELL YOU RIGHT NOW, LET'S TAKE A BRIEF

16   RECESS FOR ABOUT TEN MINUTES OR SO.

17           **MR. CURRY:**   ALL RIGHT.   THANK YOU.

18           **(WHEREUPON, THE COURT WAS IN RECESS.)**

19           **REPORTER'S NOTE:**   (MR. SHERIDAN ENGLAND, MR. GEORGE

20   H. KENDALL AND MR. NICHOLAS J. TRENTICOSTA, COUNSEL FOR

21   PETITIONERS, WERE PRESENT IN COURT.   MR. MICHAEL BRENT HICKS

22   AND MR. RICHARD A. CURRY, COUNSEL FOR DEFENDANTS, WERE PRESENT

23   IN COURT.)

24           **THE COURT:**   BE SEATED, FOLKS.

25           **REPORTER'S NOTE:**   (AT THIS TIME, MR. ALBERT WOODFOX

1   WAS PRESENT IN THE COURTROOM.)

2           **THE COURT:**  LET ME JUST INTERJECT.  YOU KNOW, THE

3   PLEADINGS SPEAK FOR THEMSELVES.  SO I DON'T NEED ANY HELP

4   INTERPRETING THOSE.

5           **MR. CURRY:**  I UNDERSTAND.  I THINK I CAN BE VERY

6   BRIEF WITH THE PETITION.

7           **THE COURT:**  ALL RIGHT.  PROCEED.

8   **BY MR. CURRY:**

9       **Q.**   I HAD REFERRED YOU TO PARAGRAPH 9 OF THE PETITION,

10  THE 1978.  MY QUESTION WAS SIMPLY:  ISN'T IT TRUE THAT THE

11  LAWSUIT CLAIMS THAT YOU WERE SUBJECTED TO A FULL STRIP SEARCH

12  AND RECTAL EXAM EVERY TIME YOU HAD AN ATTORNEY VISIT, A COURT

13  APPEARANCE, HOSPITAL VISIT AND FAMILY VISIT; WAS THAT YOUR

14  ALLEGATION IN 1978?

15      **A.**   YES.

16      **Q.**   IS THAT YOUR ALLEGATION TODAY AS WELL IN THIS

17  LAWSUIT?

18      **A.**   PRETTY MUCH.

19      **Q.**   AND THAT THE COURT CONDUCTED A HEARING IN 1978 ON

20  YOUR PETITION; ISN'T THAT RIGHT?

21      **A.**   YES.

22      **Q.**   AND THE COURT ENTERED WRITTEN REASONS FOR JUDGMENT?

23      **A.**   YES.

24      **Q.**   AND THAT'S SOMETHING ELSE YOU ATTACHED TO YOUR ARP;

25  ISN'T THAT RIGHT?

1        **A.**    I ATTACHED EVERY MOTION THAT WAS FILED BY US, AS

2   WELL AS THE DEPARTMENT OF CORRECTIONS.

3        **Q.**    AS WELL AS THE RULINGS BY THE COURT, CORRECT?

4        **A.**    YES.

5        **Q.**    OKAY.   COULD I ASK YOU TO LOOK AT THE WRITTEN

6   REASONS FOR JUDGMENT, WHICH IS PART OF YOUR ATTACHMENTS, THE

7   VERY LAST PARAGRAPH?   THE COURT ORDERED THAT THE DEPARTMENT OF

8   CORRECTIONS COME UP WITH GUIDELINES FOR STRIP SEARCHES,

9   CORRECT?

10       **A.**    IF I REMEMBER, THE COURT ORDERED THE DEPARTMENT OF

11  CORRECTIONS COME UP WITH GUIDELINES THAT WERE ALONG HIS

12  RULING, I THINK, AND I THINK HE ALSO MENTIONS THE ACA

13  STANDARDS AND THE ABA STANDARDS AS REASONS WHY HIS RULING WAS

14  MADE IN THAT WAY.

15       **Q.**    AND YOU SUBMITTED GUIDELINES, OR THEY WERE SUBMITTED

16  ON YOUR BEHALF THAT YOU PROPOSED TO BE ENTERED?

17       **A.**    YES.

18       **Q.**    AND THOSE WERE INCORPORATED INTO THE CONSENT

19  AGREEMENT, WHICH WAS THE LAST DOCUMENT ATTACHED TO YOUR ARP;

20  IS THAT RIGHT?

21       **A.**    YES.

22       **Q.**    NOW, THAT CONSENT AGREEMENT HAD FOUR PARTS, AND THE

23  FIRST PART DESCRIBED HOW THE SEARCH WOULD HAVE TO BE

24  CONDUCTED.   YOU KNOW, THESE ARE THE NEW RULES ON HOW TO

25  CONDUCT STRIP SEARCHES; IS THAT YOUR RECOLLECTION?

1             **THE COURT:**  AGAIN, YOU KNOW, I CAN READ THE

2 JUDGMENT.

3             **MR. CURRY:**  OKAY.

4 **BY MR. CURRY:**

5     **Q.**    MR. WOODFOX, WAS IT YOUR INTENT THAT THE DEPARTMENT

6 OF CORRECTIONS WOULD BE BOUND BY THE TERMS OF THAT CONSENT

7 AGREEMENT ON HOW IT WOULD CONDUCT SEARCHES IN THE FUTURE?

8             **MR. ENGLAND:**  OBJECTION.

9             **THE COURT:**  COME FORWARD, PLEASE.

10             **MR. ENGLAND:**  I OBJECT TO HIS LINE OF INQUIRY.  I

11 THINK THIS IS THE DEFENDANT'S MOTION TO DISMISS AND THE

12 SUPPLEMENTAL BRIEFINGS.  IF COUNSEL WANTS TO ARGUE WITH MR.

13 WOODFOX ABOUT HIS INTENT IN 1978, I DON'T SEE THE RELEVANCE.

14             **THE COURT:**  YES, I DON'T KNOW WHERE IT'S RELEVANT,

15 BUT...

16             **MR. CURRY:**  THE PRELIMINARY INJUNCTION -- THE MOTION

17 TO DISMISS IS ONE THING.  ON A PRELIMINARY INJUNCTION, THE

18 LIKELIHOOD OF SUCCESS ON THE MERITS IS ALSO RELEVANT,

19 OBVIOUSLY.

20             **THE COURT:**  TRUE.

21             **MR. CURRY:**  THAT'S THE BIGGEST PARTICULAR THING.

22 IT'S OUR POSITION THAT WE WILL SHOW -- AND I'VE GOT THREE

23 QUESTIONS, REALLY, THAT THE INTENT BACK THEN WAS TO BE BOUND

24 BY THIS, AND WE WILL, AS PART OF THE -- OUR OBJECTION TO THE

25 PERMANENT INJUNCTION, AND, THEREFORE, AS PART OF THE OBJECTION

1   TO PRELIMINARY INJUNCTION, POINT OUT THAT THIS -- THAT'S THE

2   CONTROLLING DOCUMENT.

3         **THE COURT:**   WELL, ASK YOUR THREE QUESTIONS.

4         **MR. CURRY:**   OKAY.

5   BY MR. CURRY:

6   Q.   MR. WOODFOX, WAS IT YOUR INTENT THAT THE DEPARTMENT

7   OF CORRECTIONS WOULD BE BOUND TO CONDUCT SEARCHES IN

8   ACCORDANCE WITH THE TERMS OF THAT CONSENT AGREEMENT?

9   A.   AT THE TIME, MY INTENT WAS TO STOP PEOPLE FROM

10  STRIPPING ME AND LOOKING UP MY BUTT WHEN THEY WANT, MAKING ALL

11  KINDS OF DEROGATORY COMMENTS, TOUCHING MY BUTTOCKS.   THAT WAS

12  THE TYPE OF STUFF THAT WAS GOING ON WHEN WE FILED THIS SUIT

13  BACK IN 1977.

14  Q.   AND DID YOU INTEND FOR THE DEPARTMENT OF CORRECTIONS

15  TO BE BOUND OR JUST LSP; WAS IT FOR THE WHOLE DEPARTMENT?

16  A.   THE DEPARTMENT OF CORRECTIONS.

17  Q.   ALL RIGHT.   AND DID YOU -- DID YOU ENVISION THAT

18  THAT WOULD REMAIN IN EFFECT 35 YEARS LATER?

19  A.   YEAH.

20  Q.   IT WAS YOUR INTENT TO BE BOUND BY THAT AGREEMENT AS

21  WELL, WASN'T IT?

22  A.   I'M NOT QUITE SURE I UNDERSTAND WHAT YOU --

23  Q.   DID YOU UNDERSTAND THAT YOU AND THE DEPARTMENT WERE

24  BOTH BOUND BY THAT AGREEMENT?

25  A.   THE ORDER WASN'T AGAINST ME.   THE CONSENT DECREE

1    WASN'T FOR ME.  IT WAS FOR THE DEPARTMENT OF CORRECTIONS AND

2    THE ADMINISTRATION AT ANGOLA.

3        Q.    BUT YOU AGREED TO THE --

4        A.    AS I UNDERSTOOD IT, I COULDN'T BE STRIP SEARCHED BUT

5    UNDER CERTAIN CIRCUMSTANCES.

6        Q.    RIGHT.  YOU AGREED TO STRIP SEARCHES UNDER THOSE

7    CIRCUMSTANCES, THOUGH, CORRECT?

8        A.    YEAH.

9        Q.    THAT WAS THE AGREEMENT?

10        A.    AND THE JUDGE'S ORDER AND THE CONSENT DECREE.

11        Q.    OKAY.

12        A.    SIGNED BY THE DEPARTMENT OF CORRECTIONS.

13        Q.    OKAY.  MR. WOODFOX, DO YOU KNOW WHAT A HANDCUFF KEY

14    IS?

15        A.    YEAH.

16        Q.    HAVE YOU EVER BEEN IN POSSESSION OF A HANDCUFF KEY?

17        A.    NO.

18        Q.    IN FACT, WEREN'T YOU ONCE FOUND GUILTY OF HAVING A

19    HANDCUFF KEY IN YOUR POSSESSION?

20        A.    NO.

21        MR. CURRY:  LET ME ATTACH -- I'M SORRY.  I WOULD

22    LIKE TO INTRODUCE STATE 1 INTO EVIDENCE.

23        THE COURT:  IS THERE ANY OBJECTION?

24        MR. ENGLAND:  I HAVEN'T SEEN IT, YOUR HONOR.

25        MR. CURRY:  I THINK YOU HAVE.

| | |
|---|---|
| 1 | **MR. ENGLAND:** I THOUGHT YOU WERE MARKING SOMETHING |
| 2 | ELSE. I'M SORRY. I HAVE NO OBJECTION TO THIS. |
| 3 | **THE COURT:** ALL RIGHT. THEN STATE 1 IS ADMITTED. |
| 4 | BY MR. CURRY: |
| 5 | **Q.** NOW, I'D LIKE TO SHOW YOU A DOCUMENT THAT I WILL |
| 6 | MARK STATE 2, WHICH IS BATES NUMBER AWO278. |
| 7 | **MR. CURRY:** MAY I APPROACH THE WITNESS, YOUR HONOR? |
| 8 | **THE COURT:** YES. |
| 9 | BY MR. CURRY: |
| 10 | **Q.** DO YOU RECOGNIZE THAT DOCUMENT, MR. WOODFOX? |
| 11 | **A.** YES, I RECOGNIZE THAT. |
| 12 | **Q.** MY QUESTION IS: ISN'T IT TRUE THAT YOU WERE ONCE |
| 13 | FOUND GUILTY OF HAVING A HANDCUFF KEY IN YOUR POSSESSION? |
| 14 | **A.** MY ANSWER IS NO AGAIN. |
| 15 | **Q.** OKAY. AND WHAT DOES THIS -- WHAT DOES THIS DOCUMENT |
| 16 | SHOW THEN, STATE 2? |
| 17 | **A.** AT THE TIME WHEN I GOT THAT DISCIPLINARY REPORT, |
| 18 | THAT HANDCUFF KEY WAS BROUGHT IN MY CELL. WE WERE GOING |
| 19 | THROUGH A LOT AT THAT TIME BECAUSE OFFICER MILLER HAD BEEN |
| 20 | KILLED AND A LOT OF PEOPLE AT ANGOLA TOOK EVERY OPPORTUNITY |
| 21 | THEY CAN TO INFLICT PAIN UPON US, AND FALSIFYING DISCIPLINARY |
| 22 | REPORTS WAS PART OF IT. |
| 23 | **Q.** THIS WAS FIVE YEARS AFTER OFFICER MILLER'S DEATH? |
| 24 | **A.** IT'S FIVE YEARS -- |
| 25 | **Q.** MY QUESTION WAS NOT -- |

1    **A.**    UNTIL I WAS TRANSFERRED TO WADE IN NOVEMBER 2010,

2  YOU STILL HAD PEOPLE AT ANGOLA WHO BLAMED US FOR OFFICER

3  MILLER'S DEATH AND WHO STILL HATED US AND STILL TOOK -- WHO

4  TOOK EVERY OPPORTUNITY THEY COULD TO INFLICT WHATEVER PAIN IN

5  HOWEVER FASHION THEY WANTED UPON US.

6    **Q.**    THE LOCKDOWN REVIEW BOARD FOUND YOU GUILTY OF THIS

7  ALLEGATION, DIDN'T THEY?

8    **A.**    I DON'T THINK THEY WERE GOING TO DO ANYTHING OTHER.

9    **Q.**    CAN YOU ANSWER YES OR NO?

10    **A.**    YES.

11    **Q.**    WERE YOU FOUND GUILTY OF THIS?

12    **A.**    YES.

13    **Q.**    AND, IN FACT, YOU WERE TRANSFERRED TO CAMP J AS

14  PUNISHMENT FOR THAT; ISN'T THAT TRUE?

15    **A.**    YES.   AND LATER ON, ON APPEAL, THAT WAS CANCELLED.

16    **Q.**    ON APPEAL OF THIS?

17    **A.**    YEAH, I NEVER WENT TO CAMP J.   THE ONLY TIME I EVER

18  WENT TO CAMP J WAS IN 1999 AS A RESULT OF A HUNGER STRIKE.

19    **Q.**    YOU WERE NEVER FOUND INNOCENT OF THIS CHARGE,

20  THOUGH, WERE YOU?

21    **A.**    I CAN ONLY TELL YOU THAT I WAS TOLD THAT SOMEONE

22  HIGHER UP HAD OVERRULED THE DISCIPLINARY BOARD, AND I WOULD

23  NOT BE GOING TO CAMP J, AND I WAS NOT TRANSFERRED TO CAMP J.

24  I REMAINED IN CCR.   THE ONLY TIME I HAVE EVER BEEN TO CAMP J,

25  AS I SAID EARLIER, WAS IN 1999 AS A RESULT OF PARTICIPATING IN

1   A HUNGER STRIKE.

2        **Q.**   MR. SHERIDAN ASKED YOU A BUNCH OF QUESTIONS ABOUT

3   WHAT WAS IN YOUR CELL AT WADE; DO YOU RECALL THAT?

4        **A.**   YES.

5        **Q.**   A MATTRESS AND THINGS LIKE THAT; ISN'T IT TRUE YOU

6   ALSO HAVE A RADIO IN YOUR CELL?

7        **A.**   YES.

8        **Q.**   AND EARPHONES FOR THAT RADIO?

9        **A.**   EXCUSE ME?

10       **Q.**   EARPHONES?

11       **A.**   YES.

12       **Q.**   INK PENS?

13       **A.**   YES.

14       **Q.**   DO YOU HAVE -- TO WRITE AT LEAST -- INK PEN AND INK,

15   DRAWING MATERIAL?

16       **A.**   I DON'T HAVE ANY HOBBY CRAFT.

17       **Q.**   BUT YOU COULD IF YOU ASKED FOR IT?

18       **A.**   YES, IT IS ALLOWED.

19       **Q.**   OTHER INMATES ON YOUR TIER DO HAVE SUCH MATERIALS?

20       **A.**   YES, SOME DO.

21       **Q.**   OF COURSE, YOU HAVE A TOOTHBRUSH?

22       **A.**   YES.

23       **Q.**   AND AN ELECTRIC RAZOR?

24       **A.**   YES.

25       **Q.**   IF YOU WERE SO INCLINED, DO YOU BELIEVE THAT YOU

1    COULD MAKE A HANDCUFF KEY OUT OF THOSE MATERIALS?

2    **A.**    NOT ME.  THERE ARE GUYS PROBABLY COULD DO IT.

3    **Q.**    YOU COULD NOT?

4    **A.**    NO, I DON'T -- I DON'T HAVE -- I'VE NEVER

5    PARTICIPATED IN THAT KIND OF ACTIVITY.  I DON'T KNOW HOW TO

6    MAKE HANDCUFF KEYS, SHIMS, OR NONE OF THAT STUFF.

7    **Q.**    AREN'T YOU AWARE THAT A NUMBER OF INMATES -- EXCUSE

8    ME, LET ME REPHRASE THAT.

9    AREN'T YOU AWARE THAT CONTRABAND HAS BEEN DISCOVERED ON A

10    NUMBER OF INMATES COMING AND LEAVING THE WADE MAXIMUM-SECURITY

11    CELL BLOCKS OVER THE LAST YEAR?

12    **A.**    NO, I'M NOT.  EVER SINCE NOVEMBER 1ST, 2010, I HAVE

13    BEEN VIRTUALLY ISOLATED ON A TIER, N1, CCR.

14    **Q.**    MR. WOODFOX, YOU TESTIFIED THAT YOU WERE ONCE

15    SEARCHED SIX TIMES IN ONE DAY; IS THAT RIGHT?

16    **A.**    YES.

17    **Q.**    THAT'S NOT ROUTINE, IS IT?

18    **A.**    YEAH.  IF I LEAVE THAT CELL THREE TIMES A DAY, I

19    WILL BE STRIP SEARCHED SIX TIMES IN THAT DAY.

20    **Q.**    MY QUESTION IS --

21    **A.**    AND IT JUST SO HAPPENED ON THAT DAY, I HAD YARD

22    CALL, I HAD CLINIC CALL, AND I HAD A LEGAL CALL, AND EACH TIME

23    I WAS STRIPPED BOTH TIMES, LEAVING AND RETURNING, EVEN THOUGH

24    I HAD NEVER LEFT THE OBSERVATION OF THE SECURITY OFFICERS OR

25    MY RESTRAINTS HAD NOT BEEN REMOVED FOR ANYTHING.

1      **Q.**    ISN'T IT HIGHLY UNUSUAL FOR YOU TO LEAVE YOUR CELL

2   BLOCK THREE TIMES IN ONE DAY?

3      **A.**    YEAH.

4      **Q.**    DO OTHER INMATES ON YOUR TIER THERE SUPPORT YOUR

5   CHALLENGE TO THE STRIP SEARCH?

6      **A.**    OTHER INMATES?

7          **MR. ENGLAND:**    RELEVANCE.

8      **A.**    THIS IS ABOUT ME.   THIS IS ABOUT ME BEING TIRED.

9          **THE COURT:**    SUSTAINED.

10     **A.**    THIS IS ABOUT ME.   I FILED THIS --

11         **THE COURT:**    IT HAS BEEN ANSWERED.

12     **A.**    OKAY, YOUR HONOR.

13         **MR. CURRY:**    THAT'S ALL I HAVE, YOUR HONOR.

14         **THE COURT:**    REDIRECT?

15  EXAMINATION

16  BY MR. ENGLAND:

17     **Q.**    MR. WOODFOX, MR. CURRY ASKED YOU ABOUT STRIP

18  SEARCHES IN THE SUMMER; DO YOU REMEMBER THAT?

19     **A.**    YES.

20     **Q.**    AND HE SAID IT'S EASIER TO STRIP SEARCH BECAUSE YOU

21  ARE ALREADY ALMOST NAKED BECAUSE IT'S HOT; DO YOU REMEMBER

22  THOSE QUESTIONS?

23     **A.**    WELL, HE DIDN'T SAY IT WAS HOT, BUT I REMINDED HIM

24  HOW HOT THEM CELLS BE IN THE SUMMERTIME.

25     **Q.**    WELL, DOES IT MAKE YOU FEEL ANY BETTER WHEN YOU'RE

1   BEING STRIP SEARCHED EVERY DAY THAT YOU HAVE TO TAKE LESS

2   CLOTHES OFF WHEN IT'S HOT?

3           **MR. CURRY:**   OBJECTION.   I DON'T THINK IT'S RELEVANT.

4           **THE COURT:**   WHAT'S YOUR OBJECTION?

5           **MR. CURRY:**   RELEVANCE.

6           **THE COURT:**   OVERRULED.   GO AHEAD.   YOU MAY ANSWER.

7       **A.**    YOU KNOW, IT'S HARD TO PUT INTO WORDS HOW

8   HUMILIATING IT IS TO BE STANDING IN FRONT OF TWO MEN AND HAVE

9   ALL YOUR CLOTHES TAKEN OFF AND TO HAVE TO OPEN YOUR MOUTH,

10  RAISE YOUR TONGUE, RAISE YOUR ARMS, RAISE YOUR GENITALS, RAISE

11  YOUR FEET, TURN AROUND AND SPREAD YOUR BUTTOCKS FOR THEM TO

12  LOOK AT, JUST TO GO ON THE YARD OR TO GO TO A HOSPITAL

13  CALL-OUT OR TO GO TALK TO MY ATTORNEYS ON THE PHONE, OR FOR AN

14  ATTORNEY TO VISIT.   AND THERE IS NO SIGHT.   IT'S LIKE, HOW I

15  CONDUCT MYSELF, HOW I CARRY MYSELF, HOW I GO OUT OF MY WAY NOT

16  TO BE A PROBLEM PRISONER DON'T MEAN ANYTHING.   IT DON'T COUNT

17  FOR ANYTHING.

18  BY MR. ENGLAND:

19      **Q.**    LET ME -- THANK YOU.   MR. CURRY ASKED YOU A SERIES

20  OF QUESTIONS ABOUT ICE AND MICROWAVES; DO YOU REMEMBER THOSE

21  QUESTIONS?

22      **A.**    YES.

23      **Q.**    ALL RIGHT.   CAN YOU EXPLAIN THAT TO ME ONCE MORE SO

24  I CAN UNDERSTAND?

25      **A.**    UP UNTIL FEBRUARY OF 2013, THE ICE CHEST AND THE

1   MICROWAVE WAS ON THE TIER.  SOMEONE DID SOMETHING, AND AS A

2   TIER PUNISHMENT, COLONEL NAIL, WHO IS THE SUPERVISOR OF THE

3   SOUTHSIDE COMPOUND, REMOVED THE MICROWAVE AND THE ICE CHEST

4   OFF THE TIER AND PUT THEM OUTSIDE THE TIER.

5          THE ONLY WAY THAT WE CAN GET MICROWAVE SERVICE OR ICE,

6   THERE IS A GAP AT THE DOOR AT THE FRONT OF THE TIER.  YOU HAD

7   TO PUT IT ON THE FLOOR AND SHOVE IT OUT THERE TO THE OFFICER,

8   HE WOULD PUT IT IN THE MICROWAVE AND SHOVE IT BACK.  THE SAME

9   WITH ICE.  YOU WOULD -- IF IT WASN'T FOR YOU, WHOEVER ASKED

10  YOU TO DO IT, THIS WAS ALLOWED.

11      Q.   OKAY.  SO AT THE TIME YOU WERE PASSING FROZEN WATER

12  BACK AND FORTH TO OTHER INMATES, THAT WAS ALLOWED UNDER THE

13  RULES; IS THAT -- AM I UNDERSTANDING YOU?

14      A.   YEAH, THE ICE CHEST WAS ON THE TIER BEFORE THEY

15  MOVED IT.

16      Q.   OKAY.  AND MR. CURRY ALSO ASKED YOU WHETHER YOU

17  PASSED MAGAZINES TO OTHER INMATES; DO YOU REMEMBER THOSE

18  QUESTIONS?

19      A.   YES.

20      Q.   AND YOU SAID THAT YOU DID; IS THAT RIGHT?

21      A.   YES.

22      Q.   IS THAT ALLOWED UNDER THE RULES?  HAVE YOU EVER BEEN

23  WRITTEN UP FOR THAT; IS THAT A VIOLATION OF SOMETHING?

24      A.   NO.

25      Q.   OKAY.  HAVE YOU EVER BEEN WRITTEN UP FOR DOING IT?

1      **A.**   NO.

2      **Q.**   DO YOU KNOW OF ANY OTHER INMATES ON CCR WHO HAVE

3  BEEN WRITTEN UP FOR PASSING A MAGAZINE TO EACH OTHER?

4      **A.**   NO.

5      **Q.**   AND MR. CURRY ASKED YOU WHETHER YOU HAD RADIOS,

6  PENS, TOOTHBRUSHES AND A RAZOR; DO YOU REMEMBER THOSE

7  QUESTIONS?

8      **A.**   YES.

9      **Q.**   HE ASKED YOU IN THE CONTEXT OF WHETHER OR NOT YOU

10  COULD MAKE A HANDCUFF KEY; IS THAT RIGHT?

11      **A.**   YES.

12      **Q.**   I'D LIKE TO ASK YOU A DIFFERENT QUESTION.  HAVE YOU

13  EVER TRIED TO PUT A RAZOR IN YOUR ANUS OR UNDER YOUR GENITALS?

14      **A.**   NO, I HAVE NOT.

15      **Q.**   HOW ABOUT A RADIO; EVER TRIED TO PUT THAT IN YOUR

16  ANUS OR UNDERNEATH YOUR GENITALS?

17      **A.**   NO, I HAVE NOT.

18      **Q.**   OKAY.  WHAT ABOUT PENS; TRY TO PUT THOSE IN YOUR

19  ANUS OR --

20      **A.**   NO, I HAVE NOT.

21      **Q.**   OKAY.  MR. CURRY ASKED YOU QUESTIONS ABOUT A

22  DOCUMENT FROM 1977.  THAT'S 35 YEARS AGO, SOMETHING.  DO YOU

23  REMEMBER THOSE QUESTIONS?

24      **A.**   NO EXACTLY.

25      **Q.**   WELL, IT WAS THIS QUESTION ABOUT THIS HANDCUFF KEY;

1    DO YOU REMEMBER THOSE QUESTIONS?

2         **A.**   YES.

3         **Q.**   AND THAT -- THE DATE OF THAT INCIDENT WAS 1977,

4    RIGHT?

5         **A.**   OKAY.

6         **Q.**   SINCE 1977, HAS ANYBODY EVERY WRITTEN YOU UP FOR

7    HANDCUFF KEYS?

8         **A.**   NO.

9         **Q.**   HOW ABOUT DURING THE '80S?

10        **A.**   NO.

11        **Q.**   THE WHOLE DECADE OF THE '80S, ANY WRITE-UPS FOR

12   HANDCUFF KEYS?

13        **A.**   NO.

14        **Q.**   THE '90S, THAT'S A WHOLE DECADE, TOO; ANY WRITE-UPS?

15        **A.**   I'VE NEVER BEEN WRITTEN UP FOR A HANDCUFF KEY.

16        **Q.**   IN THE 2000S, THAT WHOLE DECADE?

17        **A.**   NO.

18        **Q.**   OKAY.  AND I BELIEVE YOUR TESTIMONY WAS THAT THIS

19   WRITE-UP WAS OVERRULED, RIGHT?

20        **A.**   TO MY -- YOU KNOW, I NEVER WENT TO CAMP J.  I JUST

21   -- OTHERWISE, I WAS SENTENCED TO CAMP J, AND I FORGET WHO THE

22   SUPERVISOR OF CAMP RC WAS AT THAT TIME.  ABOUT A WEEK LATER HE

23   COME UP TO ME IN MY CELL, AND HE SAID, YOU CAN FORGET ABOUT

24   GOING TO CAMP J.  SOMEBODY OVERRULED THE COURT, AND YOU NOT

25   GOING TO CAMP J, AND I NEVER WENT.

1    Q.    KIND OF HARD TO REMEMBER THE SPECIFICS BECAUSE IT

2    WAS 36 YEARS AGO; IS THAT YOUR TESTIMONY?

3    A.    YEAH.

4    Q.    ALL RIGHT.   NOTHING FURTHER.

5            MR. CURRY:   I HAVE NO FURTHER QUESTIONS, BUT I WANT

6    TO INTRODUCE STATE 2.

7            THE COURT:   ALL RIGHT.

8            MR. ENGLAND:   OBJECTION.   THIS DOCUMENT IS 36 YEARS

9    OLD, AND AS THE WITNESS HAS TESTIFIED, IT WAS OVERRULED.   BUT

10   EVEN IF HADN'T BEEN, IT'S 36 YEARS AGO.   SO I DON'T SEE THE

11   RELEVANCE UNLESS THE STATE IS PREPARED TO SAY, THAT THE REASON

12   WHY THEY'RE STRIP SEARCHING MR. WOODFOX SIX TIMES A DAY IS

13   BECAUSE IN 1977, A KEY WAS FOUND IN HIS ROOM ON A REPORT THAT

14   WAS OVERRULED, BUT IF THAT'S THEIR POSITION, I WON'T OBJECT.

15   BUT IF THAT IS NOT THEIR POSITION, I DO OBJECT TO THE

16   ADMISSION.

17           THE COURT:   WELL, I WILL ADMIT IT, AND I WILL GIVE

18   IT WHAT WEIGHT I THINK IT DESERVES.

19           MR. ENGLAND:   NOTHING FURTHER FROM THE PLAINTIFF.

20           THE COURT:   ALL RIGHT.   HOW OLD ARE YOU?

21           THE WITNESS:   SIXTY-SIX, YOUR HONOR.

22           THE COURT:   ARE YOU THE OLDEST MEMBER ON THAT TIER?

23           THE WITNESS:   MAYBE BY A YEAR OR TWO.   BUT, YOU

24   KNOW, FROM -- THEY ORIGINALLY SENT 13 OF US, AND, YOU KNOW, WE

25   USED TO LAUGH BECAUSE WE USED TO SAY IT'S A TIER OF OLD MEN.

1   YOU KNOW, EVERYBODY THAT WAS SENT WAS, I THINK, IN THEIR 50S,

2   LATE 50S, MID 50S, INTO THEIR 60S.

3          **THE COURT:**  PRIOR TO THESE STRIP SEARCHES, DO YOU

4   HAVE ANY KNOWLEDGE OF ANY CONTRABAND BEING FOUND ON THAT TIER?

5          **THE WITNESS:**  I THINK ONE TIME -- THEY USED TO SELL

6   US IN THE CANTEEN THESE DISPOSABLE RAZORS, AND I THINK ONE

7   GUY, YOU KNOW, HE DON'T HAVE ANY OUTSIDE SUPPORT, NO FAMILY OR

8   NOTHING, SO HE MAKES CARDS, AND I THINK HE TOOK ONE OF THE

9   RAZORS, YOU KNOW, OUT OF THE HEAD OF THE RAZOR, AND HE WAS

10  USING IT TO CUT PAPER INTO DESIGNS WITH, BUT THAT'S THE ONLY

11  INCIDENT I CAN RECALL.

12         **THE COURT:**  BUT NOTHING WITH YOU?

13         **THE WITNESS:**  NO, I'VE NEVER BEEN -- HAD A

14  DISCIPLINARY REPORT SINCE I'VE BEEN AT DAVID WADE.

15         **THE COURT:**  ANY QUESTIONS TO FOLLOWUP TO MY

16  QUESTIONS?

17         **MR. ENGLAND:**  NO, YOUR HONOR.

18         **THE COURT:**  ALL RIGHT.  YOU MAY STEP DOWN, SIR.

19     YOUR NEXT WITNESS?

20         **MR. ENGLAND:**  THERE IS NOTHING FURTHER FROM THE

21  PLAINTIFF.

22         **THE COURT:**  ALL RIGHT.  THE STATE?

23         **MR. CURRY:**  I CALL WARDEN GOODWIN.

24        (WHEREUPON, **JERRY GOODWIN**, HAVING BEEN DULY SWORN,

25  TESTIFIED AS FOLLOWS.)

1      **THE COURT:**   GOOD MORNING.

2   EXAMINATION

3   BY MR. CURRY:

4      **Q.**   PLEASE STATE YOUR FULL NAME.

5      **A.**   JERRY GOODWIN.

6      **Q.**   AND WHAT IS YOUR CURRENT POSITION?

7      **A.**   WARDEN AT DAVID WADE CORRECTIONAL CENTER.

8      **Q.**   HOW LONG HAVE YOU BEEN THE WARDEN AT WADE?

9      **A.**   2008, MARCH, MARCH 15TH, 2008.

10     **Q.**   HOW MANY INMATES ARE HOUSED AT WADE CURRENTLY?

11     **A.**   OUR OPERATIONAL CAPACITY IS 1,224, AND WE NORMALLY

12   STAY FULL.

13     **Q.**   AND HOW MANY OF THOSE ARE MAXIMUM SECURITY

14   CLASSIFIED?

15     **A.**   APPROXIMATELY, 50 PERCENT.

16     **Q.**   HOW MANY MAXIMUM-SECURITY INSTITUTIONS ARE THERE IN

17   THE STATE OF LOUISIANA?

18     **A.**   FOR MALE OFFENDERS THERE'S THREE.  THERE'S THREE

19   CLASS ONE OR LEVEL ONE SECURITY FACILITIES.  THAT WOULD BE

20   LSP, HUNT AND DAVID WADE CORRECTIONAL CENTER.

21     **Q.**   CAN YOU DESCRIBE FOR ME HOW YOUR FACILITY -- HOW THE

22   INSTITUTION PHYSICALLY IS LAID OUT, VERY GENERALLY?  I

23   UNDERSTAND IT'S IN --

24     **A.**   YOU'RE INTERESTED JUST IN THE COMPOUND WHERE THE

25   OFFENDERS LIVE?

1       **Q.**   PLEASE.

