1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

ROBERT KING WILKERSON, ET AL, :      Docket No. C.A. 00-304-C-M3

    Plaintiffs,                  :      Baton Rouge, Louisiana
                                            Friday, January 12, 2001
        v.                 :      10:00 a.m.

RICHARD L. STALDER, ET AL,    :

    Defendants.                  :

: : : : : : : : : : : : : : : :

TRANSCRIPT OF HEARING ON DEFENDANTS' MOTION
TO DISMISS PLAINTIFFS' AMENDED COMPLAINT
BEFORE THE HONORABLE DOCIA L. DALBY,
UNITED STATES MAGISTRATE JUDGE (no jury).


APPEARANCES:

For the Plaintiffs:          MS. ROBIN E. SCHULBERG
                             Post Office Box 1483
                             Covington, Louisiana  70434

For the Defendants:          ANDRÉ CHARLES CASTAING, ESQ.
                             Louisiana Department of Justice
                             Litigation Division
                             Post Office Box 91279
                             Baton Rouge, Louisiana 70821-1279


Audio Operator:              MS. JOAN SHEETS


Transcript prepared by:      JANICE RUSSELL TRANSCRIPTS
                             1133 Tanager Trail
                             Virginia Beach, Virginia  23451
                             757/422-9089


Proceedings recorded by electronic sound recording; transcript
produced by transcription service.

#53

614-30142.8539

2

<u>P R O C E E D I N G S</u>

THE COURT:  Please be seated.

Call the case, please.

THE COURTROOM DEPUTY:  Civil Action No. 00-304-C-M3, <u>Robert King Wilkerson,et al. vs. Richard Stalder, et al</u>.

MS. SCHULBERG:  Robin Schulberg on behalf of the plaintiffs, your Honor.

THE COURT:  Good morning.

MR. CASTAING:  Good morning, your Honor.  André Charles Castaing on behalf of the defendants.

THE COURT:  Good morning.

Mr. Castaing, I believe these are your motions. Would you care to begin?

MR. CASTAING:  Good morning, your Honor.

As I have a motion-- the defendants have a motion to dismiss the original Complaint and a motion to dismiss, some of the defendants have a motion to dismiss the Amended Complaint.

As I read the Amended Complaint, it seemed that Ms. Schulberg was dropping her claims against Vannoy and Tolliver. So -- as there were no -- I read the First Amended Complaint as a superseding complaint --

MS. SCHULBERG:  That's correct.

MR. CASTAING:  -- so I did not reargue on behalf of people who apparently had been dismissed.

1          THE COURT:  Okay.

2          MR. CASTAING:  With regard to that First Amended

3    Complaint, in the meantime, defendants Peabody, Smith and

4    Myers have been served.  I did not file, basically, the same

5    pleading for them that I have filed at least once or twice

6    before, and I was holding off until the result of this hearing

7    today.  But I would orally make an appearance on behalf of

8    those three defendants and adopt those arguments on their

9    behalf because I think they're pretty much the same.

10          THE COURT:  Okay.

11          MR. CASTAING:  And again, as another preliminary

12    matter, Ms. Schulberg has attempted to serve defendants

13    Ritchie and Rachal through the Department of Corrections.

14    They no longer work there.  Subject to a protective order that

15    she not disclose the address of those individuals to outside

16    of her immediate office staff for purposes of sending a Waiver

17    of Service to them, I'm willing to send Ms. Schulberg the last

18    known address of those two individuals, provided the Court has

19    it under a protective order.

20          I didn't know if we could do this orally in court

21    this morning, or if the Court wanted paper on that or not.

22          THE COURT:  I think it'd just make it easier for the

23    record if you just have something in paper.  That way, we know

24    for sure and don't have to look back at the Minute Entry --

25          MR. CASTAING:  Sure.

4

1          THE COURT:  -- and all that.

2          MR. CASTAING:  Sure.

3          THE COURT:  Is that satisfactory to you?

4          MS. SCHULBERG:  Yes, it is, your Honor.

5          THE COURT:  Okay.

6          MR. CASTAING:  I just wanted to take the opportunity

7  and ask the Court's guidance on that this morning.

8          To the heart of the matter, the defendants assert --

9          THE COURT:  Let me just go back and explain to you.

10  I mean, obviously, I am going to grant it, I mean.  So you can

11  save yourself the step of not sending in the names.  I mean,

12  go ahead and do that.  It'll just save time and then I'll

13  just --

14          MR. CASTAING:  Yeah.  And I wasn't necessarily going

15  to file them under seal of the Court.  I was just going to say

16  that they would be placed under protective order and that she

17  wouldn't divulge them.

18          THE COURT:  All right, either way.  If that's okay

19  with y'all, that's fine.

20          MS. SCHULBERG:  That's fine.

21          MR. CASTAING:  I have no problem.  If they're subject

22  to protective order, I have no problem giving them to a member

23  of the bar so that she can accomplish what she, obviously, has

24  to accomplish.

25          THE COURT:  All right.

1          MR. CASTAING:  With this, primarily, I have urged the

2     qualified immunity defense for the monetary damage claims

3     against my clients and that arise out of this incident.

4          I think the primary issue before the Court is the

5     existence of whether or not there's a clearly -- the

6     defendants --

7          THE COURT:  Well, let me just --

8          MR. CASTAING:  -- whether the inmates --

9          THE COURT:  -- let me just ask you a few questions.

10          MR. CASTAING:  That might be easier.

11          THE COURT:  Before we get to that, I just want to

12     make sure that I understand, you know, what you've said

13     through the motions, just to get straight.

14          Now you're satisfied that the plaintiffs have alleged

15     an injury, are you not?

16          MR. CASTAING:  With regard to the 1997 --

17          THE COURT:  With regard to --

18          MR. CASTAING: -- AE?

19          THE COURT:  Yes.

20          MR. CASTAING:  Yes.  I think -- I think I --

21          THE COURT:  With the Eighth Amendment claims, you're

22     satisfied that there's an injury alleged?

23          MR. CASTAING:  Yes, with regard to the defense that I

24     raised that they had not, that they were trying to get mental

25     anguish damages without a prior showing of physical injury.  I

6

1  think Ms. Schulberg's First Amended Complaint said that they

2  had suffered some things and I think, for pleading purposes, I

3  am satisfied.

4          THE COURT:  Okay.

5          Now let's go to the failure to exhaust administrative

6  remedies.

7          Are you still arguing that?

8          MR. CASTAING:  Your Honor, I think I raised that in a

9  limited fashion.  I did not raise it with regard to the

10  procedural due process claim on the Lockdown Review Board

11  decisions.  Because under the Louisiana administrative remedy

12  procedure that has been adopted by the Department, those

13  decisions are not reviewable under the ARP system.

14          THE COURT:  Well, what about the Eighth Amendment?

15          MR. CASTAING:  I think, certainly, the record

16  reflects, and I am going to have the Department supplement it,

17  certainly, Mr. --

18          THE COURT:  Woodfox.

19          MR. CASTAING:  -- Mr. Woodfox had filed that ARP, No.

20  LSP000408, which I think when the Department filed its last

21  response to the Court was in the middle of the process.  I

22  have been told by telephone secondhand this morning through my

23  secretary that Mr. Woodfox has finished it and I will have the

24  Department file a supplemental with the Court.  In reading

25  that request for administrative remedy, it certainly seems to

7

1  cover enough of the condition stuff that I'm not

2  particularly --

3          THE COURT:  So you're satisfied with Mr. Woodfox?

4          MR. CASTAING:  Yes.

5          THE COURT:  Now what about Mr. Wilkerson and Mr.

6  Wallace?

7          MR. CASTAING:  Excuse me, your Honor.  Let me grab --

8          Both of whom, under the Department's filing, had

9  attempted to file a request for administrative remedy, but was

10 rejected because the Department -- if I can find it --

11         THE COURT:  Characterized it.

12         MR. CASTAING:  The Department characterized it as an

13 ungrievable challenge to the Lockdown Review Board decision.

14         I know Ms. Schulberg filed it in the record.  I know

15 Ms. Schulberg attached a copy of those documents to her

16 opposition.