2       **A.**   OKAY.  WE HAVE TWO COMPOUNDS.  THERE IS A -- WHAT WE

3 CALL THE NORTH COMPOUND, WHICH IS PRIMARILY DORMITORIES, AND

4 OUR PROTECTION UNIT ALSO IS LOCATED ON THAT COMPOUND.  AND

5 THEN YOU CROSS INTO THE SOUTH COMPOUND, WHICH WAS A NEW

6 CONSTRUCTION, IN 1987 IS WHEN THAT COMPOUND WAS CONSTRUCTED.

7 THAT'S OUR MAXIMUM CUSTODY WITH THE EXCEPTION OF ONE DORMITORY

8 ON THAT UNIT, WHICH IS MEDIUM- AND MINIMUM-CUSTODY INMATES

9 THAT PROVIDE ALL THE SERVICE WORK FOR THAT COMPOUND.

10       **Q.**   OKAY.  I'M PUTTING ON THE OVERHEAD HERE A DIAGRAM OF

11 THE -- WHAT DOES THAT DEPICT?

12       **A.**   THAT IS THE SOUTH COMPOUND AT DAVID WADE.

13       **Q.**   AND I WILL NOTE FOR THE RECORD THIS IS -- I DON'T

14 BELIEVE IT'S TO SCALE, BUT I THINK IT'S APPROXIMATE, AND I'M

15 GOING TO MOVE TO INTRODUCE IT PURELY AS DEMONSTRATIVE

16 EVIDENCE, BUT I'LL DO THAT LATER.

17     WARDEN, YOU WERE DESCRIBING THE H5 DORM WHICH IS WHERE

18 MEDIUM- OR MINIMUM-SECURITY INMATES LIVE?

19       **A.**   THERE'S BOTH, MEDIUM- AND MINIMUM-CUSTODY INMATES IN

20 THAT DORMITORY.

21       **Q.**   THAT'S LABELED H5?

22       **A.**   YES, SIR.  YOU HAVE H5A AND H5B.  THERE'S TWO

23 DIFFERENT DORMITORIES, EACH WITH 79 INMATES IN THEM.

24       **Q.**   NOW, THESE LONG THIN BUILDINGS, N1, N2, N3, N4, WHAT

25 ARE THOSE?

1        **A.**    THOSE ARE ALL CELL BLOCKS.

2        **Q.**    AND WHAT TYPE INMATE WILL RESIDE THERE?

3        **A.**    THOSE ARE ALL FOR MAXIMUM CUSTODY, EITHER CCR OR

4    OTHER MAXIMUM-CUSTODY INMATES, WHETHER THEY BE EXTENDED

5    LOCKDOWN OR ADMIT SEG OR WHATEVER.

6        **Q.**    AND I BELIEVE YOU TESTIFIED CCR IS IN N1?

7        **A.**    YES, SIR, IT'S ON A TIER OF N1.

8        **Q.**    IT THAT LIKE THE TOP HALF OF N1?

9        **A.**    YEAH, THE TOP FRONT HALF OF -- IF YOU -- AS YOUR PEN

10   IS, IF YOU GO UP, YES, SIR, THEN TO MY LEFT, THAT WOULD BE THE

11   N1 TIER, THE OTHER WAY.   THAT'S THE N1 A TIER RIGHT THERE,

12   YES, SIR.

13       **Q.**    I HAVE CIRCLED -- I'LL LABEL IT CCR; IS THAT

14   CORRECT?

15       **A.**    YES, SIR.

16       **Q.**    WHAT TYPE OF INMATES ARE HOUSED IN CCR?

17       **A.**    THOSE ARE OFFENDERS THAT HAVE BEEN CLASSIFIED

18   MAXIMUM CUSTODY DUE TO -- IT COULD BE FOR NUMEROUS REASONS.

19   IT COULD BE FOR PROTECTIVE CUSTODY.   THEY NEED TO BE PROTECTED

20   FROM OTHER OFFENDERS, AS WELL AS OTHER OFFENDERS NEED TO BE

21   PROTECTED FROM THEM.   THEY COULD BE A HIGH ESCAPE RISK, NOT

22   NECESSARILY PEOPLE THAT HAVE HAD ANY RECENT DISCIPLINARY

23   ACTION, IT'S NOT A PUNITIVE AREA, BUT IT IS AN AREA FOR

24   MAXIMUM-CUSTODY OFFENDERS THAT REALLY CANNOT LIVE IN THE

25   DORMITORY FOR -- THERE COULD BE NUMEROUS REASONS WHY THEY

1   COULD NOT LIVE IN A DORMITORY.

2   **Q.**   WHAT IS YOUR ROLE IN OVERSEEING SECURITY AT WADE?

3   **A.**   WELL, I'M THE WARDEN OVER THE INSTITUTION.  I'M

4   ULTIMATELY RESPONSIBLE FOR THE ENTIRE OPERATION.  I DO HAVE AN

5   ASSISTANT WARDEN THAT PRIMARILY MANAGES SECURITY, YOU KNOW,

6   THE DAY-TO-DAY OPERATIONS, BUT HE REPORTS TO ME AND I'M

7   ULTIMATELY RESPONSIBLE FOR ALL THE FUNCTIONS AT THE

8   INSTITUTION.

9   **Q.**   ARE YOU FAMILIAR WITH HOW INMATES RESIDING IN THESE

10  N1 THROUGH N4 CELL BLOCKS, HOW THEY ARE TRANSPORTED TO THE

11  RECREATION YARDS FOR EXERCISE?

12  **A.**   YES, SIR.

13  **Q.**   CAN YOU TELL ME HOW -- WHERE, FIRST OF ALL, THE N1

14  INMATES, WHERE WOULD THEY GO TO EXERCISE?

15  **A.**   THEY USE THE RECREATION AREA, THE SEVEN PEN, THE

16  SMALL -- YES, SIR, RIGHT WHERE YOUR PEN IS, THAT'S IT.

17  **Q.**   I CIRCLED -- AND I'LL SAY CCR EXERCISE.

18  **A.**   YEAH, THAT'S THE CCR EXERCISE AREA, AND THE OTHER

19  OFFENDERS USE THAT AREA, BUT THAT'S WHERE CCR USES THOSE

20  EXCLUSIVELY, AND THEN WHEN THEY'RE THROUGH FOR THE DAY, THEN

21  THE OTHER OFFENDERS CAN USE THAT AREA AS WELL.

22  **Q.**   BUT WHILE THE CCR INMATES ARE IN THAT FIRST EXERCISE

23  YARD, WOULD OTHER INMATES BE USING THE REMAINING TWO EXERCISE

24  YARDS?

25  **A.**   YES, SIR.

1    **Q.**    ARE YOU FAMILIAR WITH HOW INMATES ARE TRANSPORTED

2    FROM THE N1 CELL BLOCK TO THE EXERCISE YARD?

3    **A.**    YES, SIR.

4    **Q.**    AND DESCRIBE IN YOUR OWN WORDS THAT PROCESS.

5    **A.**    WELL, THE OFFICERS GO DOWN THE TIER, THERE WILL BE

6    TWO OFFICERS, AND THEY PERFORM THE YARD CALL, AND THE

7    OFFENDERS WHO WANT TO GO OUT FOR OUTDOOR RECREATION LET IT BE

8    KNOWN THAT THEY WANT TO GO, AND THEN THE OFFICERS GO TO THAT

9    INDIVIDUAL, THEY WOULD PERFORM A SEARCH OF HIS CLOTHING, THEY

10   DO A VISUAL BODY CAVITY SEARCH, THEY RETURN HIS CLOTHING TO

11   HIM, HE GETS DRESSED AND THEY RESTRAIN HIM, AND AT THAT POINT,

12   HE IS ESCORTED OFF THE TIER AND HELD IN THE LOBBY OF THE

13   BUILDING UNTIL THEY HAVE COMPLETED THEIR PROCESS, AND THEN

14   THEY ARE ESCORTED OUT, UP TO SEVEN OF THEM AT ONE TIME ARE

15   ESCORTED OUT TO THE EXERCISE AREA.

16   **Q.**    SO WOULD THEIR PATH GO SOMETHING LIKE THIS?

17   **A.**    YES, SIR, SOMETHING LIKE THAT.   THERE'S A SIDEWALK

18   RIGHT THERE.   IT'S PRETTY MUCH THEY COME OUT OF THE DOOR, TURN

19   LEFT, GO DOWN THE SIDEWALK TO THE RECREATIONAL AREA.

20   **Q.**    DO YOU CONSIDER THE CELL BLOCK A SECURE AREA THAT IS

21   SEGREGATED FROM THE REST OF THE POPULATION?

22   **A.**    YES, SIR.   IT'S BASICALLY SEGREGATED.   THERE ARE

23   OTHER OFFENDERS THAT MAYBE COME OUT OF H5 OR OTHER AREAS OF

24   THE PRISON THAT WOULD HAVE ACCESS TO THAT CELL BLOCK FROM TIME

25   TO TIME.

1     **Q.**   AND WHEN THEY HAVE ACCESS TO THAT CELL BLOCK, ARE

2    THEY SUBJECTED TO STRIP SEARCH AS WELL, A VISUAL BODY CAVITY

3    SEARCH?

4     **A.**   YES, SIR.  WHEN THEY ENTER THE BUILDING AND LEAVE

5    THE BUILDING.

6     **Q.**   SO WHEN INMATES COME IN OR OUT OF THAT CELL BLOCK

7    BUILDING, ARE THEY SUBJECT TO SEARCH, AND IF SO, WHAT TYPE OF

8    SEARCH?

9     **A.**   ANY OFFENDER ENTERING A SEGREGATED AREA FROM GENERAL

10   POPULATION IS SUBJECTED TO A VISUAL BODY CAVITY SEARCH.  THEN

11   HE GOES ABOUT HIS BUSINESS.  HE MAY BE THERE TO PERFORM

12   MAINTENANCE FUNCTIONS.  HE MAY BE THERE TO SERVE FOOD, HE MAY

13   BE THERE TO, YOU KNOW, PASS OUT LAUNDRY OR WHATEVER HE'S GOING

14   TO DO, INMATE MINISTERS, COUNSEL SUBSTITUTES, LIBRARY CLERKS,

15   THOSE TYPE PEOPLE.

16    **Q.**   HOW MANY INMATES IN THE OVERALL FACILITY MIGHT USE

17   THESE EXERCISE YARDS DURING A GIVEN DAY?

18    **A.**   IN THE SUMMERTIME WHEN YOU HAVE A LOT MORE DAYLIGHT,

19   I GUESS YOU WOULD HAVE UPWARDS OF OVER 200.  THE NUMBER WILL

20   GO DOWN A LITTLE BIT IN THE WINTERTIME WITH DAYLIGHT-SAVINGS

21   TIME ENDING, YOU DON'T HAVE AS MUCH DAYLIGHT.

22    **Q.**   WHEN THE INMATES ARE IN THESE EXERCISE YARDS, ARE

23   THEY RESTRAINED?

24    **A.**   NO, SIR.  ONCE THEY ARE INSIDE THE ACTUAL EXERCISE

25   YARD ITSELF, THE RESTRAINTS ARE REMOVED.

1     **Q.**    DURING THE COURSE OF A 24-HOUR PERIOD, WOULD OTHER

2    INMATES HAVE OCCASION TO BE IN THE VICINITY OF THESE EXERCISE

3    YARDS?

4     **A.**    YES, SIR.

5     **Q.**    DESCRIBE HOW THAT MIGHT HAPPEN.

6     **A.**    YOU HAVE MAINTENANCE INMATES THAT COULD BE IN THERE

7    WORKING, REPAIRING THINGS, OR YOU HAVE THE OFFENDERS IN H5,

8    THEY ACTUALLY -- OFFENDERS IN H5 ACTUALLY HAVE TO GO TO THE

9    NORTH COMPOUND FOR THEIR MEALS.  SO THEY WALK RIGHT PAST THOSE

10   EXERCISE YARDS AT LEAST THREE TIMES A DAY GOING TO THE NORTH

11   COMPOUND FOR BREAKFAST, LUNCH AND SUPPER.  THEY ALSO HAVE TO

12   USE THE SERVICE WALK THAT GOES REAL CLOSE TO THE EXERCISE PENS

13   TO ACCESS THE CLASSIFICATION OFFICE, THE INFIRMARY, SECURITY

14   BUILDING.  THEN THIS RECREATIONAL AREA ON YOUR DRAWING HERE,

15   THE BOTTOM, THE RECREATIONAL AREA, THAT'S ACTUALLY TWO

16   BASKETBALL COURTS THAT THE OFFENDERS IN H5 HAVE ACCESS TO.

17   THEN THERE'S ALSO THE ORDERLIES THAT WOULD, YOU KNOW, CLEAN

18   THE AREA ON A DAILY BASIS.

19    **Q.**    HAS CONTRABAND EVER BEEN FOUND IN ANY OF THESE

20   EXERCISE YARDS?

21    **A.**    YES, SIR.

22    **Q.**    DO YOU RECALL ANY -- WHAT TYPES OF CONTRABAND?

23    **A.**    IT'S PRIMARILY SMOKING MATERIAL, LIGHTERS, THINGS OF

24   THAT NATURE, GAMBLING TICKETS A FEW TIMES, I THINK.

25    **Q.**    WHEN INMATES ARE ON THESE TIERS, N1 THROUGH N4,

1    FIRST OF ALL, ARE THOSE -- IS THE PHYSICAL LAYOUT OF THE

2    INTERNAL CELL BLOCKS SIMILAR?

3         **A.**   YES, SIR, THEY ARE ALL EXACTLY THE SAME, N1 THROUGH

4    N4, THEY ARE ALL BUILT ON THE SAME PATTERN.

5         **Q.**   COULD INMATES ON THESE CELL BLOCKS PASS CONTRABAND

6    AMONG THEMSELVES?

7         **A.**   THEY CAN, YES, SIR.

8         **Q.**   COULD INMATES ON THESE CELL BLOCKS, WHEN THEY ARE

9    USING THE EXERCISE YARDS, COULD THEY CONCEAL CONTRABAND IN THE

10   EXERCISE AREA?

11        **A.**   THEY CAN.   ANYTHING IS POSSIBLE.

12        **Q.**   ARE YOU FAMILIAR WITH -- I'M GOING --

13             **MR. CURRY:**   FIRST OF ALL, I WOULD LIKE TO IDENTIFY

14   THIS AS STATE 3 AND OFFER IT AS DEMONSTRATIVE EVIDENCE.

15             **THE COURT:**   ANY OBJECTION?

16             **MR. ENGLAND:**   NO OBJECTION.

17             **THE COURT:**   ALL RIGHT.   STATE 3 IS ADMITTED.

18             **MR. CURRY:**   NEXT, I WOULD LIKE TO MARK --

19             **THE COURT:**   GO AHEAD AND MARK THAT.   I'M GOING TO

20   TAKE ABOUT A TWO MINUTE -- I HAVE TO TAKE A PHONE CALL.   I

21   WILL BE BACK.

22             **MR. CURRY:**   OKAY.   -- AS STATE 4.

23             **(WHEREUPON, THE COURT WAS IN RECESS.)**

24             **REPORTER'S NOTE:**   (ALL PARTIES PRESENT IN COURT.)

25             **THE COURT:**   CONTINUE, PLEASE.

1  BY MR. CURRY:

2       Q.   WARDEN GOODWIN, I'VE HANDED YOU WHAT I'VE MARKED AS

3  STATE EXHIBIT 4.  TELL ME WHAT THAT DOCUMENT IS, PLEASE.

4       A.   THIS IS A DEPARTMENT OF CORRECTIONS, DEPARTMENT

5  REGULATIONS C-02-003, DESCRIBING THE SEARCHES OF OFFENDERS.

6  IT'S A SECURITY POLICY FOR THE DEPARTMENT.

7       Q.   HOW LONG HAS THAT REGULATION BEEN IN PLACE?

8       A.   THIS PARTICULAR ONE WAS DATED NOVEMBER 12TH, 2008.

9       Q.   WOULD THAT HAVE BEEN BEFORE OR AFTER INMATE WOODFOX

10  WAS TRANSFERRED TO YOUR FACILITY?

11       A.   THAT'S PRIOR TO WOODFOX ARRIVING AT WADE.

12       Q.   ARE YOU FAMILIAR WITH THE MANNER IN WHICH STRIP

13  SEARCHES ARE PERFORMED ON INMATES LEAVING AND ENTERING THE N1

14  CELL BLOCK?

15       A.   YES, SIR.

16       Q.   HAVE YOU EVER BEEN PRESENT WHEN ANY OF THOSE

17  SEARCHES TOOK PLACE?

18       A.   I HAVE.

19       Q.   HOW WOULD THAT HAVE COME TO HAPPEN?  HOW WOULD YOU

20  HAVE WITNESSED A SEARCH?

21       A.   WELL, I HAVE -- I GUESS I SHOULD MAYBE GET A BETTER

22  UNDERSTANDING OF THE QUESTION.  YOU KNOW, I HAVE WORKED AT

23  DAVID WADE FOR 30 YEARS.  I USED TO BE AN OFFICER IN THESE

24  CELL BLOCKS, SO I'VE -- I DON'T KNOW IF YOU'RE TALKING ABOUT

25  MORE RECENTLY OR --

1      Q.    HAVE YOU PERFORMED SEARCHES SUCH AS THIS?

2      A.    YES, I HAVE.

3      Q.    YOU HEARD INMATE WOODFOX AND SUBSEQUENTLY LIEUTENANT

4   ELMORE DESCRIBE THE SEARCHES; IS THAT BASICALLY IN ACCORDANCE

5   WITH YOUR UNDERSTANDING OF HOW THE SEARCHES TAKE PLACE?

6      A.    YES, SIR.

7      Q.    HOW LONG HAS IT BEEN WADE'S POLICY TO CONDUCT THESE

8   SEARCHES WHENEVER AN INMATE LEAVES ONE OF THESE SECURE CELL

9   BLOCKS?

10     A.    SINCE AT LEAST 1984.  SINCE I STARTED MY EMPLOYMENT

11  THERE IN 1984.

12     Q.    DO YOU BELIEVE THAT THE SEARCHES BEING CONDUCTED ON

13  TIER -- ON THE CCR TIER OF N1 CELL BLOCK ARE CONSISTENT WITH

14  THE REGULATION THAT I'VE MARKED AS STATE 4?

15     A.    YES, SIR, I DO.

16        MR. CURRY:  I MOVE TO INTRODUCE STATE 4.

17        THE COURT:  ALL RIGHT.  IS THERE ANY OBJECTION?

18        MR. ENGLAND:  NO OBJECTION.

19        THE COURT:  IT'S ADMITTED.

20  BY MR. CURRY:

21     Q.    WARDEN GOODWIN, DO YOU REVIEW DISCIPLINARY REPORTS

22  ISSUED AT WADE?

23     A.    YES, SIR.

24     Q.    I'D LIKE YOU TO REVIEW SEVERAL SUCH REPORTS THAT

25  HAVE BEEN ISSUED IN THE LAST YEAR OR SO.  I WILL MARK AS STATE

1  5, A DISCIPLINARY REPORT THAT WAS DATED -- THE INCIDENT WAS

2  JULY 11TH, 2012.

3        **MR. CURRY:**   MAY I APPROACH THE WITNESS, YOUR HONOR?

4        **THE COURT:**   YES.

5  BY MR. CURRY:

6        **Q.**   COULD YOU REVIEW THAT AND TELL ME BRIEFLY WHAT YOU

7  RECALL OF THAT INCIDENT?

8        **A.**   YES.   THIS WAS A SHIM THAT WAS FOUND.   THE OFFENDER

9  HAD IT HIDDEN IN HIS MOUTH, INSIDE HIS MOUTH.   IT WAS FOUND IN

10 A VISUAL BODY CAVITY SEARCH.   IT APPARENTLY WAS A PIECE OF

11 METAL THAT CAME OFF JUST A NORMAL REGULAR BIC BUTANE LIGHTER

12 THAT HE HAD SHAPED INTO AN OBJECT, THAT WHEN YOU INSERTED IT

13 INTO A HANDCUFF, IT FUNCTIONED AS A KEY.   IT WOULD ACTUALLY

14 OPEN PEERLESS AND SMITH & WESSON RESTRAINTS.   THOSE ARE THE

15 TWO BRANDS THAT ARE PRIMARILY USED BY THE DEPARTMENT, PEERLESS

16 AND SMITH & WESSON.

17       **Q.**   WHERE WAS THAT INMATE RESIDING?

18       **A.**   HE WAS IN N3, ONE OF THE CELL BLOCKS ON THE SOUTH

19 COMPOUND.

20       **Q.**   NEXT, I'LL SHOW YOU WHAT I'VE MARKED AS STATE 6,

21 WHICH IS A REVIEW OF USE OF FORCE FROM APRIL 27TH, 2013.

22       **MR. CURRY:**   CAN I APPROACH, YOUR HONOR?

23       **THE COURT:**   YES.

24 BY MR. CURRY:

25       **Q.**   AND, WARDEN GOODWIN, CAN YOU DESCRIBE THAT INCIDENT

1  AFTER YOU HAVE REVIEWED IT?

2      **A.**   YES, SIR.  THIS WAS A FIGHT BETWEEN TWO OFFENDERS ON

3  EXTENDED LOCKDOWN.  THEY WERE RETURNING FROM THE RECREATION

4  YARD.  ONE OF THE OFFENDERS ATTACKED THE OTHER OFFENDER, AND

5  HE HAD AS A WEAPON LIKE A METAL TOBACCO CAN LID, LIKE A LID

6  OFF A CAN OF SKOAL LID OR SOMETHING LIKE, IT WAS METAL.

7      **Q.**   SO HE WAS ACTUALLY COMING BACK FROM THESE REC YARDS,

8  THE VERY TRANSPORTATION THAT WE'RE HERE TALKING ABOUT TODAY?

9      **A.**   YES, SIR.  AS I REMEMBER CORRECTLY, THEY WERE

10 RETURNING FROM -- YEAH, I'M READING NOW.  THEY WERE ESCORTING

11 FROM THE RECREATION YARD WHEN THIS INCIDENT OCCURRED, THIS ACT

12 OF VIOLENCE.  BOTH INMATES WERE IN FULL RESTRAINTS.  BOTH

13 INMATES HAD BEEN ON THE REC YARD UNDER OBSERVATION.

14     **Q.**   SHOULD THIS CONTRABAND HAVE BEEN DISCOVERED THROUGH

15 A VISUAL BODY CAVITY SEARCH?

16     **A.**   YES, SIR, SHOULD HAVE BEEN.  BUT HE MAY HAVE PICKED

17 IT UP WHEN HE WAS ON THE YARD.  HE MAY NOT HAVE HAD IT WHEN HE

18 WENT OUT, BUT HE MIGHT HAVE PICKED IT UP WHEN HE WAS IN THE

19 REC YARD AND CONCEALED IT AT THAT TIME AND USED IT WHILE

20 RETURNING TO THE CELL BLOCK, PRIOR TO BEING SUBJECTED TO THE

21 VISUAL BODY CAVITY SEARCH WHEN HE RETURNED TO HIS UNIT.

22     **Q.**   ALL RIGHT.  LET ME SHOW YOU WHAT I HAVE MARKED AS

23 STATE EXHIBIT 7, WHICH IS A DISCIPLINARY REPORT -- I'M

24 SORRY -- AN UNUSUAL OCCURRENCE REPORT OF AN INCIDENT DATED

25 MAY 5, 2013.  I'M SORRY.  I MISSPOKE.  LET ME -- NO, MAY 5,

1    2013 IS STATE 7.

2             **MR. CURRY:**   MAY I APPROACH, YOUR HONOR?

3             **THE COURT:**   YES.

4    BY MR. CURRY:

5        Q.    WARDEN GOODWIN, WHAT DOES STATE EXHIBIT 7 DESCRIBE?

6        A.    THAT'S AN UNUSUAL OCCURRENCE REPORT ON CONTRABAND

7    FOUND ON AN OFFENDER IN N1.   HE HAD QUITE AN ASSORTMENT OF

8    ITEMS THAT HE BROUGHT OUT OF HIS CELL WITH HIM WHEN HE WENT TO

9    THE VISITATION ROOM.

10       Q.    ARE THESE ITEMS THAT SHOULD HAVE BEEN DISCOVERED IN

11   A VISUAL BODY CAVITY SEARCH?

12       A.    THEY SHOULD HAVE BEEN, YES, SIR.

13       Q.    WAS IT A CONCERN TO YOU THAT THEY WERE NOT?

14       A.    YEAH, THIS WAS REALLY THE KINDA LIKE THE STRAW THAT

15   BROKE THE CAMEL'S BACK, I GUESS, WHEN I WAS INFORMED OF THIS

16   INCIDENT, I HAD A DISCUSSION WITH SOME OF MY STAFF AND WANTED

17   TO KNOW WHAT WAS GOING ON, AND HOW COULD SOMETHING LIKE THIS

18   HAPPEN.   AND COLONEL NAIL ADVISED ME THAT DURING THE

19   INVESTIGATION OF THIS MATTER, HE FOUND OUT THAT THE STAFF,

20   THAT SOME OF THE STAFF ARE NOT PROPERLY PERFORMING THE

21   SEARCHES ON THE OFFENDERS PRIOR TO AND UPON RETURNING TO THE

22   CELL BLOCK.   AND WE KIND OF MADE SURE FROM THAT POINT FORWARD,

23   THAT ALL STAFF WERE FOLLOWING THE ESTABLISHED POLICIES AND

24   PROCEDURES, NOT JUST PART OF THEM.

25       Q.    NEXT, I HAVE ALSO SHOWN YOU -- I'VE LEFT WITH YOU

1  STATE EXHIBIT 8.   COULD YOU LOOK AT THAT, PLEASE?

2  **A.**   YES, SIR.   THAT'S AN UNUSUAL OCCURRENCE REPORT WHERE

3  AN OFFENDER OUT OF H5 WAS CAUGHT PASSING CONTRABAND TO AN

4  OFFENDER IN THE EXERCISE YARD.

5  **Q.**   SO JUST TO BE CLEAR, THIS WAS AN INMATE WHO WAS IN

6  THE MEDIUM -- MINIMUM-SECURITY DORM, H5, WAS CAUGHT PASSING

7  CONTRABAND TO AN INMATE IN ONE OF THESE EXERCISE YARDS?

8  **A.**   YES, SIR.

9  **Q.**   AND FINALLY, I HAVE GIVEN YOU STATE EXHIBIT 9, AND

10  PLEASE TELL ME WHAT THAT DEPICTS -- DESCRIBES.

11  **A.**   IT'S ALSO AN INCIDENT IN JULY OF THIS YEAR WHERE AN

12  OFFICER WAS PERFORMING A VISUAL BODY CAVITY SEARCH OF AN

13  OFFENDER PRIOR TO BRINGING HIM ON TO THE RECREATION YARD, AND

14  AS HE WAS PERFORMING THE SEARCH, INSIDE THE OFFENDER'S

15  JUMPSUIT, HE FOUND A HOMEMADE SHIM THAT WAS MADE FROM A

16  TOOTHBRUSH WITH INK PEN PARTS, AND ALSO AFTER TESTING THIS

17  ITEM, IT WAS DETERMINED IT WOULD ALSO OPEN RESTRAINTS AS WELL

18  OR PEERLESS AND SMITH & WESSON RESTRAINTS.

19  **Q.**   I HAVE PUT ON THE ELMO -- WHAT HAVE I PUT ON THE

20  ELMO?   THIS IS THE THIRD PAGE OF THAT DOCUMENT.

21  **A.**   YES, THAT'S A XEROX PICTURE OF THE PLASTIC HANDLE ON

22  ONE END WITH A LITTLE PIECE OF METAL MELTED DOWN INTO IT, AND

23  THE LITTLE PIECE OF METAL SHIM IS WHAT WOULD OPERATE THE HAND

24  RESTRAINTS.

25  **Q.**   AND DID I UNDERSTAND YOU TO SAY THIS WAS TESTED TO

1   SEE IF IT WOULD, IN FACT, OPEN A HANDCUFF KEY?

2        **A.**    YES.

3        **Q.**    AND IT DID?

4        **A.**    IT DID.

5        **Q.**    AND THIS WAS FOUND ONLY SEVERAL MONTHS AGO?

6        **A.**    THIS WAS IN JULY, YES, SIR.   JULY 25TH OF THIS YEAR.

7        **Q.**    AND THE INMATE WHO WAS FOUND WITH THIS SHIM WAS

8   LIVING WHERE?

9             **THE COURT:**   YOU ARE UPSIDE DOWN.

10       **A.**    HE WAS LIVING IN ONE OF THOSE CELL BLOCKS, N3, I

11  BELIEVE, I'M NOT SURE.

12  **BY MR. CURRY**:

13       **Q.**    NOW, IS N3 SIMILAR TO THE SETUP IN N1?

14       **A.**    IT'S SIMILAR TO N1, B, C AND D, IT'S DIFFERENT FROM

15  THE CCR TIER.   THE PHYSICAL PLAN IS THE SAME, BUT THE AREA

16  ITSELF IS MORE PUNITIVE THAN THE CCR TIER, OR IT'S PUNITIVE.

17  THERE'S NO -- THERE'S A LOT MORE PRIVILEGES, A LOT MORE

18  PROPERTY AND OTHER THINGS THEY CAN HAVE ON THE CCR TIER THAT

19  THEY CAN'T HAVE IN THAT AREA OF THE FACILITY.

20       **Q.**    SO WOULD AN INMATE LIVING IN N3 HAVE MORE OR LESS

21  ACCESS TO MATERIALS WITH WHICH TO CREATE A SHIM SUCH AS THE

22  ONE DEPICTED IN STATE 9?

23       **A.**    THEY SHOULD HAVE LESS.

24       **Q.**    ALL OF THESE DISCIPLINARY REPORTS THAT I HAVE SHOWED

25  YOU WERE ISSUED TO INMATES LIVING IN TIERS N1, N2, N3 OR N4?

1    **A.**    YES, WITH THE EXCEPTION OF THE ONE OFFENDER IN H5.

2    **Q.**    THE ONE THAT PASSED IT BACK?

3    **A.**    THAT WAS INTRODUCING CONTRABAND INTO THE EXERCISE

4    AREA.  THE REST OF THEM WERE IN THE CELL BLOCKS, YES, SIR.

5    **Q.**    AND JUST TO BE CLEAR, INMATE WOODFOX IS LIVING IN

6    ONE OF THOSE CELL BLOCKS?

7    **A.**    YES, SIR.

8    **MR. CURRY:**  I'D MOVE TO INTRODUCE STATE EXHIBITS 5

9    THROUGH 9.

10    **MR. ENGLAND:**  I HAVE A LOT OF OBJECTIONS, YOUR

11    HONOR, OR I CAN RAISE THEM AFTER CROSS-EXAMINATION.

12    **THE COURT:**  COME TO THE PODIUM AND MAKE YOUR

13    OBJECTIONS.

14    **MR. ENGLAND:**  FIRST, WITH RESPECT TO ALL OF THE

15    EXHIBITS, THEY ARE ALL INVOLVING OTHER INMATES, NOT MR.

16    WOODFOX, SO RELEVANCE.  THE SECOND IS THEY SEEM TO BE

17    OCCURRING IN A NUMBER OF FACTS OR SCENARIOS NOT PRESENT HERE,

18    LIKE A SHAKEDOWN AS OPPOSED TO A BODY CAVITY SEARCH.  THESE

19    ALSO APPEAR TO BE INMATES FROM DIFFERENT TIERS.  I DON'T THINK

20    THAT THEY ARE RELEVANT TO THE QUESTION BEFORE THIS COURT WHICH

21    IS WHAT MR. WOODFOX IS GOING THROUGH.

22    IF THE STATE WANTS TO STIPULATE THAT CONTRABAND EXISTS,

23    WE HAVE NO OBJECTION TO THAT, BUT IF THE STATE IS NOT PREPARED

24    TO BRING ANY OF THESE DOCUMENTS AS IT RELATES TO MR. WOODFOX

25    AT MINIMUM, THEN THE DOCUMENTS AREN'T RELEVANT.

1    **THE COURT:**  ALL RIGHT.  THE OBJECTION IS TO

2  RELEVANCE --

3    **MR. CURRY:**  YOUR HONOR, OBVIOUSLY --

4    **THE COURT:**  -- AS IT RELATES TO MR. WOODFOX IN THIS

5  CLAIM.

6    **MR. CURRY:**  OBVIOUSLY, JUDGE, THESE ARE ROUTINE

7  SEARCHES.  THEY ARE NOT PROBABLE CAUSE SEARCHES.  WE ARE

8  DEFENDING THEM AS ROUTINE SEARCHES.  THE VERY NATURE OF THESE

9  SEARCHES IS THAT WE CAN'T KNOW WHAT EACH INDIVIDUAL IS HIDING

10  OR CONCEALING.

11    THE REASON OTHER INMATES HAVEN'T BEEN FOUND WITH

12  CONTRABAND IS BECAUSE WE PERFORM THESE SEARCHES ON EVERYONE.

13  THESE VERY CLEARLY AND CONCLUSIVELY DEMONSTRATE, WE BELIEVE,

14  THAT THESE SEARCHES ARE NECESSARY TO INTERCEPT, IDENTIFY AND

15  INTERCEPT THIS VERY TYPE OF --

16    **THE COURT:**  I AM GOING TO CONDITIONALLY ADMIT THESE

17  REPORTS, AND I SAY CONDITIONALLY BECAUSE I'M GOING TO LOOK AT

18  THEM AND SEE HOW THEY TIE UP AND SEE WHAT THE FACTORS ARE.  I

19  HAVEN'T HAD AN OPPORTUNITY TO LOOK AT THEM.

20    **MR. CURRY:**  OKAY.