17         THE COURT:  Well, that's the way the Department

18 characterized it, but wewn't both of these alleged Eighth

19 Amendment violations, also?

20         MR. CASTAING:  I'm trying to find it.

21         I'm not laying my hand on it, your Honor, but

22 obviously, if they did, then that would be sufficient.

23 Because I think all -- I think the -- obviously, your Honor,

24 the Department's characterization of it is not binding on the

25 Court and it's obviously their opinion.

8

1          To the extent that the filings by those two inmates
2   adequately raise the issue, the fact that the Department
3   rejected it is not conclusive on the Court.  I think the Court
4   has the power to de novo review the matter and if those two
5   requests for administrative remedy adequately raised it, then
6   I think under the Fifth Circuit jurisprudence the fact that
7   they filed a request is sufficient and if the Department did
8   not process it properly, then they have de facto exhausted it.
9          THE COURT:  Okay.  I guess my question was more do
10  you believe that they adequately raised it, but --
11         MR. CASTAING:  And I'm trying to find the paper.  I
12  knew you were going to ask me that question, and I was trying
13  to find the paper, you know, to make sure I answered it.
14         MS. SCHULBERG:  Here's the requests and the
15  responses.
16         MR. CASTAING:  Thank you.
17         MS. SCHULBERG:  Both of the responses.
18         MR. CASTAING:  Thank you.
19         THE COURT:  I think we've handled the response.  It's
20  the request that you need to --
21         MR. CASTAING:  Yeah.
22         THE COURT:  -- focus on.
23         MR. CASTAING:  With regard to Mr. Wallace's, which
24  looks very similar to Mr. Woodfox's --
25         THE COURT:  Well, he says, "Such rights as the First,

9

1    Eighth and Fourteenth Amendments are denied me."  He says,
2    "Chosen to act with total disregard for my well-being and the
3    being of others similarly situated.  Solitary confinement not
4    based on behavior, but based on revenge."
5            Would you agree that that sufficiently alleges an
6    Eighth Amendment violation?
7            MR. CASTAING:  Yes, ma'am.
8            THE COURT:  Okay.  That takes care of Mr. Wallace.
9            MR. CASTAING:  And Mr. Wilkerson --
10           THE COURT:  Let's look at Mr. Wilkerson.
11           MR. CASTAING:  -- which is easier to read.
12           I mean, he has the solitary confinement.
13           THE COURT:  Look down toward the end.  (Reading):
14                "This perpetual administrative indifference adds
15                insult to injury.  It exacerbates my already cruel
16                and unusual standing within the prison.  The wanton
17                violation of my civil and human rights has got to
18                halt.  Inhuman practice of perpetually holding me in
19                solitary confinement."
20           MR. CASTAING:  It may be a little closer call than
21    the previous one because it's kind of saying "You're not
22    letting me out," but to the extent that it's Eighth, that
23    there's any, I think it raises that their Eighth Amendment
24    rights have been --
25           THE COURT:  Okay.

1        MR. CASTAING:  And again, your Honor, when there was

2  counsel in this case, my original raising of it was it was not

3  part of the Complaint.

4        THE COURT:  Right.  I'm just trying to --

5        MR. CASTAING:  Oh --

6        THE COURT:  -- clarify where we are so that we can

7  get down -- I think we're going right where you started at the

8  beginning, but I just wanted to make sure of that because

9  there's no point in us writing a long extensive report on that

10  when it's agreed.

11        MR. CASTAING:  And, your Honor --

12        THE COURT:  All right.  Let's go to --

13        MR. CASTAING:  Protected liberty interests, your

14  Honor.

15        THE COURT:  Yes.

16        MR. CASTAING:  I think the -- you have to show -- the

17  plaintiff, in order to collect money damages for a liberty

18  interest claim, has got to show that there was a clearly

19  established right of which they were deprived, both at the

20  time of the incident and today.  That's qualified immunity.

21        Since the Court --

22        THE COURT:  What is the time of the incident?

23        MR. CASTAING:  The time of the incident would be with

24  regard to the due process claims, the lockdown review, the

25  specific Lockdown Review Board decisions of which they are

1 | complaining.  Since it's every 90 days, the specific dates
2 | aren't in there, but it would be the particular Lockdown
3 | Review Board decisions, the unprescribed ones.
4 |          I think, as a result of our filings back and forth, I
5 | think we're in agreement --
6 |          THE COURT:  That you're in agreement that you're
7 | talking about the same lockdown review?
8 |          MR. CASTAING:  The ones -- the ones -- no -- that we
9 | go no farther back than one year before the filing of the
10 | lawsuit.
11 |          MS. SCHULBERG:  That's correct, although we would
12 | continue, since they stay in extended lockdown until the
13 | decisions that are going on include the pendency of this
14 | lawsuit, also.
15 |          THE COURT:  Okay.
16 |          MR. CASTAING:  Yeah.  To the extent those are raised
17 | in here, obviously, they'll get -- those are -- and I was
18 | speaking to the prescription aspect of it.
19 |          THE COURT:  All right.
20 |          MR. CASTAING:  Yeah.  To the -- that we can go no
21 | farther back than a Lockdown Review Board that happened more
22 | than a year prior to the incident.
23 |          So that's the, as established back then and then we
24 | also have to look at it since it's a two-prong, two, I guess,
25 | prong test that you also have to look at what rights are

12

1    clearly established today as we stand here.

2           With regard to qualified immunity, there are, of

3    course, two things we have to look at in determining what law

4    is clearly established.

5           The first is the Fifth Circuit has held in a line of

6    cases that the right has to be, that pre-existing case law has

7    to truly compel the result, not just suggest the result for

8    all like-situated situations.

9           Secondly, is which cases do we look at to determine

10   what the case law actually is?

11          Subsequent to my filing, the Fifth Circuit has

12   clarified what cases we look at.  Ms. Schulberg had cited some

13   cases from another Circuit, from the Third Circuit, U. S.

14   Third Circuit, I believe, that she said clearly established

15   the law.

16          In a rehearing that the Fifth Circuit granted in

17   Shipp v. McMahon -- I don't have the F.3rd cite because as of

18   yesterday it wasn't, the Westlaw didn't have it.  But it was a

19   panel rehearing on December 5th, 2000.  And the Westlaw number

20   is 2000 Westlaw 178,1679. -- the Court said -- it's under that

21   Key No. 10 to help you find it since I don't have a West page

22   number.  It's on page 7 of my printout --

23              "Furthermore, in determining whether a right is

24              clearly established, we are confined to precedent

25              from our Circuit or the Supreme Court."

1            THE COURT:  Okay.

2            MR. CASTAING:  So the Fifth Circuit seems to have

3    clarified the issue, the legal inquiry of what cases do we

4    look at to determine whether pre-existing clearly compelled

5    this result.  So it's kind of a long way around of saying that

6    we look at Fifth Circuit cases; we look at Supreme Court

7    cases.

8            THE COURT:  Okay.

9            MR. CASTAING:  With that, my first argument is the

10   inmates were not deprived of a liberty interest, in the first

11   place, by these Lockdown Review Boards.  Lockdown Review

12   Boards engage in a review for discretionary release.  They

13   were deprived of a liberty interest, to the extent one

14   existed, being in general population.  They were deprived in

15   1972, or I think in Mr. Woodfox's case, in 1996, I think, and

16   his ARP says when he was returned to Angola following a

17   criminal conviction.

18            So, to that extent, they weren't deprived of a right.

19   They have simply not be granted a discretionary release, which

20   is indistinguishable from every time the Parole Board

21   determines not to let somebody out on discretionary release or

22   the Pardon Board determining not to let somebody, not to

23   recommend a pardon.

24            Secondly --

25            THE COURT:  You're saying you can only look at it

14

1  when they were first in there and they can stay in there

2  forever after that?

3          MR. CASTAING:  Yes, ma'am.  There's no protected

4  liberty interest in release, just as they have no protected

5  liberty interest if they are serving a life sentence and

6  getting out earlier.  If they're serving like a criminal

7  sentence, they can appear before the, if they meet the

8  statutory criteria to appear before the Parole Board, then the

9  Parole Board may let them out.

10          But to -- there is -- they have not been deprived, in

11 this case, they have not been deprived of a liberty interest.

12 The actual deprivation took place when they were originally

13 placed in lockdown.

14          THE COURT:  What was the deprivation when they were

15 originally placed in lockdown?