21    **THE COURT:**  SO UNDER THAT BASIS, THEN I'LL MAKE A

22  FINAL RULING BEFORE THE CONCLUSION OF THIS HEARING.

23  **BY MR. CURRY:**

24    **Q.**  AND WARDEN GOODWIN, IN LIGHT OF THAT, JUST TO BE

25  CLEAR, ALL OF THESE INMATES, ALL OF THE -- EXCEPT FOR THE

1   TOBACCO PASSING -- THE INMATES ON WHO THIS CONTRABAND WAS

2   DISCOVERED WERE RESIDING ON ONE OF THE N1 THROUGH N4 CELL

3   BLOCKS?

4       **A.**   THAT'S CORRECT.

5       **Q.**   AND THEY WERE -- THEY ARE SUBJECT TO THE SAME VISUAL

6   BODY CAVITY SEARCH AS INMATE WOODFOX ON CCR?

7       **A.**   YES, SIR.   ALL THE OFFENDERS IN N1, N2, N3 AND N4

8   ARE UNDER THE SAME GUIDELINES FOR SEARCHES.   THERE'S NO

9   DIFFERENCE BETWEEN INMATE A AND INMATE Z.   THEY ARE ALL

10  IDENTICAL.

11      **Q.**   UPON DISCOVERING THIS CONTRABAND AND OTHER

12  CONTRABAND -- STRIKE THAT.

13      WERE THERE OTHER DISCIPLINARY REPORTS HAPPENING IN

14  CONNECTION WITH THESE CELL BLOCKS DURING THIS TIME PERIOD?

15          **THE COURT:**   ALL RIGHT.   I THINK WE ARE GOING TO

16  PAUSE NOW FOR LUNCH, AND WE'LL COME BACK AND RESUME THE

17  QUESTIONING OF THE WARDEN.   WHAT TIME, MS. EDWARDS?   I HAVE A

18  10-MINUTE MATTER OR A 15-MINUTE MATTER AT 2:00.

19          **THE CLERK:**   YES, 1:30 TO 2:00.

20          **THE COURT:**   I'M GOING TO HAVE TO HAVE YOU COME BACK

21  AT ABOUT 2:15.   I HAVE OTHER MATTERS THAT ARE PENDING.

22          **MR. CURRY:**   I UNDERSTAND, YOUR HONOR.   WE HAVE A

23  WITNESS WHO IS GOING TO TRY CATCH A 4:00 FLIGHT, I BELIEVE,

24  BUT --

25          **THE COURT:**   WE CAN TAKE HIM OUT OF ORDER.

| | |
|---|---|
| 1 | **MR. CURRY:** OKAY. |
| 2 | **THE COURT:** WE CAN PUT HIM ON AT -- |
| 3 | **MR. CURRY:** WE'VE ONLY GOT ONE MORE WITNESS, YOUR |
| 4 | HONOR. |
| 5 | **THE COURT:** ALL RIGHT. WE CAN DO THAT. |
| 6 | **MR. CURRY:** THANK YOU. |
| 7 | **THE COURT:** ALL RIGHT. |
| 8 | **(WHEREUPON, THE COURT WAS IN RECESS.)** |
| 9 | **REPORTER'S NOTE:** (ALL PARTIES PRESENT IN COURT.) |
| 10 | **THE COURT:** BE SEATED, PLEASE. WARDEN, YOU CAN |
| 11 | RESUME THE STAND. |
| 12 | **MR. CURRY:** IF I MAY, JUDGE, COULD WE TAKE OUT OF |
| 13 | ORDER -- |
| 14 | **THE COURT:** OH, YES, YES. I AGREED TO DO THAT. |
| 15 | **MR. CURRY:** -- PAT KEOHANE? |
| 16 | **THE COURT:** THANKS FOR REMINDING ME. |
| 17 | (WHEREUPON, **PATRICK W. KEOHANE,** HAVING BEEN DULY |
| 18 | SWORN, TESTIFIED AS FOLLOWS.) |
| 19 | **THE COURT:** GOOD AFTERNOON. |
| 20 | **THE WITNESS:** GOOD AFTERNOON, JUDGE. |
| 21 | **MR. CURRY:** YOUR HONOR, WE'D LIKE TO QUALIFY MR. |
| 22 | KEOHANE AS AN EXPERT IN CORRECTIONAL PRACTICE AND SECURITY |
| 23 | ISSUES. |
| 24 | **THE COURT:** ALL RIGHT. GIVE ME YOUR NAME AGAIN FOR |
| 25 | THE RECORD, SIR. |

1    THE WITNESS:  PATRICK W. KEOHANE, K-E-O-H-A-N-E.

2  EXAMINATION OF QUALIFICATIONS

3  BY MR. CURRY:

4    Q.    I HAVE ATTACHED -- I HAVE MARKED AS STATE EXHIBIT 10

5  A RESUMÉ DATED SEPTEMBER 17TH, 2013.  DID YOU PREPARE THIS

6  RESUMÉ?

7    A.    YES.

8    Q.    AND IS IT CURRENT AND ACCURATE?

9    A.    YES, SIR.

10    THE COURT:  ANY OBJECTION TO HIS BEING QUALIFIED AS

11  AN EXPERT IN CRIMINAL JUSTICE?

12    MR. ENGLAND:  NO, YOUR HONOR.

13    THE COURT:  ALL RIGHT.  WE'LL GO AHEAD AND ACCEPT

14  HIM.

15    MR. CURRY:  IN THAT EVENT, YOUR HONOR --

16    THE COURT:  YOU CAN ATTACH HIS CV, OR ADMIT HIS CV.

17    MR. CURRY:  IN THAT EVENT, I'LL JUMP RIGHT INTO IT.

18  EXAMINATION

19  BY MR. CURRY:

20    Q.    MR. KEOHANE, HAVE YOU VISITED WADE CORRECTIONAL

21  CENTER?

22    A.    YES, SIR.

23    Q.    EARLIER THIS YEAR?

24    A.    ABOUT FIVE MONTHS AGO.

25    Q.    AND DID YOU TOUR THE N1 CCR TIER?

1   **A.**   YES, I DID.

2   **Q.**   DID YOU VIEW THE EXERCISE YARDS THAT HAVE BEEN

3   DISCUSSED TODAY?

4   **A.**   YES, SIR.

5   **Q.**   WHAT HAVE YOU DONE IN PREPARATION FOR YOUR TESTIMONY

6   HERE TODAY?

7   **A.**   WELL, I CAME DOWN HERE FROM SOUTHERN MISSOURI, AND

8   I'VE READ ALL THE MATERIALS THAT WERE PROVIDED TO ME ON THE

9   CASE THAT -- AND SO THAT WAS MY PREPARATION, AND THEN THE

10  ON-SITE VISIT TO THE FACILITY.

11  **Q.**   DID YOU REVIEW DEPARTMENTAL REGULATION C-02-003?

12  **MR. CURRY:**   EXCUSE ME.   MAY I SEE EXHIBIT NO. 2 --

13  STATE EXHIBIT 4?  MAY I, YOUR HONOR?

14  **THE COURT:**   YES.

15  **A.**   YES, SIR, I HAVE READ IT AND UNDERSTAND IT.

16  **BY MR. CURRY**:

17  **Q.**   MOST OF YOUR CAREER HAS BEEN IN -- YOUR ACTIVE

18  CAREER WAS IN THE FEDERAL SYSTEM; IS THAT RIGHT?

19  **A.**   YES, SIR.

20  **Q.**   IS THE -- THE REGULATION THAT YOU JUST REVIEWED;

21  WHAT DOES THAT ADDRESS, VERY GENERALLY?

22  **A.**   IT TALKS ABOUT SEARCHING THE OFFENDERS, CONTRABAND

23  PROCEDURES, ET CETERA.  THEY'RE VERY SIMILAR TO THE FEDERAL

24  BUREAU OF PRISONS OF WHICH I WAS A PART OF FOR OVER 32 YEARS.

25  **Q.**   WERE YOU IN COURT TODAY WHEN WARDEN GOODWIN

1  TESTIFIED ABOUT A NUMBER OF DISCIPLINARY REPORTS THAT WERE

2  SUBMITTED OVER THE LAST YEAR OR SO AT WADE?

3      **A.**   YES, SIR.

4      **Q.**   AND HAVE YOU INDEPENDENTLY HAD AN OPPORTUNITY TO

5  REVIEW THOSE REPORTS?

6      **A.**   YES, I DID.

7      **Q.**   WHAT IS YOUR OPINION OF THE IMPACT OF THOSE REPORTS?

8      **A.**   THIS DEMONSTRATES THE NEED TO CONTINUE THE SEARCHES

9  OF OFFENDERS FOR CONTRABAND, THE INTRODUCTION OF CONTRABAND

10  INTO FACILITIES, AND WHAT HAVE YOU, AND THE SAFETY OF THOSE

11  WHO -- INMATES THAT LIVE THERE AND ALSO THE STAFF WHO WORK IN

12  THOSE FACILITIES.

13      **Q.**   IS IT YOUR -- IS IT YOUR BELIEF, BASED ON YOUR MANY

14  YEARS OF -- AS WARDEN, ASSISTANT WARDEN, AND AS AN ACA

15  AUDITOR, THAT CONTRABAND IS A SIGNIFICANT THREAT TO

16  INSTITUTIONAL SECURITY?

17      **A.**   YES, IT IS, VERY MUCH SO.

18      **Q.**   COULD YOU EXPLAIN WHY IT'S SUCH A CONCERN?

19      **A.**   BECAUSE INSIDE THE FACILITIES ARE SO DYNAMIC ABOUT

20  THE INTRODUCTIONS OF ISSUES, LIKE, FOR EXAMPLE, WEAPONS,

21  NARCOTICS, VARIOUS TYPES OF CONTRABAND THAT CELL PHONES ARE A

22  HUGE ISSUE NOW ALL OVER THE UNITED STATES, BEING INTRODUCED

23  INTO THE PRISONS.

24      AND SO SEARCHES OF AREAS AND PERSONS IS A VERY ESSENTIAL

25  PART OF JUST 101 CORRECTIONS AND MAKING SURE WE'RE PROVIDING A

1   SAFE ENVIRONMENT FOR THE PEOPLE THAT HAVE TO LIVE THERE AND

2   THOSE WHO HAVE TO WORK THERE.

3       **Q.**   WHAT ARE SOME COMMON MEANS INMATES MIGHT USE TO

4   CONCEAL AND TRANSPORT CONTRABAND?

5       **A.**   WELL, THERE'S A NUMBER OF WAYS.  WHEN IT COMES TO

6   NARCOTICS, A LOT OF THEM INGEST IN BALLOONS AND SWALLOW THEM,

7   AND THEN WHEN THEY DEFECATE, THEY FISH THEM OUT, AND THEN THEY

8   ARE VERY VALUABLE TO THE -- AND ABLE TO SELL AT A HIGH NUMBER

9   WITHIN THE PRISON OR WHAT HAVE YOU.  MONEY IS ALSO SOMETHING

10  THAT'S CONCEALED ON PEOPLE, ESPECIALLY THROUGH CONTACT

11  VISITATION, WHICH IS A MAJOR AVENUE OF PEOPLE BRINGING IT IN.

12  YOU ALSO HAVE SOME ON OCCASION, UNFORTUNATELY, THERE ARE STAFF

13  MEMBERS WHO VIOLATE THE LAW AND BRING THINGS IN FOR A MONETARY

14  REWARD OF SOME KIND.  SO ALL THOSE ARE POTENTIAL WAYS TO GET

15  IT IN.

16      **Q.**   WHAT ABOUT ONCE IN THE PRISON; DO -- WHAT ARE COMMON

17  WAYS FOR INMATES TO TRANSPORT IT BETWEEN THEMSELVES AROUND THE

18  PRISON?

19      **A.**   WELL, THEY DO IT IN A NUMBER OF WAYS, THEY HIDE IT

20  IN THEIR CLOTHING; OBVIOUSLY, OR SHOES, OR AVENUES LIKE THAT.

21      BUT IN YOUR HIGHER MAXIMUM-SECURITY INSTITUTIONS, PUTTING

22  THINGS IN THEIR RECTUM IS A VERY COMMON THING.  MONEY,

23  HANDCUFFS KEYS, WEAPONS, BELIEVE IT OR NOT, AND MANY -- OVER

24  THE YEARS THAT I'VE BEEN AROUND, ON MANY, MANY OCCASIONS WE

25  HAVE FOUND CONTRABAND IN THE RECTAL CAVITY, AND SO THAT IS

1   A -- AND I THINK A LOT OF IT DEPENDS ON THE SOPHISTICATION OF

2   THE INMATE, THE LONG-TERM, ONE WHO HAS BEEN THERE A LONG TIME,

3   WHO KNOWS A LOT OF WAYS TO INTRODUCE IS PROBABLY YOUR BIGGER

4   VIOLATOR.

5       Q.   ARE VISUAL BODY CAVITY SEARCHES AN EFFECTIVE WAY OF

6   DISCOVERING CONTRABAND CONCEALED ON OR ABOUT THE BODY?

7       A.   ONE OF THE -- YES, IT IS.

8       Q.   ARE OLDER INMATES MORE OR LESS LIKELY TO CONCEAL AND

9   SMUGGLE CONTRABAND WITHIN A FACILITY?

10      A.   I DON'T THINK AGE REALLY PLAYS ANY DIFFERENCE IN IT.

11  SOMETIMES THE OLDER INMATES ARE ACTUALLY PREYED UPON BY

12  YOUNGER PEOPLE WHO WANT A MULE, A MULE BEING SOMEONE WHO WILL

13  CARRY THE CONTRABAND, AND SO THEY DON'T GET ACCUSED OF, YOU

14  KNOW, DOING IT.  SO SOMETIMES THEY VICTIMIZE THE OLDER

15  POPULATION BECAUSE THEY ARE NOT PHYSICALLY ABLE TO DEFEND

16  THEMSELVES AS WELL.  I'M TALKING ABOUT THE IN MAXIMUM

17  SECURITY-TYPE INMATES.

18      Q.   YOU'VE VIEWED THE CCR TIER N1 AT WADE, CORRECT?

19      A.   YES.

20      Q.   BASED ON YOUR EXPERIENCE, DO YOU SEE WAYS THAT

21  INMATES COULD EXCHANGE OR TRANSFER CONTRABAND AMONG THE CELLS

22  ON THAT TIER?

23      A.   THE CELLS ARE BARS ON THE FRONT, THE DESIGN.  THEY

24  CAN PASS THINGS THROUGH THE BARS OR UNDER THE DOORS OR THERE'S

25  A -- THEY'RE SLIDER GRILLS, SO THERE IS A SMALL AREA LARGE

1    ENOUGH FOR THEM TO MOVE CONTRABAND UP AND DOWN THE RANGE.

2         WHILE I WAS THERE I DID INTERVIEW FIVE INMATES THAT LIVED

3    IN THERE, AND I RANDOMLY PICKED THEM OUT.  I DIDN'T LET THE

4    STAFF TELL ME WHO TO TALK TO.  I SAID, I WANT TO TALK TO THIS

5    GUY, THIS GUY, AND THIS GUY.  ALL FIVE OF THEM AGREED TO COME

6    OUT AND TALK TO ME AT DIFFERENT TIMES, ONE-ON-ONE, AND I

7    TALKED TO THEM ABOUT THEIR CONDITIONS OF CONFINEMENT, YOU

8    KNOW, NONE OF WHICH HAD ANYTHING BAD TO SAY ABOUT THE STAFF,

9    ABOUT THE TREATMENT OR WHATEVER.  THEY NEVER RAISED THE ISSUES

10   OF SEARCHES OR ANY OF THAT.  WHAT THEY DID, TWO OF THEM WANTED

11   TO GET OUT AT SOME POINT, THREE OF THEM UNDERSTOOD WHY THEY

12   WERE THERE, AND THEY WEREN'T INTERESTED IN COMING OUT.  SO I

13   HAD SOME INPUT.  I FELT CONFIDENT THAT I WAS GETTING A GOOD

14   LOOK AT WHAT THE CONDITIONS WERE DOWN THERE.

15        Q.    IS THE PRACTICE OF VISUAL BODY CAVITY SEARCHES IN

16   USE AT WADE CONSISTENT WITH PRACTICING WELL-OPERATED

17   INSTITUTIONS ACROSS THE COUNTRY?

18        A.    YES.

19        Q.    AND IS THE REGULATION THAT WE'VE INTRODUCED AS STATE

20   4, IS THAT CONSISTENT WITH THE REGULATIONS IN PLACE IN

21   WELL-OPERATED INSTITUTIONS ACROSS THE COUNTRY?

22        A.    MY EXPERIENCE IN THE 32 YEARS IN THE FEDERAL BUREAU

23   OF PRISONS WAS THEIR POLICIES ARE VERY, VERY SIMILAR TO OURS

24   USED IN THE FEDERAL SYSTEM.  AND AFTER I'VE AUDITED PROBABLY

25   30 DIFFERENT STATES, SINCE I'VE AUDITED 70 INSTITUTIONS FROM

1    ONE END OF THE COUNTRY TO THE OTHER, IT'S VERY -- THEIR

2    POLICIES ARE VERY SIMILAR IN TERMS OF THE PROCEDURES ON

3    SEARCHES OF INMATES.

4         Q.    IN YOUR OPINION, ARE THE VISUAL BODY CAVITY SEARCHES

5    CONDUCTED ON INMATES UPON ENTERING AND LEAVING THE MAXIMUM-

6    SECURITY AREAS IN WADE REASONABLE AND APPROPRIATE?

7         A.    VERY MUCH SO, YES.

8         Q.    IS IT YOUR OPINION THAT THESE SEARCHES ARE

9    CONSISTENT WITH GOOD CORRECTIONAL PRACTICE?

10        A.    YES.

11        Q.    AND IS IT YOUR OPINION THAT THERE IS A LEGITIMATE

12   PENOLOGICAL INTEREST IN CONDUCTING SEARCHES UNDER THE

13   CIRCUMSTANCES?

14        A.    ABSOLUTELY.

15        Q.    THAT'S ALL THE QUESTIONS I HAVE.

16             THE COURT:   ANY CROSS?

17             MR. ENGLAND:   ONE MOMENT, YOUR HONOR.

18   EXAMINATION

19   BY MR. ENGLAND:

20        Q.    GOOD AFTERNOON, MR. KEOHANE.

21        A.    GOOD AFTERNOON.

22        Q.    YOU TALKED ABOUT YOUR VISIT TO WADE.   DO YOU

23   REMEMBER THAT?

24        A.    YES, SIR.

25        Q.    AND WHEN YOU VISITED WADE, DID YOU VISIT MR.

1  WOODFOX?

2      **A.**   NO, I DIDN'T VISIT WITH MR. WOODFOX.

3      **Q.**   HAVE YOU EVER VISITED WITH MR. WOODFOX?

4      **A.**   NO.

5      **Q.**   OKAY.

6      **A.**   I'VE SEEN HIM PRIOR AT THE COURT HERE, BUT THAT WAS

7  THE FIRST TIME.

8      **Q.**   SO HAVE YOU EVER HAD ANY OCCASION TO REVIEW THE

9  SPECIFIC FACTS AND CIRCUMSTANCES OF MR. WOODFOX'S STRIP

10  SEARCHES?

11      **A.**   JUST WHAT YOU WERE ARTICULATING EARLIER IN THIS

12  HEARING.

13      **Q.**   OKAY.  SO PRIOR TO TODAY, YOU'VE KNOWN NOTHING ABOUT

14  WHAT'S GOING ON WITH MR. WOODFOX AND THE STRIP SEARCHES; IS

15  THAT RIGHT?

16      **A.**   NO.

17      **Q.**   THAT'S NOT RIGHT?

18      **A.**   NO, IT ISN'T.

19      **Q.**   OKAY.  SO PLEASE EXPLAIN.  WHAT DO YOU KNOW PRIOR TO

20  TODAY WHAT'S BEEN GOING ON WITH MR. WOODFOX'S STRIP SEARCHES?

21      **A.**   WELL, I'VE READ THE POLICIES ON WHAT THE PROCEDURES

22  ARE AND I'VE HEARD HIM -- I ALSO HEARD HIM TESTIFY, SO THAT'S

23  PRETTY MUCH IT.

24      **Q.**   OKAY.  SO LET ME ASK IT AGAIN:  PRIOR TO TODAY,

25  HEARING MR. WOODFOX TESTIFY, YOU HAVE NO PERSONAL KNOWLEDGE AS

1   TO THE STRIP SEARCHES OF MR. WOODFOX?  YES OR NO?

2        **A.**   NO.

3        **Q.**   NO, YOU DO NOT HAVE PERSONAL KNOWLEDGE?

4        **A.**   NO, OTHER THAN WHAT I ALREADY ARTICULATED.

5        **Q.**   OKAY.  AND YOU TESTIFIED THAT THERE NEEDS TO BE

6   SEARCHES IN A FACILITY TO DETECT CONTRABAND, RIGHT?

7        **A.**   RIGHT.

8        **Q.**   AND STRIP SEARCHING IS ABOUT DETECTING CONTRABAND,

9   RIGHT?

10       **A.**   MOST OF THE TIME, YES.

11       **Q.**   IS THERE ANY OTHER REASON WHY YOU WOULD STRIP SEARCH

12  SOMEONE?

13       **A.**   EVIDENTIARY, JUST HAD AN ASSAULT, SOMEONE GOT HURT,

14  YOU ARE GOING TO SEARCH FOR EVIDENCE IN THE ASSAULT OR

15  WHATEVER.  SO...

16       **Q.**   ANYTHING OTHER THAN ASSAULTS, MR. KEOHANE?

17       **A.**   I BEG YOUR PARDON?

18       **Q.**   ANY OTHER REASON THAN ASSAULTS?

19       **A.**   IN THIS DAY AND TIME, IT'S TOO COMPLEX TO BE ABLE TO

20  GIVE YOU A SIMPLE ANSWER BECAUSE YOU HAVE GANG ACTIVITY, YOU

21  HAVE PEOPLE BEING UNDER PRESSURES AND WHAT HAVE YOU.  SO --

22       **Q.**   ALL RIGHT.

23       **A.**   -- THERE'S A LOT OF REASONING FOR SEARCHES.

24       **Q.**   OKAY.  WELL, LET'S JUST TALK ABOUT THE ONES YOU'VE

25  IDENTIFIED, ASSAULTS.  MR. WOODFOX, HAS HE BEEN INVOLVED IN

1   ANY ASSAULTS SINCE HE HAS BEEN AT WADE?

2   **A.**   NO, I DON'T THINK SO.

3   **Q.**   SO ASSAULTS WOULD NOT APPLY TO MR. WOODFOX, RIGHT?

4   **A.**   NO, BUT SEARCHES APPLY TO EVERYBODY.

5   **Q.**   OKAY.  BUT JUST ANSWER MY QUESTION.

6   **A.**   OKAY.

7   **Q.**   ASSAULTS DON'T APPLY TO MR. WOODFOX, RIGHT?

8   **A.**   APPARENTLY NOT.

9   **Q.**   OKAY.  AND GANG ACTIVITY, MR. WOODFOX, IS HE IN ANY

10   GANG?

11   **A.**   IS HE A GANG?

12   **Q.**   IS HE IN A GANG?

13   **A.**   I DON'T KNOW.

14   **Q.**   OKAY.

15   **A.**   YOU'LL HAVE TO ASK HIM.

16   **Q.**   SO GANG, THAT WOULDN'T APPLY TO MR. WOODFOX EITHER,

17   RIGHT?

18   **A.**   NOT NECESSARILY.

19   **Q.**   WELL, IT'S YES OR NO, MR. KEOHANE.  IN YOUR EXPERT

20   OPINION, DOES THE GANG ANALYSIS APPLY TO MR. WOODFOX?

21   **A.**   WELL, FIRST OF ALL, YOU ARE ASKING ME IS HE A GANG

22   MEMBER, AND I DON'T KNOW WHETHER HE IS OR ISN'T.  SO I CAN'T

23   REALLY HONESTLY ANSWER THAT.

24   **Q.**   ALL RIGHT.  SO YOU DON'T KNOW IF THE GANG ANALYSIS

25   APPLIES TO MR. WOODFOX; IS THAT YOUR TESTIMONY?

1    **A.**   YEAH, THAT WOULD BE.

2    **Q.**   ALL RIGHT.  AND YOU'VE SAID THAT IT'S COMPLEX, AND

3    THERE'S A LOT OF FACTORS THAT GO INTO WHY YOU MIGHT STRIP

4    SEARCH SOMEBODY, RIGHT?  BUT YOU CAN'T TESTIFY TO ANY OF THOSE

5    REASONS HERE TODAY IN COURT, OTHER THAN FOR THE DETECTION OF

6    CONTRABAND; ISN'T THAT RIGHT?

7    **A.**   THAT'S WHAT IT'S ABOUT, CONTRABAND.

8    **Q.**   IS THAT A YES TO MY QUESTION, MR. KEOHANE?

9    **A.**   I'M NOT SURE I ANSWERED -- GIVE ME THE QUESTION

10   AGAIN.

11   **Q.**   SURE.  ARE YOU ABLE TO TESTIFY HERE TODAY ABOUT ANY

12   REASON WHY MR. WOODFOX SHOULD BE STRIP SEARCHED OTHER THAN THE

13   DETECTION OF CONTRABAND?

14   **A.**   YES.

15   **Q.**   WHAT IS THAT?

16   **A.**   CONSISTENCY.  CONSISTENCY TO TREAT ALL INMATES

17   FAIRLY AND MAKE SURE THAT YOU DON'T SEPARATE OR DO ONE THING

18   MORE WITH ONE OR THE OTHER.  YOU HAVE TO HAVE CONSISTENCY IN

19   DEALING WITH THEM.

20   **Q.**   ALL RIGHT.  SO, IN YOUR OPINION, IT IS FAIR TO STRIP

21   SEARCH MR. WOODFOX BECAUSE THAT'S WHAT YOU SHOULD DO TO ALL

22   INMATES; IS THAT RIGHT?

23   **A.**   MAXIMUM-SECURITY INMATES LIVING IN A SECURE AREA,

24   YES.

25   **Q.**   ALL RIGHT.  IS THERE ANYTHING OTHER THAN CONSISTENCY

1  THAT YOU'RE HERE TO TESTIFY ABOUT TODAY?

2  **A.**   CONSISTENCY IS EXTREMELY IMPORTANT WHEN YOU'RE

3  MANAGING A PRISON.  YOU CAN'T --

4  **Q.**   MY QUESTION WAS:  IS THERE ANYTHING OTHER THAN

5  CONSISTENCY THAT YOU'RE HERE TO TESTIFY TODAY ABOUT?

6  **A.**   I JUST WANTED TO ADD THAT CONSISTENCY IS EXTREMELY

7  IMPORTANT.

8  **Q.**   ALL RIGHT.  SO TO ANSWER MY QUESTION, IS THERE

9  ANYTHING OTHER THAN CONSISTENCY THAT YOU ARE HERE TO TESTIFY

10  TODAY ABOUT WHY IT'S IMPORTANT TO STRIP SEARCH MR. WOODFOX?

11  **A.**   BECAUSE IT'S IMPORTANT TO SEARCH ALL INMATES IN A

12  MAXIMUM-SECURITY AREA THAT ARE BEING MOVED.

13  **Q.**   IS THAT ANOTHER WAY OF SAYING CONSISTENCY?

14  **A.**   YES.

15  **Q.**   OKAY.  SO OTHER THAN CONSISTENCY, IS THERE ANYTHING

16  ELSE THAT YOU'D LIKE TO TALK ABOUT AS A TOPIC, AS A

17  JUSTIFICATION FOR STRIP SEARCHING MR. WOODFOX?

18  **A.**   THIRTY-TWO YEARS OF SEARCHES AND FOLLOWING THE

19  PROCEDURES AND BEING FAIR ARE A VITAL NECESSITY.

20  **Q.**   IS THAT ANOTHER WAY OF SAYING CONSISTENCY, MR.

21  KEOHANE?

22  **A.**   YEAH, YOU COULD SAY THAT.

23  **Q.**   ALL RIGHT.  SO IS THERE ANYTHING ELSE OTHER THAN

24  CONSISTENCY THAT YOU ARE HERE TO TESTIFY ABOUT WITH REGARDS TO

25  THE JUSTIFICATIONS FOR STRIP SEARCHING MR. WOODFOX?

1    **A.**    IT'S IMPORTANT FOR ALL INMATES TO HAVE THE SAME

2    TREATMENT.

3    **Q.**    IS THAT ANOTHER WAY OF SAYING CONSISTENCY, MR.

4    KEOHANE?

5    **A.**    YEAH.   AROUND THAT, YES.

6    **Q.**    ALL RIGHT.

7    **THE COURT:**   IS THERE ANY OTHER -- HE'S ASKED THE

8    QUESTION, MR. KEOHANE, IS THERE ANY OTHER THING OTHER THAN THE

9    VARIOUS WAYS YOU APPROACHED CONSISTENCY THAT APPLY TO MR.

10   WOODFOX IN THIS CASE?

11   **THE WITNESS:**   JUST THE FACT THAT, YOUR HONOR, DURING

12   MY TENURE WITH THE FEDERAL BUREAU OF PRISONS, I SAW THREE,

13   FOUR OFFICERS THAT WERE KILLED, AND A LOT OF IT WAS BECAUSE OF

14   THE LACK OF SEARCHES THAT WERE GOING ON, THE -- FOLLOWING THE

15   PROCEDURES AND WHAT HAVE YOU.

16   SO IT'S A REAL PERSONAL THING TO ME TO MAKE SURE AND

17   VALUE THE EFFORTS OF STAFF TO PROTECT NOT ONLY FROM EACH

18   OTHER -- I'M TALKING ABOUT THE INMATES NOW -- BUT ALSO TO

19   PROTECT THE STAFF AND THE OTHER INMATES IN THE FACILITY, TOO.

20   SO IT'S SO CRUCIALLY IMPORTANT TO DO THESE SEARCHES AND SO,

21   YES, I'VE BEEN PERSONALLY AFFECTED BY IT BECAUSE I HAD TO GO

22   IN TO MARION ON THE SAME DAY TWO OFFICERS WERE KILLED, AND IF

23   THEY WOULD HAVE FOLLOWED THIS SEARCH PROCEDURE, THAT WOULDN'T

24   HAVE HAPPENED, BUT IT DID, SO I'M VERY PASSIONATE, AS YOU CAN

25   TELL, ABOUT SEARCHES AND MAKING SURE THAT YOU HAVE A SAFE

1   ENVIRONMENT FOR THE INMATES THAT LIVE THERE AND THE STAFF WHO

2   HAVE TO WORK THERE.

3         **MR. ENGLAND:**  I'M NOT SURE IF THAT WAS RESPONSIVE,

4   YOUR HONOR, BUT MAYBE I'LL MOVE ON.

5         **THE COURT:**  I THINK THAT'S THE BEST YOU ARE GOING TO

6   GET.

7         **MR. ENGLAND:**  ALL RIGHT.  I'LL OBJECT TO THE ANSWER

8   AS NONRESPONSIVE, BUT WE'LL MOVE ON.

9   **BY MR. ENGLAND:**

10        **Q.**   YOU AGREE THAT THE CONTRABAND IS A SECURITY THREAT.

11  YOU TESTIFIED TO THAT EARLIER, RIGHT?  HAVE YOU ANALYZED THE

12  CONTRABAND PRACTICES AT WADE INSTITUTION?  I'M SORRY.  LET ME

13  REPHRASE THAT.

14       HAVE YOU ANALYZED THE OCCURRENCE OR THE DETECTION OF

15  CONTRABAND AT WADE?

16        **A.**   I'VE READ THE POLICY AND THE PROCEDURE, AND IT'S IN

17  LINE WITH THE FEDERAL BUREAU OF PRISONS, SO I ACCEPTED THAT

18  PART, YES.

19        **Q.**   OKAY.  BUT HAVE YOU ANALYZED THE NUMBER OF

20  OCCURRENCES OF THE DETECTION OF CONTRABAND AT WADE?  THAT'S MY

21  QUESTION.

22        **A.**   I THOUGHT THEY WERE MINISCULE AS COMPARED TO SOME OF

23  THE PLACES THAT I RAN.

24        **Q.**   ALL RIGHT.  SO IT IS YOUR TESTIMONY THAT CONTRABAND

25  IS A MINISCULE ISSUE AT WADE; IS THAT RIGHT?

1           **A.**    BASED ON -- JUST BASED ON WHAT THEY FOUND SO FAR.

2           **Q.**    UH-HUH.

3           **A.**    BECAUSE I'VE FOUND MUCH WORSE IN MY DAY.

4           **Q.**    ALL RIGHT.   BUT AT WADE IT'S MINISCULE, RIGHT?

5           **A.**    AS WHAT WAS PRESENTED, AND I DON'T KNOW ALL OF THE

6    ISSUES ON THEIR CONTRABAND, BUT I SAT IN HERE AND LISTENED TO

7    SOME OF THE CONTRABAND THEY HAD HAD AND THAT THEY HAD

8    DISCOVERED THERE.

9           **Q.**    WELL, I WANT TO BE CLEAR, MR. KEOHANE.   YOU HAVE

10   BEEN OFFERED AS AN EXPERT FOR THE DEFENDANT ON CONTRABAND,

11   RIGHT?

12          **A.**    I GUESS, YES.