16          MR. CASTAING:  I don't --

17          THE COURT:  What if they were only placed in there 24

18 hours?  Isn't that a bit different from 28 years?

19          MR. CASTAING:  It might well be, your Honor.  It

20 might well be.

21          But that gets to a separate part of my argument,

22 which is there is no liberty interest in being released for

23 two reasons and that is, first, it's not clearly established

24 after Sanden v. Connor (phonetic) and after the Fifth

25 Circuit's decision in Oralina v. Kyle (phonetic) that anything

1  that does not clearly impact the duration of their confinement
2  in prison will henceforth qualify for protected liberty
3  status.  It may well --
4         THE COURT:  This doesn't impose an atypical and
5  significant hardship on the inmate in relation to the ordinary
6  incidence of prison life?
7         MR. CASTAING:  The Court --
8         THE COURT:  How many people do you have in lockdown
9  for 28 years?
10        MR. CASTAING:  I don't know, your Honor.
11        It may well be that legally, at the end of this
12  lawsuit, the Court may well find that it is an atypical and
13  significant deprivation and that the deprivation is of Sanden
14  significance.  However, given the existing case law and the
15  Fifth Circuit's statements that you don't have, that they find
16  it hard to believe that anything short of actually increasing
17  the length of time you spend in custody will qualify.
18        THE COURT:  Where does it say that?
19        MR. CASTAING:  I think in Oralina v. Kyle.
20        THE COURT:  Well, let's look at the Supreme Court.
21        Where does it say in Sanden that duration, I mean,
22  that it has to be the duration of sentence?
23        MR. CASTAING:  It does not directly say that in
24  Sanden, your Honor.
25        THE COURT:  If you're talking about --

16

1        MR. CASTAING:  And I guess, I want to make clear that

2   what I'm arguing at this point on the qualified immunity

3   offense is not what ultimately the Court might hold a 28-year

4   sentence in extended lockdown actually might be under the law.

5   It's merely is it so clearly established that pre-existing law

6   compels, not merely suggests, the result.

7        THE COURT:  I understand.  I understand the

8   distinction that you're making.

9        But what I'm going to ask you -- well, if you're

10  looking at something that is an atypical and significant

11  hardship on the inmate -- well, let me ask you this:

12       If you had an Eighth Amendment violation, assume that

13  you had one --

14       MR. CASTAING:  Yes, ma'am.

15       THE COURT:   -- would such a violation over an

16  extended time constitute an atypical and significant hardship?

17       MR. CASTAING:  I think those are two different

18  inquiries, your Honor.  Because a significant and atypical

19  goes to a procedural due process question; whereas, the Eighth

20  Amendment imposes certain substantive --

21       THE COURT:  But aren't you looking at the nature of

22  the deprivation to see whether or not you are entitled to due

23  process?

24       MR. CASTAING:  Yes.  But I think it's -- and

25  obviously, if there's a substantive right like the Eighth

64-30142.8554

1   Amendment, no amount of notice and a hearing --

2        THE COURT:  Right.

3        MR. CASTAING:  -- is going to --

4        THE COURT:  Right.

5        MR. CASTAING:  -- satisfy --

6        THE COURT:  Right.  Is going to satisfy it.

7        MR. CASTAING:  -- beating them up.

8        THE COURT:  So that's my question, I guess.  If it

9   rises to that level, obviously you don't even have to have a

10  hearing.  You get it, anyway, but --

11       MR. CASTAING:  Yeah.  If it's an Eighth Amendment

12  violation, the question of hearing and process doesn't matter.

13  It's a substantive violation of law and that's that, at least

14  there's no -- it's not a due process question and it's a

15  substantive law Eighth Amendment excessive conditions of

16  confinement case.

17       But with -- might, you know, might the Court hold --

18  I guess I'm repeating myself -- under the existing law, it is

19  not --

20       THE COURT:  Well, let's just assume hypothetically

21  that it is an Eighth Amendment violation.

22       MR. CASTAING:  Okay.

23       THE COURT:  Okay.  Then your argument is there is no

24  due process simply because it's an Eighth Amendment violation?

25  What are you saying?

18

```
 1          MR. CASTAING:  My argument is --

 2          THE COURT:  What does that do to the hearing and the

 3   due process?

 4          MR. CASTAING:  I think they are, in many ways,

 5   independent of each other.  I think, if it is an Eighth

 6   Amendment violation, it would depend what the Eighth Amendment

 7   violation would be.  But if we're assuming it's a conditions

 8   of confinement as opposed to an excessive force or medical

 9   treatment kind of thing, that it's the, in this kind of case,

10   that the duration, because conditions can be a violation if

11   they are long in duration when they might not be if they're

12   short in duration.

13          THE COURT:  Okay.  Well, let's go back.

14          Why do prisons use solitary confinement?  And I'm

15   using that in the sense of disciplinary administrative

16   lockdown, the series.  Let's just -- for right now, let's not

17   distinguish.

18          MR. CASTAING:  And I hate to quibble with the hypo,

19   but I would say under Louisiana solitary confinement is

20   illegal, so we don't have that.  We have extended lockdown and

21   CCR.

22          THE COURT:  Well --

23          MR. CASTAING:  I just want to make sure that I'm not

24   conceding --

25          THE COURT:  Okay.
```

19

```
 1            MR. CASTAING:  -- that we have --
 2            THE COURT:  Why would we have --
 3            MR. CASTAING:  -- lockdown.
 4            THE COURT:  -- extended lockdown?
 5            MR. CASTAING:  There are a number of reasons why.  I
 6   think under the rule inmates can be placed on extended
 7   lockdown.  I would hate -- I don't want to make this -- I
 8   don't want to claim this is exhaustive, but, for instance, for
 9   disciplinary reasons.  They can be --
10            THE COURT:  But generally, why is it constitutionally
11   permissible to place inmates in administrative disciplinary
12   lockdown, in lockdown, where they are limited, certainly, much
13   more than to the general population?
14            MR. CASTAING:  Because the --
15            THE COURT:  And I'm not disagreeing with you, but --
16            MR. CASTAING:  Why is it --
17            THE COURT:  -- that certainly has been done and the
18   courts have upheld it.  So --
19            MR. CASTAING:  Why is it constitutionally
20   permissible?
21            THE COURT:  Yes.
22            MR. CASTAING:  Because the Constitution doesn't
23   prohibit it.  Because --
24            THE COURT:  Well --
25            MR. CASTAING:  -- an inmate has no --
```

20

1          THE COURT:  But why doesn't it?

2          MR. CASTAING:  Because the Constitution, they have no

3  particular constitutional right in a particular housing

4  status.  Generally, the Supreme Court and the Fifth Circuit

5  have ruled that --

6          THE COURT:  And prisons are given a great deal of

7  leeway --

8          MR. CASTAING:  A great deal of latitude.

9          THE COURT:  -- in how to conduct their prisons.

10          MR. CASTAING:  Yes, ma'am.

11          THE COURT:  But what are the parameters of that

12  leeway?  I mean, doesn't it have to be related to some

13  legitimate interest?

14          MR. CASTAING:  The issue of a legitimate interest

15  comes into play when the conditions get so severe.  However,

16  on an Eighth Amendment perspective, I don't know that the

17  Eighth Amendment has, the Eighth Amendment has some

18  substantive requirements.  I don't know --

19          THE COURT:  If you got convicted of a crime and the

20  Warden and the guys out there said, your Honor, "We hate

21  lawyers.  We hate lawyers."

22          MR. CASTAING:  I don't know that that's so

23  hypothetical.

24          THE COURT:  "And we're going to put him in the hot

25  box for the rest of his time because we hate lawyers."

64-30142.8558

1          MR. CASTAING:  I think --

2          THE COURT:  Would that be okay?

3          MR. CASTAING:  I don't -- if it's -- if you mean hot

4   box like in the old movies, no, but that's because there's no

5   legitimate penalogical objective and the condition itself, no

6   matter what the motivation, would be cruel and unusual.

7          THE COURT:  So does the --

8          MR. CASTAING:  Just as would flogging --

9          THE COURT:  Does the motivation matter?  Let's just

10  stick to the motivation.

11         MR. CASTAING:  I think the motivation will matter

12  somewhat on --

13         THE COURT:  We have an awful lot of language about

14  legitimate reasons.