13          **Q.**    AND ISN'T IT YOUR JOB TO FIGURE OUT ALL OF THE

14   CONTRABAND THAT'S KNOWN OR KNOWABLE IN THAT FACILITY?

15          **A.**    THERE IS NO ONE IN THIS ROOM THAT CAN EVER DEFINE

16   EXACTLY WHAT THE CONTRABAND IS OR WHAT IS IT, OR IT WOULDN'T

17   HAVE BEEN CONTRABAND SEARCHES TO EVEN BEGIN WITH, SO I CAN'T

18   ANSWER THAT.

19          **Q.**    WELL, LET'S TRY IT THIS WAY.   IN THE CALENDAR YEAR

20   2013, HOW MANY INSTANCES OF CONTRABAND DID YOU FIND OCCURRING

21   AT WADE FACILITY?

22          **A.**    I DIDN'T SPECIFICALLY LOOK FOR ANY PARTICULAR

23   SEARCHES ON CONTRABAND OR WHAT IT WAS --

24          **Q.**    OKAY.

25          **A.**    -- OTHER THAN WHAT WAS PRESENTED IN THE COURTROOM

1   EARLIER.

2       **Q.**   OKAY.  SO OTHER THAN WHAT'S BEEN PRESENTED AS

3   STATE'S 5 THROUGH 9, YOU HAVE NO EVIDENCE TO TALK ABOUT ANY

4   DETECTION OF CONTRABAND IN WADE FACILITY; IS THAT RIGHT?

5       **A.**   I HAVE PLENTY TO TALK ABOUT ON CONTRABAND IN

6   SEARCHES, YES.

7       **Q.**   ANSWER THIS QUESTION.

8       **A.**   OKAY.

9       **Q.**   DO YOU HAVE EVIDENCE OR TESTIMONY TO PROVIDE TODAY

10  ABOUT THE DETECTION OF CONTRABAND AT WADE FACILITY, OTHER THAN

11  WHAT'S BEEN PRESENTED IN DEFENDANT'S EXHIBITS 5 THROUGH 9?

12      **A.**   NO, I HAVE NOT -- YOU KNOW, I DON'T HAVE A LIST OF

13  ALL THE CONTRABAND THAT'S BEEN FOUND AT WADE.

14      **Q.**   ALL RIGHT.  SO THAT'S A NO, RIGHT?

15      **A.**   THAT IS A NO, YES.

16      **Q.**   OKAY.  NOW, YOU TALKED ABOUT CONTRABAND:  WEAPONS,

17  NARCOTICS, CELL PHONES, RIGHT; IS THAT RIGHT?

18      **A.**   YES.

19      **Q.**   AND EARLIER MR. CURRY WAS ASKING QUESTIONS OF MR.

20  WOODFOX, I BELIEVE, ABOUT MICROWAVE FOOD PRODUCTS AND ICE; DO

21  YOU REMEMBER THOSE QUESTIONS AND ANSWERS?

22      **A.**   I THINK SO, YES.

23      **Q.**   IS ICE CONTRABAND?

24      **A.**   IT DEPENDS ON HOW YOU'RE USING IT.

25      **Q.**   ALL RIGHT.  LET ME GIVE YOU A HYPOTHETICAL.  IF MR.

1  WOODFOX WERE TO CONCEAL ICE IN HIS RECTUM TO PASS TO ANOTHER

2  INMATE, WOULD THAT BE CONTRABAND OF A SERIOUS PENOLOGICAL

3  INTEREST?

4      **A.**   WELL --

5      **Q.**   YES OR NO, MR. KEOHANE?

6      **A.**   I CAN'T ANSWER IT BECAUSE IT DOESN'T MAKE ANY SENSE.

7      **Q.**   OKAY.

8      **A.**   ICE IN HIS RECTUM.

9      **Q.**   THAT'S FINE.   ALL RIGHT.   NOW, WEAPONS, HOW MANY

10  WEAPONS HAVE BEEN FOUND AT WADE FACILITY IN THE CALENDAR YEAR

11  2013?

12      **A.**   I HAVE NO IDEA.

13      **Q.**   OKAY.   NARCOTICS?

14      **A.**   I DON'T HAVE A LIST OR -- YOU KNOW.

15      **Q.**   DO YOU HAVE AN ESTIMATE?

16      **A.**   NO, NOT REALLY.

17      **Q.**   DID YOU LOOK --

18      **A.**   FOR NARCOTICS?

19      **Q.**   -- FOR NARCOTICS OCCURRING WITHIN THE DAVID WADE

20  FACILITY?

21      **A.**   NO, I DON'T THINK SO.

22      **Q.**   WHAT ABOUT CELL PHONES?

23      **A.**   I'VE HEARD THAT THERE HAVE BEEN SOME CELL PHONES

24  FOUND IN THE FACILITY.

25      **Q.**   IN 2013, HOW MANY?

1    **A.**    I DIDN'T ASK FOR THE NUMBER.    I JUST HEARD THAT.

2    **Q.**    SOMEBODY JUST TOLD IT TO YOU?

3    **A.**    YEAH.

4    **Q.**    AND WHO WAS THAT?

5    **A.**    THE WARDEN.

6    **Q.**    THE WARDEN TOLD YOU THAT THERE WERE CELL PHONES?

7    **A.**    NO, NOT CELL PHONES.    HE TOLD ME THEY FOUND A CELL

8    PHONE.

9    **Q.**    ALL RIGHT.    SO THE WARDEN TOLD YOU THAT A CELL PHONE

10    WAS FOUND AT DAVID WADE; IS THAT RIGHT?

11    **A.**    THAT'S WHAT HE SAID, YES.

12    **Q.**    ALL RIGHT.    SO YOU CAN'T REALLY TESTIFY ABOUT THE

13    SPECIFICS OF CONTRABAND AT WADE FACILITY TODAY, CAN YOU?

14    **A.**    I CAN -- I CAN TESTIFY ABOUT THE SEARCHES AND THE

15    NEED FOR THE SEARCH.

16    **Q.**    ALL RIGHT.    BUT CAN YOU TESTIFY ABOUT THE SPECIFICS

17    OF THE CONTRABAND OCCURRENCE AT WADE FACILITY?

18    **A.**    I CAN'T PROVIDE YOU WITH A LIST, NO, I CANNOT.

19    **Q.**    ALL RIGHT.    SO I WANT TO MAKE SURE THAT I UNDERSTAND

20    YOUR ANSWER CORRECTLY.

21    **A.**    OKAY.

22    **Q.**    I'M NOT ASKING YOU FOR A LIST.    MY QUESTION IS:    CAN

23    YOU TALK ABOUT THE SPECIFICS OF THE OCCURRENCE OF CONTRABAND

24    AT WADE FACILITY?    YES OR NO?

25    **A.**    OTHER THAN THE REPORTS THAT I'VE REVIEWED THAT --

1  WHERE THEY DID FIND THAT SEARCHES LIKE IT WAS PRESENTED IN THE

2  COURT, YES, I CAN TESTIFY ON THOSE ISSUES, BUT NOT OTHER THAN

3  THAT.

4      **Q.**  OKAY.  SO YOUR TESTIMONY IS REALLY ONLY LIMITED TO

5  EXHIBITS 5 THROUGH 9 AS IT RELATES TO THE SPECIFIC OCCURRENCES

6  OF CONTRABAND AT DAVID WADE; IS THAT RIGHT?

7      **A.**  NO.  MY TESTIMONY IS REGARDING THE 45 YEARS OF

8  EXPERIENCE IN CORRECTIONS.

9      **Q.**  BUT I'M ASKING YOU ABOUT SPECIFIC KNOWLEDGE WITH

10  WHAT HAPPENS AT WADE FACILITY?

11      **A.**  WHETHER IT'S WADE OR WHATEVER INSTITUTION IT'S AT.

12      **Q.**  RIGHT.  SO SPECIFICALLY AS IT RESULTS TO EXAMPLE OF

13  CONTRABAND BEING FOUND AND DETECTED AT WADE, THE EXTENT OF

14  YOUR KNOWLEDGE IS EXHIBITS 5 THROUGH 9 FROM DEFENDANT, RIGHT?

15          **MR. CURRY:**  OBJECTION.

16          **THE COURT:**  HOLD ON.  WHAT IS YOUR OBJECTION?

17          **MR. CURRY:**  I'VE BEEN REAL PATIENT, BUT HE WAS NOT

18  TENDERED AS AN EXPERT IN CONTRABAND.  HE WAS TENDERED AS AN

19  EXPERT IN SEARCH, SECURITY, GOOD CORRECTIONAL PRACTICE.

20          **THE COURT:**  WELL, THAT'S THE SUBJECT THAT YOUR

21  QUESTIONS ARE.  I'M GOING TO ALLOW HIM TO GO, BUT REPHRASE

22  YOUR QUESTIONS AND SEE IF WE CAN'T NARROW IT DOWN.

23          **MR. ENGLAND:**  ALL RIGHT.

24  BY MR. ENGLAND:

25      **Q.**  WELL, LET'S JUST GO TO THE EXHIBITS.  DO YOU HAVE

1  DEFENDANT'S 5 THROUGH 9 IN FRONT OF YOU?

2      **A.**   ARE YOU TALKING ABOUT THE INCIDENT REPORTS?

3      **Q.**   YES.

4      **A.**   YEAH, I SAW THEM.

5      **Q.**   DO YOU HAVE THEM IN FRONT OF YOU?

6      **A.**   NO.

7          **MR. ENGLAND:**  MAY I APPROACH, YOUR HONOR?

8          **THE COURT:**  YES.

9  BY MR. ENGLAND:

10     **Q.**   I'VE HANDED YOU WHAT'S BEEN MARKED PROVISIONALLY AS

11 DEFENDANT'S 5 THROUGH 9.   TAKE A LOOK AT EXHIBIT 5 AND LET ME

12 KNOW WHEN YOU'RE READY.

13     **A.**   OKAY.

14     **Q.**   AND THIS IS AN INCIDENT REPORT REGARDING ONE JAMAR

15 WEBB; DO YOU SEE THAT?

16     **A.**   YES, SIR.

17     **Q.**   AND A HANDCUFF KEY WAS FOUND IN HIS MOUTH; DO YOU

18 SEE THAT?

19     **A.**   YES.

20     **Q.**   MR. WEBB IS LISTED AS LIVING IN HOUSING ASSIGNMENT

21 N3A-3; DO YOU SEE THAT?

22     **A.**   YES.

23     **Q.**   WHAT ARE THE SECURITY PROTOCOLS AT HOUSING

24 ASSIGNMENT N3A-3?

25     **A.**   I HAVE NO IDEA.

1        Q.    ALL RIGHT.    AND DO YOU KNOW IF MR. WEBB HAS ANY

2    RELATION TO MR. WOODFOX?

3        A.    NOT THAT I'M AWARE OF.

4        Q.    IS THERE ANYTHING IN THIS EXHIBIT IN YOUR EXPERT

5    OPINION THAT RELATES SPECIFICALLY TO MR. WOODFOX?

6        A.    OTHER THAN HE WAS IN SIMILAR HOUSING THAT WAS

7    DISPLAYED ON THE GRAPH, SO HE WOULD BE SUBJECT TO THE SAME

8    SECURITY PROCEDURES ON SEARCHES.

9        Q.    MY QUESTION, THOUGH, IS:    IS THERE ANYTHING IN THIS

10   REPORT THAT TELLS YOU THAT THIS INCIDENT HAS ANYTHING TO DO

11   WITH MR. WOODFOX?

12       A.    WELL, HIS NAME ISN'T ON HERE, NO, IT ISN'T.

13       Q.    NO.    LET'S GO TO EXHIBIT 6.

14       A.    OKAY.

15       Q.    TAKE A LOOK AT DEFENDANT'S 6.    LET ME KNOW WHEN

16   YOU'RE READY.

17       A.    THERE'S A LITTLE MORE TO THIS ONE NOW.

18       Q.    I UNDERSTAND.

19       A.    SO GIVE ME A SECOND.

20       Q.    NOW, EXHIBIT 6 IS NOT A STRIP SEARCH INCIDENT

21   REPORT, IS IT?

22       A.    WELL, HAD THEY DONE THE STRIP SEARCH AND DONE IT

23   RIGHT, THEY MAY NOT HAVE HAD THIS SITUATION, SO I --

24            MR. ENGLAND:    MOVE TO STRIKE THE ANSWER AS

25   NONRESPONSIVE.

1        **A.**    OKAY.

2    BY MR. ENGLAND:

3        **Q.**    IS THIS A --

4            **THE COURT:**    JUST ANSWER THE QUESTION.

5            **THE WITNESS:**    OKAY.

6    BY MR. ENGLAND:

7        **Q.**    THIS IS NOT A STRIP SEARCH MEMO, IS IT?

8        **A.**    WELL, IT DEPENDS ON HOW YOU DEFINE IT.

9        **Q.**    OKAY.  WELL, LET'S DEFINE IT WITH WHAT IT READS.

10   DIRECTING YOUR ATTENTION TO PAGE 1, GO AHEAD AND READ THE TOP

11   TWO LINES FOR THE COURT.

12       **A.**    YOU MEAN ON THE INCIDENT REPORT ITSELF?

13       **Q.**    THE VERY FIRST PAGE, NO, NO, THE VERY FIRST PAGE,

14   RIGHT AT THE TOP.  WHAT DOES IT SAY UNDERLINED RIGHT THERE?

15       **A.**    "I HAVE REVIEWED THE USE OF FORCE/AGGRAVATED FIGHT/

16   FIGHT/PHYSICAL CONCERNING OFFENDER, WALTER NICKLESS AND

17   ANTHONY CLARK, OR CYRIAK, WHICH OCCURRED ON N4 HOUSING UNIT AT

18   APPROXIMATELY 1010 HOURS ON 27 APRIL, 2013."

19       **Q.**    OKAY.  AND THAT'S CYRIAK, C-Y-R-I-A-K.  SO THIS IS A

20   USE OF FORCE REPORT, RIGHT?

21       **A.**    UH-HUH.  YEAH.

22       **Q.**    AND DOES STRIP SEARCH APPEAR ANYWHERE IN THE

23   LANGUAGE OF THIS REPORT?

24       **A.**    LET'S SEE.  THERE WAS A HAND-CRAFTED WEAPON WHICH

25   HAD BEEN CONSTRUCTED OF A METAL COPENHAGEN SNUFF CAN, AND THAT

1    WAS PART OF THE EVIDENCE THAT APPARENTLY THEY RECOVERED AFTER
2    THE FIGHT.

3         Q.    SO IS THAT A YES, STRIP SEARCH APPEARS IN THIS
4    REPORT, OR NO, IT DOES NOT?

5         A.    SO IT DOES HAVE SOMETHING TO DO WITH SEARCHING,
6    YEAH, THEY SHOULD HAVE SEARCHED.

7         Q.    THE QUESTION IS:   DOES STRIP SEARCH APPEAR IN
8    EXHIBIT 6?  YES OR NO?

9         A.    I'M NOT SURE IT'S A YES OR NO ANSWER I CAN GIVE YOU.

10        Q.    OKAY.

11        A.    YOU KNOW, IT'S PART OF THE EVIDENCE THAT THEY FOUND,
12   THEY FOUND THAT THERE WAS A WEAPON INVOLVED, AND THEY -- YOU
13   KNOW, AND SO THEN IT RAISES A QUESTION, WHY DID HE HAVE A
14   WEAPON AND WHY WASN'T HE SEARCHED, OR WAS HE SEARCHED OR
15   WHATEVER?

16        Q.    LET ME TRY IT ONE MORE TIME.

17             THE COURT:   HIS QUESTION WAS:   DID IT APPEAR IN THAT
18   REPORT?

19             THE WITNESS:   NO.

20   BY MR. ENGLAND:

21        Q.    OKAY.  AND, IN FACT, THERE'S AN EMPTY SNUFF CAN
22   FOUND IN THE INMATE'S CELL, RIGHT, IN THIS REPORT?

23        A.    I DON'T KNOW.  I DIDN'T GET THAT FAR.

24        Q.    GO AHEAD AND TAKE A LOOK.  I'M GOING TO DIRECT YOUR
25   ATTENTION TO THE SECOND PAGE.

1     A.    OKAY.

2     Q.    AND MAYBE FOUR LINES FROM THE BOTTOM, STARTING WITH

3     "LIEUTENANT HILL CONDUCTED A SEARCH..."

4     A.    "PHOTOS WERE TAKEN FROM THE FIGHT AREA WHERE

5     OFFENDER, NICKLESS, WAS INJURED AND THE" -- LET'S SEE.  "THE

6     DUTY OFFICER WAS NOTIFIED."  IS THAT WHAT YOU'RE -- AM I IN

7     THE RIGHT PLACE?

8              MR. ENGLAND:  LET ME -- MAY I APPROACH?

9              THE COURT:  YES, YOU MAY.

10    A.    YOU DID SAY THE SECOND PAGE, RIGHT?

11    BY MR. ENGLAND:

12    Q.    RIGHT HERE.

13    A.    OH, OKAY.  HE WAS ESCORTED TO THE SOUTH INFIRMARY

14    FOR FURTHER --

15             THE REPORTER:  CAN YOU SPEAK INTO THE MICROPHONE,

16    PLEASE?

17             THE WITNESS:  I'M SORRY.

18    A.    LET'S SEE HERE.  HE WAS TRANSFERRED TO DWCC VEHICLE

19    BY SERGEANT DUNN AND KIDD AND EXITED FRONT GATE.  I GUESS HE

20    WAS TAKEN DOWN TO THE HOSPITAL.  LIEUTENANT HILL CONDUCTED A

21    SEARCH OF THE OFFENDER, NICKLESS' CELL, AND FOUND ANOTHER

22    EMPTY SNUFF CAN.  THE CAN AND THE WEAPON WERE CONFISCATED.

23    PHOTOS WERE TAKEN OF THE FIGHT AREA WHERE OFFENDER, NICKLESS,

24    WAS INJURED AND OFFENDER, NICKLESS' INJURY.  DUTY OFFICER AND

25    THE WARDEN WERE NOTIFIED.

1    **Q.**   WELL, IF YOU'RE GOING TO READ THE WHOLE THING, GO

2    AHEAD AND READ THE NEXT SENTENCE RIGHT AFTER THAT.

3    **A.**   OKAY.   LET'S SEE.   OFFENDER NICKLESS, WHO HAS A

4    DOCUMENTED PATTERN OF VIOLENT BEHAVIOR, IS BEING PLACED IN OPP

5    NUMBER 53 UPON RETURN TO THE INSTITUTION.

6    **Q.**   ALL RIGHT.   SO BACK TO MY ORIGINAL QUESTION.   THIS

7    USE OF FORCE REPORT INVOLVED THE DETECTION OF AN EMPTY SNUFF

8    CAN IN ONE OF THE OFFENDER'S CELLS; ISN'T THAT RIGHT?

9    **A.**   ANOTHER -- I GUESS THAT WAS ANOTHER PART OF THE

10   SNUFF CAN, YEAH.

11   **Q.**   AND THE OTHER PART OF THE SNUFF CAN WAS FOUND ON HIS

12   PERSON IN HIS POCKET?

13   **A.**   AS A WEAPON, YEAH.

14   **Q.**   OKAY.   AND YOUR TESTIMONY IS THAT THE CANS, THE ONE

15   IN HIS POCKET AND THE ONE FOUND IN THE CELL, WOULD HAVE BEEN

16   DETECTED IF THE OFFICERS WOULD HAVE SEARCHED IN THE OFFENDER'S

17   ANUS OR UNDERNEATH HIS GENITALS; IS THAT YOUR TESTIMONY?

18   **A.**   NO.

19   **Q.**   OKAY.

20   **A.**   NO, NOT AT ALL.

21   **Q.**   ALL RIGHT.

22   **A.**   I NEVER MENTIONED ANYTHING ABOUT ANUS AND DETECTION

23   THERE, THE WAY YOU DESCRIBED.

24   **Q.**   ALL RIGHT.   LET'S MOVE TO EXHIBIT 7.   TAKE A LOOK AT

25   THAT ONE AND LET ME KNOW WHEN YOU'RE READY.

1    **A.**    NO. 7, OKAY.

2    **Q.**    AND DEFENDANT'S 7, THIS ISN'T TALKING ABOUT THE

3    DETECTION OF CONTRABAND PURSUANT TO A STRIP SEARCH EITHER, IS

4    IT?

5    **A.**    LET'S SEE HERE.   THEY WERE CONDUCTING A VISUAL BODY

6    CAVITY SEARCH OF OFFENDER ZORAN JOHNSON.   CAPTAIN THOMAS,

7    ALONG WITH MYSELF, NOTICED A ROLLED UP SOCK IN OFFENDER

8    JOHNSON'S POSSESSION.   AFTER CONFISCATING THE ITEM, OFFICER

9    [SIC] JOHNSON HAD A SONY CD PLAYER WITH TWO BATTERIES, A CD,

10   EARPHONE AND BLACK PENS, CIGARETTES AND ROLLING PAPERS.

11   **Q.**    SO MY QUESTION TO YOU IS:   THIS EXHIBIT IS NOT

12   TALKING ABOUT THE DETECTION OF CONTRABAND PURSUANT TO A STRIP

13   SEARCH, RIGHT?

14   **A.**    I DON'T KNOW WHETHER IT WAS DIRECTLY RELATED WITH A

15   STRIP SEARCH OR NOT.   BUT...

16   **Q.**    OKAY.   WELL, LET ME ASK YOU:   IN YOUR EXPERT

17   OPINION, CAN AN INMATE STUFF A SONY CD PLAYER, TWO AA

18   BATTERIES, A CD, AN EAR PHONE SET, BLACK PENS, CIGARETTES WITH

19   ROLLING PAPERS, A YELLOW LIGHTER AND CONDOMS INTO HIS RECTUM?

20   **A.**    YES.

21   **Q.**    THEY CAN?

22   **A.**    YOU BET.

23   **Q.**    OKAY.   LET'S GO TO EXHIBIT 8.

24   **A.**    BEG YOUR PARDON?

25   **Q.**    LET'S GO TO EXHIBIT 8.

1          **A.**    OKAY.

2          **Q.**    TAKE A LOOK AT THAT DOCUMENT AND LET ME KNOW WHEN

3     YOU'RE READY.

4          **A.**    OKAY.

5          **Q.**    THIS DOCUMENT IS IN RELATION TO TWO INMATES PASSING

6     CONTRABAND TO EACH OTHER IN THE N1 EXERCISE YARD; IS THAT

7     RIGHT?

8          **A.**    YES.

9          **Q.**    AND A GUARD SAW THAT, RIGHT?

10         **A.**    A CORRECTIONAL OFFICER, YES.

11         **Q.**    SO THIS HAS NOTHING TO DO WITH STRIP SEARCHING,

12    RIGHT?

13         **A.**    WELL, IF ONE PERSON HAD THE CONTRABAND, IT COULD

14    HAVE BEEN RELATED TO NOT SEARCHING OR NOT WHATEVER, BUT IN

15    THIS PARTICULAR CASE, IT DOESN'T APPEAR TO BE.

16         **Q.**    OKAY.    NOW TO EXHIBIT 9.

17         **A.**    OKAY.

18         **Q.**    TAKE A LOOK AT THAT DOCUMENT AND LET ME KNOW WHEN

19    YOU'RE READY.

20         **A.**    OKAY.

21         **Q.**    AND THIS HAS TO DO WITH THE DETECTION OF A HOMEMADE

22    SHIM IN THE INMATE'S CLOTHING; ISN'T THAT RIGHT?

23         **A.**    RIGHT.

24         **Q.**    AND THIS WASN'T FOUND IN HIS ANUS OR UNDER HIS

25    GENITALS, RIGHT?

1      **A.**    THE SEARCHES THAT ARE CONDUCTED --

2      **Q.**    I'M SORRY.  ANSWER THIS QUESTION.  WAS THAT

3   CONTRABAND ITEM FOUND IN HIS ANUS OR UNDER HIS GENITALS?

4      **A.**    NOT -- NO.

5      **Q.**    OKAY.  YOU WOULD AGREE WITH ME THAT IN EACH OF THESE

6   EXHIBITS, NONE OF THESE HAVE ANY DIRECT RELATIONSHIP TO MR.

7   WOODFOX, RIGHT?

8      **A.**    I THINK THAT EVERYTHING HAS A RELATION WITH MR.

9   WOODFOX.

10     **Q.**    OH, PLEASE EXPLAIN.

11     **A.**    WELL, YOU KNOW, HE'S SUBJECT TO THESE SEARCHES FOR

12  THE CONSISTENCY I TALKED ABOUT EARLIER, AND HE SHOULD BE

13  TREATED NO DIFFERENT THAN ANY OTHER INMATE WITH THE SECURITY

14  POLICIES AND PROCEDURES THAT ARE AT THE FACILITY.  I DON'T

15  THINK, FROM WHAT I HAVE SEEN AND THE INMATES THAT I

16  INTERVIEWED ON THAT UNIT, THERE WAS CONSISTENCY THERE, AND I

17  THINK THAT'S THE EXPECTATION.

18     **Q.**    I WANT TO MAKE SURE THAT I UNDERSTAND YOUR ANSWER.

19     **A.**    OKAY.

20     **Q.**    AND I WANT TO MAKE SURE THAT I'M VERY, VERY CLEAR.

21  I'M NOT ASKING ABOUT BROAD, GENERAL TERMS HERE.  I'M TALKING

22  ABOUT A VERY SPECIFIC QUESTION.  THE SPECIFIC FACTS OF

23  EXHIBITS 5 THROUGH 9, YOU WOULD AGREE WITH ME, HAVE NOTHING TO

24  DO WITH MR. WOODFOX; HE WAS NOT INVOLVED, HE WASN'T THERE,

25  RIGHT?

1       **A.**    I DON'T AGREE WITH THAT, NO.

2       **Q.**    OKAY.  FINE.  LET'S TURN TO STATE'S -- DEFENDANT'S

3    4.  THIS IS THE POLICY C-02-003.  YOU'VE SEEN THAT POLICY

4    BEFORE, RIGHT?

5       **A.**    YES, SIR.

6       **Q.**    AND YOU SUPPORT THAT POLICY, RIGHT?

7       **A.**    YES.

8       **Q.**    LET ME DIRECT YOUR ATTENTION TO POLICY -- I'M GOING

9    TO CALL IT 7 SUBPART D, IT'S LISTED ON PAGE 4.

10      **A.**    I'M ON PAGE 4.

11      **Q.**    ALL RIGHT.  AND SUBPART D SAYS THAT, UPON APPROVAL

12   BY A CAPTAIN OR HIGHER RANKING EMPLOYEE, A ROUTINE STRIP

13   SEARCH MAY BE CONDUCTED AT ANY TIME; DO YOU SEE THAT?

14      **A.**    YES.

15      **Q.**    DO YOU AGREE WITH THAT?

16      **A.**    YES.

17      **Q.**    ANY TIME?

18      **A.**    YES.

19      **Q.**    FOR WHATEVER REASON?

20      **A.**    YES.

21      **Q.**    LET'S TALK ABOUT A LITTLE BIT ABOUT YOUR EARLIER

22   TESTIMONY.  YOU TALKED ABOUT HOW INMATES MIGHT INGEST

23   NARCOTICS AND THEN PASS THEM ONCE THEY ARRIVE INSIDE THE

24   FACILITY; DO YOU REMEMBER THAT TESTIMONY?

25      **A.**    VAGUELY.

1     Q.    THEY MIGHT PASS THEM AND THEN SELL THEM?

2     A.    RIGHT.

3     Q.    AND THAT WOULD BE THE CONTRABAND, RIGHT?

4     A.    RIGHT.

5     Q.    YOU WOULD AGREE WITH ME THAT THAT SCENARIO DOESN'T

6   APPLY TO MR. WOODFOX, RIGHT?

7     A.    I DON'T KNOW WHETHER IT DOES OR NOT.  ONLY HE KNOWS

8   THAT.

9     Q.    WELL, MR. WOODFOX IS NOT AN INCOMING INMATE, RIGHT?

10    A.    HE IS IN A MAXIMUM SECURITY UNIT.

11    Q.    MY QUESTION IS:  IS MR. WOODFOX AN INCOMING INMATE?

12    A.    IS HE AN INCOMING INMATE?

13    Q.    YES.

14    A.    WELL, APPARENTLY NOT, BECAUSE HE'S BEEN THERE FOR A

15  NUMBER OF YEARS, SO...

16    Q.    OKAY.  SO THE SCENARIO IN WHICH AN INMATE COMING

17  FROM THE FREE WORLD INTO A FACILITY AND INGESTING DRUGS,

18  PASSING IT THROUGH HIS RECTUM, SELLING IT TO OTHER INMATES,

19  THAT DOESN'T APPLY TO MR. WOODFOX, RIGHT?

20    A.    I DON'T KNOW WHAT -- I DON'T KNOW IF IT APPLIES TO

21  HIM OR NOT BECAUSE ONLY HE KNOWS THAT.

22    Q.    ALL RIGHT.  WHAT ABOUT MONEY; DOES MONEY BEING

23  PASSED TO MR. WOODFOX THROUGH CONTACT VISITS; DOES THAT APPLY

24  TO MR. WOODFOX?

25    A.    AGAIN, HE HAS TO ANSWER THAT QUESTION BECAUSE I

1  DON'T KNOW WHAT HE --

2      **Q.**   YOU DON'T KNOW, THOUGH, RIGHT?

3      **A.**   NO, I DON'T.

4      **Q.**   AND WHAT ABOUT STAFF MEMBERS PASSING CONTRABAND?

5  YOU TESTIFIED EARLIER THAT STAFF MEMBERS ON OCCASION HAVE BEEN

6  FOUND TO BE FACILITATING THE CONTRABAND.  DO YOU KNOW IF THAT

7  SCENARIO APPLIES TO MR. WOODFOX?

8      **A.**   AGAIN, HE WOULD KNOW THE ANSWER TO THAT, NOT ME.

9      **Q.**   YOU DON'T KNOW, THOUGH?

10     **A.**   NO, I DON'T.

11     **Q.**   OKAY.  YOU ALSO TESTIFIED THAT ONCE INSIDE A

12  FACILITY, INMATES CAN HIDE ITEMS IN THEIR CLOTHING, RIGHT?

13     **A.**   RIGHT.

14     **Q.**   DO YOU HAVE ANY EVIDENCE THAT MR. WOODFOX HAS EVER

15  HID CONTRABAND ITEMS IN HIS CLOTHING?

16     **A.**   NO, I DON'T.

17     **Q.**   YOU ALSO TALKED ABOUT HOW INMATES WILL HIDE ITEMS IN

18  THEIR RECTUM; DO YOU REMEMBER THAT?

19     **A.**   RIGHT.

20     **Q.**   AND DO YOU HAVE ANY EVIDENCE THAT MR. WOODFOX HAS

21  HID CD PLAYERS IN HIS RECTUM?

22     **A.**   NO.

23     **Q.**   OKAY.  YOU TALKED ABOUT EARLIER UNDER QUESTIONING

24  FROM MR. CURRY THAT AGE DOESN'T MATTER WHEN IT COMES TO

25  CONTRABAND.  I BELIEVE YOU SAID THAT OLDER INMATES CAN BE

1    PREYED UPON AS MULES FOR YOUNGER INMATES BECAUSE THEY CAN'T

2    DEFEND THEMSELVES; DID I GET THAT RIGHT?

3         **A.**    THAT'S A POSSIBILITY, YES.

4         **Q.**    OKAY.  DO YOU HAVE ANY EVIDENCE THAT MR. WOODFOX IS

5    BEING PREYED UPON BY ANYBODY TO BE A MULE TO TRANSPORT DRUGS

6    OR CD PLAYERS OR ICE OR ANYTHING ELSE?

7         **A.**    NO.  I HAVE NO IDEA WHETHER -- THAT'S SOMETHING YOU

8    WILL HAVE TO ASK HIM.  I DON'T KNOW.

9         **Q.**    ALL RIGHT.  SO TO BE CLEAR, YOUR TESTIMONY HERE

10   TODAY IS TO TALK GENERALLY ABOUT THE IMPORTANCE OF SEARCHES,

11   RIGHT?

12        **A.**    PRETTY MUCH, YES.

13        **Q.**    BUT NOT AS ANYTHING IS APPLIED TO MR. WOODFOX IN HIS

14   SPECIFIC SITUATION, RIGHT?

15        **A.**    RIGHT.

16        **Q.**    OKAY.  YOU TESTIFIED EARLIER THAT INMATES CAN PASS

17   CONTRABAND TO EACH OTHER IN CCR; DO YOU REMEMBER THAT?

18        **A.**    YES.

19        **Q.**    I BELIEVE YOU SAID THAT HERE WERE BARS AND SLIDER

20   GRILLS WHERE CONTRABAND CAN BE PASSED?

21        **A.**    RIGHT.

22        **Q.**    COULD CONTRABAND BE PASSED OUTSIDE OF THE PRESENCE

23   OF GUARDS?

24        **A.**    YES.

25        **Q.**    AND HOW WOULD THAT HAPPEN?

1    **A.**   BECAUSE A GUARD ISN'T ON -- YOU KEEP REFERRING TO

2    THEM AS GUARDS.  I REFER TO THEM AS CORRECTIONAL OFFICERS.

3    **Q.**   ALL RIGHT.  LET ME REPHRASE THE QUESTION.

4    **A.**   OKAY.

5    **Q.**   THE CORRECTIONAL OFFICERS AT CCR, THEY ARE WATCHING

6    ALL THE TIME, RIGHT?

7    **A.**   NO.

8    **Q.**   THEY ARE NOT?

9    **A.**   NOT ALL THE TIME.