15         MR. CASTAING:  And I think deferring to -- I think

16  the Court defers, will normally defer to those legitimate

17  penalogical objectives and give great deference.  I think the

18  absence of a legitimate penalogical objective can come into

19  play.  Now if there is --

20         THE COURT:  So can you do something for a legitimate

21  motive that would be impermissible if the motivation for it

22  were revenge?

23         MR. CASTAING:  It would depend -- if it was revenge

24  for, say, filing a lawsuit or engaging in constitutional and

25  protected rights, that's prohibited.  I mean, you know, if

1  it's in -- you know, if they are placed in lockdown or

2  retained in lockdown because they are black, or because they

3  are Jewish, that raises a whole different host of problems,

4  but those tend to be substantive First Amendment or equal

5  protection kind of problems and not the due process aspect

6  since due process deals with the process and the result.

7          THE COURT:  Well if -- now let's go back to the

8  lockdown.

9          Obviously, lockdown has been found to pass muster

10  under a number of situations.

11          MR. CASTAING:  Yes, ma'am.

12          THE COURT:  And just assume with me for a moment that

13  there comes a point where it no longer is permissible.  Is

14  there a due process obligation to determine when that point

15  is?

16          MR. CASTAING:  I don't think so, your Honor.  I think

17  if it then becomes impermissible -- if the -- if it becomes

18  impermissible because of its duration, then that becomes a

19  substantive Eighth Amendment violation and it doesn't really

20  matter.  I mean, no amount of notice and a hearing is really

21  going to cure the substantive Eighth Amendment problem.  I

22  mean, you know, there are those cases that say depriving

23  somebody of any exercise whatsoever for a couple of days isn't

24  an Eighth Amendment violation, but, if it's really, really

25  long term, then it might be.  But I think no amount of notice

23

1  and a hearing is going to cure that substantive problem if

2  it's there for a long time.    But that becomes the Eighth

3  Amendment claim and not the due process claim.

4         THE COURT:  And?

5         MR. CASTAING:  And as I've sometimes argued, I don't

6  think any amount of notice and a hearing is going to satisfy

7  an inmate who had excessive force used on him.  And it's

8  either excessive, or it's not.

9         THE COURT:  Well, but you're talking about, with

10  excessive force, you're talking about an incident, one

11  incident.  The equivalent here would be if these gentlemen

12  were tied to a post every day and beaten.  I mean, you could

13  say they wanted the beatings to stop, I mean, and each beating

14  wouldn't be a separate thing, but if it is the continuation

15  day after day that they're talking about.

16         So it's difficult to characterize this, I think, in

17  terms of discrete claims that occur in a certain time frame.

18  We're talking about cumulation over years.

19         MR. CASTAING:  And I think the cumulation aspect goes

20  to an Eighth Amendment claim.

21         THE COURT:  Uh-huh.  (Indicating an affirmative

22  response)

23         MR. CASTAING:  And not to the due process claim, that

24  the length of their -- if the cumulative effect of the length

25  of their confinement in lockdown has become cruel and unusual

1 | punishment, then that would be, that is a separate cause of
2 | action from a due process claim that they were not released
3 | from lockdown.  And that's because due process deals with the
4 | process involved and not the result reached.  And if there's
5 | no deprivation of a liberty interest and in my qualified
6 | immunity context, no deprivation of a liberty interest that's
7 | clearly established under current law, then that's not a due
8 | process issue.
9 |      It might well be a substantive Eighth Amendment
10 | right, but under the due process aspect of it, with the Fifth
11 | Circuit's rulings saying that, interpreting <u>Sanden</u> and saying
12 | we find it difficult to believe that anything short of it will
13 | henceforth qualify.
14 |      THE COURT:  So if it were an Eighth Amendment claim,
15 | what you're saying is that it is so atypical and significant a
16 | hardship that it goes beyond the <u>Sanden</u> into the Eighth and,
17 | therefore, you're not entitled to <u>Sanden</u> due process.  Is that
18 | what you're saying?
19 |      MR. CASTAING:  I think if it is atypical, and I don't
20 | know that atypical necessarily -- I haven't completely thought
21 | it through -- but I don't know that the atypical and
22 | significant to the ordinary incidence of prison life is a
23 | clean fit with a substantive Eighth Amendment violation.
24 |      THE COURT:  Okay.  Pursue that.
25 |      MR. CASTAING:  I think that -- because, first, one

1    has to look at what the actual deprivation imposed is.

2          THE COURT:  All right. What is it?

3          MR. CASTAING:  In this case, they were placed in 1972

4    -- and I think in Mr. Woodfox's case, replaced in the late

5    nineties -- in extended lockdown custody status.

6          And to the extent there was a liberty interest in not

7    being placed there -- and I don't think there is for a second

8    reason that I'll argue about expectation -- that's when it

9    occurred.

10          Now if it's atypical in the normal incidence of

11    prison life, Ms. Schulberg in her proposed Second Amended

12    Complaint has alleged some things.

13          THE COURT:  And let me get this straight.  You're

14    saying if you originally had a reason to put someone in

15    lockdown --

16          MR. CASTAING:  Yes, ma'am.

17          THE COURT:  -- that that forever forecloses any right

18    after that to be released?

19          MR. CASTAING:  No, ma'am, that's not my argument.

20          My argument is that you don't have a -- if you were

21    originally validly placed, that's when the deprivation

22    occurred and you don't have a due process claim later on for

23    discretionary release.  It may well be that later release may

24    be constitutionally required if, for instance as is alleged

25    here, the cumulation of a lengthy stay in lockdown rises to

1  the level of a substantive constitutional violation because of
2  the conditions of confinement.
3      I mean, I can make up -- I can come up with some
4  other hypotheticals.  For instance, if they decide that they
5  don't want to release you because you have filed lawsuits, if
6  they don't want to, you know --
7      THE COURT:  But it doesn't matter whether the reasons
8  for originally locking someone down are valid any longer or
9  not?
10     MR. CASTAING:  I don't think so, your Honor, for the
11 same reason that if you were originally convicted, that
12 determines it.  The fact that somebody chooses not to let you
13 out later --
14     THE COURT:  Well, is the prison in the situation of a
15 legislature and a court in convicting people?
16     MR. CASTAING:  They certainly have some of those
17 authorities because they can take away good time.
18     THE COURT:  But isn't that --
19     MR. CASTAING:  The Legislature --
20     THE COURT:  -- authority about taking away good time
21 subject to certain limits?
22     MR. CASTAING:  Yes, ma'am.
23     THE COURT:  And don't they have the authority to
24 maintain discipline and to --
25     MR. CASTAING:  Yes, ma'am.  And they have been --

27

1        THE COURT:  -- run the prison?

2        MR. CASTAING:  And the Louisiana Legislature

3    delegated the authority to --

4        THE COURT:  But do they have unfettered freedom to

5    punish for things that did not, don't have anything to do with

6    their prison, but other things outside of the prison?

7        MR. CASTAING:  That's a hard question to answer

8    because "unfettered" is so broad.  I mean --

9        THE COURT:  Well, do they have any --

10       MR. CASTAING:  -- they must be --

11       THE COURT:  -- authority to punish people for things

12   that they did outside of prison that don't affect the prison?

13       MR. CASTAING:  They have the right to classify people

14   if there are things, as in this case, do affect the prison.

15       THE COURT:  Right, absolutely.  Absolutely.

16       MR. CASTAING:  That if, for instance, a prisoner had

17   been convicted in Criminal Court of killing a prison guard,

18   they can take that into account in determining the --

19       THE COURT:  Well, but, let me --

20       MR. CASTAING:  -- custody status of that individual.

21       THE COURT:  Would they have the right -- let's get

22   back to our hypothetical of you've been, we'll just make you

23   wrongly convicted.