10   **Q.**   OKAY.  SO IS IT YOUR TESTIMONY THAT THE CORRECTIONS

11   OFFICERS IN CCR ARE SOMEWHERE ELSE WHEN INMATES ARE WALKING UP

12   AND DOWN THE TIER?

13   **A.**   THEY'RE UNDER SUPERVISION, BUT IT'S LIKE ANYTHING

14   ELSE, YOU KNOW, THEY HAVE TO USE THE RESTROOM OR THEY TURN

15   THEIR BACK OR AN INMATE DIVERTS THEIR ATTENTION FROM WHAT THEY

16   WERE LOOKING AT.  INMATES HELP EACH OTHER TO CONCEAL THINGS,

17   TO DO THINGS, TO MOVE THINGS WITHOUT THE OFFICERS INVOLVED, SO

18   ALL THE ABOVE.

19   **Q.**   OKAY.  SO YOU HEARD MR. WOODFOX'S TESTIMONY EARLIER

20   TODAY THAT WHEN HE IS BROUGHT OUT OF HIS CELL, HE IS STRIP

21   SEARCHED AND HE IS PLACED IN HANDS, WAIST AND FEET SHACKLES;

22   DO YOU REMEMBER THAT?

23   **A.**   YES.

24   **Q.**   SO WHEN MR. WOODFOX IS SHACKLED LIKE THAT, AND THERE

25   ARE TWO GUARDS WITH HIM, YOU AGREE WITH ALL THAT; THAT'S THE

1  WAY IT SHOULD BE DONE, RIGHT?

2       **A.**    YES.

3       **Q.**    AND THAT'S THE WAY THEY DO IT AT WADE, RIGHT?

4       **A.**    YES.

5       **Q.**    SO WHO'S PASSING MR. WOODFOX ANYTHING IN THAT

6  SCENARIO?

7       **A.**    WELL, I DON'T KNOW.  I MEAN, OBVIOUSLY, IT HAPPENS,

8  AND I'VE SEEN IT HAPPEN MANY, MANY, MANY TIMES WITH INMATES

9  WHO WERE IN COMPLETE SHACKLES, AND THEN SLIP THEIR CUFFS, YOU

10 KNOW, GET LOOSE.  THE TWO OFFICERS THAT WERE KILLED IN MARION

11 AT THE FEDERAL PRISON THERE, THAT WAS THE SITUATION.  THEY

12 SLIPPED THEIR CUFFS, THEY HAD HANDCUFF KEYS, THEY GOT OUT OF

13 THEIR CUFFS, THEY GRABBED A HOMEMADE KNIFE, KILLED THESE TWO

14 OFFICERS, SO I'VE SEEN THE WORSE OF IT, YES.

15      **Q.**    I'D LIKE TO DIRECT YOUR ATTENTION BACK TO MR.

16 WOODFOX, THAT'S WHAT WE'RE HERE TO TALK ABOUT TODAY.  WHO'S

17 PASSING MR. WOODFOX CONTRABAND WHEN HE HAS WAIST, HANDS AND

18 FEET SHACKLES AND TWO GUARDS WALKING WITH HIM EVERYWHERE HE

19 GOES ON THAT TIER?

20      **A.**    ALL I CAN TELL YOU IS IT HAPPENS.

21      **Q.**    OKAY.  ARE YOU FAMILIAR WITH THE TYPE OF RESTRAINTS

22 THAT MR. WOODFOX IS WEARING RIGHT NOW?

23      **A.**    YES.  I SAW HIM STAND UP.  SOMEBODY BROUGHT THAT UP

24 EARLIER.  HE STOOD UP.  HE'S GOT A BELLY CHAIN ON, I THINK,

25 AND LEG IRONS, I THINK.

1    Q.   OKAY.  AND YOU HEARD HIM TALK ABOUT THE TYPES OF

2    RESTRAINTS THAT HE WEARS WHEN HE'S AT WADE.  MY UNDERSTANDING

3    IS THAT THEY'RE SIMILAR EXCEPT HIS HANDS ARE AT HIS SIDES; IS

4    THAT YOUR UNDERSTANDING AS WELL?

5    A.   TO PREVENT HIM FROM ASSAULTING STAFF OR INMATES.

6    Q.   OKAY.  AND CAN YOU EXPLAIN FOR THE COURT HOW MR.

7    WOODFOX IN THAT -- THESE RESTRAINTS AND THE OTHER RESTRAINTS

8    WHERE HIS HANDS ARE AT HIS SIDE, HOW HE CAN INSERT SOMETHING

9    INTO HIS ANUS?

10   A.   WELL, NO, OTHER THAN THE FACT THAT IT'S POSSIBLE.

11   Q.   ALL RIGHT.  LET ME --

12   A.   IT'S POSSIBLE FOR HIM TO --

13   Q.   EXPLAIN THE POSSIBILITY.  GO AHEAD.

14   A.   WELL, HE HAS THE AVAILABILITY TO BE ABLE TO URINATE,

15   SO HE CAN, YOU KNOW, DO THAT.  SO IF HE CAN URINATE WITH THOSE

16   ON, THEN I'M ASSUMING THAT HE CAN PROBABLY REACH HIS ANAL

17   CAVITY.

18   Q.   YOU'RE ASSUMING?

19   A.   WELL, YOU KNOW...

20   Q.   IS HE DOUBLED JOINTED?

21   A.   WELL, I'VE SEEN MANY OF --

22   Q.   MY QUESTION IS:  IS MR. WOODFOX DOUBLE JOINTED, IF

23   YOU KNOW?

24   A.   I'M NOT A DOCTOR.  I HAVE NO IDEA WHETHER HE'S

25   DOUBLE JOINTED.

1    **Q.**   IS THERE ANYBODY THAT YOU COULD BRING TO COURT TODAY

2    OR AT ANY FUTURE TIME WHO COULD DEMONSTRATE HOW TO INSERT

3    SOMETHING INTO YOUR ANUS WHEN YOU'RE WEARING SHACKLES LIKE

4    THAT?

5    **A.**   I'VE SEEN PLENTY OF THEM DO IT.

6    **Q.**   FOR EXAMPLE, WHO?

7    **A.**   MANY INMATES AT MARION, ILLINOIS.

8    **Q.**   GIVE ME A NAME.

9    **A.**   WELL, I'LL HAVE TO THINK ABOUT THAT FOR JUST A

10   SECOND.

11   **Q.**   TAKE YOUR TIME.

12   **A.**   OKAY.  I WILL.  LET'S SEE.  PROBABLY THE MOST

13   OBVIOUS ONE THAT I EVER SAW WAS A GUY WHO WAS IN THE VISITING

14   ROOM AND INJECTED 137 BALLONS OF NARCOTICS IN HIS RECTUM.

15   **Q.**   WITH THOSE KIND OF RESTRAINTS ON?

16   **A.**   YEAH.

17   **Q.**   OKAY.  AND WHAT WAS HIS NAME?

18   **A.**   I CAN'T REMEMBER HIS NAME.  THIS WAS 15, 20 YEARS

19   AGO.  BUT HE HAD 137 BALLOONS IN HIS RECTAL CAVITY.

20   **Q.**   THIS WAS AT THE MARION JAIL?

21   **A.**   THIS WAS -- NO, THIS WAS AT LEWISBURG -- NO, NO,

22   TERRE HAUTE, INDIANA, AT THE PENITENTIARY IN TERRE HAUTE.

23   **Q.**   TERRE HAUTE --

24   **A.**   INDIANA.

25   **Q.**   -- INDIANA.  WHAT YEAR WAS THIS?

1    **A.**   THAT WOULD HAVE BEEN -- LET'S SEE.   I WAS A CAPTAIN

2    THEN, SO IT WOULD HAVE BEEN 1978, '79.

3    **Q.**   YOU WERE A CAPTAIN THERE?

4    **A.**   YEAH.

5    **Q.**   SO THERE SHOULD BE A REPORT OF THAT, RIGHT?

6    **A.**   I WAS ALSO THE WARDEN THERE, BUT I WAS A LIEUTENANT

7    THERE, A CAPTAIN THERE, I WAS A WARDEN THERE.

8    **Q.**   AND THERE SHOULD BE A REPORT OF THAT, RIGHT?

9    **A.**   SOMEWHERE.

10   **Q.**   OKAY.

11   **A.**   IT WAS A LONG TIME AGO, YEAH.

12   **Q.**   ALL RIGHT.   MR. KEOHAN, YOU WOULD AGREE WITH ME THAT

13   OF ALL THE INMATES WHO HAVE ACCESS TO CONTRABAND OR THE

14   ABILITY TO PASS CONTRABAND TO OTHER INMATES, MR. WOODFOX IS

15   PROBABLY AT THE BOTTOM OF THE LIST, RIGHT?

16   **A.**   WHY DO YOU SAY THAT?   I DON'T UNDERSTAND THE

17   QUESTION.

18   **Q.**   WELL, LET ME TRY IT A DIFFERENT WAY.   YOU HEARD MR.

19   WOODFOX TESTIFY ABOUT HOW HE'S NOT ALLOWED TO CONGREGATE IN

20   GROUPS, RIGHT?

21   **A.**   I'VE HEARD HIM -- YEAH, I HEARD HIM EARLIER TALK

22   ABOUT THAT, YEAH.

23   **Q.**   AND YOU HEARD HIM TESTIFY THAT HE DOESN'T GET TO

24   TOUCH OTHER INMATES AND THINGS OF THAT NATURE; DO YOU REMEMBER

25   THAT TESTIMONY?

1    **A.**   WELL, YEAH, BUT HE ALSO SAID HE WAS ON THE YARD WITH

2   SEVEN OTHER GUYS IN THE AREA THERE, UNCUFFED AND ALL THAT KIND

3   OF THING, SO YEAH.

4    **Q.**   OKAY.  SO FOR ONE HOUR A DAY, THAT IS THE MOMENTS

5   WHERE MR. WOODFOX MAY PASS OR RECEIVE CONTRABAND; IS THAT

6   RIGHT?

7    **A.**   NO.

8    **Q.**   HE CAN PASS CONTRABAND?

9    **A.**   HE CAN PASS IT FROM CELL TO CELL DOWN THE RANGE.

10   THERE'S 16 CELLS, SINGLE CELLS, IN A ROW.

11   **Q.**   HOW DOES HE DO THAT IF HE'S IN HIS ROOM?

12   **A.**   HE CAN -- WHAT THEY CALL -- WHAT THEY USED TO CALL

13   IN THE FEDERAL SYSTEM, MAYBE HE CAN CLARIFY THIS, IT'S CALLED

14   A RAT LINE.

15   **Q.**   A RAT LINE, WHAT'S THAT?

16   **A.**   THAT MEANS THEY TAKE SHEETS AND THEY TEAR IT UP,

17   MAKE A LITTLE ROPE OUT OF IT, OR THEY USE DENTAL FLOSS, IF

18   THEY PERMIT DENTAL FLOSS, AND THEY TIE OBJECTS ON IT AND THEY

19   THROW IT UNDER THE CELLS AND THEY MOVE IT FROM CELL TO CELL,

20   FROM CELL TO CELL.

21   **Q.**   AND DO YOU HAVE ANY EVIDENCE THAT MR. WOODFOX HAS

22   ADULTERATED HIS SHEETS TO PASS WHATEVER?

23   **A.**   NO.

24   **Q.**   NO?

25   **A.**   NO, BUT YOU ASKED ME WHY IT WOULD HAPPEN OR HOW IT

1   COULD HAPPEN, I'M JUST TRYING TO EXPLAIN.

2        Q.   I UNDERSTAND, AND I'M NOW ASKING YOU IF YOU HAVE ANY

3   EVIDENCE IF THAT HAS EVER HAPPENED WITH MR. WOODFOX?

4        A.   I HAVE NO IDEA, NO.

5        Q.   DO YOU HAVE ANY EVIDENCE THAT THAT HAS EVER HAPPENED

6   ON THE CCR TIER AT WADE?

7        A.   NO.

8        Q.   OKAY.  SAME THING WITH FLOSS; DO YOU HAVE ANY

9   EVIDENCE OF FLOSS BEING USED FOR -- I UNDERSTOOD IT AS KITING

10  BUT --

11       A.   YEAH, THAT'S ANOTHER --

12       Q.   -- ANY EVIDENCE THAT MR. WOODFOX HAS DONE THAT?

13       A.   NO.

14       Q.   THAT THAT HAPPENS AT CCR?

15       A.   NO, I HAVE NO EVIDENCE.

16       Q.   ALL RIGHT.  SO BACK TO THE ORIGINAL LINE OF INQUIRY.

17  THERE ARE OTHER INMATES WHO MOVE MORE FREELY ABOUT THE

18  PRISONS, RIGHT?

19       A.   YES.

20       Q.   WHO ARE NOT SUBJECT TO THESE STRIP SEARCHES, RIGHT?

21       A.   RIGHT.

22       Q.   AND THOSE INMATES HAVE A GREATER OPPORTUNITY TO PASS

23  AND RECEIVE CONTRABAND; WOULDN'T YOU AGREE WITH THAT?

24       A.   YES.

25       Q.   SHOULD THEY ALL BE STRIP SEARCHED, TOO, FOR

1   CONSISTENCY?

2       **A.**   NOT NECESSARILY, NO.

3       **Q.**   WELL, YOU SAID EARLIER THAT EVERYBODY SHOULD BE

4   STRIP SEARCHED, TO BE FAIR TO ALL OF THEM?

5       **A.**   I SAID EVERYBODY IN MAXIMUM SECURITY.

6       **Q.**   OKAY.  SO WHAT ABOUT GENERAL POPULATION; SHOULD THEY

7   BE STRIP SEARCHED?

8       **A.**   DEPENDS ON WHAT THEIR CLASSIFICATION IS AND WHERE

9   THEY'RE HOUSED.

10      **Q.**   WELL, LET'S GO BACK TO POLICY C-02-003-7D, IT SAYS

11   THAT A ROUTINE STRIP SEARCH MAY BE CONDUCTED AT ANY TIME,

12   RIGHT?

13      **A.**   RIGHT.

14      **Q.**   IT DOESN'T SAY ANYTHING ABOUT CLASSIFICATION THERE,

15   DOES IT?

16      **A.**   NO, BUT THE WHOLE IDEA OF A SEARCH IS THAT -- IT'S,

17   YOU KNOW, I MEAN, IF YOU'RE GOING TO TELL EVERYBODY THEY'RE

18   GOING TO SEARCH YOU AT THAT PARTICULAR TIME THAT DOESN'T --

19   YOU KNOW, SO, YEAH, ANYBODY IS SUBJECT TO A SEARCH.

20      **Q.**   MY QUESTION IS:  POLICY 7D DOESN'T TALK ANYTHING

21   ABOUT CLASSIFICATION, RIGHT?

22      **A.**   I DON'T KNOW.  I HAVEN'T -- I'D HAVE TO READ IT ALL

23   TO FIND OUT.

24      **Q.**   GO AHEAD AND READ IT.

25      **A.**   ALL RIGHT.  IT SAYS HERE, UNANNOUNCED AND IRREGULAR

1   TIMED SCHEDULES, ALL OFFENDERS FOR --

2       **Q.**    JUST ANSWER MY QUESTION AFTER YOU READ IT, MR.

3   KEOHAN.

4       **A.**    I THOUGHT YOU WANTED ME TO --

5       **Q.**    THE QUESTION IS:  WHETHER OR NOT POLICY 7D HAS

6   ANYTHING TO DO WITH CLASSIFICATION.

7       **A.**    I WAS TRYING TO READ IT TO YOU.

8       **Q.**    I CAN READ IT, BUT JUST ANSWER MY QUESTION.  GO

9   AHEAD AND READ IT TO YOURSELF AND LET ME KNOW WHEN YOU'RE

10  READY.

11      **A.**    OH, OKAY.  THIS TALKS ABOUT ENTIRE TIERS AND

12  DORMITORIES AND SEARCHES AND ALL THAT, SO THAT'S EVERYONE

13  PRETTY MUCH.

14      **Q.**    THE QUESTION IS:  DOES POLICY 7D HAVE ANYTHING TO DO

15  WITH CLASSIFICATION?  YES OR NO?

16      **A.**    IN MY ESTIMATION, YES.

17      **Q.**    OKAY.  AND WHERE DOES CLASSIFICATION APPEAR IN THE

18  POLICY?

19      **A.**    WELL, I'M JUST SAYING IT WOULD BE MY UNDERSTANDING

20  THAT THE CLASSIFICATION IS A VERY SIGNIFICANT PART BECAUSE

21  THAT'S WHERE YOU HOUSE THE INDIVIDUALS AND --

22      **Q.**    NOT SIGNIFICANT ENOUGH TO WRITE IT IN THE POLICY,

23  THOUGH, RIGHT?

24      **A.**    WELL, YOU CAN'T WRITE EVERYTHING IN THE POLICY.  THE

25  POLICY IS A GUIDELINE, AND YOU USE IT THE BEST YOU CAN.

1    **Q.**   OKAY.

2    **A.**   BUT COMMON SENSE GOES WITH IT.   SO...

3    **Q.**   WELL, LET'S TALK ABOUT COMMON SENSE A LITTLE BIT.

4    **A.**   OKAY.

5    **Q.**   IS IT COMMON SENSE TO STRIP SEARCH AN INMATE JUST

6    BECAUSE HE NEEDS TO GO TO THE DOCTOR?

7    **A.**   YEAH.   WE HAD AN OFFICER KILLED ON HIS WAY TO THE

8    DOCTOR IN LEWISBURG, PENNSYLVANIA.

9    **Q.**   OKAY.

10   **A.**   YES, IT IS SIGNIFICANT.

11   **Q.**   AND IT'S COMMON SENSE TO DO SO WHEN HE'S RESTRAINED

12   AT THE HANDS, WAIST AND FEET LIKE MR. WOODFOX AND ESCORTED BY

13   TWO GUARDS AT ALL TIMES, RIGHT?

14   **A.**   THE OFFICER THAT GOT KILLED WAS ESCORTED BY FOUR

15   OFFICERS.

16   **Q.**   PLEASE ANSWER MY QUESTION.   IS IT COMMON SENSE TO

17   STRIP SEARCH --

18        **MR. ENGLAND:**   OBJECT AS NONRESPONSIVE.

19   BY **MR. ENGLAND**:

20   **Q.**   MY QUESTION IS THIS:   IS IT COMMON SENSE WHEN A MAN

21   NEEDS TO GO TO THE DOCTOR TO STRIP SEARCH HIM, PUT HIM IN

22   RESTRAINTS AT THE HANDS, WAIST AND FEET, TAKE HIM TO THE

23   DOCTOR, WATCH HIM THE ENTIRE TIME, AND THEN STRIP SEARCH HIM

24   AGAIN; IS THAT COMMON SENSE?

25   **A.**   YES.

1      **MR. CURRY:** ASKED AND ANSWERED.

2  **BY MR. ENGLAND:**

3      **Q.**    OKAY.   SAME THING WHEN HE NEEDS TO TALK TO HIS

4  LAWYER, COMMON SENSE, RIGHT?

5      **A.**    YES.

6      **Q.**    OKAY.   DO STRIP SEARCHES EVER STOP, IN YOUR OPINION,

7  MR. KEOHANE?

8      **A.**    DO THEY EVER STOP?

9      **Q.**    RIGHT.   IS THERE EVER A POINT AT WHICH YOU SAY,

10  "GEE, WE'VE DONE IT 5,000 TIMES.   MAYBE WE SHOULD TAKE IT

11  EASY."

12      **A.**    WELL, IF THEY DID IT 5,000 TIMES, THAT WOULD

13  CERTAINLY BE A RECORD, I GUARANTEE YOU.

14      **Q.**    SO ANSWER MY QUESTION:   IS THERE EVER A POINT --

15      **A.**    THERE IS NO ANSWER TO THAT QUESTION.

16      **Q.**    -- IN WHICH THE STRIP SEARCHES BECOME TOO MUCH?   YES

17  OR NO?

18      **A.**    I CAN'T ANSWER THAT QUESTION BECAUSE IT'S NOT -- IT

19  DOESN'T MAKE ANY SENSE.

20      **Q.**    OKAY.   WELL, YOU HEARD MR. WOODFOX TALK ABOUT HOW HE

21  WAS STRIP SEARCHED SIX TIMES IN ONE DAY; IS THAT TOO MUCH?

22      **A.**    GOING AND COMING ON THREE DIFFERENT ISSUES, AS I

23  UNDERSTAND?

24      **Q.**    YES.   IS THAT TOO MUCH?

25      **A.**    NO.

1    Q.    WHAT ABOUT EIGHT?

2    A.    ANY TIME YOU LEAVE A SECURE AREA SUCH AS A MAXIMUM

3    SECURITY CELL BLOCK, YOU SHOULD BE SEARCHED.

4    Q.    OKAY.

5    A.    AND THAT IS VERY CONSISTENT WITH THE OTHER

6    OPERATIONS AROUND THE COUNTRY.

7    Q.    WHAT ABOUT EIGHT; WOULD THAT BE TOO MUCH?

8    A.    I CAN'T ANSWER THAT.  I MEAN, EVERY TIME A GUY

9    LEAVES A SECURE AREA, HE SHOULD BE SEARCHED.

10    Q.    EVEN IF HE'S CUFFED AND ESCORTED?

11    A.    EVEN IF HE'S CUFFED.

12    Q.    OKAY.  IN YOUR EXPERT OPINION, DO THESE STRIP

13    SEARCHES HAVE TO BE BASED ON ANY KIND OF FACTS OR CONTEXT

14    OTHER THAN LEAVING HIS CELL?

15    A.    IF THEY'RE WRITTEN IN THE POLICY, THEY SHOULD BE

16    FOLLOWED.

17    Q.    SO AS LONG AS IT'S IN THE POLICY, IT IS OKAY WITH

18    YOU?

19    A.    YES, YOU BET.

20    Q.    NOTHING FURTHER.

21    **THE COURT:**  REDIRECT?

22    **MR. CURRY:**  YES, YOUR HONOR.

23    EXAMINATION

24    BY MR. CURRY:

25    Q.    MR. KEOHANE, IS THE ONLY GOAL OF AN EFFECTIVE

1   CONTRABAND SEARCH POLICY TO DISCOVER CONTRABAND?  DISCOVER,

2   ACTUALLY FIND IT, OR IS IT ALSO IN ORDER TO DETER IT?

3       **A.**   IT'S A DETERRENT, AND A NECESSITY TO RECOVER IF

4   THERE IS CONTRABAND INVOLVED.

5       **Q.**   YOU TESTIFIED THAT CONTRABAND IS A MINISCULE PROBLEM

6   AT WADE.  WHY, IN YOUR ESTIMATION, IS IT A MINISCULE PROBLEM

7   AT WADE?

8       **A.**   BECAUSE AS COMPARED TO WHERE I WORKED AT MARION AND

9   THE FIRST SUPER MAX IN THE UNITED STATES, AND IN SOME OF THE

10  AREAS THAT I WORKED IN THE MAJOR PENITENTIARIES WERE FULL OF

11  MAXIMUM-SECURITY PRISONERS.  WHAT I SAW PRESENTED WAS NOT THAT

12  I DIDN'T THINK THAT THEY HAD FOUND THAT MUCH AT WADE AS

13  COMPARED TO SOME OF THE STUFF THAT I'VE BEEN INVOLVED WITH

14  FINDING OVER THE YEARS.

15      **Q.**   AND DO YOU HAVE AN OPINION OR A BELIEF AS TO WHY

16  WADE HAS FOUND RELATIVELY FEW SUCH CONTRABAND ITEMS?

17      **A.**   IT'S PROBABLY BECAUSE THEY ARE PRETTY THOROUGH ON

18  THEIR SEARCHES.  AND...

19      **Q.**   THEIR CONTRABAND SEARCH POLICY IS PRETTY EFFECTIVE?

20      **A.**   I WOULD SAY THAT THAT'S A POSSIBILITY, YES.

21      **Q.**   YOU WERE ASKED EXTENSIVELY ABOUT THESE INCIDENTS OF

22  ITEMS THAT WERE DISCOVERED IN THE COURSE OF THE DISCIPLINARY

23  REPORTS THROUGH FIGHTS AND OTHER MEANS.  IS IT YOUR OPINION

24  THAT A PROPER SEARCH WOULD HAVE REVEALED THESE ITEMS AND

25  PERHAPS PREVENTED THOSE INCIDENTS?

1    **A.**    YES.

2    **Q.**    YOU ALSO TESTIFIED THAT THINGS LIKE BATTERIES OR A

3    TAPE PLAYER CONCEIVABLY COULD BE CONCEALED IN AN INMATE'S

4    ANUS.   COULD YOU EXPLAIN?

5    **A.**    YES.   I THINK I HAD MENTIONED THE 137 BALLOONS IN A

6    GUY'S ANUS, THAT THEY HAD PUT IT IN DURING A VISITING

7    SITUATION.   THERE HAVE BEEN SITUATIONS, BOTH WHEN I WAS A

8    CAPTAIN OF SECURITY AND ALSO IN THE YEARS THAT I WAS THE

9    WARDEN AND WHAT HAVE YOU, THAT I WITNESSED MANY, MANY PIECES

10   OF CONTRABAND, HUGE PIECES THAT WERE CONCEALED IN THE RECTAL

11   CAVITY MOVING ABOUT THAT WERE DETECTED, EVERYTHING FROM KNIVES

12   TO .38 CALIBER BULLETS, HANDCUFF KEYS.   YOU NAME IT, I MEAN,

13   I'VE SEEN IT.   IT'S A STRETCH OF THE IMAGINATION THAT NOBODY

14   IN THEIR RIGHT MIND WOULD EVER THINK THAT SOME OF THIS STUFF

15   WOULD GET IN THAT RECTAL CAVITY, BUT IT IS A FACT THAT A LOT

16   OF TRANSPORTING OF NARCOTICS AND OTHER KINDS OF CONTRABAND

17   INSIDE A PRISON IS BY MEANS OF USE IN THE RECTAL CAVITY.

18   **Q.**    EARLIER YOU TESTIFIED ABOUT INMATES COMING INTO THE

19   FACILITY, AND AFTER INGESTING BALLOONS FILLED WITH SUBSTANCES

20   AND DEFECATING THEM, ON CROSS YOU WERE ASKED ABOUT INMATES

21   COMING INTO A FACILITY FOR THE FIRST TIME.   WAS IT YOUR INTENT

22   TO LIMIT IT ONLY TO INMATES COMING INTO THE FACILITY FOR THE

23   FIRST TIME?

24   **A.**    NO.

25   **Q.**    IN FACT, WHEN MR. WOODFOX RETURNS TO WADE THIS

1    AFTERNOON, WILL HE NOT BE A RETURNING INCOMING INMATE?

2         **A.**    YES.

3         **Q.**    YOU TESTIFIED THAT CONSISTENCY AND TREATMENT OF ALL

4    INMATES THE SAME ARE CRITICAL REASONS FOR THE PRACTICE AT

5    WADE.  WHY ARE THESE SO IMPORTANT?

6         **A.**    BECAUSE, YOU KNOW, IN PRISONS, WE WORK EXTREMELY

7    HARD TO MAKE SURE THAT EVERYONE GETS A FAIR SHAKE, AND THAT

8    NOBODY IS TREATED DIFFERENTLY, YOU KNOW, IN THOSE KINDS OF

9    MANNERS.

10        IN TERMS OF THE POLICIES AND PROCEDURES OF SECURITY

11   ISSUES OR WHAT HAVE YOU, THERE ARE 16 OTHER GUYS IN THAT CCR

12   BLOCK, AND I TOLD YOU EARLIER THAT I HAD INTERVIEWED FIVE OF

13   THEM.  NONE OF THEM RAISED THE ISSUE OF -- FELT LIKE THEY WERE

14   GETTING SEARCHED TOO MUCH, BUT YOU ALSO HEARD THE PLAINTIFF

15   SAY THAT THAT ALL THE OTHERS ON THE CELL BLOCK THERE RECEIVE

16   ABOUT THE SAME KIND OF ISSUE IN TERMS OF SEARCHES THAT HE

17   DOES.  SO I DIDN'T SEE HIM AS ANYTHING DIFFERENT THAN THE REST

18   OF THE -- ESPECIALLY THE FIVE THAT I PERSONALLY INTERVIEWED.

19        **Q.**    DO YOU BELIEVE THAT DRUGS COULD BE GIVEN TO MR.

20   WOODFOX DURING VISITATION PERIODS?

21        **A.**    POSSIBLY.

22        **Q.**    HAVE YOU SEEN THIS OCCUR IN OTHER FACILITIES?

23        **A.**    MANY.

24        **Q.**    DO YOU BELIEVE IT WOULD BE GOOD CORRECTIONAL

25   PRACTICE TO SEARCH -- TO STRIP SEARCH ONLY SOME INMATES ON A

1    TIER AND NOT OTHERS?

2        **A.**    NO, IT WOULD NOT.

3        **Q.**    WHY NOT?

4        **A.**    BECAUSE IT WOULD PUT TOO MUCH HEAT ON WHOEVER WAS

5    NOT BEING SEARCHED BECAUSE THE FIRST THING THAT THE INMATE

6    WOULD ASSUME THAT HE'S BEING TREATED DIFFERENT THAN I, AND SO

7    HE MUST BE AN INFORMANT OR WHATEVER, AND HE'D DRAW ALL KINDS

8    OF HEAT FROM EVERYBODY, INCLUDING MAYBE RISKING HIM BEING

9    SERIOUSLY HURT OR ASSAULTED.

10        **Q.**    MIGHT HE ALSO BE USED AS A MULE?

11        **A.**    HE COULD BE, AND THAT GOES BACK TO THE POSSIBILITY

12    THAT, YOU KNOW, THEY DO USE DIFFERENT -- SOMETIMES, I MEAN,

13    THE OLD -- THE OLDER TIMERS IN PRISON ARE LIKE OLD GUN

14    SLINGERS, AS THEY GET OLDER, THEY FRANKLY GET TESTED, AND SOME

15    OF THEM ARE ABUSED FROM TIME TO TIME.  SOME OF THEM ARE REALLY

16    IN -- FROM THE EXPERIENCE FACTORS, SOME ARE IDOLIZED BY SOME

17    OF THE YOUNGER INMATES.  SO IT COULD GO EITHER WAY, BUT I

18    DON'T SEE ANY DIFFERENCE IN THEIR AGING PROCESS IN TERMS OF

19    THEIR BEHAVIOR.

20        **Q.**    BUT IF HE WERE EXEMPT FROM BEING SEARCHED, MIGHT HE

21    BE MORE OF A TARGET TO BE USED AS A MULE?

22        **A.**    YES.

23        **Q.**    THAT'S ALL THE QUESTIONS I HAVE.

24            **THE COURT:**  ANY FURTHER QUESTIONS?

25            **MR. ENGLAND:**  YES.

1    EXAMINATION

2    BY MR. ENGLAND:

3        Q.    YOU JUST TESTIFIED THAT IF YOU STOP STRIP SEARCHING

4    AN INMATE, HE MIGHT DRAW HEAT, RIGHT?

5        A.    FROM THE OTHER INMATES.

6        Q.    RIGHT.

7        A.    HE WOULD BE TREATED DIFFERENT THAN --

8        Q.    ALL RIGHT.  SO I WOULD --

9        A.    FAVORITISM.

10       Q.    I WANT TO BE VERY, VERY CLEAR.

11       A.    OKAY.

12       Q.    IT'S YOUR TESTIMONY THAT WADE MUST CONTINUE STRIP

13   SEARCHING MR. WOODFOX, LOOKING INTO HIS ANUS BECAUSE IF THEY

14   STOP, OTHER INMATES ARE GOING TO BEAT HIM UP?

15           THE COURT:  MODERATE YOUR VOICE.

16           MR. ENGLAND:  I'M SORRY.  I'M SORRY.  I APOLOGIZE.

17   BY MR. ENGLAND:

18       Q.    IS IT YOUR TESTIMONY THAT IF MR. WOODFOX IS NO

19   LONGER STRIP SEARCHED EVERY DAY SIX TIMES A DAY, OTHER INMATES

20   ARE GOING TO BEAT HIM UP?

21           MR. CURRY:  OBJECTION, YOUR HONOR.  THAT'S SUCH A

22   GROSS MISCHARACTERIZATION, SIX TIMES EVERY DAY.

23           THE COURT:  REPHRASE YOUR QUESTION.

24   BY MR. ENGLAND:

25       Q.    MR. KEOHAN, ARE YOU CONCERNED THAT MR. WOODFOX WOULD

1 BE LABELED AS AN INFORMER BY OTHER INMATES AT WADE?

2 **A.** IF HE WAS TREATED DIFFERENT AND IT WAS OBVIOUS TO

3 THE OTHER ONES, HE COULD DRAW SOME HEAT, YEAH, IF HE WAS

4 TREATED DIFFERENT THAN THE OTHER INMATES.

5 **Q.** AND IT IS YOUR OPINION THAT MR. WOODFOX, WHO'S

6 CARRIED ON LITIGATION AGAINST THESE DEFENDANTS FOR OVER A

7 DECADE, IS SUDDENLY GOING TO BE LABELED AN INFORMANT FOR THESE

8 VERY SAME DEFENDANTS; IS THAT RIGHT?

9 **A.** POSSIBILITY, YES.

10 **Q.** OKAY. HOW POSSIBLE?

11 **A.** WELL, IN MY EXPERIENCE, IT'S A VERY REALIST

12 POSSIBILITY.

13 **Q.** OKAY. MR. CURRY WAS ASKING YOU QUESTIONS ABOUT THE

14 CONSISTENCY. DO YOU REMEMBER THOSE QUESTIONS AND ANSWERS?

15 **A.** VAGUELY, YES.

16 **Q.** AND YOU WERE ON THE BOARD OF THE ACA, RIGHT, FOR A

17 TIME?

18 **A.** I WAS A COMMISSIONER FOR THEM, YES.