24       MR. CASTAING:  Yeah.

25       THE COURT:  And you are going to prison and they

1  don't like lawyers and so they put you in lockdown because
2  they don't like lawyers, not because of anything that's
3  happened in the prison.  Is that okay?  Does their motivation
4  play into this at all?
5       MR. CASTAING:  Is it unconstitutional?  No.
6       THE COURT:  It's not unconstitutional?
7       MR. CASTAING:  It's not unconstitutional.  It might
8  be, for instance, if it's an abuse of their discretion, it
9  might be a state law claim, you know.  The 19th Judicial
10  District Court had the authority, or, under state law, the
11  decisions of prison administrators can be reviewed under
12  certain circumstances.
13       THE COURT:  Does it matter how long they keep you in
14  lockdown?
15       MR. CASTAING:  Again, I think it becomes a
16  substantive Eighth Amendment problem if the conditions are
17  bad.
18       THE COURT:  So you would have absolutely no rights
19  until your Eighth Amendment claim ripens?
20       MR. CASTAING:  I had no constitutional right.  I
21  mean, lawyers are in a suspect category and just doing
22  something --
23       THE COURT:  And then --
24       MR. CASTAING:  -- to somebody because they're a
25  lawyer isn't -- that's -- you know, respectfully, under

1  federal law  --

2       THE COURT:  And then what would your claim be?  When

3  your Eighth Amendment claims ripen, would you characterize

4  your claim?

5       MR. CASTAING:  I might have an Eighth Amendment

6  conditions of confinement claim if the cumulation of certain,

7  if the cumulation of the conditions becomes so onerous.

8       THE COURT:  The cumulation?  You mean just because

9  it's day after day, or --

10       MR. CASTAING:  I think because it's -- if -- I think

11  it's both.  I think Wilson v. Cedar talks about that sometimes

12  conditions together might rise to the level of a

13  constitutional violation when each individual one might not.

14  I think you have to look at both the cumulation, that is, the

15  set of conditions at any given time, and then look at the

16  length that those have occurred.  I think the case law does

17  speak to length of time that, as I said before, you know, not

18  being able to exercise for a week is different from not being

19  able to exercise at all for a week for a year.  The cumulative

20  effect can add up, yes.

21       But again, that's an Eighth Amendment claim and

22  again, it's not a matter of what, and you said, is this,

23  quote, "right?"  I don't know if this is, quote, "right."  Is

24  it constitutional?  Yes.  And that's the argument I'll make

25  here.  I mean, whether it's good prison management or a good

1  idea, or any of those things isn't really raised before the

2  Court on this motion and the Constitution doesn't really speak

3  to that.

4            Much as if you have, if you get incarcerated, you've

5  got no, under Louisiana law, if you're otherwise eligible for

6  parole, you go before the Parole Board and they have

7  discretion.

8            THE COURT:  What is the purpose of the 90-day review?

9            MR. CASTAING:  I think they want to, you know -- and

10 I'm going on the fly on this.  I mean, I would certainly want

11 to, you know, if this became an issue in court, obviously put

12 some evidence in the record from the people who know better.

13 My understanding is, you know, they want to re-evaluate and

14 take a look because they probably think it's a good idea for

15 prison management purposes.  And that falls in that large set

16 of good prison management rules that the court in Sanden was

17 talking about that says, that doesn't necessarily rise to the

18 level of a constitutional liberty interest.

19            And they think it's a good idea.  Just because, I

20 think, under the Camp J Management Program, they do it more

21 than 90 days.

22            THE COURT:  Well, does it matter if it's a complete

23 sham?

24            MR. CASTAING:  No, not unless the regulations

25 themselves create an expectation of release.

1          If there is, and as a second part of my argument,

2    Sanden significance is one element of the existence of a

3    liberty interest, but you also have, the State actually has to

4    have created some type of entitlement that you shall, unless

5    test, the if then, if you meet these criteria, then you will

6    be released.  In that situation, yes, it would matter if it's

7    a sham.  Because the State would have created a liberty

8    interest in release upon the meeting of certain substantive

9    criteria and then the question of what process was received

10   then does become important.

11         But that's not the situation under Louisiana's

12   prisons for release from a custody status, or at least it's

13   not -- there are no allegations in the record, or in either

14   the Complaint or First Amended Complaint -- and I don't think,

15   either the proposed Second Amended Complaint -- that that's

16   the situation we have in Louisiana.

17         So they don't have to have it constitutionally or due

18   process purposes, they don't have to have that here.  And if

19   it's a sham, that may be --

20         THE COURT:  Are there any liberty interests?  What

21   would -- give me some examples of liberty interest.

22         MR. CASTAING:  If they take away good time.  In a

23   prison context --

24         THE COURT:  Is there any liberty interest other than

25   duration of sentence?

1          MR. CASTAING:  There's no clearly established one

2     post Sanden, post Oralina with regard to prison regulations.

3     I think it's -- when the Fifth Circuit said we find it

4     difficult to believe that it's anything other than something

5     that would extend the length of time they spend in prison.

6     Now if they had a disciplinary -- if they earned good time,

7     taken away that good time, liberty interest.  Wolfe v.

8     McDonald applies.

9          But, by the same token, if they have that hearing, if

10    they file a request later and say, "Please give me my good

11    time back" four years down the line, that's a discretionary

12    matter, you know.  It's like if they want to grant them an

13    out-of-time appeal, or review it later, or something like

14    that.

15         THE COURT:  Well, I don't know if there's still a

16    mental unit out there, but let's suppose you decide you're

17    going to put them in a mental unit and keep them there,

18    rather.

19         MR. CASTAING:  It would depend upon the particular

20    conditions in the mental unit.  If they were involuntarily,

21    yeah -- the other two and Sanden -- if they were involuntarily

22    subjecting them to mental health treatment.

23         THE COURT:  So if they involuntarily put them in a

24    mental unit, then that would be -- and kept them there

25    forever?

1          MR. CASTAING:  I think the -- it would depend upon

2     the conditions.  I mean, the title on, the plaque on the front

3     of the building wouldn't be, to me, as indicative of actually

4     what was happening.  Now if they were administering

5     psychotropic medication, yeah.  I think it would take a little

6     bit of looking at exactly what was going on.  I mean, if it

7     said mental health unit on the front and what was going on is

8     indistinguishable from Camp J, I don't think that really --

9     that doesn't --

10          THE COURT:  Is taking someone and putting them in a

11    mental unit and administering psychotropic medications an

12    Eighth Amendment violation?

13          MR. CASTAING:  The prison probably --

14          THE COURT:  As a punishment because you don't like

15    the lawyer.

16          MR. CASTAING:  Well, I think the involuntary

17    administration of psychotropic -- well, there are probably

18    several lawyers that could -- I don't know if that would be

19    hurting them or helping them in a lot of cases.  That might be

20    a situation because of the unique nature of administration of

21    medication and the right to bodily integrity and the right to

22    refuse medical treatment and all of those things.  I think

23    that would probably rise to the level of an Eighth Amendment

24    violation.

25          THE COURT:  So then you would not be entitled to due

34

1  process under your argument?

2        MR. CASTAING:  I think the liberty interest analysis

3  and the Eighth Amendment analysis are basically independent.

4  It may be, as in the Court's hypothetical, it may be that both

5  are covered.

6        THE COURT:  Uh-huh.  (Indicating an affirmative

7  response)

8        MR. CASTAING:  It may be that -- I think the

9  involuntary  -- I think there's, if I recall the case law,

10  it's Zimmerong v. Birch (phonetic), or something -- I think

11  the involuntary, certainly the involuntary administration of

12  mental health medication has some due process components to

13  it.

14        But conversely, I would argue to the Court that

15  taking away good time is clearly a due process violation.  I

16  don't know that it's an Eighth Amendment violation.  I don't

17  know that it's cruel and unusual punishment, necessarily.

18        THE COURT:  Uh-huh.  (Indicating an affirmative

19  response)

20        MR. CASTAING:  Because the courts have held a very,

21  very, very deferential standard on inquiring into the

22  proportionality of a particular sentence, that there's only

23  the most -- with regard to criminal sentences, it's a very,

24  very hands off proportionality review that's almost no review

25  at all and I think in an inmate case, given the deference

1  courts give prison administrators, I really can't, I find it
2  very hard to see an Eighth Amendment violation arising out of
3  taking away good time.  But that's clearly a liberty interest
4  and clearly entitled to the <u>Wolfe v. McDonald</u> due process
5  protections when they take away good time.
6          So, I mean, sometimes they may overlap and sometime
7  they don't.
8          THE COURT:  Okay.  Well, let me move on --
9          MR. CASTAING:  Sure.
10          THE COURT:  -- and ask you another question that I
11  just wanted to do for housekeeping purposes.
12          MR. CASTAING:  Okay.
13          THE COURT:  Specifically, with regard to specific
14  defendants, do you have any remaining problems with the causal
15  connexity between the defendant and the allegations?
16          MR. CASTAING:  With regard -- and having read --
17  certainly with regard to the individuals -- and I speak both
18  of the people I have appeared for in writing and the proposed
19  defendants I have yet to --
20          THE COURT:  Right.
21          MR. CASTAING:  -- in writing appear for -- anybody
22  who was on a review board, no.
23          THE COURT:  Okay.
24          MR. CASTAING:  I think if they were on a review
25  board, no.  I don't think there's a due process problem, but

36

1   they're the ones you'd sue if there was one.