19 **Q.** OKAY. AND DID THE ACA EVERY PROMULGATE GUIDELINES

20 OR POLICIES OR RECOMMENDATIONS THAT CONSISTENCY WAS AN

21 IMPORTANT PART OF STRIP SEARCHING?

22 **A.** NOT SPECIFICALLY, YOU KNOW, BUT CONSISTENCY IS A

23 VERY, VERY IMPORTANT THING.

24 **Q.** OKAY. YOU SPENT A --

25 **A.** ESPECIALLY ON STANDARDS BECAUSE YOU HAVE 460

1  STANDARDS THAT ARE NON-MANDATORY STANDARDS, AND YOU HAVE 61

2  MANDATORY STANDARDS, AND THOSE ARE CONSISTENT WITH THE

3  ACCREDITATION PROCESS.

4      **Q.**    AND I WANT TO BE VERY CLEAR.  I'M NOT ASKING YOU

5  ABOUT WHETHER POLICIES ARE CONSISTENT.  MY QUESTION IS THIS:

6  DO THE ACA SAY, STRIP SEARCHING IS IMPORTANT BECAUSE A, THE

7  DETECTION OF CONTRABAND AND B, CONSISTENCY?

8      **A.**    I DON'T KNOW WHETHER IT SAYS EXACTLY THAT, BUT MY

9  INTERPRETATION OF IT IS SINCE I CHAIR MANY OF THE COMMITTEES,

10  IS CONSISTENCY IS EXTREMELY IMPORTANT, YES.

11      **Q.**    SO THAT'S JUST YOUR INTERPRETATION, RIGHT?

12      **A.**    WELL, I THINK IT'S MORE THAN JUST MINE.

13      Q.    OKAY.

14      **A.**    BUT YES.

15      **Q.**    IS THERE ANY DOCUMENT FROM THE ACA THAT SAYS THAT

16  CONSISTENCY IS A PURPOSE OF STRIP SEARCHING AN INMATE; IS

17  THERE AN ACA DOCUMENT THAT SAYS THAT?

18      **A.**    I'M NOT SURE IF IT SAYS EXACTLY THAT, BUT YES.

19      **Q.**    OKAY.  BUT WHAT'S THE DOCUMENT THAT SORT OF SAYS

20  THAT?

21      **A.**    IT IS PART OF THE ASSESSMENT THAT I GIVE, WHENEVER I

22  AUDIT A PRISON OR A JAIL.

23      **Q.**    I'M NOT ASKING YOU ABOUT YOUR ASSESSMENTS.  I'M

24  ASKING YOU ABOUT THE ACA MODEL GUIDELINES.

25      **A.**    WELL, I AM REPRESENTING THE ACA AT THAT TIME.  SO,

1    YES.

2         Q.    OKAY.   AND SO WHERE IS THAT DOCUMENT?

3         A.    PEOPLE LIKE ME WHO HAVE THAT KIND OF EXPERIENCE.

4         Q.    NO.   MY QUESTION IS:   WHERE IS THE DOCUMENT?

5         A.    I DON'T HAVE IT, AND I WOULDN'T KNOW EXACTLY WHAT

6    THE DOCUMENT IS TITLED, OR EVEN IF THERE IS ONE, BUT

7    CONSISTENCY IS VERY MUCH A PART OF RUNNING A FACILITY.

8         Q.    OKAY.

9         A.    JUST FOR THE CONCEPT OF FAIRNESS.

10        Q.    AND FINALLY, MR. CURRY ASKED YOU A COUPLE QUESTIONS

11   ABOUT THE MINISCULE NATURE OF CONTRABAND AT WADE; DO YOU

12   REMEMBER THAT, THOSE QUESTIONS THAT HE ASKED YOU?

13        A.    YEAH, I REMEMBER.

14        Q.    AND I BELIEVE YOU TESTIFIED THAT CONTRABAND WAS

15   MINISCULE BECAUSE OF THE OPERATIONS THAT WADE WAS DOING TO

16   REDUCE CONTRABAND; IS THAT RIGHT?

17        A.    NO, THAT'S NOT WHAT IT WAS.

18        Q.    I'M SORRY.   CAN YOU PLEASE REEXPLAIN TO ME WHAT IT

19   WAS THAT YOU SAID?

20        A.    I SAID THAT IN THE INSTITUTIONS THAT I HAVE RAN ALL

21   OVER THE UNITED STATES, FIVE FEDERAL PRISONS, THREE MAXIMUM

22   SECURITIES, IT IS -- IT WAS -- DIDN'T SEEM THAT THERE WAS THAT

23   MUCH CONTRABAND, IF THOSE ARE THE EXAMPLES THAT I HEARD,

24   BECAUSE I HAVE PLENTY MORE THAT WERE MUCH MORE INTENSE.

25        Q.    OKAY.   ALL RIGHT.   SO YOU DID NOT TESTIFY THAT

1  CONTRABAND AT WADE WAS LOW BECAUSE OF THEIR GOOD PROCESSES; AM

2  I UNDERSTANDING YOU?

3      **A.**    HE ASKED ME, ARE YOU -- IS THAT THE REASON?  AND I

4  SAID, THAT'S A POSSIBILITY.

5      **Q.**    OKAY.

6      **A.**    MAYBE THEY DO A LOT OF SEARCHES VERY EFFECTIVELY,

7  AND MAYBE THAT'S THE REASON THEY HAVE SO FEW EXAMPLES.  BUT IN

8  MY -- SOME OF THE INSTITUTIONS THAT I'VE RAN, I COULD SIT HERE

9  FOR ALL NIGHT AND RUN DOWN THE DIFFERENT ONES THAT I'VE BEEN

10  INVOLVED IN IN MY DAY.  SO THEY DIDN'T SEEM LIKE THAT MUCH.

11      **Q.**    SO DAVID WADE CONDUCTS A LOT OF SEARCHES, STRIP

12  SEARCHES, VERY EFFECTIVELY; THAT'S YOUR TESTIMONY, RIGHT?

13      **A.**    I SAID THAT THEY MIGHT, YEAH.

14      **Q.**    THEY MIGHT?

15      **A.**    YEAH, THEY MIGHT.

16      **Q.**    BUT YOU DON'T KNOW?

17      **A.**    I DON'T KNOW.  I WASN'T PART OF THE SEARCH.  SO...

18      **Q.**    OKAY.  I HAVE NOTHING FURTHER.  I APOLOGIZE FOR

19  RAISING MY VOICE.

20      **A.**    NO PROBLEM, SIR.  THANK YOU.

21          **THE COURT:**  ALL RIGHT.  AND, HOPEFULLY, YOU CAN

22  CATCH YOUR PLANE.

23          **THE WITNESS:**  THANK YOU, SIR.

24          **THE COURT:**  ALL RIGHT.  WE ARE GOING TO TAKE A BRIEF

25  RECESS AND THEN THE WARDEN WILL RESUME.

1    (WHEREUPON, THE COURT WAS IN RECESS.)

2    **REPORTER'S NOTE:**   (ALL PARTIES PRESENT IN COURT.)

3    **THE COURT:**   BE SEATED, FOLKS.

4    **MR. CURRY:**   MAY I PROCEED?

5    **THE COURT:**   YES, GO AHEAD.

6    **MR. CURRY:**   I HAVE VERY LITTLE, JUDGE.

7    (WHEREUPON, **JERRY GOODWIN,** HAVING BEEN PREVIOUSLY

8    DULY SWORN, CONTINUED TO TESTIFY AS FOLLOWS.)

9    **EXAMINATION**

10   **BY MR. CURRY:**

11   **Q.**   WARDEN GOODWIN, JUST A FEW THINGS I'D LIKE TO

12   CLARIFY FROM EARLIER TESTIMONY.   MR. ENGLAND ASKED YOU ABOUT

13   WHETHER THINGS LIKE A MATTRESS HAD EVER BEEN DISCOVERED IN AN

14   INMATE'S ANUS, TO WHICH YOU REPLIED YOU HAD NOT.   TELL ME,

15   HOWEVER, SOME OF THE THINGS THAT HAVE BEEN DISCOVERED IN AN

16   INMATE'S RECTUM THROUGH SEARCHES.

17   **A.**   I THINK HE ASKED --

18   **THE COURT:**   HOLD ON.

19   **MR. ENGLAND:**   I OBJECT.   I DON'T BELIEVE I'VE

20   EXAMINED THE WITNESS.

21   **MR. CURRY:**   OH, THAT WAS A QUESTION FOR MR. -- YOU

22   ARE RIGHT.   I STAND CORRECTED.   THAT WAS A QUESTION DIRECTED

23   TO MR. ELMORE.

24   **BY MR. CURRY:**

25   **Q.**   IT WOULD PROBABLY BE DIRECTED TO YOU SHORTLY, BUT

1  I'LL PRE-EXEMPT IT.  SO...

2       **A.**  COULD YOU REPEAT THE QUESTION?

3       **Q.**  TELL ME -- PLEASE TELL THE COURT, PLEASE, WHAT SORTS

4  OF ITEMS YOU HAVE FOUND AT WADE INSERTED IN AN INMATE'S

5  RECTUM.

6       **A.**  WELL, THERE'S BEEN DIFFERENT ITEMS OF CONTRABAND

7  DISCOVERED OVER THE YEARS THAT INMATES HAVE HIDDEN IN

8  DIFFERENT BODY CAVITIES.  IN THE RECTUM ITSELF I CAN RECALL

9  CIGARETTE LIGHTERS, CIGARETTES, CELL PHONES, BATTERIES, THINGS

10  OF THAT NATURE.

11       **Q.**  A CELL PHONE?

12       **A.**  YES, SIR.

13       **Q.**  THE WHOLE CELL PHONE?

14       **A.**  YES, SIR.  IT HAD AN EXTRA BATTERY WITH IT, TOO.

15       **Q.**  DID THAT HAPPEN AT WADE?

16       **A.**  SIR?

17       **Q.**  AT WADE?

18       **A.**  YES, SIR.  THE INMATE WAS RETURNING FROM A COURT

19  ORDER, HAD BEEN OUT ON COURT ORDER FOR A COUPLE OF WEEKS, HAD

20  BEEN STAYING AT ANOTHER FACILITY, AND WHEN HE ARRIVED AT WADE,

21  THEY WERE DOING THE SEARCH, AND THEY -- DURING THE COURSE OF

22  THE SEARCH, THEY FOUND A CELL PHONE INSIDE HIS -- WELL, I

23  MEAN, WHEN HE BENT OVER, IT KIND OF FELL OUT A LITTLE BIT.

24       **Q.**  THERE WAS ALSO TESTIMONY ABOUT CAMERAS ON THE

25  PERIMETER OF THE FACILITY THAT COULD BE TRAINED TO THE

1    EXERCISE YARD.  COULD YOU ELABORATE A BIT ON THAT?

2         **A.**    THE EXERCISE YARD IS NOT OBSERVED UNDER CAMERA -- IS

3    NOT ON CAMERA OBSERVATIONS, I SHOULD SAY.  WE DO HAVE

4    PERIMETER CAMERAS, BUT THEY'RE TRAINED ON THE PERIMETER FENCE,

5    AND AS PART OF OUR PERIMETER SECURITY, ALONG WITH OUR

6    SHAKER-FENCE TECHNOLOGY THAT WE HAVE INSTALLED, THOSE CAMERAS

7    PRIMARILY MAINTAIN COVERAGE OF THE PERIMETER FENCE, WHERE THEY

8    ARE MONITORED IN THE CONTROL CENTER QUITE A BIT OF DISTANCE

9    FROM THAT AREA, BUT WE DO NOT HAVE CAMERAS MONITORING THE

10   RECREATION AREA FOR EXTENDED LOCKDOWN INMATES.

11        **Q.**    IN THEORY, THEY COULD BE TURNED THAT WAY, BUT THEY

12   ARE NOT OR --

13        **A.**    YEAH, YOU CAN -- THEY -- YOU CAN MOVE AND PIVOT AND

14   OTHER THINGS WITH THE CAMERAS AND YOU PROBABLY COULD GET A

15   VIEW, BUT THOSE CAMERAS ARE QUITE A DISTANCE FROM THAT AREA.

16        **Q.**    AND FOR SECURITY PURPOSES, THEY ARE TRAINED ON THE

17   PERIMETER?

18        **A.**    THAT'S CORRECT.

19        **Q.**    OKAY.

20        **A.**    ON THE DOUBLE FENCE ITSELF.

21        **Q.**    AND THERE WAS ALSO TESTIMONY ABOUT -- AND I JUST

22   WANT TO CLEAR UP, RATHER THAN HAVE IT LAY IN THE RECORD.

23   SOMETIMES INMATES ARE SHACKLED TO BE BROUGHT TO A SECURITY

24   HEADQUARTERS AREA IN ORDER TO HAVE SECURE TELEPHONE CALLS WITH

25   THEIR ATTORNEYS; IS THAT RIGHT?

1    **A.**   YES.   TO THE SECURITY OFFICE, YES, SIR.

2    **Q.**   AND THERE WAS SOME TESTIMONY EARLIER THAT SECURITY

3    OFFICERS WERE ABLE TO HEAR THE PHONE CALLS TAKE PLACE.   COULD

4    YOU DESCRIBE IN MORE DETAIL THE CIRCUMSTANCES UNDER WHICH

5    THOSE PHONE CALLS TAKE PLACE?

6    **A.**   THERE ARE TIMES THAT I'VE WALKED OVER WHEN LEGAL

7    CALLS HAVE BEEN TAKING PLACE, NOT NECESSARILY WITH WOODFOX.   I

8    HAVE SEEN HIM ON THE PHONE A COUPLE OF TIMES, BUT THE

9    OFFICER -- IT'S A BIG ROOM.   IT'S PROBABLY A 600-SQUARE FOOT

10   ROOM, AND THE OFFENDER IS ON THE OTHER SIDE OF THE ROOM.   I

11   MEAN, THE OFFICER CAN'T HEAR WHAT'S BEING SAID BY THE

12   OFFENDER, AND HE CERTAINLY CAN'T HEAR WHAT THE ATTORNEY ON THE

13   OTHER END, OR WHOEVER THE GUY -- WHOEVER HE'S TALKING TO,

14   WHATEVER LEGAL REPRESENTATIVE HE'S TALKING TO, HE CERTAINLY

15   CAN'T HEAR THAT PART OF THE CONVERSATION.   HE COULD HEAR THE

16   OFFENDER TALKING, BUT HE CAN'T -- WE DON'T LISTEN TO THOSE

17   PHONE CALLS.   I JUST WANTED TO MAKE THAT POINT CLEAR.

18   **Q.**   WHAT TYPE OF PHONE DOES HE USE?

19   **A.**   IT'S A -- IT'S NOT THE REGULAR OFFENDER TELEPHONE

20   SYSTEM.   IT'S ON ONE OF OUR INSTITUTIONAL PHONES.   IT'S A

21   CORDLESS PHONE THAT'S TIED INTO THE THREE-DIGIT PHONE SYSTEM

22   WE HAVE.

23   **Q.**   SO HE COULD MOVE AWAY -- HE COULD MOVE ANYWHERE IN

24   THE ROOM HE WANTED TO?

25   **A.**   YES, SIR.

1    **Q.**   OKAY.   WHY IS CONTRABAND SUCH A CONCERN FOR AN

2    INSTITUTION SUCH AS WADE?

3    **A.**   IT'S A MAXIMUM-SECURITY FACILITY.   IT'S ONE OF THE

4    THREE LEVEL-ONE FACILITIES IN THE STATE.   WE HOUSE PRETTY MUCH

5    ANY OFFENDER WITH THE EXCEPTION OF DEATH ROW.   OBVIOUSLY, NO

6    FEMALES, BUT ALL MALE OFFENDERS.   IT IS A VERY HIGH, SECURE

7    AREA, ESPECIALLY THE SOUTH COMPOUND OF DAVID WADE CORRECTIONAL

8    CENTER.

9    OUR MEDIUM CUSTODY OF THE POPULATION ARE VERY LONG-TERM

10   OFFENDERS.   MOST OF THEM ARE THERE FOR VERY SERIOUS CRIMES,

11   YOU KNOW.   THEY ARE DOING SEVERAL YEARS.

12   A LOT OF THEM ARE LIFERS.   WE HAVE 200 OR 300 LIFERS AT

13   WADE, OR, YOU KNOW, IT IS QUITE A HIGH-SECURITY POPULATION,

14   EVEN IN OUR MEDIUM-SECURITY POPULATION, THESE ARE HIGH-RISK

15   OFFENDERS THAT WE MANAGE AT DAVID WADE CORRECTIONAL CENTER.

16   SO IT'S CRITICALLY IMPORTANT FOR THE PUBLIC SAFETY, THE SAFETY

17   OF OUR STAFF, THE SAFETY OF THE OFFENDERS THAT LIVE AT WADE,

18   THAT WE DO EVERYTHING WE CAN TO CONTROL THE FLOW OF

19   CONTRABAND.

20   **Q.**   WHAT ABOUT CONTRABAND LIKE TOBACCO; IS THAT REALLY A

21   CONCERN?

22   **A.**   IT'S A CONCERN BECAUSE IT'S A FORM OF CURRENCY.   I

23   MEAN, PEOPLE PAY OFF THEIR GAMBLING DEBTS, PEOPLE USE IT JUST

24   LIKE YOU AND I WOULD USE A DOLLAR BILL.

25   **Q.**   WHAT CONCERNS WOULD YOU HAVE WITH THINGS LIKE

1  CIGARETTE LIGHTERS?

2      **A.**   OBVIOUSLY, THE BIC LIGHTERS, AS WE TALKED ABOUT

3  EARLIER, THE LITTLE METAL RING AROUND THE TOP OF THEM CAN BE

4  USED TO MAKE A WORKING HANDCUFF KEY; BUT OUTSIDE OF THAT, JUST

5  THE FACT THAT IT'S A SOURCE OF FIRE, AND, YOU KNOW, IF YOU --

6  IF YOU HAVE A FIRE IN ONE OF YOUR MAXIMUM-SECURITY CELL

7  BLOCKS, THAT'S NOT AN EASY FACILITY TO EVACUATE, IF YOU NEED

8  TO EVACUATE.

9      YOU HAVE TO OBVIOUSLY TAKE THE OFFENDERS' LIVES VERY

10  SERIOUSLY OF GETTING THEM OUT OF THERE, BUT YOU CAN'T JUST

11  OPEN THE DOOR AND SAY, OKAY, Y'ALL LEAVE.  Y'ALL GO ON.  THE

12  BUILDING IS ON FIRE.  Y'ALL GO OUTSIDE, AND WE'LL COME FIND

13  YOU IN A LITTLE BIT.  THEY HAVE TO BE ORDERLY EVACUATED.

14      SO, YOU KNOW, INMATES SETS FIRES TO MATTRESSES, EVEN

15  THOUGH WE HAVE FIRE RETARDANT MATTRESSES AND SHEETS AND THINGS

16  OF THAT NATURE, OFFENDERS STILL FROM TIME TO TIME CAN BE

17  DISRUPTIVE OR, YOU KNOW, GET OVER THEIR BOREDOM OR WHATEVER

18  REASON, THEY WILL SET FIRES JUST TO, YOU KNOW, WATCH THE

19  EXCITEMENT AND THINGS OF THAT NATURE.

20      **Q.**   A LOT OF THE CROSS-EXAMINATION TODAY FOCUSED ON

21  SEARCHES AS APPLIED TO, AND THE GROUNDS FOR SEARCHING INMATE

22  WOODFOX IN PARTICULAR.  HAVE YOU EVER BEEN IN A POSITION WHERE

23  YOU WOULD CONSIDER EXEMPTING AN INDIVIDUAL INMATE FROM THE

24  ROUTINE TIER SEARCHES WITHIN ANY OF THESE CELL BLOCKS?

25      **A.**   NO, SIR.  IT'S KIND OF LIKE A UNIVERSAL PRECAUTION

1  ON BLOOD SPILLS.  YOU KNOW, YOU JUST DO -- YOU TREAT EVERYBODY

2  THE SAME.  YOU HAVE TO.  YOU CAN'T EXEMPT ANY ONE INDIVIDUAL

3  OR ANY GROUP OF INDIVIDUALS, OR IT -- EVERYBODY'S THE SAME.

4  THE POLICY IS APPLICABLE TO EVERYONE IN THAT CERTAIN CUSTODY

5  STATUS.

6      **Q.**  AND HAVE YOU -- IN REVIEWING ARPS AND DISCIPLINARY

7  REPORTS, ARE YOU AWARE OF ALLEGATIONS THAT INDIVIDUALS WITHIN

8  A GIVEN TIER ARE TREATED DIFFERENTLY OR ARE THEY ALL TREATED

9  THE SAME?

10      **A.**  CAN YOU --

11      Q.  I'M SORRY.

12      **A.**  -- RESTATE THE QUESTION OR SAY IT AGAIN?

13      Q.  TO THE BEST OF YOUR KNOWLEDGE, ARE INDIVIDUALS

14  WITHIN AN INDIVIDUAL TIER TREATED CONSISTENTLY AT WADE TODAY?

15      **A.**  YES.

16      **MR. CURRY:**  YOUR HONOR, THAT'S ALL THE QUESTIONS I

17  HAVE.  I WOULD LIKE TO, BEFORE I REST -- I BELIEVE WE SHOULD

18  HAVE EXHIBITS STATE 1 THROUGH 10.  THERE IS SOME QUESTION OF

19  WHETHER I TENDERED EXHIBIT 2.  IF I HAVEN'T YET, I THINK

20  THAT'S BEEN --

21      **THE COURT:**  IT WAS ADMITTED.

22      **MR. CURRY:**  YES, I THOUGHT IT WAS.

23      **THE CLERK:**  I DON'T HAVE 1.

24      **MR. CURRY:**  I'LL GET IT RIGHT NOW.  IT WAS ADMITTED.

25      AND FINALLY, YOUR HONOR, I BELIEVE EXHIBITS 5 THROUGH 9,

1  YOU CONDITIONALLY ACCEPTED --

2  **THE COURT:**  YES, I STILL HAVEN'T LOOKED AT THEM, AND

3  I WILL MAKE A RULING ON THAT.

4  **MR. CURRY:**  OKAY.

5  **THE COURT:**  BUT AS OF RIGHT NOW, THEY ARE IN.  YOU

6  HAVE DONE EVERYTHING YOU NEED TO DO.

7  **MR. CURRY:**  OKAY.  I WAS GOING TO ASK THAT THEY BE

8  PROFFERED IF THEY WERE NOT -- FOR ANY REASON, IF THEY WEREN'T

9  ADMITTED.  BUT...

10  **THE COURT:**  ALL RIGHT.  I WILL GIVE YOU AN

11  OPPORTUNITY TO PROFFER SHOULD I DENY THEM.

12  **MR. CURRY:**  THANK YOU, JUDGE.

13  **THE COURT:**  CROSS?

14  **EXAMINATION**

15  **BY MR. ENGLAND:**

16  **Q.**  GOOD AFTERNOON, WARDEN GOODWIN.

17  **A.**  GOOD AFTERNOON.

18  **Q.**  I'D LIKE TO START WITH QUESTIONS THAT GET TO THE

19  FUNDAMENTAL POINT OF THIS HEARING.  IS IT YOUR TESTIMONY THAT

20  IT'S OKAY TO LOOK IN MR. WOODFOX'S ANUS AND TO HAVE HIM LIFT

21  HIS GENITALS JUST BECAUSE HE NEEDS TO GO TO THE DOCTOR?

22  **A.**  NO, YOU DO THAT BECAUSE HE HAS TO EXIT THE BUILDING.

23  **Q.**  OKAY.  SO IS IT YOUR TESTIMONY THAT --

24  **A.**  IT DOESN'T MATTER WHERE HE'S GOING, BUT IF HE'S

25  EXITING THE BUILDING, IT'S NECESSARY, YES.

1    Q.    ALL RIGHT.  SO --

2    A.    ALONG WITH LOOKING IN HIS MOUTH AND UNDER HIS

3    TONGUE, BEHIND HIS EARS, PLACES LIKE THAT.

4    Q.    ALL RIGHT.

5    A.    IN HIS HAIR.

6    Q.    OKAY.  SO TO BE CLEAR, IF MR. WOODFOX NEEDS TO GO TO

7    THE DOCTOR OR TALK TO HIS ATTORNEYS, AS LONG AS HE'S EXITING

8    THE BUILDING, IT'S YOUR TESTIMONY THAT IT'S OKAY TO STRIP

9    SEARCH HIM TWICE, AT LEAST?

10   A.    DID YOU SAY IF HE DOESN'T LEAVE THE BUILDING?

11   Q.    IF MR. WOODFOX LEAVES THE BUILDING, THE TIER, TO GO

12   SEE HIS DOCTOR, IT'S YOUR TESTIMONY THAT IT'S OKAY TO STRIP

13   SEARCH HIM AT LEAST TWICE IN THAT SCENARIO?

14   A.    A VISUAL BODY CAVITY SEARCH TO BE CONDUCTED TWICE;

15   IT WOULDN'T BE A STRIP SEARCH, IT WOULD BE A VISUAL BODY

16   CAVITY SEARCH.

17   Q.    AND THAT WOULD STILL BE HIM REQUIRED TO STRIP NAKED

18   IN FRONT OF GUARDS?

19        THE COURT:  WHAT'S THE DIFFERENCE?

20        THE WITNESS:  THE STRIP SEARCH, THEY DON'T DO THE

21   BENDING AND LOOKING UP THE ANAL CAVITY.  EVERYTHING WITH THE

22   EXCEPTION OF THAT AND UP UNDERNEATH THE GENITALS.

23   BY MR. ENGLAND:

24   Q.    OKAY.  YOU TESTIFIED EARLIER THAT -- LET ME TAKE YOU

25   THROUGH THIS EXHIBIT, AND THEN WE'LL GET TO THAT.  I'LL COME

1   FORWARD.

2       **A.**    OKAY.

3       **Q.**    EARLIER YOU TALKED ABOUT THE SPACE, THE EXERCISE

4   YARDS.  I'M DIRECTING YOU TO THE ONE THAT SAYS EXERCISE AND

5   THEN THE OTHER BOX, IT'S LIKE TWO BOXES THAT SAYS EXERCISE.

6   DO YOU SEE THAT?

7       **A.**    YES, SIR.

8       **Q.**    AND SO THE SINGLE BOX EXERCISE, THAT'S WHERE THE CCR

9   AND MAXIMUM-SECURITY INMATES EXERCISE; IS THAT RIGHT?

10      **A.**    WELL, THEY'RE ALL MAXIMUM-SECURITY INMATES, SO THEY

11  USE ALL THREE OF THOSE.  THERE'S ACTUALLY THREE EXERCISE,

12  EXERCISE, EXERCISE.  IT SHOULD BE EXERCISE IN THAT THIRD ONE

13  THAT'S BLANK RIGHT THERE.

14      **Q.**    UH-HUH.

15      **A.**    BECAUSE THAT'S THE TOTAL OF 21 PENS.  THERE'S SEVEN

16  IN EACH ROW.

17      **Q.**    ALL RIGHT.  AND SO MR. WOODFOX EXERCISES IN THE BOX

18  FARTHEST TO THE LEFT; IS THAT RIGHT?

19      **A.**    THAT'S CORRECT.

20      **Q.**    AND THERE ARE AT ANY GIVEN TIME SEVEN INMATES IN

21  THOSE PENS; IS THAT RIGHT?

22      **A.**    YES, THAT'S CORRECT.

23      **Q.**    AND EARLIER I BELIEVE MR. CURRY INDICATED THAT THIS

24  MAP WAS NOT TO SCALE, RIGHT?

25      **A.**    YES, SIR, IT'S NOT.  IT'S NOT TO SCALE.

1    **Q.**   I'M SORRY TO INTERRUPT.

2    **A.**   IT'S NOT TO SCALE, NO.

3    **Q.**   BUT THERE'S THIS GAP HERE BETWEEN THE ONE BOX AND

4    THE TWO BOXES; DO YOU SEE THAT?

5    **A.**   YES.

6    **Q.**   IS THERE, IN FACT, A GAP ON THE PHYSICAL LAYOUT OF

7    WADE FACILITY BETWEEN THOSE EXERCISE PENS?

8    **A.**   YES, THERE'S A WALKWAY THERE.

9    **Q.**   OKAY.   AND SO WOULD YOU AGREE WITH ME THAT IT WOULD

10   BE IMPOSSIBLE FOR AN INMATE TO PASS AN ITEM ACROSS THE SPACE

11   BETWEEN THE EXERCISE PENS?

12   **A.**   NO, I WOULDN'T.

13   **Q.**   HAVE YOU EVER SEEN THAT HAPPEN?

14   **A.**   YES.

15   **Q.**   CAN YOU EXPLAIN THAT?

16   **A.**   ONE OF THOSE IS CONTAINED IN THAT REPORT.  I BELIEVE

17   ONE OF THE INMATES FROM H5 WALKED BY AND ATTEMPTED TO PASS

18   SOMETHING IN THAT -- FROM THIS -- FROM THIS WALKWAY.

19   **Q.**   OKAY.  WE'LL TALK ABOUT THAT.  OTHER THAN THAT --

20   **A.**   YES.  IT'S QUITE POSSIBLE, YES.

21   **Q.**   OKAY.  ALL RIGHT.

22   **A.**   YOU GOT -- I'M SORRY.

23   **Q.**   THAT'S ALL RIGHT.  WHEN WE GET TO THAT EXHIBIT,

24   WOULD YOU JUST LET ME KNOW WHICH ONE THAT WAS?

25   **A.**   SURE.

1    Q.   ALL RIGHT.  HOW DOES CONTRABAND GET INTO YOUR

2    FACILITY, WARDEN?

3    A.   ANY NUMBER OF WAYS.  IT COULD BE BROUGHT BY

4    VISITORS, IT COULD BE BROUGHT BY STAFF, IT COULD BE DROPPED ON

5    THE SIDE OF THE ROAD FOR ONE OF OUR TRUSTEES TO PICK UP.

6    THERE'S ANY NUMBER OF WAYS, IT COULD COME THROUGH THE MAIL

7    ROOM, ANY NUMBER OF WAYS.

8    Q.   DOES IT TYPICALLY COME FROM YOUR CCR INMATES LIKE

9    MR. WOODFOX?

10   A.   DOES IT ORIGINATE THERE OR DOES IT ARRIVE THERE?

11   Q.   EITHER?

12   A.   IT COULD, YES.

13   Q.   WELL, BY PERCENTAGE, HOW MUCH CONTRABAND WOULD YOU

14   SAY COMES IN FROM VISITOR CONTACTS?

15   A.   YOU KNOW, I REALLY DON'T HAVE ANY IDEA BECAUSE I'M

16   SURE THERE'S CONTRABAND THAT COMES IN THAT WE HAVE -- THAT WE

17   NEVER DETECT AND HAVE NO IDEA THAT IT'S THERE.

18   Q.   WELL, LET'S TALK ABOUT THE --

19   A.   SO AS FAR AS WHAT'S ACTUALLY CAUGHT, I MEAN, I DON'T

20   KNOW.  I DON'T HAVE ANY IDEA.  TWENTY-FIVE PERCENT, JUST TO

21   THROW A NUMBER OUT, BUT I HAVE -- DON'T HOLD ME TO THAT

22   NUMBER.  I HAVE NO IDEA WHAT IT IS.

23   Q.   I UNDERSTAND, AND I WON'T HOLD YOU TO IT, BUT LET'S

24   TRY IT THIS WAY.  WOULD IT BE FAIR TO SAY THAT THE VAST

25   MAJORITY OF CONTRABAND IN YOUR FACILITY COMES FROM THE OUTSIDE

1    IN?

2        **A.**   OH, YES, IT HAS TO ORIGINATE FROM THE OUTSIDE.

3        **Q.**   OKAY.  AND THE CONTRABAND THAT YOU'VE DETECTED IN

4    YOUR FACILITY, I BELIEVE YOU TALKED ABOUT TOBACCO, I BELIEVE

5    ONE OF THESE REPORTS SAYS A SHANK OR A KNIFE-TYPE ITEM.  ANY

6    OTHER KIND OF CONTRABAND THAT YOU COULD DESCRIBE FOR THIS

7    COURT HERE TODAY?

8        **A.**   I MEAN, YOU -- ON OCCASION, YOU FIND NARCOTICS, LIKE

9    MARIJUANA.  YOU FIND WEAPONS, YOU FIND CELL PHONES, THINGS

10   LIKE THAT.  THERE'S A LONG LIST OF ENUMERATED ITEMS THAT ARE

11   CONSIDERED CONTRABAND.  UNFORTUNATELY, WE HAVEN'T FOUND ANY

12   EXPLOSIVES, BUT WE'VE PROBABLY FOUND SOME OF JUST ABOUT

13   EVERYTHING ELSE ON THAT LIST.

14       **Q.**   AND WHERE DO YOU TYPICALLY FIND THOSE CONTRABAND

15   ITEMS?

16       **A.**   INSIDE THE PRISON.

17       **Q.**   WHERE?