2           I think with regard to letting out, the proposed

3   Second Amended Complaint certainly makes some specific factual

4   allegations with regard to Warden Cain.

5           I still have problems with Stalder.  Just the fact

6   that, you know, there's some people at Angola and something

7   happened, I still have some problems with showing that he has

8   that kind of actual personal, actually knew of a

9   constitutional violation and actually knowingly took no step

10  to cure it.

11          THE COURT:  Okay.  And what about Norris?  Is Norris

12  one of the --

13          MR. CASTAING:  I think he's one of the Lockdown

14  Review Board members --

15          THE COURT:  He's one of the review board people?

16          MR. CASTAING:  -- that's alleged.  Yeah, to the

17  extent they're on the board.

18          THE COURT:  Okay.  All right.  I just wasn't sure if

19  that's who that was.

20          All right.  I'll let you close quickly, but I think

21  we're going to --

22          MR. CASTAING:  Yeah.

23          THE COURT:  -- the center of what we want, basically.

24          MR. CASTAING:  Yeah.  I mean, we have discussed --

25  and I appreciate the Court's time on this in granting an

1  argument.  This is the first motion to dismiss I've argued in
2  11 years.  In 11 years, I've had two summary judgments and one
3  motion to dismiss, now.  As I always tell new attorneys when
4  they come to our office, "Well, do I have to show up?"  "No,
5  they'll let you know."  It's like I've done two in ten years.
6          I think the Court has gotten to the heart of the
7  matter.  I think on the due process issues -- there's the
8  existence of the liberty interest is, as the Supreme Court
9  said in American Manufacturers, I think, Mutual Insurance,
10  that it's a threshold question and it requires both, and
11  assuming that they were deprived, which I don't think they
12  were because I think the deprivation occurred when they were
13  initially placed, but even if, you still have to have, in
14  order for a liberty interest to exist, you have to have two
15  elements and that is it has to both be of Sanden significance
16  and secondly, state law, or rules, or regulations, or
17  something has to have created that entitlement, not just a
18  unilateral hope, but that if certain substantive criteria are,
19  in fact, met, then you are automatically entitled to a
20  particular result.
21          And I don't think either of those are satisfied in
22  this case and certainly, the clearly established law does not
23  state that.  The current law does not clearly compel and not
24  merely suggest the result.
25          Now it may well be that at the end of this lawsuit

1  the Court may well find that 28 years is long enough to get

2  over the Sanden significance hurdle and assuming they get over

3  the second hurdle, which is that the State didn't, in fact,

4  establish a right to get out, which I don't think, but if that

5  second half of the liberty test is satisfied, this is the kind

6  of time that qualified immunity comes into play.  They can get

7  relief in terms of a declaration that their rights were

8  violated and the Court can enter appropriate relief.

9         So they're not -- if the monetary damage claims get

10 dismissed, they are not, and we were thrown out of court, it

11 does not render the Court totally powerless.

12        THE COURT:  Is it absolutely essential that the State

13 give you the procedure for the due process, or can a liberty

14 interest be so extensive that it gives right to due process

15 just on its own?

16        MR. CASTAING:  I think the general rule is that it

17 has to be created in sources extrinsic to the Constitution,

18 except for those two specific examples that the Supreme Court

19 recognized in Sanden, one of which was involuntary commitment

20 to a mental facility, and I forget what the other one was.

21 But normally, the case law has, the parole cases have all

22 examined the state parole statute to see whether or not there

23 was an expectation in which -- some states had a rule.  That's

24 why -- the great laboratories of democracy.  Some states had a

25 rule that if you --

1          THE COURT:  Well, does due process always depend upon

2     what a state wants it to be?  I mean, you could --

3          MR. CASTAING:  The -- once -- the question of whether

4     or not a liberty interest exists is a question of federal law,

5     but you have to look to state law to determine whether or not

6     the State has surrounded that interest with enough

7     entitlement.

8          THE COURT:  So you can take it away as long as the

9     State doesn't have any regulations around it?

10         MR. CASTAING:  Because it doesn't qualify as a

11    protected liberty interest under the Fourteenth Amendment.

12         THE COURT:  Okay.  All right.

13         MR. CASTAING:  Thank you, your Honor.

14         THE COURT:  Let's hear from the plaintiffs.

15    Thank you.

16         MS. SCHULBERG:  Good morning, your Honor.

17         THE COURT:  Good morning.

18         MS. SCHULBERG:  Let me just say a few words about

19    qualified immunity and Sanden.

20         In Wilson v. Lane, the U. S. Supreme Court said that

21    you look not just, or suggested -- I'm not going to say "say"

22    -- suggested that you look not just to the law of the Circuit

23    you're in, but also a consensus of persuasive authority in

24    other Circuits.  That's 526 U.S. 603.

25         There are three other Circuits that have interpreted

1  Sanden to create a test of atypical and significant hardship

2  in relation to the incidence of prison life.  And that's not

3  just the Third Circuit in Shoates (phonetic), but also the

4  Eleventh Circuit and the Ninth Circuit.

5        THE COURT:  What are we comparing to when we're

6  talking about the lockdown and you say compared to the

7  ordinary incidence of prison life?  Are we talking about other

8  people in lockdown, or are we talking about a prison in

9  general?

10        MS. SCHULBERG:  The general prison population, your

11  Honor.

12        THE COURT:  And aren't there a number of cases that

13  talk about the comparison to other people in lockdown?

14        MS. SCHULBERG:  That could be.  They certainly have

15  been in lockdown longer than other people.  I don't know that

16  they're subject to any different conditions than other people

17  in lockdown.  Certainly, they've been in longer, as far as I

18  know, than anyone else.

19        THE COURT:  What is your basis for saying that you

20  would compare them to other inmates in the regular population

21  as opposed to other inmates in lockdown?

22        MS. SCHULBERG:  Because we think the protected, the

23  liberty interest is an interest in being in the general prison

24  population, rather than in lockdown.  Either you have a --

25        THE COURT:  Well, if that's so, why wouldn't you have

1   a due process right for every disciplinary lockdown, which

2   clearly has not been the case, regardless of duration?

3          MS. SCHULBERG:  Well, until <u>Sanden</u>, you did.  It was

4   a protected liberty interest, whether you were put into

5   extended lockdown, and you had a due process right.

6          THE COURT:  But we're post <u>Sanden</u> now, aren't we?

7          MS. SCHULBERG:  Right.  So now you've got to look, in

8   addition, is it an atypical and significant hardship compared

9   to the incidence, or the ordinary incidence of prison life.  I

10  believe that's the language.

11         THE COURT:  Yes, that's the language.

12         Go ahead.

13         MS. SCHULBERG:  I just wanted to call your attention

14  to the fact that the Third Circuit is not the only one that's

15  held that <u>Sanden</u> holds that liberty interest depends on

16  whether there's an atypical and significant hardship.

17         And the Fifth Circuit cases don't really discuss the

18  matter and one is clearly dicta and in the other, they're

19  talking about fundamental interest to us such that you are

20  entitled to proceed in forma pauperis.  They really discuss

21  this issue about can confinement in segregation ever be an

22  atypical or significant hardship.

23         THE COURT:  What about the defendants' argument that

24  the atypical situation here, if it rises to the level of an

25  Eighth Amendment violation, then it's simply an Eighth

42

1  Amendment violation and you don't have the due process

2  application?

3        MS. SCHULBERG:  Well, I think you could clearly have

4  both, your Honor.