18       **A.**   IT COULD BE ANYWHERE.  THEY COULD BE TAPED UNDER A

19   TABLE, THEY COULD BE ON AN INMATE'S PERSON.  THEY COULD BE IN

20   HIS JUMPSUIT, THEY COULD BE UNDER HIS MOUTH.  ONE OF THE

21   FAVORITE HIDING PLACES THAT I REMEMBER AS A CORRECTIONAL

22   OFFICER IS ALWAYS OFFENDERS THAT HAD FALSE TEETH.  THEY WOULD

23   WANT TO -- THEY'D HIDE CASH MONEY AND MARIJUANA AND STUFF

24   UNDERNEATH THEIR PLATE IN THEIR TEETH.  THERE'S -- I MEAN, YOU

25   CAN FIND IT ANYWHERE.  IT'S ANYWHERE AND EVERYWHERE.

1     **Q.**   LET ME TRY --

2     **A.**   IT'S ALWAYS AROUND YOU.   IT'S KIND OF LIKE THE FORCE

3  ON STAR WARS, YOU KNOW, IT'S ALWAYS THERE.

4     **Q.**   OKAY.   LET ME TRY IT A SLIGHTLY DIFFERENT WAY.   WHEN

5  YOU DETECT CONTRABAND, THE INMATES, MORE TIMES THAN NOT, ARE

6  THEY GENERAL POPULATION, CCR?

7     **A.**   MOST OF OUR CONTRABAND INCIDENTS AT DAVID WADE OCCUR

8  IN THE CELL BLOCKS.

9     **Q.**   THE GENERAL POPULATION?

10    **A.**   NO, SIR, IN THE CELL BLOCKS, N1, N2, N3, N4.

11 CONTRABAND IS CIGARETTE LIGHTERS, TOBACCO ITEMS, SUCH AS THAT

12 NATURE IS DEFINED AS CONTRABAND AT OUR INSTITUTION BECAUSE OF

13 THE SERIOUS RISK OF FIRE AND THINGS OF THAT NATURE.   SO THE

14 MAJORITY OF OUR -- WHAT WE DEFINE AS CONTRABAND IS PROBABLY

15 LIGHTERS, MATCHES, STRIKERS, MATCH STRIKERS, THINGS OF THAT

16 NATURE, AND THEY'RE PREDOMINANTLY FOUND IN OUR CELL BLOCKS.

17    **Q.**   YOU WOULD AGREE THAT THE MATCHES AND THE LIGHTERS,

18 THOSE ARE ITEMS THAT HAVE TO COME FROM STAFF, RIGHT?

19    **A.**   THEY COULD COME FROM -- WELL, WE SELL THEM IN THE

20 COMMISSARY, WE STILL SELL CIGARETTES TO GENERAL POPULATION

21 INMATES, SO THEY CAN COME FROM INMATES.   IT'S A BIG BLACK

22 MARKET IN THE PRISON AND, YOU KNOW, A PACK OF BUGLER THAT

23 SELLS FOR $3.98 IN THE CANTEEN, YOU CAN PROBABLY TURN AROUND

24 AND SELL THAT FOR 45, 50 BUCKS BY SELLING IT TO THE INMATES IN

25 LOCKDOWN.

1    **Q.**    OKAY.   SO INMATES ARE ALLOWED TO SMOKE AT YOUR

2    FACILITY?

3    **A.**    IN CERTAIN AREAS.

4    **Q.**    OKAY.

5    **A.**    NO INMATES IN MAXIMUM CUSTODY, ONLY MEDIUM- AND

6    MINIMUM-CUSTODY INMATES.

7    **Q.**    ALL RIGHT.   DOES MR. WOODFOX SMOKE?

8    **A.**    HE'S MAXIMUM CUSTODY.   IF HE DID, IT WOULD BE A

9    VIOLATION.   WHETHER HE DOES OR NOT, I DON'T KNOW.

10    **Q.**    OKAY.   DID YOU EVER HEAR OF REPORTS OF MR. WOODFOX

11    SMOKING?

12    **A.**    I HAVE NOT.

13    **Q.**    OKAY.   IF HE WAS CAUGHT SMOKING, HE WOULD BE WRITTEN

14    UP FOR IT, THOUGH, RIGHT?

15    **A.**    THAT'S CORRECT.

16    **Q.**    BUT YOU ARE AWARE OF NO REPORT TO THAT EFFECT?

17    **A.**    I AM NOT.

18    **Q.**    OKAY.   AND WOULD YOU AGREE WITH ME THAT THE PURPOSE

19    OF STRIP SEARCHING IS TO DETECT CONTRABAND?

20    **A.**    VISUAL BODY CAVITY SEARCHES ARE CONDUCTED FOR

21    SEVERAL REASONS, BUT PRIMARILY FOR PUBLIC SAFETY, STAFF SAFETY

22    AND OFFENDER SAFETY.   AND ONE OF THE PRIMARY FUNCTIONS OF THE

23    SEARCHES IS TO DETECT CONTRABAND WHICH HELPS YOU IN ALL THREE

24    OF THOSE AREAS I JUST NAMED.

25    **Q.**    SO THE DETECTION OF CONTRABAND IS KIND OF THE

1  OVERARCHING DRIVING FORCE OF A STRIP SEARCH OF WHICH THERE ARE

2  OTHER BENEFITS LIKE SAFETY; WOULD THAT BE FAIR TO SAY?

3  **A.**   I MISSED THE FIRST PART OF WHAT YOU SAID.

4  **Q.**   I'M SORRY.

5  **A.**   SAY IT AGAIN.

6  **Q.**   WOULD IT BE FAIR TO SAY THEN THAT WHEN YOU VISUAL

7  BODY CAVITY SEARCH SOMEONE, THE PRIMARY GOAL IS THE DETECTION

8  OF CONTRABAND, BUT THAT HAS OTHER BENEFITS LIKE SAFETY AND SO

9  ON AND SO FORTH?

10  **A.**   RIGHT, THAT'S CORRECT.   THE PRIMARY FUNCTION IS TO

11  EITHER FIND CONTRABAND OR PREVENT THE SPREAD OF CONTRABAND.

12  **Q.**   AND AS VISUAL -- I'M GOING TO USE THAT TERM FOR

13  CONVENIENCE BECAUSE I KNOW IT'S THE ONE YOU PREFER.   AS VISUAL

14  BODY CAVITY SEARCHES OCCUR AT YOUR FACILITY, IS IT YOUR

15  PRACTICE -- DO YOU INSTRUCT YOUR CORRECTIONAL OFFICERS THAT

16  THEY HAVE TO HAVE A REASON TO CONDUCT ONE OF THOSE SEARCHES?

17  **A.**   WE FOLLOW THE DEPARTMENT REGULATION ISSUED BY THE

18  SECRETARY, AND WE HAVE INSTITUTIONAL POLICIES AND GUIDELINES

19  THAT WE GO BY.   THE RANDOM STRIP SEARCHES THAT YOU REFERRED TO

20  EARLIER BUT WITH AN APPROVAL OF A CAPTAIN OR HIGHER, WE DO NOT

21  DO THOSE AT DAVID WADE CORRECTIONAL CENTER.   THOSE ARE NOT

22  CONDUCTED AT DAVID WADE.

23  **Q.**   WELL, I'D LIKE TO DIRECT YOUR --

24  **A.**   BUT THE SECRETARY AUTHORIZES THEM IF WE SO -- YOU

25  KNOW, IF WE FELT THE NEED TO DO THAT, BUT WE DO NOT DO THOSE

1  AT DAVID WADE.

2       Q.   ALL RIGHT.   LET ME -- DO YOU HAVE EXHIBIT 4 IN FRONT

3  OF YOU, BY ANY CHANCE?

4       **A.**   NO, SIR.

5       Q.   LET ME SEE IF I CAN GET YOU A COPY.

6            **MR. ENGLAND:**   MAY I APPROACH?

7            **THE COURT:**   YES.

8  BY MR. ENGLAND:

9       Q.   I'M SHOWING YOU WHAT'S BEEN MARKED AS DEFENDANT'S 4,

10  AND DIRECTING YOUR ATTENTION TO NUMBER 7D ON PAGE 4.   7D SAYS

11  THAT UPON APPROVAL BY A CAPTAIN OR HIGHER-RANKING EMPLOYEE, A

12  ROUTINE STRIP SEARCH MAY BE CONDUCTED, SO ON AND SO FORTH --

13  AT ANY TIME.   DO YOU SEE THAT?

14      **A.**   YES.

15      Q.   AND YOU AGREE WITH THAT?

16      **A.**   I AGREE THAT'S WHAT IT SAYS, YES.

17      Q.   DO YOU AGREE WITH THE POLICY?

18      **A.**   ABSOLUTELY.

19      Q.   OKAY.   AND SO WOULD THAT POLICY ALLOW YOU TO STRIP

20  SEARCH MR. WALLACE -- I'M SORRY -- MR. WOODFOX RIGHT NOW?

21      **A.**   IT WOULD ALLOW YOU TO DO THAT WITH APPROVAL OF A

22  CAPTAIN OR A HIGHER'S PERMISSION, YES.

23      Q.   WELL, EVERY TIME MR. WOODFOX IS STRIP SEARCHED WHEN

24  HE GOES TO THE DOCTOR, WHEN HE TALKS TO HIS LAWYERS, DOES A

25  CAPTAIN APPROVE THAT?

1      **A.**   NO.   WE DON'T DO STRIP SEARCHES.

2      **Q.**   SORRY.

3      **A.**   I'VE BEEN AT WADE 30 YEARS, AND I DON'T THINK WE

4   HAVE EVER CONDUCTED A -- AS DEFINED BY REGULATION, WE'VE NEVER

5   CONDUCTED A STRIP SEARCH.   WE DO VISUAL BODY CAVITY SEARCHES.

6      **Q.**   OKAY.

7      **A.**   WHICH ARE LISTED ON THE NEXT PAGE.

8      **Q.**   I APOLOGIZE.   YOU'RE RIGHT.   LET'S TURN TO PAGE 5,

9   THAT SECTION E.   IS THAT WHAT YOU'RE REFERRING TO HERE, E3,

10  WHEN AN OFFENDER IS ENTERING OR LEAVING A SEGREGATION AREA?

11     **A.**   THAT'S ONE OF THE REASONS, YES.

12     **Q.**   OKAY.   ALL RIGHT.

13     **A.**   UPON COURT ORDER, ALL OF THOSE -- THOSE ARE REASONS

14  OR THOSE ARE THE TIMES THAT WE DO VISUAL BODY CAVITY SEARCHES,

15  AS LISTED IN THIS POLICY, SECTION E, PAGE 5.

16     **Q.**   UH-HUH.   IS THERE ANY EXCEPTION TO THAT RULE?

17     **A.**   WHAT DO YOU MEAN?

18     **Q.**   IS THERE ANY EXCEPTION TO AN OFFENDER BEING VISUALLY

19  BODY CAVITY SEARCHED?

20     **A.**   SURE.   YOU KNOW, THERE'S EXCEPTIONS TO EVERY RULE.

21  THE EXCEPTION WOULD BE IF, SAY, AN OFFENDER GOT STABBED AND

22  WAS BLEEDING OUT, AND IF YOU STOP TO DO A VISUAL BODY CAVITY

23  SEARCH, HE'S GOING TO DIE BEFORE YOU GET HIM TO THE HOSPITAL,

24  YOU MAY NOT DO THE VISUAL BODY CAVITY SEARCH.   YOU MAY THROW

25  HIM IN THE VAN AND GET HIM TO THE HOSPITAL FOR EMERGENCY

1   MEDICAL CARE.

2        SO THERE'S EXCEPTIONS.  YOU KNOW, I WOULD NOT FIND

3   SOMEONE IN VIOLATION OF THE POLICY IF THEY TOOK IT UPON

4   THEMSELVES TO MAKE SURE THE OFFENDER LIVED, EVEN THOUGH THEY

5   MAY HAVE VIOLATED THE POLICY.

6       Q.   SO WHAT ABOUT IF THE INMATE IS CUFFED IN CHAINS,

7   ANKLE, WAIST, WRIST AND ESCORTED BY TWO OFFICERS WHO STAY WITH

8   HIM THE ENTIRE TIME; IS THAT AN EXCEPTION TO THIS POLICY?

9       A.   NO.

10      Q.   SO I WANT TO BE CLEAR:  IF I WAS A MAXIMUM-SECURITY

11  INMATE, AND THIS IS THE THRESHOLD, I'M STRIP SEARCHED, I CROSS

12  THE THRESHOLD, I CROSS BACK; THAT WOULD BE TWO STRIP SEARCHES,

13  RIGHT?

14      A.   VISUAL BODY CAVITY SEARCHES, YES, SIR.

15      Q.   SORRY.  VISUAL BODY CAVITY SEARCHES.

16      A.   BUT YOU'D HAVE TO LEAVE THE BUILDING.  YOU'D HAVE TO

17  GO A LOT FURTHER THAN YOU JUST WENT.

18      Q.   WELL, RIGHT.  BUT I'M JUST SAYING IF THIS IS THE

19  THRESHOLD, THIS --

20      A.   YEAH, YOU'D HAVE TO ACTUALLY EXIT THE UNIT.  YOU'D

21  HAVE TO EXIT THAT BUILDING GOING SOMEWHERE ELSE.

22      Q.   RIGHT.  BUT THAT WOULD BE A YES, THOUGH, RIGHT?

23      A.   THAT WOULD BE CORRECT.

24      Q.   OKAY.

25      A.   BECAUSE HE WASN'T UNDER OBSERVATION BEFORE THE

1  OFFICER ARRIVED AT THE CELL TO PREPARE HIM TO GO TO THIS

2  CALL-OUT OR TO GO ON THIS COURT ORDER, OR TO, YOU KNOW, BE

3  ESCORTED TO ANOTHER AREA OF THE PRISON, HE WASN'T UNDER

4  OBSERVATION.  HE HAD ACCESS TO ANYTHING THAT HE COULD HAVE IN

5  THE CELL, ANYTHING THAT COULD HAVE BEEN USED AS, YOU KNOW, AS

6  A WEAPON OR CONTRABAND OR WHATEVER.

7      SO THAT'S THE NEED FOR THE VISUAL BODY CAVITY SEARCH.

8  JUST LIKE WHEN MASTER SERGEANT KENSEY AND MASTER SERGEANT

9  BUGGS BROUGHT MR. WOODFOX DOWN HERE TODAY, THEY -- THIS IS AN

10 OUTSIDE COURT TRIP.  THEY PREPARED HIM FOR THIS TRIP BY

11 PERFORMING A VISUAL BODY CAVITY SEARCH ON HIM FOR THEIR OWN

12 SAFETY AND FOR THE PUBLIC SAFETY PRIOR TO LEAVING THE

13 INSTITUTION WITH HIM.

14     Q.   I UNDERSTAND.  BUT IN TALKING ABOUT A SCENARIO LIKE

15 GOING TO THE DOCTOR --

16     A.   YES, SIR.

17     Q.   -- YOU AGREE THAT WHEN MR. WOODFOX IS IN THE

18 RESTRAINTS, THE FEET, WAIST AND WRISTS, HE CAN'T REALLY GRAB

19 ANYTHING, RIGHT?

20     A.   HIS HANDS, YEAH, HE CAN.

21     Q.   AND HE COULD GRAB THINGS, EVEN THOUGH THAT THERE ARE

22 TWO GUARDS WALKING WITH HIM WHEREVER HE GOES?

23     A.   TWO OFFICERS ARE ESCORTING HIM AT ALL TIMES, THAT'S

24 CORRECT.

25     Q.   AND HE --

1          **A.**    AND SOMETIMES IF HE'S AT, YOU KNOW, E.A. CONWAY-LSU,

2    SHREVEPORT, THE OFFICERS MAY SPLIT UP.   THEY MAY ACTUALLY ONLY

3    BE ONE OFFICER WITH HIM FOR A BRIEF PERIOD OF TIME.

4          SO, YOU KNOW, IT'S REALLY HARD, JUST LIKE I WAS LOOKING

5    AT MR. BUGGS AND MR. KENSEY JUST A FEW MINUTES AGO, AND EVEN

6    THOUGH THEY ARE HERE WITH OFFENDER WOODFOX, NEITHER ONE OF

7    THEM HAPPENED TO BE LOOKING AT HIM AT THE TIME I LOOKED OVER

8    AT HIM A WHILE AGO.

9          SO THEY'RE NEVER UNDER CONSTANT OBSERVATION, NO MATTER

10   HOW CLOSE THE OFFICER IS TO YOU, YOU'RE NEVER UNDER CONSTANT

11   OBSERVATION.   THERE'S DISTRACTIONS AND OTHER THINGS GOING ON.

12   THERE'S CODE BLUES IN THE HOSPITAL, THERE'S 100 THINGS THAT

13   COULD GO ON THAT COULD DISTRACT YOU.

14         **Q.**    WELL, MR. WOODFOX TESTIFIED ABOUT GOING TO THE

15   DOCTOR, AND HE SAID THAT THE OFFICERS ARE IN THE ROOM WITH HIM

16   AS THE DOCTORS ARE TALKING, AND HE'S SHACKLED THERE; DO YOU

17   REMEMBER THAT TESTIMONY?

18         **A.**    YES, I DO.

19         **Q.**    IS THAT NOT ACCURATE?

20         **A.**    COULD YOU SAY THAT AGAIN?

21         **Q.**    MR. WOODFOX TESTIFIED THAT WHEN HE GOES TO THE

22   DOCTOR, HE'S STRIP SEARCHED, HE'S PLACED IN THE SHACKLES, AND

23   THE OFFICERS WALK WITH HIM --

24         **A.**    CAN I ASK -- FOR CLARIFICATION, IS HE GOING TO THE

25   DOCTOR AT DAVID WADE CORRECTIONAL CENTER, OR IS HE GOING TO

1    THE DOCTOR AT --

2        **Q.**    INSIDE YOUR FACILITY.

3        **A.**    -- ONE OF THE HOSPITALS?

4        **Q.**    YES, INSIDE YOUR FACILITY.

5        **A.**    OKAY.

6        **Q.**    THE CORRECTIONAL OFFICERS GO WITH HIM, THEY SIT IN

7    THE ROOM WITH HIM, HE REMAINS RESTRAINED THE ENTIRE TIME?

8        **A.**    THAT'S CORRECT.    UNLESS THE DOCTOR, OF COURSE,

9    WANTED ONE OF THE RESTRAINTS BE REMOVED, IF THEY -- YOU KNOW,

10    IF THEY'RE CHECKING HIS FEET FOR SWELLING, THINGS LIKE THAT,

11    THEY MIGHT ASK THAT THE LEG RESTRAINTS BE REMOVED.    THEY MIGHT

12    ASK THAT ONE OF THE HAND RESTRAINTS BE REMOVED.    IT DEPENDS ON

13    WHAT PROCEDURE THEY'RE DOING.    THEY MAY NOT ASK THAT ANY

14    RESTRAINT BE REMOVED; BUT, YES, WE'RE REQUIRE FOR THE DOCTOR'S

15    SAFETY, WE REQUIRE THAT THE OFFICER BE IN THERE AT THE TIME

16    WITH THE OFFENDER.

17        **Q.**    AND SO WHEN MR. WOODFOX TESTIFIED ABOUT THOSE

18    PROCEDURES, HE WAS DESCRIBING THEM ACCURATELY; IS THAT FAIR TO

19    SAY?

20        **A.**    EXCEPT FOR THE CONSTANT SUPERVISION.    IT'S LIKE I

21    POINTED OUT A WHILE AGO, YOU CAN NEVER EVER BE UNDER CONSTANT

22    SUPERVISION.    I MEAN, AN OFFICER IS NOT LIKE A TRAFFIC LIGHT

23    CAMERA AT A RED LIGHT, THEY'RE NOT GOING TO CATCH EVERYBODY

24    THAT RUNS THE RED LIGHT LIKE THE CAMERA WILL BECAUSE THE

25    CAMERA NEVER BLINKS.

1    **Q.**    OKAY.  SO IT'S YOUR TESTIMONY THAT YOUR OFFICERS DO

2  NOT KEEP CONSTANT SUPERVISION OVER MR. WOODFOX; IS THAT RIGHT?

3    **A.**    THESE OFFICERS ARE -- I WOULDN'T IF I WAS WITH THEM,

4  THAT'S JUST NOT HUMANLY POSSIBLE.  THERE ARE ALL KINDS OF

5  THINGS THAT'S GOING TO DISTRACT YOU.

6    **Q.**    EVEN FOR THE BRIEF 15 MINUTES A DAY MAYBE THAT HE'S

7  OUT OF HIS CELL?

8    **A.**    IT DON'T TAKE BUT A MINUTE OR A SECOND OR A JIFFY

9  FOR SOMETHING TO HAPPEN.

10    **Q.**    OKAY.  YOU TESTIFIED THIS MORNING ABOUT INMATES

11  GOING BETWEEN THE SECURED PARTS OF YOUR FACILITY AND GOING

12  ABOUT THEIR BUSINESS.  I THINK THAT MIGHT HAVE BEEN CLEANING

13  AND VARIOUS WORK IN THE JAIL.  DID I REMEMBER THAT CORRECTLY?

14    **A.**    I DON'T REMEMBER IF I TESTIFIED TO THAT OR NOT.

15    **Q.**    OKAY.  WELL, LET ME JUST ASK YOU.  INMATES, MAYBE

16  TRUSTEES, OTHERS, THEY GO FAIRLY FREELY WITHIN THE FACILITY,

17  FROM SECURED AND LESSER SECURED AREAS; IS THAT FAIR TO SAY?

18    **A.**    THERE'S DIFFERENT CHECKPOINTS AND THINGS, PLACES.

19  THEY DON'T GO FREELY.  THEY HAVE TO GO THROUGH -- IF THEY

20  LEAVE ONE COMPOUND TO THE OTHER, THEY HAVE TO GO THROUGH

21  CHECKPOINTS AND SUBMIT TO SEARCHES, THINGS OF THAT NATURE.

22    **Q.**    RIGHT.  SO THEY MOVE WITHIN THE RULES OF YOUR

23  FACILITY, BUT THEY DO MOVE WITHIN --

24    **A.**    THAT'S CORRECT.

25    **Q.**    AND WHEN THEY GO THROUGH THOSE CHECKPOINTS, THEY

1    MIGHT BE VISUALLY BODY CAVITY SEARCHED; IS THAT RIGHT?

2        **A.**    PROBABLY NOT, NO.  IT'S POSSIBLE THEY COULD BE

3    BECAUSE I MEAN, THERE COULD BE A PROBABLE CAUSE ISSUE OR OTHER

4    THINGS.  HE MAY BE COMING OUT OF THE KITCHEN AND YOU MAY SEE A

5    BULGE IN HIS PANTS, AND YOU MAY WANT TO DO A VISUAL BODY

6    CAVITY SEARCH OF HIM TO FIND THE FOOD THAT HE'S STOLEN OUT OF

7    THE KITCHEN OR FIND THE CONTRABAND THAT HE'S STOLEN OUT OF THE

8    WAREHOUSE OR WHATEVER.  SO THERE'S TIMES WHEN -- IF YOU HAVE

9    PROBABLE CAUSE, HE MIGHT BE SUBJECTED TO A VISUAL BODY CAVITY

10   SEARCH.

11       **Q.**    DO YOU NEED PROBABLE CAUSE TO CONDUCT A BODY CAVITY

12   SEARCH?

13       **A.**    NOT A STRIP SEARCH, BUT YOU DO -- IT HAS TO BE ONE

14   OF THESE REASONS RIGHT HERE.

15       **Q.**    UH-HUH.

16       **A.**    SO...

17       **Q.**    WELL --

18       **A.**    FOR A VISUAL BODY CAVITY SEARCH, THAT'S LISTED IN

19   THE C-02-003 REPORT.

20       **Q.**    I'M SORRY.  I'M LOOKING AT 7E, VISUAL BODY CAVITY

21   SEARCH.  CAN YOU SHOW ME WHERE IT SAYS PROBABLE CAUSE?

22       **A.**    YOU WOULDN'T GET PAST THE GENERAL SEARCH ACTUALLY IN

23   THAT TYPE SITUATION BECAUSE WHEN HE PULLS HIS PANTS DOWN, HE

24   STILL HAD HIS BOXERS ON, YOU'D FIND WHAT YOU WERE LOOKING FOR

25   AT THAT POINT.  SO YOU'D ACTUALLY JUST BE CONDUCTING WHAT'S

1    CALLED A GENERAL SEARCH, A PATDOWN OR A GENERAL SEARCH. SO

2    THERE'S PROBABLY NOT ANY SITUATION I CAN THINK OF WHERE THAT

3    OFFENDER WOULD BE SUBJECTED TO A STRIP SEARCH OR A VISUAL BODY

4    CAVITY SEARCH BY PASSING THROUGH THAT CHECKPOINT.

5         Q.   I UNDERSTAND. BUT I WANT TO GO BACK TO THE PHRASE,

6    PROBABLE CAUSE. WHERE IS PROBABLE CAUSE NEEDED IN YOUR

7    FACILITY AS IT RELATES TO SEARCHING OF INMATES?

8         A.   IF YOU DO A BODY CAVITY SEARCH, YOU WOULD NEED A

9    REASON TO DO THAT.

10        Q.   OKAY. MR. WOODFOX IS SUBJECT TO VISUAL BODY CAVITY

11   SEARCHES, RIGHT?

12        A.   VISUAL, BUT NOT ACTUALLY BODY CAVITY SEARCH.

13        Q.   SO WHAT IS THE REASON THAT MR. WOODFOX IS SUBJECTED

14   TO THE VISUAL BODY CAVITY SEARCHES?

15        A.   WHEN HE ENTERS OR LEAVES A FACILITY FOR A COURT

16   APPEARANCE, TRIP, OR WORK DETAIL, AFTER THE OFFENDER

17   PARTICIPATED IN A PHYSICAL CONTACT VISIT, WHEN THE OFFENDER IS

18   ENTERING OR LEAVING A SEGREGATION AREA, AFTER UNESCORTED

19   CONTACT WITH GENERAL POPULATION, OFFENDERS BY AN OFFENDER IN

20   SEGREGATION STATUS.

21        Q.   OKAY. I WANT TO BE CLEAR: THE ONLY REASON WHY MR.

22   WOODFOX IS SUBJECTED TO THE VISUAL BODY CAVITY SEARCHES IS

23   BECAUSE HE'S ENTERING AND EXITING THE CCR TIER; IS THAT RIGHT?

24        A.   THAT, AND HE DOES HAVE UNESCORTED CONTACT WITH

25   GENERAL POPULATION OFFENDERS FROM TIME TO TIME.

1    **Q.**   OKAY.  WHEN DOES HE HAVE CONTACT WITH THE GENERAL

2    POPULATION?

3    **A.**   LIKE YOU GOT TO BROADEN THE DEFINITION, LIKE WHEN

4    HIS CLOTHES ARE RETURNED FROM THE LAUNDRY, THOSE ARE LAUNDERED

5    BY OFFENDERS IN OUR LAUNDRY.

6    **Q.**   UH-HUH.

7    **A.**   AND THEY'RE SENT OUT AND MARKED N1A, SO THOSE

8    OFFENDERS HAVE ACCESS TO HIS CLOTHING SO, TECHNICALLY, YOU

9    KNOW, THEY'VE HAD UNSUPERVISED ACCESS WITH STUFF THAT'S

10   RETURNING TO HIM.

11   **Q.**   OKAY.

12   **A.**   OUR ORDERLIES SERVE FOOD, ORDERLIES GO CLEAN THE

13   SHOWERS.  MOST OF THE TIME IT'S GOING TO BE AN OFFICER ON THE

14   TIER WITH THEM, BUT, YOU KNOW, THEY MAY BE -- THERE'S ALL

15   KINDS OF SITUATIONS THAT COME UP IN A PRISON.  IT'S A

16   24-HOUR-A-DAY, SEVEN-DAY-A-WEEK OPERATION.  YOU MAY HAVE AN

17   EMERGENCY SITUATION WHERE THAT OFFICER HAS TO LEAVE OFF THE

18   TIER ABRUPTLY AND DOESN'T HAVE TIME TO TAKE THE

19   OFFENDER/ORDERLY WITH HIM.

20   **Q.**   AND THE ORDERLIES WHO HAVE ACCESS TO HIS CLOTHING IN

21   THESE OTHER SCENARIOS YOU'RE TALKING ABOUT, ARE THEY VISUALLY

22   BODY CAVITY SEARCHED AS WELL?

23   **A.**   NO.

24   **Q.**   JUST MR. WOODFOX?

25   **A.**   JUST WHEN HE FITS ONE OF THE CRITERIA RIGHT HERE.

1      Q.    RIGHT.   OKAY.

2      A.    SECTION E ON PAGE 5.

3      Q.    ALL RIGHT.   YOU TESTIFIED THIS MORNING ABOUT

4   GAMBLING TICKETS; DO YOU RECALL THAT?

5      A.    I DO.   I REMEMBER MENTIONING GAMBLING TICKETS.

6      Q.    WHAT'S A GAMBLING TICKET?

7      A.    IT'S LIKE A TICKET WHERE YOU MARK WHICH FOOTBALL

8   TEAM OR BASKETBALL TEAM YOU'RE BETTING ON TO WIN THE GAME.

9      Q.    OKAY.   AND SO IT'S A --

10     A.    IT'S A FORM OF BOOKMAKING INSIDE A PRISON.

11     Q.    OKAY.   AND ARE YOU AWARE IF MR. WOODFOX HAS EVER

12  BEEN FOUND WITH GAMBLING TICKETS?

13     A.    I DON'T KNOW.

14     Q.    OKAY.   AND WHERE DO YOU FIND MOST OF THE GAMBLING

15  TICKETS?

16     A.    EVERYWHERE.   USUALLY DURING SEARCHES AND SHAKEDOWNS,

17  THEY'RE USUALLY FOUND ON AN INMATE'S PERSON.

18     Q.    OKAY.   EVERYWHERE BUT MR. WOODFOX'S PERSON, RIGHT?

19     A.    I DON'T KNOW IF ALBERT HAS EVER HAD A GAMBLING

20  TICKET OR NOT.   HE MAY HAVE.

21     Q.    WELL, IF HE HAS, THERE WOULD BE A REPORT OF IT,

22  RIGHT?

23     A.    YEAH.   BUT HE'S GOT A -- HE'S GOT ABOUT FIVE OR SIX

24  RECORDS.   I DON'T KNOW IF HE'S EVER BEEN WRITTEN UP FOR

25  GAMBLING.   HE MAY HAVE.   I DON'T KNOW.

1    **Q.**   OKAY.  WELL, IF IT'S NOT IN THE RECORD, YOU WOULD

2    AGREE WITH ME THAT IT HASN'T HAPPENED, RIGHT?

3        **A.**   OR HE JUST NEVER GOT CAUGHT, YES.

4        **Q.**   OKAY.  OR HE NEVER GOT CAUGHT?

5        **A.**   RIGHT.

6        **Q.**   OKAY.  AND SO THIS IS INMATES TALKING TO OTHER

7    INMATES ABOUT WHO'S GOING TO WIN THE GAME, RIGHT?

8        **A.**   NO.  THEY ACTUALLY PUT IT IN WRITING.

9        **Q.**   THEY WRITE TO EACH OTHER ABOUT WHO IS GOING TO WIN

10   THE GAME?

11       **A.**   IT'S A TICKET, AND YOU FILL OUT WHICH TEAM YOU'RE

12   BETTING ON AND HOW MANY PACKS YOU'RE BETTING, OR HOW MANY

13   STAMPS YOU'RE BETTING, WHETHER YOU'RE TAKING THE SPREAD, THE

14   OVER AND UNDER.  THEY BOOK JUST LIKE THEY AT SPORTS BOOK AT

15   CAESAR'S PALACE.

16       **Q.**   AND SO THEY GAMBLE CIGARETTES; IS THAT RIGHT?

17       **A.**   CIGARETTES OR STAMPS USUALLY.  SOMETIMES IT'S TUNA

18   FISH OR COMMISSARY ITEMS.

19       **Q.**   DOES MR. WOODFOX HAVE ACCESS TO CIGARETTES?

20       **A.**   HE SHOULDN'T, NO.

21       **Q.**   OKAY.

22       **A.**   HE CAN'T BUY THEM FROM THE COMMISSARY.

23       **Q.**   ALL RIGHT.  HE WOULDN'T GAMBLE WITH A GAMBLING

24   TICKET WITH PACKS, RIGHT?  HE CAN'T DO THAT, IT'S IMPOSSIBLE,

25   RIGHT?

1     **A.**    NO, IT'S NOT IMPOSSIBLE.  LIKE I TOLD YOU EARLIER,

2   MOST OF OUR INCIDENTS OF CONTRABAND IS TOBACCO IN OUR MAXIMUM-

3   SECURITY CELL BLOCKS.  THE OFFENDERS DO GET ACCESS TO THEM,

4   WHETHER THEY SHOULD HAVE ACCESS TO IT OR NOT IS THE QUESTION.

5   THEY SHOULD NOT HAVE ACCESS TO IT, BUT THEY DO HAVE ACCESS TO

6   IT.

7     **Q.**    ALL RIGHT.  WELL, LET ME TRY IT SLIGHTLY DIFFERENTLY

8   THEN.  YOU ARE AWARE OF NO EVIDENCE THAT MR. WOODFOX HAS EVER

9   ILLEGALLY HAD TOBACCO PRODUCTS, GENERALLY STAMPS OR FISH, I

10   BELIEVE?

11     **A.**    I'M NOT, NO.

12     **Q.**    OKAY.

13     **A.**    TUNA FISH.

14     **Q.**    OKAY.  AND WHEN THESE INMATES USE THESE GAMBLING

15   TICKETS, ARE YOU FINDING THEM IN THE ROOMS OR ON THE GROUNDS?

16     **A.**    THE LAST ONES I FOUND, THE INMATE HAD IN HIS

17   WAISTBAND OF HIS PANTS.  THAT'S BEEN A FEW YEARS AGO, A COUPLE

18   OF YEARS AGO.  I WAS DOING A PAT SEARCH AND YOU RUN YOUR THUMB

19   THROUGH THE WAISTBAND OF THE PANTS AND I FOUND A BUNCH OF

20   GAMBLING TICKETS.

21     **Q.**    OKAY.  BUT ARE YOU AWARE OF ANY EXAMPLES OF THESE

22   GAMBLING TICKETS BEING FOUND IN AN INMATE'S ANUS OR UNDERNEATH

23   HIS GENITALS?

24     **A.**    WHOSE?