5        If it's an atypical and significant hardship, you've

6  got a liberty interest and then you have to decide did they

7  get all the process that it was due.

8        If it's an Eighth violation, then they can't do it.

9  I believe, just thinking about the <u>Sanden</u> test, it seems

10 mostly, it seems objective; whereas, the Eighth Amendment

11 violation has a subjective component as well.

12       So there's an independent value to having a due

13 process claim.

14       THE COURT:  So could you have -- what would due

15 process be in this situation?

16       MS. SCHULBERG:  A hearing with decision makers who

17 deliberated and made a decision based on the criteria:  Are

18 they a danger or threat to the prison population, to prison

19 security, or an escape risk?  Those are the substantive

20 standards for putting somebody into extended lockdown.

21       THE COURT:  And where did you get those substantive

22 standards from?

23       MS. SCHULBERG:  From the disciplinary rules --

24       THE COURT:  Okay.

25       MS. SCHULBERG:  -- quoted in <u>McCrae v. Hankins</u>:

1          "No prisoner can be placed in extended lockdown for

2          any reason unless he has been found guilty of

3          violating one or more serious rules, or being

4          dangerous to himself or others, or of being a serious

5          escape risk, or being in need of protection, or if

6          posing a clear threat to the security of the

7          facility, or if being the subject of an investigation

8          conducted by non-institutional authorities into a

9          serious felony."

10         Here, I believe Mr. Wallace was initially placed in

11    extended lockdown for an investigation and at this point, my

12    clients -- the Board gives us a reason for continuing them in

13    extended lockdown the original nature of their offense.

14         Now if the original nature of the offense was a

15    sentence to life imprisonment in extended lockdown, you

16    wouldn't have the 90 days review.

17         So the only criteria that are left are these other

18    ones about do they continue to be a danger to the prison

19    population and are they a serious escape risk, or are they a

20    security risk.   There's no issue here about them needing

21    protection from other inmates.

22         THE COURT:  Okay.

23         Go ahead.

24         MS. SCHULBERG:  On the issue of release from extended

25    lockdown versus initially getting put in there, I think it's a

1  false distinction.  Their liberty interest is in being in the

2  general prison population subject to the ordinary incidence of

3  prison life versus being in a particularly confined, an

4  extremely confined situation, extended lockdown.  It matters

5  not whether you're being initially put in there, whether your

6  claim arises from being initially put in there, or from

7  attempting to get out.  The liberty interest is the same.

8          On the -- that's about all I have to say on due

9  process.  If you want to --

10          THE COURT:  Do you think you'll always have a liberty

11  interest if you're in lockdown?

12          MS. SCHULBERG:  After Sanden?

13          THE COURT:  Uh-huh.  (Indicating an affirmative

14  response)

15          MS. SCHULBERG:  It has to be an atypical and

16  significant hardship.  We are looking here at duration.

17  Sanden clearly deals with duration as well as conditions.

18          THE COURT:  Is it duration or conditions, or duration

19  and conditions?

20          MS. SCHULBERG:  Both.

21          THE COURT:  So if the conditions are the same but the

22  duration is different, what is atypical and poses a

23  significant hardship on the conditions, vis-à-vis the

24  conditions?

25          MS. SCHULBERG:  Well, I think conditions that might

1  | not be a significant hardship in the short term, i.e., 30

2  | days, rise to the level of significant hardship after 28

3  | years.

4  |          THE COURT:  And what are those conditions?

5  |          MS. SCHULBERG:  Twenty-three hours a day in a cell

6  | alone, only face-to-face contact with other inmates is an hour

7  | a day when they're released to take a shower and they can walk

8  | along the tier, those kinds of things.  Three days a week,

9  | they can spend that hour outside alone in something that looks

10 | like a dog run.

11 |          THE COURT:  So there isn't a liberty interest

12 | initially, you're saying.  You agree with that?

13 |          MS. SCHULBERG:  There isn't?

14 |          After Sanden -- well, Sanden does say that the

15 | conditions -- I think you have to look at it case by case.

16 | Sanden does say that in that particular case the conditions in

17 | extended lockdown were not all that different from the

18 | conditions in the general prison population.

19 |          So you'd probably have to look at it case by case.

20 |          THE COURT:  Was it the conditions in the general

21 | population, or the conditions in administrative lockdown and

22 | disciplinary lockdown?  Aren't most of these cases looking at

23 | the conditions in lockdown when they're talking about whether

24 | or not there's a liberty interest and whether or not those

25 | conditions are violative?

1          MS. SCHULBERG:  I honestly don't know, your Honor.  I

2   thought they were looking at the general prison in Sanden.

3          THE COURT:  Well, if they're always looking at the

4   general prison, then wouldn't you have a liberty interest at

5   the outset, always?  What is it that distinguishes or, if you

6   don't have a liberty interest at the outset, if --

7          MS. SCHULBERG:  Oh, right.  I see.  Yes, your Honor.

8          THE COURT:  Prisons can have great discretion in how

9   they govern their prisons and they have to discipline inmates

10   and already people going in have very limited rights.  And so

11   there's a limit to what you can do for discipline and lockdown

12   has been one of those things that they use for protection, for

13   discipline.

14          So if it's okay to do that under certain

15   circumstances -- let's say someone has been fighting with

16   everybody and so they put them in lockdown -- if that's not a

17   liberty interest at that point, if he doesn't have a liberty

18   interest at that point, when does one arise, or how does one

19   arise?

20          MS. SCHULBERG:  When there's no longer a reason under

21   the regulations to keep him in and when he's been in for a

22   period of time.  I suppose you could compare it to other

23   people in lockdown longer than other people.  This is an

24   excessive type of, an excessive response to the infraction.

25          THE COURT:  Do you know how many people are in

1   lockdown, or how long?

2          MS. SCHULBERG:  No.  I think there's some people, a

3   few people who have been in almost as long as my clients, but

4   only a few.  I don't have that information.

5          THE COURT:  Go ahead.

6          MS. SCHULBERG:  On the causal connection issue, your

7   Honor, the defendants have been challenging that as to

8   supervisory liability.  It sounds like the only remaining

9   challenge is to Stalder, assuming we have leave to amend our

10  Complaint and add the allegations about Cain that were in the

11  Second Amended Complaint.

12         THE COURT:  I don't recall.  Did you have anything

13  about Stalder in the Second Amended?  I know you did about --

14         MS. SCHULBERG:  About Cain.

15         THE COURT:  -- Warden Cain, but I don't --

16         MS. SCHULBERG:  Not anything new about Stalder, no,

17  your Honor.  I think that's a question of discovery.

18         The elements of supervisory liability are knowledge,

19  knowing of the abuse that the plaintiffs are suffering,

20  knowing that they'll continue to suffer unless you as

21  supervisor do something with regard to your subordinates and

22  failing to do something and causing the continuation of the

23  injury because you fail to do something.  And I think we

24  alleged that.

25         In terms of proof of that, how can we prove Stalder

1   knows?  That's a question for discovery, your Honor.  Stalder

2   knows whether he knows.

3          I think the point of qualified immunity is not to put

4   officials in a situation where they get blindsided.  They

5   don't really know what the claim is about and the claim

6   survives simply because there's an allegation of a violation

7   of law at a level of generality that they can never escape.

8   But here, we've gone as specific as we can.  When the specific

9   facts are in the knowledge of the defendants, then we have a

10  right to have discovery and get more particulars.

11         THE COURT:  Well, move quickly now to clearly and

12  established constitutional law, if you would.

13         MS. SCHULBERG:  Oh, under due process?

14         Well, my first argument is that you don't, under

15  Supreme Court precedent, you don't just look at Circuit law.

16  You can look at other Circuits and other Circuits say, at

17  least three, that the test is atypical and significant

18  hardship, not per se classification.

19         My next argument is that it was a clearly established

20  liberty interest to be free of extended lockdown prior to

21  Sanden.  What might not be clear at this point is how far

22  Sanden abridged that.  So a reasonable official would still be

23  operating under the pre-Sanden standard.  The Fifth Circuit

24  hasn't squarely addressed it.

25         So it's the old law that applies and the liberty

1  interest existed under the old law.  This is not a situation

2  of a new right being created after the fact of the conduct.

3  This is a question of an old right possibly being abridged,

4  but that's not yet what really decided, or the extent of the

5  abridgement is not yet decided.