25     **Q.**    THE INMATES?

1    **A.**   YES, THEY'VE FOUND THEM IN DOING A VISUAL BODY

2    CAVITY SEARCH.  YOU FIND THEM WRAPPED IN CELLOPHANE TAPED TO

3    THE BOTTOM OF PEOPLE'S TESTICLES SOMETIME.

4    **Q.**   OKAY.  DO YOU REMEMBER THE NAME OF THAT --

5    **A.**   I DON'T.

6    **Q.**   OKAY.  DO YOU REMEMBER HOW LONG AGO THAT WAS?

7    **A.**   IT HAPPENS FROM TIME TO TIME.  I COULD PROBABLY FIND

8    SEVERAL INCIDENTS OF SOMETHING LIKE THAT BEING TAPED TO THE

9    BOTTOM OF SOMEBODY'S GENITALS.

10    **Q.**   ALL RIGHT.  BUT THERE WOULD BE A REPORT ABOUT IT?

11    **A.**   OH, YEAH.

12    **Q.**   OKAY.  I'M GOING TO TURN TO THE EXHIBITS,

13    DEFENDANT'S 5 THROUGH 9.  DO YOU HAVE THOSE IN FRONT OF YOU?

14    **A.**   NO, SIR.

15    **Q.**   LET ME TRY TO GET THEM FOR YOU.

16    **MR. ENGLAND:**  MAY I APPROACH?

17    **THE COURT:**  YES.

18    BY MR. ENGLAND:

19    **Q.**   I'LL GIVE YOU BACK 4.  TURN TO EXHIBIT DEFENDANT'S

20    4.  I'M SHOWING YOU WHAT'S BEEN MARKED STATE'S -- OR

21    DEFENDANT'S 5.  TAKE A LOOK AT THAT DOCUMENT AND LET ME KNOW

22    WHEN YOU'RE READY.

23    **A.**   OKAY.

24    **Q.**   WARDEN, DID YOU PREPARE THIS DOCUMENT?

25    **A.**   NO, SIR.

1    **Q.**    DID YOU SIGN THIS DOCUMENT OR RATIFY IT?

2    **A.**    I REVIEWED IT, BUT NO, I DIDN'T SIGN IT.

3    **Q.**    WHEN DID YOU REVIEW IT?

4    **A.**    I REVIEW ALL DISCIPLINARY REPORTS, USUALLY AFTER

5    THEY'VE HAD THEIR DUE PROCESS HEARING, I REVIEW ALL THE

6    DISCIPLINARY PACKETS AND THE RESULTS OF THE DISCIPLINARY

7    COURT.

8    **Q.**    OKAY.

9    **A.**    SO I WOULD HAVE REVIEWED PROBABLY SOME TIME END OF

10    JULY, FIRST PART OF AUGUST, 2012.

11    **Q.**    ALL RIGHT.  BUT FOR ANY OF THESE EXHIBITS, 5 THROUGH

12    9, YOU DON'T HAVE PERSONAL KNOWLEDGE OF THESE INCIDENTS EXCEPT

13    FOR WHAT'S WRITTEN IN THESE REPORTS; IS THAT FAIR TO SAY?

14    **A.**    I BELIEVE SO.  LET ME LOOK AT THIS ONE REAL QUICK.

15    YES, THAT WOULD BE FAIR TO SAY.  I DIDN'T WITNESS --

16    PERSONALLY WITNESS ANY OF THESE.

17    **Q.**    ALL RIGHT.  WELL, IN EXHIBIT 5, THIS IS LISTING ONE

18    JAMAR WEBB; DO YOU SEE THAT?

19    **A.**    YES, SIR.

20    **Q.**    CAN YOU TELL US ANYTHING ABOUT MR. WEBB?

21    **A.**    WHAT DO YOU WANT TO KNOW ABOUT HIM?

22    **Q.**    WHAT'S HE IN FOR?

23    **A.**    MANSLAUGHTER.

24    **Q.**    AND DOES HE HAVE AN EXTENSIVE OR --

25    **A.**    HE'S GOT A --

1    **Q.**    -- LENGTHY DISCIPLINARY HISTORY?

2    **A.**    -- HORRIBLE, HORRIBLE CONDUCT RECORD.  HE'S BEEN

3    TRANSFERRED -- HE WAS TRANSFERRED TO US AS A DISCIPLINARY

4    TRANSFER --

5    **Q.**    OKAY.

6    **A.**    -- FROM WINNFIELD CORRECTIONAL CENTER.

7    **Q.**    OKAY.  ALL RIGHT.  AND ARE YOU AWARE IF MR. WEBB AND

8    MR. WOODFOX HAVE ANY RELATIONSHIP WITH EACH OTHER?

9    **A.**    NO, I'M NOT AWARE OF IF THEY -- ARE YOU TALKING

10   ABOUT ARE THEY RELATED LIKE COUSINS OR --

11   **Q.**    DO THEY HAVE ANY RELATIONSHIP AT ALL, FRIENDS,

12   ACQUAINTANCES, TALK TOGETHER, DO ANYTHING TOGETHER?

13   **A.**    I HAVE NO IDEA, NO.

14   **Q.**    OKAY.  LET'S MOVE TO EXHIBIT 6.

15   **A.**    OKAY.

16   **Q.**    LET ME KNOW WHEN YOU'RE READY.

17   **A.**    OKAY.  I THINK I'M READY.  I'VE LOOKED AT THESE

18   EARLIER BRIEFLY, SO I SHOULD BE READY.

19   **Q.**    I UNDERSTAND.  OH, YOU'RE READY?

20   **A.**    YES, SIR.

21   **Q.**    CAN YOU TELL US A LITTLE BIT ABOUT MR. NICHOLAS AND

22   MR. CYRIAK?

23   **A.**    WELL, THEY GOT INTO A FIGHT ON APRIL 27TH, 2013.

24   **Q.**    I'M SORRY.  LET ME TRY TO REPHRASE.  DO YOU KNOW

25   ANYTHING ABOUT THEM PERSONALLY, WHAT THEY'RE IN FOR, WHAT

1 THEIR DISCIPLINARY HISTORY IS?

2 **A.**   I DO.   WALTER NICKLESS WAS A CCR TRANSFER.   HE CAME

3 TO US WITH OUR ORIGINAL TRANSFER FROM LSP ON NOVEMBER 1ST,

4 2010.   HE HAS DIGRESSED IN HIS BEHAVIOR.   HE'S IN DISCIPLINARY

5 DETENTION EXTENDED LOCKDOWN NOW BECAUSE OF DISCIPLINARY

6 PROBLEMS HE HAD ON THE CCR TIER.

7 HE'S IN A MUCH -- IN A MORE PUNITIVE AREA NOW, NOT IN A

8 CLOSED CUSTODY RESTRICTED AREA, AND HE HAS A HISTORY OF

9 VIOLENCE AND A HISTORY OF BEING A WHITE SUPREMACIST AND HE'S

10 JUST -- HE'S JUST NOT A VERY NICE GUY.

11 **Q.**   WHAT ABOUT MR. CYRIAK?

12 **A.**   I DON'T REALLY KNOW A WHOLE LOT ABOUT ANTHONY

13 CYRIAK.   I KNOW HE'S BEEN ON EXTENDED BASICALLY SINCE WE'VE

14 HAD HIM, PROBABLY A COUPLE OF YEARS.   HE HAS BEHAVIOR

15 PROBLEMS.   MOST OF THE OFFENDERS THAT WE GET COME TO US FROM

16 OTHER INSTITUTIONS AS DISCIPLINARY TRANSFERS.   THEY HAVE NOT

17 BEEN VERY SUCCESSFUL AT DCI OR AT HUNT OR LSP OR PHELPS, WHEN

18 IT WAS OPEN, OR WINN OR ALLEN, AND THEY SEND THEM TO US AS A

19 DISCIPLINARY TRANSFER.

20 **Q.**   AND IS THERE ANY EVIDENCE THAT YOU'RE AWARE OF THAT

21 EXHIBIT 6 HAS ANY DIRECT RELATIONSHIP TO MR. WOODFOX, OR WAS

22 HE INVOLVED?

23 **A.**   NO, HE WASN'T INVOLVED.   THIS WAS NO INVOLVEMENT OF

24 HIS THAT I'M AWARE OF.

25 **Q.**   AND DO YOU KNOW IF MR. WOODFOX HAS ANY RELATIONSHIP

1    TO MR. NICKLESS AND MR. CYRIAK?

2         **A.**   I KNOW HE KNOWS WALTER NICKLESS.  THEY WERE ON THE

3    SAME TIER TOGETHER.  I DON'T THINK HE -- HE PROBABLY DOESN'T

4    KNOW ANTHONY CYRIAK.

5         **Q.**   ALL RIGHT.  EXHIBIT 7, SAME THING.  CAN YOU TELL US

6    A LITTLE BIT ABOUT MR. ZORAN JOHNSON?

7         **A.**   ZORAN IS FROM RINGGOLD, LOUISIANA, AND HE'S A

8    BIG-TIME DRUG DEALER AND A PURVEYOR OF INSTITUTIONAL

9    CONTRABAND.

10        **Q.**   OKAY.

11        **A.**   HE RUNS QUITE A PROFITABLE BUSINESS WHEN HE GETS

12   AWAY WITH IT FROM TIME TO TIME.

13        **Q.**   OKAY.  AND AS A RESULT OF THIS INCIDENT I'M SEEING,

14   A SONY CD PLAYER WAS FOUND?

15        **A.**   THAT'S CORRECT.

16        **Q.**   IS THAT CONTRABAND IN THE FACILITY AS A WHOLE OR

17   ONLY FOR CERTAIN AREAS?

18        **A.**   HE'S IN DISCIPLINARY DETENTION, SO IT'D BE AN

19   UNAUTHORIZED ITEM IN HIS AREA.

20        **Q.**   BUT OTHER PEOPLE COULD HAVE THEM?

21        **A.**   OTHER PEOPLE CAN HAVE THEM.  THEY CAN HAVE THEM IN

22   CCR, THEY CAN HAVE THEM IN GENERAL POPULATION.  THEY CAN'T

23   HAVE THEM IN DISCIPLINARY DETENTION.

24        **Q.**   ARE WE TALKING ABOUT, IF YOU KNOW, LIKE A LITTLE

25   MINI-BOOMBOX OR LIKE A WALKMAN KIND OF THING?

1          **A.**    NO, NO, IT'S JUST A SMALL CD PLAYER, HANDHELD, YOU

2    KNOW, EVERYTHING IS ABOUT THAT BIG NOW (INDICATING).    IT'S

3    JUST, YOU KNOW, SOMETHING ABOUT THAT BIG, JUST A REGULAR SMALL

4    CD PLAYER.

5          **Q.**    ALL RIGHT.    AND WITH EXHIBIT 7, ARE YOU AWARE OF ANY

6    EVIDENCE THAT MR. WOODFOX WAS CONNECTED TO THIS OR KNOWS MR.

7    JOHNSON?

8          **A.**    I'M NOT AWARE OF THAT, NO.

9          **Q.**    OKAY.    LET'S GO TO EXHIBIT 8.    SAME THING.    MR.

10   MICHAEL HILL AND ANTHONY TELLIS.    CAN YOU TELL US A LITTLE BIT

11   ABOUT THOSE TWO INDIVIDUALS?

12         **A.**    MICHAEL IS DOING A LIFE SENTENCE FOR MURDER.    HE HAS

13   A VERY POOR CONDUCT RECORD.    HE HAPPENED TO GO A SIGNIFICANT

14   PERIOD OF TIME WITHOUT ANY DISCIPLINARY ACTION.    HE MADE HIS

15   WAY TO A DORMITORY, BUT HE HAS A LONG HISTORY OF VIOLENCE, AND

16   HE'S BEEN AT WADE FOR A NUMBER OF YEARS.    SO I KNOW MICHAEL

17   PRETTY WELL.

18       HE HAS A REAL WEAKNESS FOR HOMOSEXUALS, HE LOVES

19   HOMOSEXUAL INMATES, AND HE DOES EVERYTHING HE CAN TO TRY TO

20   PROVIDE FOR THEM WHEN HE CAN, YOU KNOW.    HE TRIES TO COURT

21   THEM OR WHATEVER, WHATEVER TERMINOLOGY YOU WANT TO USE TO --

22   YOU KNOW, HE TRIES TO BEFRIEND THEM, AND THAT WAS THE

23   SITUATION HERE.    HE WANTED TO GET ANTHONY SOME CIGARETTES, AND

24   SO HE RISKED HIS DORMITORY BED TO DO THAT.

25         **Q.**    MR. HILL -- I'M SORRY -- YOU SAID HE HAD A HISTORY

1  OF VIOLENCE.  INSIDE OF YOUR FACILITY?

2      **A.**   OH, YEAH, HE'S VERY VIOLENT.  HE FIGHTS A LOT.   ANY

3  TIME THAT SOMEBODY TALKS TO ONE OF HIS FRIENDS, HE GETS INTO A

4  FIGHT, JUST ABOUT.

5      **Q.**   AND YOU SAID THAT HE HAD A BREAK IN THAT VIOLENCE

6  FOR A PERIOD OF TIME, AND THEN HE WAS ABLE TO GET INTO A

7  DORMITORY SETTING.

8      **A.**   YEAH, HE DID PRETTY WELL.  HIS FATHER PASSED AWAY A

9  COUPLE OF YEARS AGO, AND I ALLOWED HIM TO ATTEND THE FUNERAL

10  AND HIS MOTHER IS GETTING OLD, SHE LIVES IN SOUTH LOUISIANA

11  DOWN AROUND ST. FRANCISVILLE/BATON ROUGE AREA.  HE WAS WORKING

12  HARD TO GET A GEOGRAPHICAL TRANSFER, AND IN ORDER TO GET A

13  GEOGRAPHICAL TRANSFER, YOU GENERALLY HAVE TO DO SIX MONTHS IN

14  GENERAL POPULATION WITHOUT ANY SIGNIFICANT DISCIPLINARY

15  ACTIONS.

16      SO HE WAS TRYING REALLY HARD TO DO THAT, BUT HIS WEAKNESS

17  FOR MORE FEMININE INMATES WON OUT, I BELIEVE, AND NOW HE'S

18  BACK IN THE CELL BLOCK AGAIN.  HAS BEEN SINCE JUNE 4TH, 2013.

19      **Q.**   AND HOW LONG DID MR. HILL'S INCIDENT-FREE TIME

20  PERIOD LAST?

21      **A.**   PROBABLY AROUND SEVEN OR EIGHT MONTHS, MAYBE.

22      **Q.**   ALL RIGHT.  SO IN SEVEN OR EIGHT MONTHS, HIM BEING

23  INCIDENT-FREE, NONVIOLENCE GOT HIM BACK INTO THE DORM?

24      **A.**   NO, HE HAD ALREADY BEEN TO THE DORMITORY.  HE WAS IN

25  THE DORMITORY WHEN HE HAD STARTED HIS RUN FOR REQUESTING A

1   GEOGRAPHICAL TRANSFER.

2       **Q.**   ALL RIGHT.   WELL, LET ME BACK UP.   WAS THERE ANY

3   POINT IN TIME MR. HILL WAS IN A RESTRICTIVE ENVIRONMENT, CCR?

4       **A.**   YEAH.   HE HAS OVER THE YEARS.   YOU KNOW, I'VE KNOWN

5   MICHAEL FOR 20-PLUS YEARS.   HE GOES TO EXTENDED LOCKDOWN

6   SOMETIMES AND, YOU KNOW, HE'LL GO A COUPLE OF YEARS WITHOUT A

7   WRITE-UP IN EXTENDED, HE GOES BACK IN GENERAL POPULATION.

8   HE'LL DO ALL RIGHT FOR A WHILE, AND THEN HE GETS BACK ON

9   EXTENDED.

10      **Q.**   HOW DOES HE GET OUT OF --

11          **MR. CURRY:**   OBJECTION.   IS THIS RELEVANT?

12          **THE COURT:**   I DON'T KNOW WHERE YOU ARE HEADING.

13          **MR. CURRY:**   I MEAN, I'VE BEEN REAL PATIENT, BUT THIS

14   IS GOING ON AND ON AND ON.

15          **MR. ENGLAND:**   ALL RIGHT.   I GUESS I'M TRYING TO

16   ESTABLISH, YOUR HONOR, THE CONDUCT, THE PROFILES OF THE

17   INDIVIDUALS WHO ARE -- THE STATE HAS OFFERED AS, AT BEST,

18   MAYBE COMPARISON TO MR. WOODFOX, BUT IF I'VE GONE TOO FAR,

19   I'LL MOVE ON.

20          **THE COURT:**   WELL, YOU'VE DONE THAT WITH THESE GUYS.

21          **MR. ENGLAND:**   OKAY.

22          **THE WITNESS:**   THEY'RE ALL MAXIMUM CUSTODY.

23          **MR. ENGLAND:**   ALL RIGHT.   SO I WILL VERY BRIEFLY

24   WRAP UP THEN.

25   BY MR. ENGLAND:

1    **Q.**    WITH EXHIBITS 8 AND 9, ANY EVIDENCE THAT MR. WOODFOX

2    WAS INVOLVED OR HAS RELATIONSHIPS WITH ANY OF THESE

3    INDIVIDUALS?

4    **A.**    NOT THAT I'M AWARE OF.

5    **Q.**    OKAY.    NOW, LIEUTENANT ELMORE TESTIFIED EARLIER THAT

6    IN OR AROUND MARCH OF THIS YEAR, I GUESS --

7    **A.**    THAT WAS AT THE BOTTOM OF THE EXHIBIT.    THAT'S MR.

8    -- THAT'S MR. KEOHAN'S RESUMÉ, I BELIEVE.    I DON'T THINK YOU

9    MEANT TO GIVE THAT TO ME.

10    **Q.**    I WANT TO GO BACK TO THE TRUSTEES FOR A MINUTE.    ARE

11    THE TRUSTEES HOUSED IN A TIER CALLED H5?

12    **A.**    MOST OF OUR TRUSTEES ARE HOUSED IN H5, AND A LOT OF

13    TIMES AN INMATE CAN LIVE IN THE NORTH COMPOUND.    IF HE MAKES

14    TRUSTEE, AND THERE'S NO BEDS AVAILABLE IN H5, HE MAY HAVE TO

15    STAY IN H1, H2, H3 OR H4 UNTIL A BED BECOMES AVAILABLE IN H5,

16    BUT HE WILL BE MOVED TO H5 AS BEDS BECOME AVAILABLE.

17    **Q.**    OKAY.

18    **A.**    BUT NOT EVERYBODY IN H5 ARE TRUSTEES.    THERE'S

19    MEDIUM- AND MINIMUM-CUSTODY INMATES IN THOSE TWO DORMITORIES.

20    **Q.**    AND DO YOU FIND THAT YOU'LL DETECT MORE CONTRABAND

21    IN H5, OR IN GENERAL POP THAN OTHER AREAS OF YOUR FACILITY?

22    **A.**    MOST OF OUR CONTRABAND IS LOCATED IN THE

23    MAXIMUM-SECURITY CELL BLOCKS.

24    **Q.**    OKAY.    YOU TESTIFIED A LITTLE BIT EARLIER ABOUT AN

25    INMATE WITH A CELL PHONE IN HIS RECTUM; DO YOU REMEMBER THAT?

1      **A.**    I DO.

2      **Q.**    AND UNDER THE FACTS OF THAT -- WELL, LET ME BACK UP.

3   ANY OTHER TIMES WHERE YOU'VE SEEN AN INMATE WITH AN ITEM --

4      **A.**    THAT'S ACTUALLY HAPPENED TWICE WITHIN THE LAST YEAR

5   OR SO.  WE HAD THE OFFENDER THAT CAME FROM JACKSON PARISH, A

6   RETURN FROM JACKSON PARISH ON A COURT ORDER, AND THE OTHER GUY

7   CAME FROM WEST CARROLL PARISH, AND HE CAME IN WITH A CELL

8   PHONE IN HIS ANAL AREA AS WELL.

9      **Q.**    AND IN BOTH OF THOSE SCENARIOS, WE'RE TALKING ABOUT

10   INMATES BEING BROUGHT INTO YOUR FACILITY FROM SOME OUTSIDE

11   PLACE; IS THAT CORRECT?

12      **A.**    THAT'S RIGHT.  THEY WERE RETURNING -- ONE GUY

13   FROM -- WAS RETURNING FROM A COURT ORDER IN RICHLAND -- I

14   MEAN, IN JACKSON PARISH, AND THE OTHER GUY WAS A DISCIPLINARY

15   TRANSFER TO US FROM WEST CARROLL PARISH.

16      **Q.**    AND AS IT RELATES TO YOUR TESTIMONY ABOUT PHONE

17   CALLS, INMATE PHONE CALLS WHILE OFFICERS ARE PRESENT, YOU

18   TESTIFIED THAT AN INMATE CAN MOVE AROUND; IS THAT RIGHT?

19      **A.**    THEY CAN'T MOVE -- THEY USE A CORDLESS PHONE.  THEY

20   GET ON THE OTHER SIDE OF THE ROOM FROM WHERE THE OFFICER IS.

21   HE'S NOT FREE TO JUST MOVE ABOUT, NO, SIR, THAT'S NOT WHAT I

22   -- IF I MEANT THAT -- IF I SAID THAT, I DIDN'T MEAN TO SAY

23   THAT.  HE'S NOT FREE TO MOVE ABOUT, BUT HE CAN GET FAR AWAY

24   FROM THE OFFICER AS HE NEEDS TO HAVE THE PRIVACY THAT HE

25   NEEDS.

1    Q.    OKAY.   AND --

2    A.    WITHIN THE CONFINES OF THAT ROOM.   I MEAN, HE CAN'T

3  GO OUTSIDE OR ANYTHING.

4    Q.    WHAT'S IN THE ROOM?

5    A.    IT'S A SECURITY OFFICE.

6    Q.    BUT WHAT --

7    A.    THERE'S A COUPLE OF DESKS.   IT'S AN OFFICE FOR,

8  LIKE, THE CAPTAINS AND THE MAJORS TO USE, TO DO THEIR

9  PAPERWORK, TO DO THEIR REPORTS AND THINGS LIKE THAT.   IT IS

10  ALSO USED AS A NON-CONTACT VISITING AREA FOR -- ON WEEKENDS.

11    Q.    WELL, THE OFFICERS WHO ARE WATCHING, LET'S SAY, MR.

12  WOODFOX, WHILE HE'S CONDUCTING A PHONE, HE'S IN A CLEAR LINE

13  OF SIGHT, RIGHT?

14    A.    YES.   THEY CAN VISUALLY OBSERVE HIM.   VISUALLY

15  OBSERVE HIM BUT SHOULDN'T BE ABLE TO HEAR WHAT HE'S SAYING.

16  THEY CAN HEAR HIM TALKING, BUT THEY SHOULDN'T BE ABLE TO

17  DISTINGUISH WHAT HE'S SAYING UNLESS HE GETS REALLY LOUD OR

18  SOMETHING.

19    Q.    LIKE I DO SOMETIMES?

20    A.    SOMETIMES, LIKE YOU DID EARLIER, YES, SIR.

21    Q.    ALL RIGHT.   HOW BIG IS THE ROOM?

22    A.    I DON'T KNOW.   IT'S PROBABLY 600 SQUARE FEET OR SO.

23  IT'S PROBABLY 20 FEET BY 30 FEET.

24    Q.    OKAY.

25    A.    ROUGHLY, THAT'S A ROUGH ESTIMATE.

1      Q.    SO THE FURTHEST AN OFFICER COULD BE AWAY FROM AN

2   INMATE WOULD BE ABOUT 20 FEET, RIGHT?

3      A.    OR 30, IF HE WAS ON THE OTHER END OF THE ROOM.

4      Q.    OKAY.   SO --

5      A.    IT'S 20 BY 30.

6      Q.    ROUGHLY, ABOUT THE DISTANCE BETWEEN YOU AND I NOW?

7      A.    I THINK A LITTLE FURTHER THAN THAT.   MAYBE IT'S A

8   LITTLE BIGGER THAN THAT.   THAT WAS A ROUGH ESTIMATE, 600

9   SQUARE FEET.   IT'S PROBABLY FROM HERE TO MR. CURRY MAYBE

10   BEHIND YOU, AWAY FROM HIM.

11      Q.    ABOUT HERE?

12      A.    COULD BE.   THAT'S ABOUT AS FAR AWAY FROM HIM AS HE

13   COULD BE.   HE'S PROBABLY NOT USUALLY THAT FAR AWAY, BUT HE

14   COULD BE ABOUT THAT FAR AWAY.

15      Q.    SO WITHOUT TALKING INTO THE MICROPHONE AND SPEAKING

16   AT MY NORMAL VOICE, YOU CAN HEAR ME, RIGHT?

17      A.    BARELY.

18      Q.    ALL RIGHT.   ANY INMATES KNOWN TO TAKE CONTRABAND OUT

19   OF THE OFFICE WHERE YOU PLACE THEM FOR THE PHONE CALLS AND

20   TAKE IT BACK TO THEIR CELLS?

21      A.    WE'VE HAD INMATES THAT HAVE PICKED UP CONTRABAND IN

22   THE SECURITY OFFICE OVER THE YEARS.   I DON'T KNOW IF IT'S EVER

23   OCCURRED DURING A LEGAL PHONE CALL THAT ALBERT PARTICIPATED

24   IN.

25      Q.    ALL RIGHT.   YOU TALKED A LITTLE EARLIER ABOUT FIRE

1  HAZARDS, RIGHT?

2      A.    YES, SIR.

3      Q.    INMATES HAVE SET FIRES TO THEIR MATTRESSES AND

4  THINGS OF THAT NATURE?

5      A.    RIGHT.

6      Q.    HAS MR. WOODFOX EVER SET FIRE TO ONE OF YOUR

7  MATTRESSES?

8      A.    NO, NOT THAT I'M AWARE OF.

9      Q.    HAS MR. WOODFOX EVER BEEN INVOLVED IN DISCIPLINARY

10 WRITE-UPS OF THE NATURE DESCRIBED IN EXHIBITS 5 THROUGH 9,

11 WHILE HE'S BEEN AT YOUR FACILITY?

12     A.    NO, HE HADN'T.  HE'S NEVER RECEIVED A DISCIPLINARY

13 REPORT SINCE HE'S BEEN AT DAVID WADE CORRECTIONAL CENTER.

14     Q.    AND HOW LONG HAS THAT BEEN?

15     A.    SINCE NOVEMBER 1ST, 2010.

16         MR. ENGLAND:  ALL RIGHT.  ONE MOMENT, YOUR HONOR?

17         THE COURT:  CERTAINLY.

18         MR. ENGLAND:  NOTHING FURTHER.

19         THE COURT:  REDIRECT?

20         MR. CURRY:  VERY BRIEFLY.

21 EXAMINATION

22 BY MR. CURRY:

23     Q.    WARDEN GOODWIN, YOU DESCRIBED IN GREAT DEAL, IN

24 RESPONSE TO QUESTIONING THE INMATES THAT WERE INVOLVED IN

25 THESE VARIOUS INCIDENTS THAT RESULTED IN DISCIPLINARY REPORTS

1  AND INCIDENT REPORTS OVER THE LAST YEAR.  THESE WERE DIVERSE

2  INDIVIDUALS WITH DIVERSE BACKGROUNDS, CRIMES AND SO FORTH;

3  ISN'T THAT RIGHT?

4     **A.**  THAT'S CORRECT.

5     **Q.**  IS IT POSSIBLE FOR YOU TO PROFILE THE TYPE OF

6  INDIVIDUAL, THE TYPE OF INMATE WHO IS MOST LIKELY TO HIDE

7  CONTRABAND?

8     **A.**  NO, IT CAN BE ANYBODY.  I MEAN, IT CAN EVEN BE

9  STAFF, SO, I MEAN, YOU CAN'T PROFILE, IT COULD BE ANYBODY.  IT

10  COULD BE THE MAYOR THAT YOU LET COME IN FOR A SPECIAL VISIT.

11  I MEAN, IT COULD BE ANYBODY.

12     **Q.**  THANK YOU.  THAT'S ALL I HAVE.

13        **THE COURT:**  ALL RIGHT.  YOU MAY STEP DOWN, SIR.

14        **THE WITNESS:**  THANK YOU, SIR.

15        **THE COURT:**  ALL RIGHT.  YOUR NEXT WITNESS?

16        **MR. CURRY:**  THAT'S ALL THE WITNESSES I HAVE, YOUR

17  HONOR.

18        **THE COURT:**  ALL RIGHT.  ANY REBUTTAL WITNESSES?

19        **MR. ENGLAND:**  NOTHING FURTHER, YOUR HONOR.

20        **THE COURT:**  ALL RIGHT.  THEN OTHER THAN THE -- MY

21  DECISION ON WHETHER TO ADMIT THE STATE'S EXHIBITS, THE MATTER

22  IS COMPLETED.

23        **MR. CURRY:**  YOUR HONOR, IF I MAY?

24        **THE COURT:**  YES.

25        **MR. CURRY:**  AS YOU'RE WELL AWARE, THE STATE HAS

1   FILED A MOTION TO DISMISS AND STATED GROUNDS FOR DISMISSAL.

2   IT'S OUR POSITION THAT GROUNDS FOR DISMISSAL WOULD ALSO BE

3   GROUNDS TO DENY PRELIMINARY INJUNCTIVE RELIEF AND, THEREFORE,

4   GROUNDS TO DENY PRELIMINARY INJUNCTIVE RELIEF, AND FOR THAT

5   REASON, WE WOULD ASK TO INCORPORATE BY REFERENCE THOSE

6   ARGUMENTS AND EVIDENCE TO THIS COURT.

7           **THE COURT:**   ALL RIGHT.

8           **MR. CURRY:**   OTHERWISE, THE MATTER IS SUBMITTED, AS

9   FAR AS WE'RE CONCERNED.

10          **THE COURT:**   ALL RIGHT.   WHAT I'D LIKE YOU TO DO --

11   GO AHEAD.

12          **MR. ENGLAND:**   CAN I BE HEARD ON THAT POINT, YOUR

13   HONOR?

14          **THE COURT:**   I'M GOING TO ASK YOU TO BRIEF THIS ISSUE

15   AND -- WELL, NOT THAT EXACT ISSUE, BUT WHAT -- GO AHEAD.

16          **MR. ENGLAND:**   ON THE DEFENDANTS' MOTION TO DISMISS,

17   AND I CAN PULL IT FOR YOU, THE COURT HAS PREVIOUSLY INDICATED

18   THAT IT WOULD TAKE NO FURTHER ARGUMENTS ON JURISDICTION HERE,

19   SO I WOULD MOVE TO STRIKE THOSE AS SPECIFICALLY CONTRARY TO

20   THE COURT'S PREVIOUS INSTRUCTIONS.

21          **THE COURT:**   WELL, HERE'S WHAT I AM GOING TO DO IN

22   REGARDS TO THE 1978 STATE COURT PROCEEDINGS AND JUDGMENT.   I

23   WANT YOU TO BRIEF IT IN THIS CONTEXT:   THE STATE HAS URGED

24   THAT I, YOU KNOW, ADOPT THAT BASICALLY AND FIND THAT THE

25   GOVERNING DOCUMENT IN ALL OF THESE PROCEEDINGS, I WANT THE

1  PARTIES TO BRIEF, ALONG WITH YOUR OTHER ARGUMENTS THAT YOU MAY

2  CARE TO RAISE TO ME, WHAT WOULD BE THE EFFECT IF I WAS TO GO

3  AHEAD AND JUST ADOPT THAT STATE COURT JUDGMENT AND GIVE IT

4  FULL FAITH AND CREDIT.  WOULD THERE BE ANY LEGAL PROBLEM WITH

5  ME DOING THAT?  GIVE ME YOUR AUTHORITIES ON IT.

6       AND THEN YOU CAN GO AHEAD AND -- MR. ENGLAND, YOU NEED A

7  TRANSCRIPT?

8            **MR. ENGLAND:**  I'D LIKE ONE, YES.

9            **THE COURT:**  ALL RIGHT.

10           **MR. ENGLAND:**  WE WILL REQUEST ONE.

11           **THE COURT:**  WHEN THE TRANSCRIPT IS PREPARED AND

12 FILED, I'D LIKE YOU TO GIVE ME YOUR VIEW AND BRIEF IT WITHIN

13 30 DAYS OF THAT DATE.  THE STATE WILL HAVE 30 DAYS TO RESPOND.

14 IF THERE IS ANY PROBLEM WITH EITHER OF YOU, IF THAT CLASHES

15 WITH YOUR SCHEDULES, JUST KINDLY LET ME KNOW, AND WE WILL TRY

16 TO ADJUST IT AND WORK AROUND IT.

17           **MR. ENGLAND:**  THANK YOU, YOUR HONOR.

18           **THE COURT:**  ALL RIGHT.  ANYTHING ELSE?

19           **MR. CURRY:**  NO, YOUR HONOR.

20           **THE COURT:**  ALL RIGHT.  THANK YOU VERY MUCH.

21           **MR. CURRY:**  THANK YOU.

22        **(WHEREUPON, THIS MATTER WAS CONCLUDED.)**

23            C E R T I F I C A T E

24       I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT

25 FROM THE RECORD OF THE PROCEEDINGS IN THE ABOVE-ENTITLED

1    NUMBERED MATTER.

2    *Shannon Thompson*

3    SHANNON L. THOMPSON, CCR

4    OFFICIAL COURT REPORTER