6        THE COURT:  Now the 28 years -- and you're basing

7  that atypical hardship on the 28 years.  Is there any other

8  aspect?  If you were describing it, how would you describe it

9  as atypical?

10       MS. SCHULBERG:  In the general prison population,

11 people live in dorms.  They work, they have educational

12 opportunities, they have exercise opportunities, they have

13 access to the law library, access to books, broader access to

14 visitation.  For example, they can have contact visitation.

15       All those things are very severely limited in

16 extended lockdown.  You don't go to the law library.  You can

17 have, at most, six books.  You sit in your cell all day.

18       THE COURT:  Well, I'm guess I'm looking at sort of,

19 also, at other people in lockdown.  Do other people in

20 lockdown get reviews and get out?

21       MS. SCHULBERG:  I don't know.  I don't know, your

22 Honor.  I know with these defendants, it's definitely a sham.

23 I could -- if you want me to do a filing on that subsequently,

24 we could do it, or we could ask my clients.

25       THE COURT:  What do you mean "it's definitely a

50

1  sham"?

2          MS. SCHULBERG:  With my clients, it's a sham.  They

3  go up there and these people are talking about hunting and

4  fishing, rather than about their case.  We want some

5  consideration of their case, based on are they a threat any

6  longer?

7          THE COURT:  What is your understanding of the reason

8  that they're kept in lockdown?

9          MS. SCHULBERG:  Revenge.

10          THE COURT:  For what?

11          MS. SCHULBERG:  They've been -- two of my clients

12  have been convicted of killing a prison guard.

13          THE COURT:  And what about the third one?

14          MS. SCHULBERG:  I believe he's in there convicted of

15  killing another inmate.  They're all members of the Black

16  Panther Party and they're political ideology frightens the

17  administration.  Political reasons, also.

18          THE COURT:  And is that -- well, I guess you had the

19  one paragraph about Warden Cain that alluded to political

20  reasons.

21          MS. SCHULBERG:  Yes, your Honor.  My clients --

22          THE COURT:  Does that make any difference in the

23  characterization of the confinement?  Does the motivation

24  behind the confinement have anything to do with it?

25          MS. SCHULBERG:  For the Eighth Amendment, it does.

1  The Eighth Amendment, you can't confine somebody for
2  vindictive reasons.  It has to be related to legitimate
3  penalogical interests.
4         THE COURT:  So would -- but does it have any
5  relationship at all to the due process claim?
6         MS. SCHULBERG:  Motivation?  It has a relationship
7  only in determining what process is due.  In other words,
8  you're entitled to a decision maker who makes his decision
9  based on legitimate penalogical interest or, in this case, the
10  standards for putting somebody in, keeping somebody in
11  extended lockdown.  You want to have somebody dealing with the
12  merits of the situation and not something that's arbitrary.
13         THE COURT:  Would it make a difference if -- let's
14  just say someone's in lockdown for a year -- let's take away
15  the 28 years -- and the sole reason for putting them in
16  lockdown is revenge.  Would that make a difference
17  constitutionally?
18         MS. SCHULBERG:  Yes, I think it would, certainly on a
19  substantive due process level, and I don't think they'd
20  receive procedural process because you wouldn't have a neutral
21  decision maker.  And now you know there's an equal protection
22  claim against a class of one, and you might have one of those,
23  too.  Personal vindictiveness is -- if you're treated
24  differently because of personal vindictiveness, then you have
25  an equal protection claim.

1          THE COURT:  And what would that do for your

2    procedural due process in that situation?

3          MS. SCHULBERG:  The vindictive motive?

4          THE COURT:  Uh-huh.  (Indicating an affirmative

5    response)

6          MS. SCHULBERG:  I think it goes to --

7          THE COURT:  Or would it affect it at all?

8          MS. SCHULBERG:  -- the requirement you have a neutral

9    -- it goes to the requirement that you have a neutral decision

10   maker.  I think the essence of having a fair hearing is that

11   you have a decision maker, a neutral --

12         THE COURT:  But you have to be entitled to a fair

13   hearing?  I mean, you're --

14         MS. SCHULBERG:  Right.  Liberty interest.

15         THE COURT:  -- talking about the contents of the

16   hearing, once you get it.  I'm talking about whether you have

17   the hearing at all.

18         MS. SCHULBERG:  You're talking about liberty

19   interest, to trigger it?

20         THE COURT:  Well, I'm --

21         MS. SCHULBERG:  No.

22         THE COURT:  -- talking about if you're in there -- if

23   you are fighting in the prison population and you get put in

24   lockdown.

25         MS. SCHULBERG:  Uh-huh.  (Indicating an affirmative

53

1  response)

2          THE COURT:  I haven't seen anything that would say

3  you're entitled to due process for getting put in lockdown in

4  that situation.

5          MS. SCHULBERG:  After Sanden?

6          THE COURT:  After Sanden.

7          MS. SCHULBERG:  Yeah, that's probably true.

8          THE COURT:  But what I'm asking is:  If you got put

9  in there purely for revenge and no other reason, would that

10  simply be a substantive violation, or would you have any due

11  process --

12          MS. SCHULBERG:  I think I would bring an equal

13  protection claim in that situation, given Sanden's limitations

14  on liberty interest.  I'd bring an equal protection claim.  I

15  think that's a classic.

16          THE COURT:  Okay.

17          All right.  Do you have anything else you want to --

18  I think we've sort of eliminated some of it.

19          MS. SCHULBERG:  I think we pretty much covered it.

20          Let me just add that the defendants' objection to

21  prospective relief is not something that goes to whether we

22  state a claim.  That's something we could hash out later, if

23  we win on the merits, and we'd figure out what kind of

24  injunction we want.

25          And I would just want to reiterate that the only

54

1   issue here, given that exhaustion is no longer an issue, is

2   qualified immunity and damages.

3           Thank you very much.

4           THE COURT:  Thank you.

5           You have any brief, brief follow-up?

6           MR. CASTAING:  Brief, brief follow-up.

7           THE COURT:  I let you talk for a long time the first

8   time.  Very brief.

9           MR. CASTAING:  I'm well aware that my oratory is not

10  spell binding.

11          I would merely point out that with regard to the

12  Stalder and causal connexity, we cited to the Court on page 15

13  of my memorandum to the Fifth Circuit's case of <u>Raez v. Saisan</u>

14  (phonetic) in which the Fifth Circuit said that under

15  qualified immunity the plaintiff has a substantial burden of

16  pleading facts that show the involvement of the supervisor.

17          That's it.  Thank you, your Honor.

18          THE COURT:  That's it?  Thank you.

19          I am going to grant your motion to amend your

20  Complaint.

21          I meant to ask you, and I didn't, the reason I waited

22  until today was to see if, in the course of this, you

23  anticipated any other amendments and I was just, rather than

24  serving again, I wanted to do it one time.

25          MS. SCHULBERG:  Not right now, your Honor, but I feel

1    a little bit in the situation of the claim might be there, but

2    for some reason, I haven't put in a detail that needs to be

3    in.

4              THE COURT:  Well, I'm just talking about for purposes

5    of this motion.

6              MS. SCHULBERG:  Okay.

7              THE COURT:  I'm not talking about, you know,

8    subsequently after you've gone through discovery.  That's a

9    different thing.  But I'm talking about just for purposes of

10   this motion and at this moment.

11             MS. SCHULBERG:  Not at this time.

12             THE COURT:  Okay.

13             Well, then, I'll grant that motion.

14             Thank you very much for coming today.  It's certainly

15   an interesting case and you've done an excellent job, both of

16   you, on presenting your arguments, and the Court will take it

17   under submission and try to get you a ruling as soon as we

18   can.

19             MS. SCHULBERG:  Thank you, your Honor.

20             THE COURT:  Thank you.

21             THE COURTROOM DEPUTY:  All rise.  Court's at recess.

22        (Hearing ending at 11:17 a.m.)

23

24

25

64-30142.8593

1                              <u>CERTIFICATE</u>

2          I certify that the foregoing is a correct transcript from

3     the electronic sound recording of the proceedings in the

4     above-entitled matter.

5          Dated this 15th day of May, 2002.

6

7                         <i>Janice Russell</i>

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25